**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| H.T., ET AL., | CONSOLIDATED<br>Civil Action No. 3:09-cv-0286 |
| Plaintiffs, | |
| | JURY TRIAL DEMANDED |
| v. | |
| | MASTER COMPLAINT –<br>FOR CLASS ACTIONS |
| MARK A. CIAVARELLA, JR., ET AL., | |
| Defendants. | (Civil Action No. 3:09-cv-0357) |
| ------------------------------------------------ | |
| WILLIAM CONWAY, ET AL., | (Civil Action No. 3:09-cv-0291) |
| Plaintiffs, | |
| v. | |
| | JUDGE:   A. RICHARD<br>CAPUTO |
| MICHAEL T. CONAHAN, ET AL., | |
| Defendants. | [ELECTRONICALLY FILED] |

# MASTER COMPLAINT – FOR CLASS ACTIONS

# INTRODUCTION

1.    With utter disdain for the rule of law, defendants Mark A. Ciavarella, Jr.

and Michael T. Conahan, in combination and conspiracy with other

defendants named herein, have collectively perpetrated, through their acts

and omissions, what ranks as one of the largest and most serious violations

of children's rights in the history of the American legal system. Both in its

duration, spanning approximately five years between 2003 and 2008 – and

its magnitude, inflicting damage on the lives of thousands of children and

their families – the scope of defendants' unlawful scheme is profoundly

shocking. In choosing to treat children as commodities that could be traded

for cash, the defendants have placed an indelible stain on the Luzerne

County juvenile justice system.

2.    Specifically, defendants Ciavarella and Conahan engaged for years in a

brazen scheme to accept financial kickbacks from defendants Powell,

Mericle, and others in exchange for placing children appearing before

Ciavarella in residential programs owned and operated by defendants

Powell and Zappala, PA Child Care LLC, Western PA Child Care LLC,

and Mid-Atlantic Youth Services. As part of the implementation of this

scheme, Ciavarella, in concert with other defendants, routinely deprived

children of their constitutional rights – established for decades – to appear

before an impartial tribunal, to be represented by counsel, to be protected

against self-incrimination and, through a detailed colloquy with the Court,

to insure a knowing, intelligent and voluntary waiver of trial rights before

pleading guilty.

3.      The fact that the victims of the defendants' misconduct were children who

went before the juvenile court expecting justice and fairness only

exacerbates the venality of defendants' conduct.  Instead of due process,

thousands of these children, among the most vulnerable members of our

society, were victims of a wave of unprecedented lawlessness that within

minutes of their court appearances, swept them away in handcuffs and

shackles and placed them in detention or other residential facilities for

months for infractions as trivial as shoplifting a four dollar jar of nutmeg or

taking change from unlocked cars.  The abuse and trauma these children

suffered at the hands of defendants has dramatically changed the trajectory

of many of their lives.

4.      Confronted as we are in this case with the wholesale subversion of

children's constitutional rights at the hands of the very public officials,

elected judges, charged with enforcing and protecting those rights, the due

process clause has never been more relevant; the principle that no

individual is above the law has never been more compelling.  This case requires that we squarely confront these two fundamental principles of our own constitutional tradition.

5.    These defendants have shamed the face of justice; plaintiffs now come before this court to seek redress.

## JURISDICTION

6.    Jurisdiction of this Court is proper pursuant to 28 U.S.C. §§ 1331 and 1343(3) and (4), in that claims are brought under 42 U.S.C. § 1983 for the redress of rights secured by the United States Constitution and under 18 U.S.C. § 1964 for civil violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68 ("RICO").

7.    Plaintiffs' claims for compensatory and punitive damages are authorized by 18 U.S.C. § 1964 and 42 U.S.C. § 1983.

8.    Plaintiffs' claims for attorneys' fees are authorized by 42 U.S.C. §§ 1983 and 1988 and 18 U.S.C. § 1964(c).

9.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the plaintiffs reside in this district, the defendants are located in this district, and the acts and omissions giving rise to the claims herein occurred in this district.

## PARTIES

### Plaintiffs

10.    Plaintiff H.T. of White Haven, Pennsylvania is a seventeen-year-old female who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

11.    Plaintiff L.T. of White Haven, Pennsylvania is the next friend and mother of Plaintiff H.T.

12.    Plaintiff B.W. of Mountain Top, Pennsylvania is a sixteen-year-old male who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

13.    Plaintiff W.W. of Mountain Top, Pennsylvania is the next friend and father of Plaintiff B.W.

14.    Plaintiff KEVIN WILLIAMSON of Hanover Township, Pennsylvania is an eighteen-year-old male who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

15.    Plaintiff SUSAN MISHANSKI of Hanover Township, Pennsylvania is the mother of Plaintiff KEVIN WILLIAMSON.

16.    Plaintiff M.Y. of Sugarloaf, Pennsylvania is a seventeen-year-old female who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

17.    Plaintiffs M.B.Y. and J.Y. of Sugarloaf, Pennsylvania are the next friends and parents of Plaintiff M.Y.

18.    Plaintiff P.S. of Wilkes-Barre, Pennsylvania is a fifteen-year-old male who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

19.    Plaintiff A.S. of Wilkes-Barre, Pennsylvania is the next friend and mother of Plaintiff P.S.

20.    Plaintiff S.S. of Wilkes-Barre, Pennsylvania is a seventeen-year-old male who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

21.    Plaintiff R.K. of Wilkes-Barre, Pennsylvania is the next friend and mother of Plaintiff S.S.

22.    Plaintiff JESSICA VAN REETH of Mountain Top, Pennsylvania is a nineteen-year-old female who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

23.    Plaintiff JACK VAN REETH of Mountain Top, Pennsylvania is the father of Plaintiff JESSICA VAN REETH.

24.    Plaintiff M.K. of Exeter, Pennsylvania is a seventeen-year-old male who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

25.    Plaintiff J.F.K. of Exeter, Pennsylvania is the father and next friend of Plaintiff M.K.

26.    Plaintiff CHARLES BALASAVAGE, JR. of Wilkes-Barre, Pennsylvania is an eighteen-year-old male who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

27.    Plaintiffs CHARLES and JOANNE BALASAVAGE of Wilkes-Barre, Pennsylvania are the parents of Plaintiff CHARLES BALASAVAGE, JR.

28.    Plaintiff JESSE BALLIET of Wilkes-Barre, Pennsylvania is a twenty-two-year-old male who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

29.    Plaintiff SARAH MYERS is a nineteen-year-old female from Wilkes-Barre, Pennsylvania who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

30.    Plaintiff FRANK WEBER is a twenty-three-year-old male from Wilkes-Barre, Pennsylvania who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

31.    Plaintiff FLORENCE MYERS of Wilkes-Barre, Pennsylvania, is the mother of Plaintiff JESSE BALLIET, Plaintiff SARAH MYERS, and Plaintiff FRANK WEBER.

32.    Plaintiff STEVEN BRANNIGAN is an eighteen-year-old male who resides in Hanover Township, Pennsylvania who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

33.    Plaintiff LISA BRANNIGAN of Hanover Township, Pennsylvania is the mother of Plaintiff STEVEN BRANNIGAN.

34.    Plaintiff JEFFREY BRUNO is a twenty-one-year-old male who resides in Larksville, Pennsylvania.  He was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

35.    Plaintiff JAY BRUNO of Larksville, Pennsylvania is the father of Plaintiff JEFFREY BRUNO.

36.    Plaintiff SCOTT BUKOSKI is a twenty-one-year-old male who resides in Nanticoke, Pennsylvania.  He was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

37.    Plaintiff D.C. of Shickshinny, Pennsylvania is a seventeen-year-old male who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

38.    Plaintiff R.C. of Shickshinny, Pennsylvania is the next friend and mother of Plaintiff D.C.

39.     Plaintiff RUTH DAVIS of Shavertown, Pennsylvania is a twenty-two-year-old female who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

40.     Plaintiff CAROL FRONCZEK of Shavertown, Pennsylvania is the mother of Plaintiff RUTH DAVIS.

41.     WILLIAM DIXON is a twenty-one-year-old male who resides in Plymouth, Pennsylvania.  He was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

42.     Plaintiff RACHELLE FARBER of Swoyersville, Pennsylvania is a twenty-four-year-old female who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

43.     Plaintiff JUDY DANE of Swoyersville, Pennsylvania is the parent of Plaintiff RACHELLE FARBER.

44.     Plaintiff J.G. of Harvey's Lake, Pennsylvania is a seventeen-year-old male who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

45.     Plaintiff M.O. of Harvey's Lake, Pennsylvania is the next friend and mother of Plaintiff J.G.

46.     Plaintiff BRIAN GYLE is a nineteen-year-old male who resides in Pittston, Pennsylvania.  He was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

47.     Plaintiff WAYNE GYLE is a twenty-one-year-old male who resides in Pittston, Pennsylvania.  He was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

48.     Plaintiff TRACY HARVEY of Harvey's Lake, Pennsylvania is an eighteen-year-old male who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

49.     Plaintiff ALEXANDER HOGAN of Kingston, Pennsylvania is an eighteen-year-old male who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

50.     Plaintiff MOLLY HOGAN of Kingston, Pennsylvania is the mother of Plaintiff ALEXANDER HOGAN.

51.     Plaintiff D.J. of Edwardsville, Pennsylvania is a sixteen-year-old male who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

52.     Plaintiff S.J. of Edwardsville, Pennsylvania is the next friend and mother of Plaintiff D.J.

53.     Plaintiff BARBARA KEARNS of Southern Pines, North Carolina is a nineteen-year-old female.  She was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

54.     Plaintiff JESSICA THURSTON of Wilkes-Barre, Pennsylvania is a twenty-year-old female who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

55.     Plaintiff BARBARA THURSTON of Wilkes-Barre, Pennsylvania is the mother of Plaintiff JESSICA THURSTON and Plaintiff BARBARA KEARNS.

56.     Plaintiff KURT KRUGER is a twenty-two-year-old male who resides in Wilkes-Barre, Pennsylvania.  He was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

57.     Plaintiff J.M.K. of Wilkes-Barre, Pennsylvania is a seventeen-year-old male who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

58.     Plaintiff B.T. of Wilkes-Barre, Pennsylvania is the next friend and mother of Plaintiff J.M.K.

59.     Plaintiff EDWARD KENZAKOSKI III is a twenty-two-year-old male from Wilkes-Barre, Pennsylvania.  He was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

60.     Plaintiffs EDWARD KENZAKOSKI JR. and SANDRA FONZO of Wilkes-Barre, Pennsylvania are the parents of plaintiff EDWARD KENZAKOSKI III.

61.     Plaintiff J.K. of Kingston, Pennsylvania is a fifteen-year-old male who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

62.     Plaintiff A.K. of Kingston, Pennsylvania is the next friend and father of Plaintiff J.K.

63.     Plaintiff B.L. of Kinston, Pennsylvania is a sixteen-year-old male who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

64.     Plaintiff M.L. of Kingston, Pennsylvania is the father and next friend of Plaintiff B.L.

65.     Plaintiff ANTHONY MILLAN of Nanticoke, Pennsylvania is a twenty-year-old male who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

66.     Plaintiff DAMON MILLAN is an eighteen-year-old male who resides in Nanticoke, Pennsylvania who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

67.    Plaintiff CINDY MILLAN of Nanticoke, Pennsylvania, is the mother of
       Plaintiffs DAMON and ANTHONY MILLAN.

68.    Plaintiff PAUL MORGAN JR., is an eighteen-year-old male from
       Mountain Top, Pennsylvania.  He was adjudicated delinquent and/or placed
       by Defendant CIAVARELLA some time between 2003 and 2008.

69.    Plaintiff FRED ODOM JR., is an eighteen-year-old male from Mountain
       Top, Pennsylvania.  He was adjudicated delinquent and/or placed by
       Defendant CIAVARELLA some time between 2003 and 2008.

70.    Plaintiff SHERRELL ODOM of Mountain Top, Pennsylvania is the mother
       of Plaintiff FRED ODOM JR.

71.    Plaintiff STEVEN PALCHANIS JR. of Wilkes-Barre, Pennsylvania is a
       twenty-one-year-old male who was adjudicated delinquent and/or placed
       by Defendant CIAVARELLA some time between 2003 and 2008.

72.    Plaintiff STEVEN PALCHANIS SR. of Wilkes-Barre, Pennsylvania is the
       father of Plaintiff STEVEN PALCHANIS JR.

73.    Plaintiff JAMIE QUINN is an eighteen-year-old female who resides in
       Wyoming, Pennsylvania. She was adjudicated delinquent and/or placed by
       Defendant CIAVARELLA some time between 2003 and 2008.

74.     Plaintiff K.R. of Hanover Township, Pennsylvania is a seventeen-year-old male who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

75.     Plaintiff T.S. of Hanover Township, Pennsylvania is the mother and next friend of Plaintiff K.R.

76.     Plaintiff DAVID ROWLANDS of Laporte, Pennsylvania is an eighteen-year-old male who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

77.     Plaintiff MARY SEVILLE of Laporte, Pennsylvania is the mother of Plaintiff DAVID ROWLANDS.

78.     Plaintiff MICHAEL S. SCARLATO of Hazleton, Pennsylvania is an eighteen-year-old male who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

79.     Plaintiffs MICHAEL P. and TINA SCARLATO of Hazleton, Pennsylvania, are the parents of Plaintiff MICHAEL S. SCARLATO.

80.     Plaintiff A.S. of Wilkes-Barre, Pennsylvania is a fifteen-year-old male who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

81.     Plaintiff G.S. of Wilkes-Barre, Pennsylvania is the next friend and father of Plaintiff A.S.

82.     Plaintiff JAMES SWARTLEY is a nineteen-year-old male from Wilkes-Barre, Pennsylvania who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

83.     Plaintiff MICHAEL VITALI of Wilkes-Barre, Pennsylvania is a twenty-two-year-old male who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

84.     Plaintiff M.M.W. of Freeland, Pennsylvania is a fourteen-year-old female who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

85.     Plaintiff J.C. of Freedland, Pennsylvania is the next friend and legal guardian of Plaintiff M.M.W.

86.     Plaintiff JOHN ASHFORD JR. of Wilkes-Barre, Pennsylvania is a twenty-one-year-old male who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

87.     Plaintiff DONNA ASHFORD of Wilkes-Barre, Pennsylvania is the mother of Plaintiff JOHN ASHFORD JR.

88.     Plaintiff CHRISTIAN BARNES of Wilkes-Barre, Pennsylvania is a twenty-one-year-old male who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

89.    Plaintiff BRIAN BARNES of Wilkes-Barre, Pennsylvania is the parent of
Plaintiff CHRISTIAN BARNES.

90.    Plaintiff SHANE BLY of Sugar Notch, Pennsylvania is a twenty-one-year-
old male who was adjudicated delinquent and/or placed by Defendant
CIAVARELLA some time between 2003 and 2008.

91.    Plaintiffs KEVIN and LINDA BLY of Sugar Notch, Pennsylvania are the
parents of twenty-year-old SHANE BLY and were ordered to pay for the
placement and probation of their son who was placed by Defendant
CIAVARELLA some time between 2003 and 2008.

92.    Plaintiff G.B. of Larksville, Pennsylvania is a seventeen-year-old male who
was adjudicated delinquent and/or placed by Defendant CIAVARELLA
some time between 2003 and 2008.

93.    Plaintiffs P.P. and J.B. of Larksville, Pennsylvania are the next friends and
parents of Plaintiff G.B.

94.    Plaintiff DARYL CHARLES of Wilkes-Barre, Pennsylvania is a twenty-
year-old male who was adjudicated delinquent and/or placed by Defendant
CIAVARELLA some time between 2003 and 2008.

95.    Plaintiff LIZA CHARLES of Wilkes-Barre, Pennsylvania is the mother of
Plaintiff DARYL CHARLES.

96.     Plaintiff WILLIAM CLARKE of Bear Creek Township, Pennsylvania is a twenty-three-year-old male who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

97.     Plaintiff SHARON GRAAF of Bear Creek Township, Pennsylvania is the mother of Plaintiff WILLIAM CLARKE.

98.     Plaintiff GLENN COOPER of Meshoppen, Pennsylvania is a twenty-one-year-old male who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

99.     Plaintiff KAREN COOPER of Meshoppen, Pennsylvania is the mother of Plaintiff GLENN COOPER.

100.    Plaintiff RICHARD COPELAND II of Sugar Notch, Pennsylvania is a twenty-year-old male who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

101.    Plaintiffs DONNA and RICHARD COPELAND of Sugar Notch, Pennsylvania are the parents of Plaintiff RICHARD COPELAND II.

102.    Plaintiff CHAD DERHAMMER of Dallas, Pennsylvania is a twenty-three-year-old male who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

103.    Plaintiff A.D. of Plymouth, Pennsylvania is a seventeen-year-old female who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

104.    Plaintiff J.E. of Plymouth, Pennsylvania is the next friend and mother of Plaintiff A.D.

105.    Plaintiff MATTHEW DOUGHERTY of Pittston, Pennsylvania is a twenty-one-year-old male who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

106.    Plaintiff E.E. of Wilkes-Barre, Pennsylvania is a fourteen-year-old female who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

107.    Plaintiff K.E. of Wilkes-Barre, Pennsylvania is a fifteen-year-old female who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

108.    Plaintiff L.E. of Wilkes-Barre, Pennsylvania is a seventeen-year-old male who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

109.    Plaintiff H.E. of Wilkes-Barre, Pennsylvania is the next friend and mother of Plaintiff L.E., Plaintiff K.E., and Plaintiff E.E.

110.    Plaintiff A.F. of Drums, Pennsylvania is a seventeen-year-old female who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

111.    Plaintiff L.F. of Drums, Pennsylvania is a nineteen-year-old female who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

112.    Plaintiff M.F. of Drums, Pennsylvania is the next friend and mother of Plaintiff A.F. and Plaintiff M.F.

113.    Plaintiff J.D.F. of Exeter, Pennsylvania is a sixteen-year-old male who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

114.    Plaintiff M.W. of Exeter, Pennsylvania is the next friend and mother of Plaintiff J.D.F.

115.    Plaintiff J.F. of Nanticoke, Pennsylvania is a fourteen-year-old male who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

116.    Plaintiff A.I.K. of Nanticoke, Pennsylvania is the next friend and mother of Plaintiff J.F.

117.    Plaintiff ALEXANDRA FAHEY is a nineteen-year-old female who resides in Pittston, Pennsylvania. She was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

118.    Plaintiff L.H. of Wilkes-Barre, Pennsylvania is a sixteen-year-old female who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

119.    Plaintiff J.M. of Wilkes-Barre, Pennsylvania is the next friend and mother of Plaintiff L.H.

120.    Plaintiff MICHAEL HAINES of Dallas, Pennsylvania is a nineteen-year-old male who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

121.    Plaintiff BARBARA HAINES of Dallas, Pennsylvania is the mother of Plaintiff MICHAEL HAINES.

122.    Plaintiff TIFFANY HARRISON of Pittston, Pennsylvania is a twenty-year-old female who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

123.    Plaintiff BERNADETTE HARRISON of Pittston, Pennsylvania is the mother of Plaintiff TIFFANY HARRISON.

124.    Plaintiff EDWARD KANE JR. is a twenty-two-year-old male who resides in Swoyersville, Pennsylvania who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

125.    Plaintiff BRIANNA KEE is an eighteen-year-old female who resides in Wilkes-Barre, Pennsylvania who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

126.    Plaintiff MATTHEW KOPETCHNY is a twenty-year-old male who resides in Kingston, Pennsylvania who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

127.    Plaintiff MAGEE MOTT is a twenty-three-year-old female who resides in Pittston, Pennsylvania who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

128.    Plaintiff G.M. of Wilkes-Barre, Pennsylvania is a fifteen-year-old male who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

129.    F.M. of Wilkes-Barre, Pennsylvania is the next friend and father of Plaintiff G.M.

130.    Plaintiff KRYSTAL POPE is a nineteen-year-old female who resides in Kingston, Pennsylvania.  She was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

131.    Plaintiff LISA SCARBROUGH of Mountain Top, Pennsylvania is a twenty-one-year-old female who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

132.    Plaintiff LAURIE SCARBROUGH of Mountain Top, Pennsylvania is the mother of Plaintiff LISA SCARBROUGH.

133.    Plaintiff MARSHONDA SEWARD is a nineteen-year-old female from Wilkes-Barre, Pennsylvania who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

134.    Plaintiff J.S. is a fifteen-year-old male who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

135.    Plaintiff C.S. of Plymouth, Pennsylvania is the next friend and mother of Plaintiff J.S.

136.    Plaintiff CHAD UCA is an eighteen-year-old male from Hazleton, Pennsylvania who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

137.    Plaintiff W.U. of Wilkes-Barre, Pennsylvania is a fifteen-year-old male who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

138.     Plaintiff D.S. of Wilkes-Barre, Pennsylvania is the next friend and mother of Plaintiff W.U.

139.     Plaintiff B.R.W. of Wilkes-Barre, Pennsylvania is a fifteen-year-old male who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

140.     Plaintiffs C.W. and S.W. of Wilkes-Barre, Pennsylvania are the next friends and parents of Plaintiff B.R.W.

141.     Plaintiff WILLIAM CONWAY is a twenty-three-year old male from Ashley, Pennsylvania who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

142.     Plaintiff CHRISTIAN RYAN is a twenty-three-year old made from Hanover Township, Pennsylvania who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

143.     Plaintiff KEVIN RYAN of Mountain Top, PA is the father of Plaintiff CHRISTIAN RYAN.

144.     Plaintiff TRACEY ROWLANDS of Laporte, Pennsylvania is a nineteen-year-old female who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

145.     Plaintiff MARY SEVILLE of Laporte, Pennsylvania is the mother of Plaintiff TRACEY ROWLANDS.

146.    Plaintiff PAIGE CICARDO of Tobyhanna, Pennsylvania is an eighteen-year-old female who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

147.    Plaintiff WILIAM CIRCARDO of Pittston, Pennsylvania is the father of Plaintiff PAIGE CIRCADO.

148.    Plaintiff ANGELIA KARSKO of Wyoming, Pennsylvania is a nineteen-year-old female who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

149.    Plaintiff ROSEMARY KARSKO of Wyoming, Pennsylvania is the mother of Plaintiff ANGELIA KARSKO.

150.    Plaintiff ELIZABETH HABEL of Plymouth, Pennsylvania is an eighteen-year-old female who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

151.    Plaintiffs GLORIA HABEL and RICHARD HABEL of Plymouth, Pennsylvania are the parents of Plaintiff ELIZABETH HABEL.

152.    Plaintiff A.L. is a seventeen-year-old female who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

153.    Plaintiffs E.L. and T.L. are the parents of Plaintiff A.L.

154.    Plaintiff TIFFANY MURPHY of Nanticoke, Pennsylvania is a nineteen-year-old female who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

155.    Plaintiff JAMES MURPHY of Wilkes-Barre, Pennsylvania, is the father of Plaintiff TIFFANY MURPHY.

156.    Plaintiff STEPHEN FINO is a twenty-one-year-old who resides in Mountain Top, Pennsylvania.  He was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

157.    Plaintiff LYNN FINO of Mountain Top, Pennsylvania is the mother of Plaintiff STEPHEN FINO.

158.    Plaintiff JARED PADDEN of Ashley, Pennsylvania is a twenty-one-year old male who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

159.    Plaintiff JOHN PADDEN of Ashley, Pennsylvania is the father of Plaintiff JARED PADDEN.

160.    Plaintiff PAUL SCHWEIZER of Harvey's Lake, Pennsylvania is a twenty-year-old male who was adjudicated delinquent and/or placed by Defendant CIAVARELLA some time between 2003 and 2008.

**Defendants**

161.  Defendant MARK A. CIAVARELLA, JR. of Kingston, Pennsylvania

("Ciavarella") at all relevant times served as Judge of the Court of

Common Pleas for Luzerne County, Pennsylvania.  He was Judge of the

Juvenile Court for Luzerne County between approximately 1996 and

May 23, 2008.  He was named President Judge for Luzerne County in

January 2007.  He is sued in his individual capacity.  At all relevant times,

he also controlled the business-entity defendant PINNACLE GROUP OF

JUPITER, LLC.

162.  Defendant MICHAEL T. CONAHAN of Mountain Top, Pennsylvania

("Conahan") at all relevant times served as Judge of the Court of Common

Pleas for Luzerne County, Pennsylvania. Between January 2002 and

January 2007, he served as President Judge for Luzerne County.  He is

sued in his individual capacity.  At all relevant times, he also controlled the

business-entity defendants BEVERAGE MARKETING OF PA., INC. and

PINNACLE GROUP OF JUPITER, LLC.

163.  Defendant ROBERT J. POWELL of Drums, Pennsylvania, at all relevant

times, was an owner of defendants PA CHILD CARE, LLC; WESTERN

PA CHILD CARE, LLC; MID-ATLANTIC YOUTH SERVICES CORP.;

and VISION HOLDINGS, LLC.

25

164.    Defendant ROBERT MERICLE of Wilkes-Barre, Pennsylvania at all
relevant times was president of defendant MERICLE CONSTRUCTION,
INC.

165.    Defendant GREGORY ZAPPALA of Monroeville, Pennsylvania, at all
relevant times, was an owner of defendants PA CHILD CARE, LLC;
WESTERN PA CHILD CARE, LLC; and MID-ATLANTIC YOUTH
SERVICES CORP.

166.    Defendant CINDY CIAVARELLA of Kingston, Pennsylvania ("Cindy
Ciavarella") is the wife of MARK A. CIAVARELLA, JR., and owner at all
relevant times of defendant PINNACLE GROUP OF JUPITER, LLC.

167.    Defendant BARBARA CONAHAN of Mountain Top, Pennsylvania
("Barbara Conahan") is the wife of MICHAEL CONAHAN and managing
member, at all relevant times, of defendant PINNACLE GROUP OF
JUPITER, LLC.

168.    Defendant MERICLE CONSTRUCTION, INC. is located in Wilkes-Barre,
Pennsylvania.

169.    Defendant MID-ATLANTIC YOUTH SERVICES CORP. is located in
Pittston Township, Pennsylvania.

170.    Defendant PA CHILD CARE, LLC is located in Pittston Township,
Pennsylvania.

171.    Defendant WESTERN PA CHILD CARE, LLC is located in Emlenton, Pennsylvania.

172.    Defendant PINNACLE GROUP OF JUPITER, LLC is a business entity located in Mountain Top, Pennsylvania.

173.    Defendant VISION HOLDINGS, LLC is a Cayman Islands business entity with a mailing address in West Hazleton, Pennsylvania.

174.    Defendant BEVERAGE MARKETING OF PA., INC. is a business entity located in Selzer, Pennsylvania.

175.    Defendant LUZERNE COUNTY is a political subdivision within the Commonwealth of Pennsylvania duly incorporated as a County with a principal place of business located in Wilkes-Barre, Pennsylvania.

## CLASS ACTION ALLEGATIONS

176.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), on behalf of themselves and classes of persons similarly situated.

177.    The classes are defined herein as follows:

A.    All children who were adjudicated delinquent or referred to placement by Ciavarella between 2003 and May 2008, whose adjudications have been or will be expunged, vacated, or otherwise invalidated, as of the date of class certification. Named plaintiffs

H.T., B.W., Kevin Williamson, M.Y., R.S., and S.S. are class representatives.  This class is referred to hereinafter as Class A.

A1.  All children who were adjudicated delinquent or referred to placement by Ciavarella without counsel and/or without colloquies on the record that informed them of their rights and the consequences of waiving those rights, before either waiving counsel and/or pleading guilty, during the time period between 2003 and May 2008, and whose adjudications have been or will be expunged, vacated, or otherwise invalidated as of the date of class certification.  Named plaintiffs H.T., B.W., Kevin Williamson, M.Y., R.S., and S.S. are also class representatives of this class.  This class is referred to hereinafter as Subclass A1.

A2. All children who were referred to placement at PA Child Care and/or Western PA Child Care by Ciavarella between 2003 and May 2008. Named plaintiffs S.S., M.K., Charles Balasavage Jr., Steven Brannigan, Jeffrey Bruno, D.C., Ruth Davis, William Dixon, Rachelle Farber, Brian Gyle, Wayne Gyle, Tracy Harvey, Alexander Hogan, D.J., Barbara Kearns, Kurt Kruger, J.M.K., Edward Kenzakoski III, J.K., Paul Morgan Jr., Fred Odom Jr., Steven Palchanis Jr., Jamie Quinn, David Rowlands, Michael S.

28

Scarlato, James Swartley, Jessica Thurston, Michael Vitali,

Frank Weber, M.M.W., G.B., William Clarke, Glenn Cooper,

Richard Copeland II, Chad Derhammer, A.D., L.E., J.D.F.,

Edward Kane Jr., Matthew Kopetchny, Magee Mott, G.M., Sarah

Myers, Lisa Scarbrough, B.R.W., William Conway, Christian

Ryan, Tracey Rowlands, Angelia Karsko, Elizabeth Habel, A.L.,

Tiffany Murphy, Stephen Fino, Jared Padden and Paul Schweizer

are class representatives. This class is referred to hereinafter as

Subclass A2.

B.  All children adjudicated delinquent or referred to placement by

Ciavarella who paid fees, costs, fines, restitution, or any other

monetary charges associated with their adjudications and/or

placements during the time period between 2003 and May 2008, as

well as all children's parents or guardians who paid fees, costs, fines,

restitution, or any other monetary charges associated with

their children's adjudications and/or placements during the same time

period. All named plaintiff youth and named plaintiff parents or

guardians are class representatives.  This class is referred to

hereinafter as Class B.

178.    The classes are sufficiently numerous such that joinder of all members is impracticable.  Between 2003 and May 2008, Ciavarella adjudicated more than 2,500 children delinquent and placed more than 1000 of these children in facilities outside their homes.  Other children were placed on probation or put under some other type of court supervision.  As of the date of class certification, the vast majority of children adjudicated delinquent by Ciavarella between 2003 and May 2008 will have had their adjudications expunged, vacated, or otherwise invalidated pursuant to the procedure explained in paragraphs 697 through 699, below.  None of the youth who appeared before Ciavarella without counsel and pled guilty had a colloquy regarding their waiver of counsel or guilty plea.  The number of children who appeared before Ciavarella without counsel during the relevant time period is believed to be in excess of 1,200.  Nearly all the children who were adjudicated delinquent by Ciavarella or placed by him between 2003 and May 2008, as well as their parents or guardians, were assessed fees, costs, fines, restitution, or other monetary charges.

179.    There are questions of law and fact common to the classes.  With respect to Class A and its Subclasses, these questions include, among others, (1) whether defendants did or conspired to violate plaintiffs' right to an impartial tribunal as guaranteed by the Fifth, Sixth, and Fourteenth

Amendments to the U.S. Constitution; (2) whether defendants did or conspired to deprive plaintiffs of their right to counsel, their right against self incrimination and their right to have any guilty plea they make be knowing, intelligent, and voluntary, in violation of the Fifth, Sixth, and Fourteenth Amendments of the U.S. Constitution; and (3) whether defendants wrongfully imprisoned plaintiffs in violation of Pennsylvania tort law.

180.    Additionally, with respect to Class B, these common questions include, among others, (1) whether defendants devised and/or engaged in a scheme or artifice to defraud the citizens of the Commonwealth of Pennsylvania, including plaintiffs, and to deprive those citizens – and particularly plaintiffs – of the intangible right of honest services and engaged in other racketeering activity; (2) whether defendants, through that racketeering activity, participated in the conduct of the affairs of an association that functioned for the purpose of adjudicating youth and providing housing for youth adjudicated delinquent; (3) whether defendants, through that racketeering activity, acquired or maintained interests in or control of the association; (4) whether defendants conspired and agreed to acquire or maintain interests in or control of the association and/or to participate in the

conduct of the affairs of the association; and (5) whether defendants'
actions caused injury to plaintiffs' property interests.

181.    The claims of the representative parties are typical of the claims of the
class. Like the other members of the class, the named plaintiffs maintain
that defendants did or conspired to violate their rights to an impartial
tribunal, to counsel, and to a knowing, intelligent and voluntary guilty plea,
as well as caused them to suffer financial loss or other injuries to their
property interests through a pattern of racketeering activity.

182.    The representative plaintiffs will fairly and adequately represent and
protect the interests of the class members. Plaintiffs have retained counsel
experienced in complex class action litigation, juvenile and constitutional
law, and the intersection thereof. Juvenile Law Center has been at the
forefront of protecting and defending children's legal rights since 1975,
and has litigated many class action lawsuits involving children's
constitutional rights over the last thirty-four years. Juvenile Law Center
attorneys have also authored or co-authored numerous scholarly articles
addressing children's legal rights in the juvenile justice system, and they
teach courses on the juvenile justice system at both the University of
Pennsylvania Law School and Temple University Beasley School of Law.
In 2008, Juvenile Law Center was one of eight organizations world-wide to

receive the MacArthur Foundation Award for Creative and Effective Institutions. Hangley Aronchick Segal & Pudlin's litigation department is highly regarded, with attorneys concentrating on a wide range of areas, including complex commercial litigation, constitutional litigation, and criminal defense and investigations. The firm's attorneys have considerable expertise in both bringing and defending class action suits in federal and state courts. The firm is proud of its long-standing relationship with one of the nation's premiere public interest law firms, the Juvenile Law Center. Anapol Schwartz Weiss Cohan Feldman & Smalley, P.C. has successfully litigated cases involving large numbers of plaintiffs for more than 30 years and has earned a national reputation for handling complex mass torts cases and class action lawsuits. Anapol Schwartz has worked with firms from across the country in pursuing compensation for the injuries its clients have sustained due to the negligent, fraudulent, and criminal actions of others. With sound legal experience, the firm provides victims with superior negotiation and trial work. Barry H. Dyller and the Dyller Law Firm are the premiere civil rights and constitutional litigators in Northeastern Pennsylvania. Mr. Dyller has handled thousands of cases, tried over ninety jury trials as lead counsel, and handled countless civil rights cases. Mr. Dyller is the recipient of various awards and honors by

civil rights organizations.  Mr. Dyller is active with the organized bar, and

will be the national chair of the Civil Rights Section of a national trial

lawyers' organization as of July 2009.  Johanna Gelb of the Gelb Law Firm

has over 20 years experience and successfully handled numerous

constitutional cases involving the 1st, 2nd, 4th, 8th, & 14th Amendments in

front of juries and on appeal.  Ms. Gelb has also been active in local and

state bar associations throughout her practice holding multiple leadership

positions.

183.    Class certification is appropriate pursuant to Federal Rule of Civil

Procedure 23(b)(3) because common questions of law and fact predominate

over any questions affecting only individual members of the class, and

because a class action is superior to other available methods of the fair and

efficient adjudication of this litigation.  In addition to the common

questions set forth in paragraphs 179 through 180, common questions

regarding potential immunity claims of defendants and the availability of

punitive damages to plaintiffs are also present.  The class members are

entitled to recovery as a result of the defendants' conspiracy to violate their

constitutional rights and defendants' violation of federal RICO statutes.

Individual differences in the cases of each class member do not defeat

commonality, as plaintiffs seek recovery for the same violations of their

constitutional rights and injury to their property interests without regard to each plaintiff's underlying circumstances.

## OVERVIEW OF THE JUVENILE JUSTICE SYSTEM

184. The juvenile justice system in Pennsylvania and throughout the United States was created based on the recognition that youth who commit delinquent acts are fundamentally different than adult criminals. Youth are considered less culpable, more vulnerable, and more susceptible to treatment and rehabilitation. The juvenile justice system is therefore designed to provide for the *care*, *supervision* and *rehabilitation* of youth committing delinquent acts. *See, e.g.*, *In re M.D.*, 839 A.2d 1116, 1120 (Pa. Super. Ct. 2003).

185. The Pennsylvania Juvenile Act states as its purpose, *inter alia*: "[t]o provide for the care, protection, safety and wholesome mental and physical development of children coming within the provisions of [the Act]." 42 Cons. Stat. § 6301(1). The Act aims to achieve its purposes "in a family environment whenever possible, separating the child from parents only when necessary for his welfare, safety or health or in the interests of public safety." 42 Pa. Cons. Stat. § 6301(3). Courts in Pennsylvania have recognized that, while principles and policies underlying the juvenile justice system may have evolved since its creation, "particular importance

is still placed upon rehabilitating and protecting society's youth." *In re J.F.*, 714 A.2d 467, 471 (Pa. Super. Ct. 1998).

186.    Youth in delinquency proceedings are entitled to nearly all of the due process rights guaranteed to adult criminal defendants. *See, e.g., McKeiver v. Pennsylvania*, 403 U.S. 528, 533 (1971) ("Among [the constitutional rights applicable in state juvenile proceedings] are the rights to appropriate notice, to counsel, to confrontation and to cross-examination, and the privilege against self-incrimination. Included, also, is the standard of proof beyond a reasonable doubt.").

187.    The constitutional right to counsel in juvenile adjudications has been firmly established for decades. More than forty years ago, the United States Supreme Court held in *In re Gault*, 387 U.S. 1 (1967), that the Due Process Clause of the Fourteenth Amendment guarantees youth charged with delinquency and facing the possibility of incarceration the right to counsel. *Gault* recognized that a system in which children's liberty interests are not protected is a system that violates due process. The Court recognized that attorneys are needed in the juvenile justice system to assist clients to "cope with problems of law, to make skilled inquiry into the facts, to insist upon regularity of the proceedings, and to ascertain whether [the client] . . . has a defense and to prepare and submit." *Id.* at 36.

188.   Consistent with *Gault*, Pennsylvania's General Assembly and the
Pennsylvania Supreme Court have established that the right to counsel
extends to juveniles through all stages of the juvenile delinquency process
(*e.g.*, detention, pre-trial motions or hearings, adjudication, disposition,
post-disposition, probation, appeal).  The General Assembly codified a
juvenile's right to counsel in the Juvenile Act.  Section 6337 of the Act
states that "a party is entitled to representation by legal counsel at all stages
of any proceedings under [the Juvenile Act]." The judiciary's concern
about delinquency hearings proceeding without counsel for the child led
the Pennsylvania Supreme Court to require, effective October 1, 2005, that,
where a waiver of counsel is proffered, that juvenile court must conduct an
extensive colloquy with the juvenile on the record to determine his or her
comprehension of the consequences of a waiver.  Pa. R. Juv. Ct. P. 152.

189.   Today, the need for the assistance of counsel in juvenile court is even more
paramount than it was when the Supreme Court issued the *Gault* decision
in 1967.  Delinquency dispositions have become longer and more punitive,
and delinquency adjudications now carry collateral consequences that
follow youth into adulthood and, in some cases, for the rest of their lives.
Of equal if not greater importance, as the stakes in juvenile court have
risen, social science research has confirmed that most youth lack the

capacity, on their own, to understand the nature of those stakes and to make intelligent decisions about how to navigate the increasingly complex dimensions of the modern juvenile court. T. Grisso, L. Steinberg, *et al.*, *Juveniles' Competence to Stand Trial: A Comparison of Adolescents' and Adult Capacities as Trial Defendants*, Law and Human Behavior, Aug. 2003, at 333-63. Because of these complexities, as recognized in the Juvenile Act, children charged as delinquents should be provided with continuous legal representation throughout the delinquency process, including, but not limited to, detention, pre-trial motions or hearings, adjudication, disposition, post-disposition, probation, appeal, expungement, and sealing of records.

190.    In 2001, Ciavarella himself publicly acknowledged the importance of the right to counsel in juvenile proceedings. After the Pennsylvania Superior Court overturned Ciavarella's adjudication of a youth whom Ciavarella also allowed to appear unrepresented before him without a constitutionally adequate waiver of counsel, Ciavarella told the *Wilkes-Barre Times Leader*, "I'll never do it again . . . . They obviously have a right to a lawyer, and even if they come in and tell me they don't want a lawyer, they're going to have one."

191.    During the next six years, Ciavarella, together with the other defendants, violated this promise, his judicial duties, and the constitutional rights of the youth plaintiffs in exchange for approximately $2.6 million.

## FACTUAL ALLEGATIONS[1]

A.    **PLAINTIFFS' ALLEGATIONS**

H.T., through and with her next friend and mother, L.T.

192.    H.T., a seventeen-year-old female, and her mother L.T. reside in White Haven, Pennsylvania.

193.    On April 17, 2007, H.T., then a fifteen year old, appeared before Ciavarella for an adjudication hearing on a charge of harassment, a third degree misdemeanor.  Specifically, H.T. was charged with creating a "My Space" page (a website) about the assistant principal of her high school.  H.T. had no prior contact with the juvenile justice system.

194.    H.T. did not have private counsel, nor was she appointed counsel.  At the courthouse, prior to the adjudication hearing, H.T.'s mother signed a form, given to her outside the courtroom and without explanation, waiving her daughter's right to counsel.  H.T. did not sign the statement.

---

[1] All of the following allegations are based on information or belief, or based on the Bill of Information filed by United States Attorney Martin C. Carlson against Mark A. Ciavarella, Jr. and Michael T. Conahan on January 26, 2009 in the United States District Court for the Middle District of Pennsylvania (No. 3:09-cr-028).

195.    At no point during the adjudication hearing did Ciavarella explain the consequences of proceeding without counsel.  H.T. admitted creating the website in question.  Ciavarella did not conduct a colloquy with H.T. on the record to explain her rights and the consequences of waiving her right to a trial.

196.    Although H.T. had no prior record and was adjudicated for a third degree misdemeanor, the court immediately committed her to a residential treatment facility operated by Youth Services Agency.  H.T. was lead away in shackles and her shocked mother collapsed into tears.

197.    H.T. remained committed to the treatment facility for approximately one month, when Juvenile Law Center filed a writ of habeas corpus challenging the constitutionality of her adjudication and detention.  In May 2007, the writ was granted by the juvenile court and H.T. was allowed to return home to her family; her adjudication was vacated.

198.    H.T. was eventually placed on a consent decree by the court; she was ordered to make payments – and is still making payments – to Juvenile Probation.

B.W., through and with his next friend and father, W.W.

199.   B.W. is a sixteen-year-old male who resides with his father W.W. in
       Mountain Top, Pennsylvania.

200.   In February 2007, at the age of fourteen, B.W. was charged with simple
       assault for getting into a fight in school and with unauthorized use of a
       motor vehicle for driving his parents' car without permission.

201.   When they arrived at the courthouse, B.W.'s father signed a form waiving
       counsel.  B.W. was told by the court officer that he had to sign the waiver
       form because his father did.

202.   B.W. appeared before Ciavarella without counsel; he was adjudicated
       delinquent after he admitted to the charges.  Ciavarella did not inform B.W.
       and his father that he had a right to an attorney and that the court would
       appoint an attorney if they could not afford one.  Nor did Ciavarella explain
       the potential consequences to B.W. of waiving his right to counsel and his
       right to trial by pleading guilty.

203.   Ciavarella ordered B.W. into placement at Camp Adams where he
       remained for about two months.  During the time he was at Camp Adams,
       B.W. was repeatedly bullied by other juveniles.  When he returned home
       he was placed on probation.

204. In January 2008, B.W. was charged with possession of marijuana with intent to deliver, simple possession, and unauthorized use of a vehicle. Allegedly, B.W. was threatened by another child he met in Camp Adams to deliver some marijuana.

205. Before the hearing on these new charges, B.W.'s father again signed the waiver of counsel form and B.W. was again told that he needed to sign the form as well.

206. B.W. appeared before Ciavarella without counsel; he was adjudicated delinquent after he admitted to the charges. Ciavarella did not inform B.W. and his father that he had a right to an attorney and that the court would appoint an attorney if they could not afford one. Nor did Ciavarella explain the potential consequences to B.W. of waiving his right to counsel or his right to trial by pleading guilty.

207. Ciavarella sent B.W. back to Camp Adams, where he remained for about six weeks before being transferred to St. Michaels, where B.W. did very well and was nominated for an award for his outstanding performance.

208. A volunteer attorney then stepped in and filed a writ of habeas corpus; B.W. was released from St. Michaels in the summer of 2008.

209.    The felony charge was *nul prossed*, but the adjudications for the

misdemeanor charges of possession of a marijuana and unauthorized use of

a motor vehicle remain on B.W.'s record.

210.    B.W. was ordered to and paid fees and costs to the court.  B.W.'s father

was ordered to and paid $3,500 to the court to cover the costs of his

placements in the various facilities.

Kevin Williamson and his mother, Susan Mishanski

211.    Kevin Williamson, now age eighteen, is the son of Susan Mishanski of

Hanover Township, Pennsylvania.

212.    In April 2008, Kevin, then a seventeen year old, was charged with simple

assault when he was in a fight with a friend outside of a concert hall.

213.    On April 22, 2008, Kevin was adjudicated delinquent in an approximately

five-minute hearing before Ciavarella.

214.    Kevin was not told of his right to an attorney, but a public defender did

appear in the middle of the hearing.  The public defender did not speak to

Kevin.  Kevin believes that he may have pled guilty to the charges, but he

does not think he was told the consequences of pleading guilty or of his

right to a trial.

215.    Ciavarella ordered that Kevin be placed at Camp Adams for three months.

216.    In May 2007, the Juvenile Law Center filed a writ of habeas corpus on

Kevin's behalf, challenging the constitutionality of Kevin's adjudication

and detention.  On June 18, 2008, the court granted the writ; Kevin's

delinquency adjudication was vacated and he was released from Camp

Adams.

217.    Kevin was put on probation by Judge Lupas on the same charge in July

2008; this time, he was represented by an attorney whom his mother

retained.  Kevin was successfully discharged from probation on February 5,

2009.

218.    Kevin's mother paid $450 to Juvenile Probation for the cost of placement.

Kevin and his mother also were ordered to and paid $140 in court fees and

$140 in Juvenile Probation fees.

M.Y., through and with her next friends and parents, M.B.Y and J.Y.

219.    M.Y. is a seventeen-year-old female who resides with her parents, M.B.Y.

and J.Y., in Sugarloaf, Pennsylvania.

220.    In April 2008, at the age of sixteen, school security found less than five

dollars worth of marijuana in the glove compartment of her father's car,

which she had driven to school that day.  She was arrested.

221.    Shortly thereafter, the family received a notice that M.Y. was to report to

court for a hearing on the possession charge.  M.Y.'s parents considered

hiring an attorney but believed the court would be fair since M.Y. was an honor student and this was her first offense.

222.    M.Y., without counsel, appeared before Ciavarella and admitted to the charge. Ciavarella adjudicated M.Y. delinquent and ordered that she be placed at Camp Adams for ninety days.

223.    M.Y.'s stunned parents immediately sought help for their daughter. A pro bono attorney filed a writ of habeas corpus challenging the constitutionality of her adjudication and detention. In response to the writ, the Luzerne County Juvenile Court released M.Y. to her parents and vacated the adjudication.

<u>P.S., through and with his next friend and mother, A.S.</u>

224.    P.S., now fifteen years old, is the son of A.S. of Wilkes-Barre, Pennsylvania. In 2007, when he was fourteen years old, P.S. was arrested for stealing loose change from unlocked cars.

225.    One of the police officers who arrested P.S. told A.S. that P.S. would receive probation because P.S. cooperated with the police and committed a minor offense.

226.    Before P.S.'s hearing, A.S. contacted two attorneys about representing P.S. The first attorney advised her against hiring him because A.S. would likely receive probation even without the assistance of an attorney. The second

attorney asked her for the name of the judge assigned to the case. When she told the attorney it was Ciavarella, the attorney advised her that it would be "a waste of money" to hire him because Ciavarella does not listen to the attorneys of juvenile defendants.

227.    Before entering Ciavarella's courtroom, A.S. was asked to sign a form waiving P.S.'s right to an attorney. A.S. told the staff person that she would like P.S. to be represented by an attorney, but that she could not afford to hire one. The staff person pressured A.S. into signing the form by telling her that it would take six to eight months to assign a public defender to P.S. and that P.S. would be held in detention in the interim.

228.    P.S. appeared before Ciavarella without counsel; he was adjudicated delinquent. Ciavarella did not inform P.S. or A.S. that P.S. had a right to an attorney and that the court would appoint an attorney if P.S. could not afford one. Nor did Ciavarella explain the potential consequences to P.S. of waiving his right to an attorney.

229.    P.S.'s hearing before Ciavarella lasted no longer than three minutes. Ciavarella asked P.S. whether he would plead guilty, but did not explain the legal rights P.S. would relinquish by waiving his right to a trial. P.S. pled guilty.

230.    P.S. was detained at Camp Adams for three days before he was transferred to Glen Mills.

231.    P.S. remained at Glen Mills for approximately twelve months, when pro bono attorneys who had become aware of his situation filed a writ of habeas corpus challenging the constitutionality of his underlying adjudication and commitment.

232.    The Luzerne County Juvenile Court granted the writ in June 2008, his adjudication was vacated, and P.S. returned home.  P.S. is currently on probation.

233.    P.S.'s father pays $440 per month in child support for P.S.  The Domestic Relations Court redirected the child support payments to Juvenile Probation while P.S. was in placement.

234.    The court also ordered P.S. to pay $1,900 in restitution fines.  Juvenile Probation also told A.S. that she will have to pay between $45 and $80 per month for every month P.S. is on probation.  Juvenile Probation told A.S. that P.S.'s probation will not end until P.S. and A.S. pay the restitution, fines, and probation fees.

235.    Although P.S. was fourteen when he was detained at Glen Mills, Glen Mills placed him in pre-GED classes.  He was not assigned a grade level.

When he returned home from Glen Mills, he was therefore held back a grade.

236. At Glen Mills, P.S. developed anxiety and depression. As a result, he can no longer attend school. He now receives homebound instruction.

S.S., through and with his next friend and mother, R.K.

237. S.S. is seventeen years old. He resides with his mother, R.K., of Wilkes-Barre, Pennsylvania.

238. In October 2007, when S.S. was sixteen years old, S.S. was charged with driving without a license and presenting false identification to the police in Dauphin County.

239. That month, S.S. appeared, with an attorney, before the Dauphin County Juvenile Court and made a counseled admission to the charges. The Dauphin County court then transferred the case to the Luzerne County Juvenile Court as S.S. was (and still is) a resident of Luzerne County.

240. On November 14, 2007, S.S. appeared without counsel before Ciavarella for an adjudication/disposition hearing. Ciavarella did not ascertain whether S.S. knew he had the right to counsel, nor did the court obtain an affirmative waiver of counsel from S.S. on the record.

241. Ciavarella ordered that S.S. be placed a Glen Mills School for an indefinite period. Upon Ciavarella's order, S.S. spent approximately two weeks from

November 14 to November 28, 2007 in PA Child Care and then was transferred to Glen Mills.

242.    S.S. remained at Glen Mills until July 2008, when Juvenile Law Center filed a writ of habeas corpus, challenging the constitutionality of his adjudication and detention. On July 31, 2008, Judge Lupas of the Luzerne County Juvenile Court issued an order releasing S.S. from his commitment at Glen Mills and vacating the delinquency adjudication and disposition of November 14, 2007.

243.    During S.S.'s placement at Glen Mills, the court garnished S.S.'s survivor's check of $598 a month, which S.S. has received from Social Security since his father passed away. S.S. was also ordered to pay fees and costs of $35 a month to the court.

Jessica Van Reeth and her father, Jack Van Reeth

244.    Jessica Van Reeth, now nineteen years old, lives with her mother, Toni, and her father, Jack Van Reeth, in Mountain Top, Pennsylvania. On January 30, 2007, Jessica, then sixteen, appeared before Ciavarella for an adjudication hearing on a delinquency petition charging her with possession of drug paraphernalia, namely a cigarette lighter and pipe, which is a misdemeanor. Jessica had no prior contact with law enforcement.

245.    Prior to the hearing, Jessica and her father were interviewed by a Luzerne County Juvenile Probation Officer, who told them that he would not recommend placement to the court.

246.    Jessica appeared in court without a lawyer.  Jessica was not advised of her right to counsel, nor did Ciavarella administer a colloquy with Jessica on the record to explain the consequences of proceeding without counsel. During the hearing, Jessica admitted to the charge and she was adjudicated delinquent.  Ciavarella did not conduct a colloquy with Jessica on the record to explain her rights and the consequences of waiving her right to a trial.

247.    Despite the fact that she had no prior record, Ciavarella ordered Jessica placed in Camp Adams for three months.  She was immediately handcuffed and escorted out of the courtroom without even getting a chance to say good-bye to her father.  She was not allowed to see her parents for the first two weeks she was in placement.

248.    Jessica was released from Camp Adams on April 26, 2007 and placed on intensive probation for an additional three months.  The Juvenile Court's supervision over Jessica ended on September 17, 2007.

249.    Jessica and her parents were ordered to and paid monies to Juvenile

Probation to cover various fees and costs associated with her adjudication

and placement.

M.K., through and with his next friend and father, J.F.K.

250.    M.K. is the seventeen year old son of J.F.K. of Exeter, Pennsylvania.

251.    In December 2004, when he was thirteen years old, M.K. was charged with

simple assault and harassment.  The charges arose out of an incident in

November, in which his mother's boyfriend alleged that M.K. spilled beer

on the floor, pushed him around, and threw a piece of steak on him.  The

boyfriend was 6'3" tall and weighed about 210 pounds, while M.K. was

4'2" tall and weighed 87 pounds.  At the time, M.K.'s parents were

involved in a custody dispute.

252.    On December 28, 2004, M.K. appeared with his father and a lawyer before

Ciavarella.  M.K., who had no prior police record, told the judge he had

done nothing wrong.  Ciavarella ordered that M.K. be placed in PA Child

Care pending a psychological evaluation.  M.K. was taken out of the

courtroom in handcuffs and shackles.

253.    On January 13, 2005, sixteen days after being locked up in PA Child Care,

M.K. was evaluated by Dr. Frank Vita.  M.K. remained in placement for an

additional thirty-two days after the evaluation.  He remained at PA Child

Care the entire time, except for one week when he was transferred to Tioga County Detention Center due to space constraints.

254. On January 27, 2005, M.K.'s father attended a meeting at PA Child Care. At that meeting, Sandra M. Brulo, then chief of Juvenile Probation, told M.K.'s father that she could send M.K. away until he was twenty-one years old. Indeed, in a report to the court dated January 28, 2005, Ms. Brulo recommended to the court that M.K. be placed for one year at the Colorado Boys Ranch, followed by a second year at Glen Mills School in Pennsylvania.

255. Frustrated that his son was being held and concerned that he would be sent out of state, M.K.'s father approached the local media. They published a story describing M.K.'s plight on February 9, 2005.

256. On February 14, 2005, five days after the article appeared in the *Wilkes-Barre Times-Leader*, M.K. again appeared in court. Ciavarella ordered that M.K. be released from PA Child Care and placed on probation for approximately six months.

257. M.K. and his father were ordered to pay $420 in probation and detention service fees to the Juvenile Probation department. In addition, M.K.'s father paid for the services of an attorney to represent his son.

Charles Balasavage Jr. and his parents, Charles and Joanne Balasavage

258.    Charles Balasavage Jr., now eighteen years old, is the son of Charles and

Joanne Balasavage of Wilkes-Barre, Pennsylvania.

259.    In 2006, when he was sixteen years old, Charles was adjudicated

delinquent by Ciavarella for receiving a stolen scooter.  Charles did not go

to trial but neither he nor his father can remember if he actually pled guilty

in the three-minute hearing.  Charles was unrepresented.  Ciavarella did not

inform Charles that he had a right to an attorney, or that the court would

appoint an attorney if he could not afford one.  Nor did Ciavarella explain

the potential consequences to Charles of waiving his right to counsel and of

waiving his right to trial by pleading guilty.

260.    Although Charles had no prior record and was adjudicated delinquent on a

misdemeanor charge, Ciavarella placed him in PA Child Care, where he

initially remained for approximately four to six weeks.  Then he was placed

at two other facilities before being sent home and placed on probation.

261.    Over the next two years, Ciavarella ordered that Charles be placed in PA

Child Care on at least four other occasions, in Western PA Child Care on

one occasion, and in various other facilities.

262.    Charles was ordered to and paid fees and costs to the court.  His parents

were ordered to and paid money to Juvenile Probation to cover the costs of

his placements in PA Child Care, Western PA Child Care, and various

other facilities, and for Charles to receive a psychological examination.

## Jesse Balliet and his mother, Florence Myers

263.    Jesse Balliet, now age twenty-two, is the son of Florence Myers of Wilkes-

Barre, Pennsylvania.

264.    In 2003, when he was fifteen years old, Jesse was adjudicated delinquent

for simple assault.  Jesse was not represented by counsel.  Ciavarella did

not inform Jesse that he had a right to an attorney or that the court would

appoint an attorney if he could not afford one.  Nor did Ciavarella explain

the potential consequences to Jesse of waiving his right to counsel and of

waiving his right to trial by pleading guilty.

265.    Even though this was Jesse's first offense, Ciavarella ordered that Jesse be

placed at Camp Adams for three months.

266.    Jesse and his father were ordered to and paid about $2,000 to Juvenile

Probation in various fees and costs including for the cost of Jesse's

placement.

## Steven Brannigan

267.    Steven Brannigan, now eighteen years old, is the son of Lisa Brannigan of

Hanover Township, Pennsylvania.

268.    Since 2003, Steven has been before Ciavarella on four separate charges of delinquency.  Each time Steven appeared before Ciavarella, he was placed.

269.    In 2003, he was placed in Camp Adams for four months.

270.    In January 2005, he appeared before Ciavarella without counsel. Ciavarella immediately sent Steven to PA Child Care for a month without receiving testimony from anyone.  He was later placed in various other facilities.

271.    In 2007, on charges of hindering, Steven appeared before Ciavarella, represented by a public defender.  The public defender advised Steven that he would likely get a maximum sentence if he did not plead guilty, so Steven pled guilty.  Ciavarella did not explain the consequences of a plea, nor did he explain Steven's right to a trial.  Ciavarella accepted his plea, however, and sent Steven to Camp Adams for a month and then to Job Corps for a year.  Steven is currently on probation.

272.    Each time Steven was in placement, his mother was required to pay child support to Juvenile Probation.  Both Steven and his mother are currently making payments to Juvenile Probation to cover the costs of supervision. Steven's mother pays $25 per month and Steven pays $40 per month.

273.    Following his placement, Steven dropped out of high school.  However, while in Job Corps, he was able to get his GED.

Jeffrey Bruno

274.    Jeffrey Bruno, now twenty-one years old, is the son of Jay and Karen

Bruno of Larksville, Pennsylvania.

275.    In 2003, when he was sixteen years old, Jeffrey was adjudicated delinquent

by Ciavarella on a charge of driving a dirt bike while intoxicated.  Jeffrey

was not represented by counsel, and he apparently pled guilty by nodding

his head after the judge read the charges.  Ciavarella did not inform Jeffrey

that he had a right to an attorney or that the court would appoint an attorney

if he could not afford one.  Nor did Ciavarella explain the potential

consequences to Jeffrey of waiving his right to counsel and of waiving his

right to trial by pleading guilty.

276.    By Ciavarella's order, Jeffrey was placed in PA Child Care for about two

and one-half months.  He was then placed at another facility for six

months.

277.    Jeffrey and his parents were ordered to pay various fees and costs to

Juvenile Probation.  Specifically, his parents paid about $4,500 for

placement costs.  Funds were deducted from Jeffrey's father's disability

check and garnished from his mother's wages.  Jeffrey and his parents also

paid $225 for probation fees and $1,200 in court costs.

Scott Bukoski

278.   Scott Bukoski is a twenty-one-year-old male from Nanticoke,

Pennsylvania.  His father is Brian Bukoski.

279.   In May 2005, Scott was adjudicated delinquent by Ciavarella on a charge

of unlawful use of a vehicle.  After Ciavarella read out loud the charges,

Scott pled not guilty.  However, without a trial, Ciavarella adjudicated

Scott delinquent.  Scott was not represented by counsel.  Ciavarella did not

inform Scott that he had a right to an attorney or that the court would

appoint an attorney if he could not afford one.  Nor did Ciavarella explain

the potential consequences to Scott of waiving his right to counsel and of

waiving his right to trial by pleading guilty.

280.   Upon Ciavarella's order, Scott was placed at Camp Adams for ninety days.

281.   Scott and his father were ordered to and paid various fees and costs to

Juvenile Probation.

D.C., through and with his next friend and mother, R.C.

282.   D.C., now seventeen years old, is the son of R.C. of Shickshinny,

Pennsylvania.

283.   In 2007, when D.C. was sixteen years old, he was adjudicated delinquent

by Ciavarella on possession of drug paraphernalia and burglary charges.

D.C., who was unrepresented by counsel, pled guilty.  Ciavarella did not

inform D.C. that he had a right to an attorney or that the court would appoint an attorney if he could not afford one. Nor did Ciavarella explain the potential consequences to D.C. of waiving his right to counsel and of waiving his right to trial by pleading guilty.

284. Ciavarella ordered D.C. to be sent to Camp Adams for a few weeks. From there he was sent to PA Child Care for a few days and then to another facility for twelve months.

285. D.C. and his parents were ordered to and paid various fees and costs to the court. Specifically, the court garnished the wages of D.C.'s father for two weeks at a rate of $125 per week. The court also took their adoption subsidy in the amount of $600 per month for a total of approximately $7200. While D.C. was on probation, his parents were ordered to pay to Juvenile Probation $35 per month and to pay separately for the ankle monitor, which was $100. D.C. also was ordered to pay $1,700 in restitution.

Ruth Davis and her mother, Carol Fronczek

286. Ruth Davis, now twenty-two years old, is the daughter of Carol Fronczek of Shavertown, Pennsylvania.

287. At age seventeen, Ruth was adjudicated delinquent by Ciavarella on a simple assault charge. Ruth, who was unrepresented by counsel, pled

guilty. Ciavarella did not inform Ruth that she had a right to an attorney or that the court would appoint an attorney if she could not afford one. Nor did Ciavarella explain the potential consequences to Ruth of waiving her right to counsel and of waiving her right to trial by pleading guilty.

288.    Upon Ciavarella's orders, Ruth was in various placements between 2003 and 2005, including in PA Child Care for approximately seven months.

289.    Ruth's mother was ordered to and paid child support to Juvenile Probation for the duration of Ruth's placement. Ruth and her mother also were ordered to and paid court fees.

William Dixon

290.    William Dixon is the twenty-one-year-old son of Janet Dixon of Plymouth, Pennsylvania.

291.    In April 2003, when he was fifteen, William was adjudicated delinquent by Ciavarella on misdemeanor charges arising out of an incident involving his family. Prior to appearing before Ciavarella, William was held in PA Child Care for five days without a hearing.

292.    When William finally appeared before Ciavarella, he was unrepresented by counsel. Ciavarella asked William if had disrespected his grandfather, to which William answered yes. William was adjudicated delinquent even though he did not actually plead guilty or admit to the charges. Ciavarella

did not inform William that he had a right to an attorney or that the court

would appoint an attorney if he could not afford one. Nor did Ciavarella

explain the potential consequences to William of waiving his right to

counsel and of waiving his right to trial by pleading guilty.

293.    Upon Ciavarella's order, William was placed at Camp Adams for sixty

days; he was placed on probation after he returned home.

294.    William's mother's paycheck was attached to cover the costs of his

placement. William was ordered to and paid Juvenile Probation $35 per

month from the period July 2003 through May 2004. In total, William and

his family paid about $2,300.

Rachelle Farber and her mother, Judy Dane

295.    Rachelle Farber, now twenty-four years old, is the daughter of Judy Dane

of Swoyersville, Pennsylvania.

296.    In December 2002, Rachelle appeared with a private attorney before

Ciavarella on charges of aggravated assault.

297.    While at the probation office prior the hearing, Rachelle and her mother

were told by the probation officer that, if the lawyer did not cease efforts to

intervene on behalf of Rachelle, Rachelle would be placed in a maximum

security facility. The probation officer told her that having an attorney

present was "making things worse."

298.    Rachelle was initially placed by Ciavarella in Camp Adams. Then, in a subsequent hearing before Ciavarella, she was placed in PA Child Care for 90 days.

299.    Rachelle's mother was told by the probation office that she was required to pay to cover the cost of Rachelle's placement.  Rachelle's mother met with the probation office and filled out paperwork that allowed Juvenile Probation to garnish her wages at the rate of $225 per month to cover the cost of placement.

300.    Upon release from PA Child Care, Rachelle was placed on house arrest and on probation.  Her mother was ordered to pay to cover the cost of the ankle bracelet, psychological testing, drug testing, and the supervision fees associated with probation.  In total, Rachelle and her mother were ordered to pay nearly $950 in probation fines and fees.

301.    As a result of her placement, Rachelle suffered severe separation anxiety. She also attempted suicide immediately after she was placed.  She continues to have nightmares about her experiences in placement.

J.G., through and with his next friend and mother, M.O.

302.    J.G., now seventeen, is the son of M.O. of Harvey's Lake, Pennsylvania.

303.    In 2007, when he was fifteen, J.G. was adjudicated delinquent by Ciavarella.  J.G. was unrepresented by counsel.  According to J.G.'s

61

mother, J.G. may have pled guilty, but she is not sure because the hearing

lasted about five seconds.  Ciavarella did not inform J.G. that he had a right

to an attorney or that the court would appoint an attorney if he could not

afford one.  Nor did Ciavarella explain the potential consequences to J.G.

of waiving his right to counsel and of waiving his right to trial by pleading

guilty.

304.    Upon Ciavarella's orders, J.G. was sent to Camp Adams for three months.

305.    J.G.'s mother was ordered to and paid about $2,000 to Juvenile Probation

for the cost of placement, a portion of which was deducted directly from

her tax refund.  J.G. and her mother were ordered to and paid about $200 in

fees and costs to Juvenile Probation.

Brian Gyle

306.    Brian Gyle, now nineteen, is the son of Maria Gyle of Pittston,

Pennsylvania.

307.    Brian was adjudicated delinquent by Ciavarella on four occasions from

2003 to 2004.  Upon Ciavarella's orders, Brian was placed at different

times in PA Child Care, Camp Adams, and Northwestern Academy.

308.    Brian and his parents were ordered to pay to Juvenile Probation $1,728.68

for fines, probation and detention fees, and services.

Wayne Gyle

309.     Wayne Gyle, now age twenty-one, is the son of Maria Gyle of Pittston, Pennsylvania.

310.     On July 21, 2004, Wayne was charged with simple assault, terroristic threats, and harassment. He was placed in PA Child Care for sixteen days prior to seeing a judge.

311.     On August 6, 2004, Wayne appeared before Ciavarella. Although the charges against him were dismissed, Ciavarella ordered that Wayne's probation resulting from an earlier adjudication be extended for one year. Neither Wayne nor his mother recall that Wayne was represented by an attorney or told of Wayne's right to counsel at this hearing.

312.     Wayne was ordered to pay Juvenile Probation fees and still owes approximately $5,000.

Tracy Harvey

313.     Tracy Harvey, now eighteen years old, is the son of Albert Harvey of Harvey's Lake, Pennsylvania.

314.     In 2007, when Tracy was sixteen years old, he was adjudicated delinquent by Ciavarella on a charge of being under the influence of a substance. Tracy, who was unrepresented, did not formally plead guilty, nor did Ciavarella seek a plea. Ciavarella merely asked the police officer what

happened, and he did not allow anyone else in the courtroom to speak. Ciavarella did not inform Tracy that he had a right to an attorney or that the court would appoint an attorney if he could not afford one. Nor did Ciavarella explain the potential consequences to Tracy of waiving his right to counsel and of waiving his right to trial by pleading guilty.

315.     Tracy was placed in PA Child Care for one week and then transferred to another facility for seven months.

316.     Tracy's father was ordered by a letter he received from Juvenile Probation to pay $200 per month to the Pennsylvania State Collection Disbursement Unit ("PA SCDU") to cover the cost of Tracy's placement. When he was unable to continue paying that amount, his wages were garnished. Since Tracy's release from placement in July 2008, he has been paying supervision fees for his probation; he was ordered to pay $350 plus $35 per month to Juvenile Probation for supervision.

Alexander Hogan and his mother, Molly Hogan

317.     Alexander Hogan, now age eighteen, is the son of Molly Hogan of Kingston, Pennsylvania.

318.     In September of 2007, Alexander, then sixteen years old, was charged with simple assault and other related charges.

319.    Alexander pled guilty and was adjudicated delinquent in a hearing that
        lasted less than ten minutes.

320.    Alexander does not remember being represented by counsel during his
        adjudicatory hearing.  Ciavarella did not inform Alexander of his right to
        an attorney or explain that an attorney would be appointed if he could not
        afford one.   Nor did Ciavarella conduct a colloquy with Alexander on the
        record to explain the consequences of waiving his right to a trial.

321.     Alexander was detained at PA Child Care for about a month and then
        transferred to Western PA Child Care where he was detained for another
        month.  Finally, Alexander was transferred to Northwestern Academy
        where he remained for approximately four months.

322.    The court ordered Alexander's mother to pay costs associated with
        Alexander's adjudication but she has been unable to afford to do so.

323.    When Alexander returned to his school, after being released from
        placement, he was harassed incessantly.  Ultimately, he stopped going to
        school because the taunting became unbearable.  He plans to work towards
        a GED.

<u>D.J., through and with his next friend and mother, S.J.</u>

324.    D.J., now sixteen years old, is the son of S.J. of Edwardsville,

Pennsylvania.

325.    In 2005, when D.J. was about thirteen years old, the police picked him up

from school on a Friday morning and told him he was being taken to

detention because he had failed to appear as a witness to a school fight.

D.J.'s mother reports that she never received a subpoena for her minor son

to appear as a witness.

326.    D.J. was taken from school to PA Child Care.  Police would not let D.J.'s

mother speak to or see her son, and the police did not fully explain what

was going on.

327.    D.J. was brought to court on the following Monday, having spent the

weekend at PA Child Care.  In court, Ciavarella yelled at D.J. and his

attorney.  D.J. was then released without ever testifying.

328.    D.J. has never been arrested or detained aside from this incident.

329.    D.J.'s mother paid $500 to the attorney to appear with her son in court.

<u>Barbara Kearns and her mother, Barbara Thurston</u>

330.    Barbara Kearns, now nineteen years old, is the daughter of Barbara

Thurston of Wilkes-Barre, Pennsylvania.

331.    In September 2003, when Barbara was fourteen years old, she appeared before Ciavarella on a curfew violation; at the time, she was on probation for a previous adjudication on a retail theft charge.  Barbara was unrepresented by counsel.  In the very short hearing, Ciavarella did not hear any evidence.  Barbara pled not guilty.  Ciavarella did not inform Barbara that she had a right to an attorney or that the court would appoint an attorney if she could not afford one.  Nor did Ciavarella explain the potential consequences to Barbara of waiving her right to counsel and of waiving her right to trial by pleading guilty.

332.    Barbara was then placed in PA Child Care for three days, at Camp Adams for over six months, and at another boot camp for a week.  In 2006, after appearing before Ciavarella again without counsel, Barbara received probation.

333.    Barbara was ordered to pay fees and costs to the court.  Her Supplemental Security Income check was garnished to offset the cost of placement.

Kurt Kruger

334.    Kurt Kruger is a twenty-two-year-old male who resides in Wilkes-Barre, Pennsylvania.

335.    In 2004, when he was seventeen years old, Kurt was adjudicated delinquent by Ciavarella on a charge of conspiracy to shoplift.  Before appearing in

court, Kurt was held in PA Child Care for three days. Kurt did not have counsel at his hearing, at which he made an admission. Ciavarella did not inform Kurt that he had a right to an attorney or that the court would appoint an attorney if he could not afford one. Nor did Ciavarella explain the potential consequences to Kurt of waiving his right to counsel and of waiving his right to trial by pleading guilty.

336.    Despite the fact that shoplifting is a summary offense, Ciavarella ordered that Kurt be placed at Camp Adams, where he remained for four months.

337.    Kurt's parents were ordered and paid to Juvenile Probation $1,000 to $2,000 for the cost of his placements. Kurt himself was ordered and paid approximately $200 in restitution.

J.M.K., through and with his next friend and mother, B.T.

338.    J.M.K., now seventeen years old, is the son of B.T. of Wilkes-Barre, Pennsylvania.

339.    J.M.K. was charged in 2002 with fighting in school and then again for a curfew violation. When he was fourteen years old, in 2005, J.M.K. was again charged with fighting.

340.    In most circumstances when J.M.K. appeared before Ciavarella, he was without counsel. In the very short hearings, J.M.K. attempted to explain the circumstances surrounding the charge, and Ciavarella did not allow him

to speak.  At all but one of these hearings, Ciavarella did not inform J.M.K. that he had a right to an attorney or that the court would appoint an attorney if he could not afford one.  Nor did Ciavarella explain the potential consequences to J.M.K. of waiving his right to counsel and of waiving his right to trial by pleading guilty.

341.    Between 2002 and 2005, J.M.K. was placed by Ciavarella in various facilities including PA Child Care and Western PA Child Care.

342.    J.M.K.'s mother was ordered to pay fees and costs associated with J.M.K.'s placement and supervision.  Because of her financial hardship, J.M.K.'s mother was unable to pay more than a couple hundred dollars during the last seven years.  Because J.M.K. received Supplemental Security Income, those checks were automatically garnished to cover the costs of his placement and supervision.  J.M.K. and his mother still owe money to Juvenile Probation.

Edward Kenzakoski III and his parents, Edward Kenzakoski Jr. and Sandra Fonzo

343.    Edward Kenzakoski III is a twenty-two-year-old male from Wilkes-Barre, Pennsylvania.  He is the son of Sandy Fonzo and Edward Kenzakoski, Jr.

344.    In September 2003, Edward, then seventeen years old, was adjudicated delinquent by Ciavarella on a misdemeanor charge of possession of drug paraphernalia.  Before the filing of the delinquency petition, Edward had

69

no prior contact with law enforcement. Edward appeared before Ciavarella without counsel. Edward was not advised of his right to counsel and to have counsel appointed for him, nor did Ciavarella conduct a colloquy with Edward on the record to explain the consequences of proceeding without counsel. Edward admitted to the charge, but Ciavarella did not conduct a colloquy with Edward on the record to explain the consequences of pleading guilty and giving up his right to a trial.

345.    After adjudicating him delinquent, Ciavarella immediately committed Edward to PA Child Care for more than thirty days.

346.    In October 2003, Edward, then in the custody of PA Child Care, appeared before Ciavarella, again without counsel, and was then ordered into placement at a boot camp for 120 days. Edward was released four months later and was placed on probation for several months.

347.    One week before his probation would have expired, Edward failed to appear at a scheduled delinquency review hearing, and the Juvenile Court issued a bench warrant. In the fall of 2005, Edward, then nineteen years old, was involved in a traffic accident. He was taken into custody based on the bench warrant and appeared, without counsel, before Ciavarella for a violation of probation hearing. Edward was immediately committed to Western PA Child Care for 120 days.

348.    Upon his release in the winter of 2006, Juvenile Court jurisdiction ended.

349.    Edward was ordered to and paid fees and costs to the court. His parents were ordered to and paid approximately $5,000 to the court to cover the costs of his placements.

## J.K., through and with his next friend and father, A.K.

350.    J.K. is the fifteen-year-old son of A.K. and D.K. of Kingston, Pennsylvania.

351.    In July 2007, when he was thirteen years old, J.K. was adjudicated delinquent on charges of criminal mischief, trespass, and attempted burglary after having been found one night playing a game called Manhunt on the grounds of a local school. Prior to going to court, J.K.'s parents applied for a public defender to represent J.K., but they were told that they made too much money to qualify.

352.    J.K. appeared before Ciavarella without counsel. His parents asked for a continuance to obtain a lawyer, but that request was denied.

353.    After he was adjudicated delinquent, J.K. was sent by the court to PA Child Care and then Camp Adams for about five days. When he returned home, he was placed on house arrest. When he broke his house arrest rules, J.K. was sent to another residential facility where he remained for approximately nine months, until September 2007.

71

354.    J.K.'s parents were ordered to and paid $3,300 to PA SCDU for his

placement; a portion of the monies were garnished from unemployment

checks.  J.K. himself was ordered to and is still paying fees and costs to the

court.

B.L., through and with his next friend and father M.L.

355.    B.L., now sixteen years old, is the son of M.L. of Kingston, Pennsylvania.

356.    In 2006, when he was thirteen years old, B.L. was adjudicated delinquent

by Ciavarella on a charge of perjury.  B.L. was unrepresented when he

appeared before Ciavarella.  Ciavarella did not inform B.L. that he had a

right to an attorney or that the court would appoint an attorney if he could

not afford one.  Nor did Ciavarella explain the potential consequences to

B.L. of waiving his right to counsel.  B.L. pled not guilty.  Ciavarella told

B.L. that he was guilty.

357.    Although he had no prior contact with the juvenile justice system,

Ciavarella ordered that B.L. be placed in Camp Adams for ninety-three

days.

358.    M.L. had $150 a week taken from his paycheck during the three months

that B.L. was placed.  B.L. has received multiple notices indicating that he

owes $500 to Juvenile Probation.

Anthony Millan and his mother, Cindy Millan

359.    Anthony Millan, now twenty years old, is the son of Cindy Millan of

Nanticoke, Pennsylvania.

360.    In 2005, when Anthony was sixteen years old, Anthony was adjudicated

delinquent for fighting in school.  This was Anthony's first offense.  When

he appeared before Ciavarella, Anthony was unrepresented by counsel.

Ciavarella did not inform Anthony that he had a right to an attorney or that

the court would appoint an attorney if he could not afford one.  Nor did

Ciavarella explain the potential consequences to Anthony of waiving his

right to counsel.  Anthony pled not guilty.

361.    Ciavarella immediately ordered Anthony shackled and sent him to Camp

Adams where he remained for three months.

362.    Anthony's mother was ordered to pay placement fees, court costs, and

supervision costs totaling over $200.

Damon Millan and his mother, Cindy Millan

363.    Damon Millan, now eighteen years old, is the son of Cindy Millan of

Nanticoke, Pennsylvania.

364.    In 2007, when Damon was sixteen years old, he was adjudicated delinquent

by Ciavarella on a breaking and entering charge.  When Damon appeared

before Ciavarella, he was represented by a private attorney.  Damon pled

73

not guilty.  However, neither Damon's attorney nor anyone else was permitted to speak.  The homeowners who were burglarized were in the courtroom and wanted to explain that they did not believe Damon was involved, but Ciavarella did not allow them to speak.

365.    Ciavarella ordered Damon to Camp Adams, where he remained for three months.

366.    Damon's mother recalls that she and Damon were ordered to and paid to Juvenile Probation roughly $200 for the cost of supervision, placement, and court fees.

Paul Morgan Jr.

367.    Paul Morgan Jr., now eighteen years old, is the son of Tracy Stair and Paul Morgan of Mountain Top, Pennsylvania.

368.    In 2005, Paul was adjudicated delinquent by Ciavarella for possession of a controlled substance.  Paul, unrepresented by counsel, pled guilty. Ciavarella did not inform Paul that he had a right to an attorney or that the court would appoint an attorney if he could not afford one.  Nor did Ciavarella explain the potential consequences to Paul of waiving his right to counsel and of waiving his right to trial by pleading guilty.

369.    Paul was placed in PA Child Care for three days.  After he was released, he was put on probation for six months.

370.    Tracy paid Juvenile Probation $35 per month during this six-month period to cover the cost of Paul's probation.

371.    In 2007, Paul was again adjudicated delinquent by Ciavarella on charges of harassment and disorderly conduct.  Again, Paul was unrepresented by counsel and pled guilty.  Ciavarella did not inform Paul that he had a right to an attorney or that the court would appoint an attorney if he could not afford one.  Nor did Ciavarella explain the potential consequences to Paul of waiving his right to counsel and of waiving his right to trial by pleading guilty.

372.    Ciavarella placed Paul at Camp Adams for three months and placed him on probation for six months following his release.

373.    At the time of these events, Paul's father had been paying to Tracy $46 per week in child support.  These payments were redirected to Juvenile Probation during the three months Paul was detained at Camp Adams. Tracy and Paul paid Juvenile Probation $35 per month while he was on probation.

Fred Odom Jr. and his mother, Sherrell Odom

374.    Fred Odom Jr., now eighteen years old, is the son of Sherrell Odom of Mountain Top, Pennsylvania.

375.    In 2003, when he was thirteen years old, Fred was adjudicated delinquent by Ciavarella for disorderly conduct and simple assault.  Fred's mother had called the police to scare Fred when he was acting out at home.  Against his mother's wishes, the police arrested Fred and filed charges.  Fred was detained at PA Child Care from November 7, 2003 until his adjudicatory hearing on November 26, 2003.  Fred entered a guilty plea during his two-minute hearing, as he and his mother believed that the judge would simply order Fred to attend counseling.  Fred was unrepresented.  Ciavarella did not inform Fred that he had a right to an attorney or that the court would appoint an attorney if he could not afford one.  Nor did Ciavarella explain the potential consequences to Fred of waiving his right to counsel and of waiving his right to trial by pleading guilty.

376.    Although Fred had no prior record, Ciavarella placed him at Camp Adams for three months, from November 26, 2003 until March 3, 2004.

377.    Fred was ordered to and paid fees and costs to the court.  His mother was ordered to pay $480 a month via garnishment to Juvenile Probation to cover the costs of Fred's placement.  She also paid for a court-ordered psychological evaluation.  Both Fred and his mother have made payments for the cost of his probation.  His mother had to withdraw funds from her

401(k), incurring penalties and taxes for early withdrawal, in order to make ends meet.

378.    As a result of his placement at Camp Adams, Fred had to repeat ninth grade. He was also initially not allowed to return to his local public high school. Fred has since obtained his GED and is pursuing post-secondary studies.

Steven Palchanis Jr., and his father, Steven Palchanis Sr.

379.    Steven Palchanis Jr., now twenty-one years old, is the son of Steven Palchanis Sr. of Wilkes-Barre, Pennsylvania.

380.    In 2003, when Steven was sixteen years old, he was adjudicated delinquent by Ciavarella for criminal trespass. Unrepresented by counsel, Steven pled guilty. Ciavarella did not inform Steven that he had a right to an attorney or that the court would appoint an attorney if he could not afford one. Nor did Ciavarella explain the potential consequences to Steven of waiving his right to counsel and of waiving his right to trial by pleading guilty.

381.    Upon Ciavarella's order, Steven was shackled and taken to PA Child Care, where he remained for three weeks before going to Camp Adams for ninety days. Following his release from placement, Steven was placed on probation for almost five years, until he paid off approximately $3,000 in restitution.

382.    Steven and his parents were ordered to and paid monies to the court for his placement; the money was garnished from the paycheck of Steven's father. Furthermore, they were required to pay various fees to Juvenile Probation while Steven was on probation.  In total, they paid about $7,000.

Jamie Quinn

383.    Jamie Quinn is an eighteen-year-old female who resides in Wyoming, Pennsylvania.

384.    In 2005, when she was fourteen years old, Jamie was charged with simple assault and harassment after punching another girl.

385.    During her hearing, Jamie was not represented by an attorney, as the intake worker had told her she did not need one because the charges were minor. Ciavarella never informed Jamie of her right to an attorney or the consequences of waiving that right.  Furthermore, Ciavarella never explained to Jamie her trial rights or what, specifically, she was charged with.

386.    Jamie was initially told she would be placed in a detention center for three to six months, but she ended up staying in various facilities (PA Child Care, Vision Quest, and Bridgeview) for nearly a year.

387.    Jamie's parents were ordered to and paid fees and costs to the court, as well as costs to Juvenile Probation for Jamie's placement.

388.    Jamie's detention had lasting and negative consequences to her, most

distinctly illustrated by the many scars she bears from self-mutilation

during her detention.

K.R., through and with his next friend and mother, T.S.

389.    K.R, now seventeen years old, is the son of T.S. of Hanover Township,

Pennsylvania.

390.    In 2007, when K.R. was sixteen years old, he was adjudicated delinquent

by Ciavarella for disorderly conduct after getting into a fight on a school

bus.  Unrepresented by counsel, K.R. pled guilty.  Ciavarella did not

inform K.R. that he had a right to an attorney or that the court would

appoint an attorney if he could not afford one.  Nor did Ciavarella explain

the potential consequences to K.R. of waiving his right to counsel and of

waiving his right to trial by pleading guilty.

391.    Ciavarella placed K.R. at Camp Adams from April to July 2007, and K.R.

is still on probation.

392.    K.R. was ordered to pay $30 per month to Juvenile Probation for every

month he is on probation.

David Rowlands and his mother, Mary Seville

393.    David Rowlands, now eighteen years old, is the son of Mary Seville of

        Laporte, Pennsylvania.

394.    In October 2003, when David was twelve years old, he was adjudicated

        delinquent by Ciavarella for harassment.  Unrepresented by counsel, David

        pled guilty.  Ciavarella did not inform David that he had a right to an

        attorney or that the court would appoint an attorney if he could not afford

        one.  Nor did Ciavarella explain the potential consequences to David of

        waiving his right to counsel and of waiving his right to trial by pleading

        guilty.

395.    Ciavarella ordered David placed in PA Child Care.  Over the course of the

        next two months, David was placed in PA Child Care, then moved to Camp

        Adams because of space constraints, and then moved back to PA Child

        Care.  Within the two months, he was moved back and forth between PA

        Child Care and Camp Adams several times.

396.    David and his mother were ordered to pay $35 per month to Juvenile

        Probation to cover the costs of his placement and supervision.

<u>Michael S. Scarlato and his parents, Michael P. and Tina Scarlato</u>

397.    Michael S. Scarlato, now eighteen years old, is the son of Michael P. and
         Tina Scarlato of Hazelton, Pennsylvania.

398.    In November 2004, when Michael was fourteen years old, he was
         adjudicated delinquent on a charge of possession of drug paraphernalia for
         bringing a pipe to school.  Unrepresented by counsel, Michael made an
         admission.  Ciavarella did not inform Michael that he had a right to an
         attorney or that the court would appoint an attorney if he could not afford
         one.  Nor did Ciavarella explain the potential consequences to Michael of
         waiving his right to counsel and of waiving his right to trial by pleading
         guilty.

399.    Ciavarella placed Michael at Camp Adams.  Over the next four years,
         Michael was in various court-ordered placements, including PA Child Care
         and Western PA Child Care.

400.    During that time, Michael's parents were ordered to and paid
         approximately $2,500 to the court for Michael's placements.  Additionally,
         Michael has paid and continues to make payments to Juvenile Probation.

A.S., through and with his next friend and father, G.S.

401.    A.S., now fifteen years old, is the son of G.S. and K.S. of Wilkes-Barre, Pennsylvania.

402.    In 2007, when he was fourteen years old, A.S. was adjudicated delinquent by Ciavarella for writing graffiti with a group of kids. A.S. was unrepresented when he pled guilty before Ciavarella. Ciavarella did not inform A.S. that he had a right to an attorney and that the court would appoint an attorney if he could not afford one. Nor did Ciavarella explain the potential consequences to A.S. of waiving his right to counsel or of waiving his right to trial by pleading guilty.

403.    Ciavarella ordered that A.S. be placed in Camp Adams for ninety days.

404.    A.S.'s parents were ordered to pay $140 per month to the court to defray the cost of his placement in Camp Adams; the monies were taken out of his father's unemployment checks. A.S. himself was ordered to pay $30 a month when he was placed on probation after being released from Camp Adams.

James Swartley

405.  James Swartley, now nineteen years old, is the son of Amy Swartley of

Wilkes-Barre, Pennsylvania.

406.  In 2005, when he was sixteen years old, James was adjudicated delinquent

by Ciavarella on a misdemeanor charge of possession of drug

paraphernalia.  James was placed at PA Child Care prior to his hearing.

When he appeared before Ciavarella, James was unrepresented by counsel

and pled guilty.  Ciavarella did not inform James that he had a right to an

attorney or that the court would appoint an attorney if he could not afford

one.  Nor did Ciavarella explain the potential consequences to James of

waiving his right to counsel and of waiving his right to trial by pleading

guilty.

407.  Ciavarella ordered that James return to PA Child Care.  James was detained

at PA Child Care for approximately eleven days before he was sent home

and placed on probation.

408.  Over the next two years, Ciavarella placed James in two separate facilities

for allegedly violating a term of the probation he was still serving.  In total,

James spent more than a year in placement.

409.  James's mother's wages were garnished while James was in placement;

about $110 was deducted every two weeks.  James's father had paid $240

per month in child support.  The court redirected the child support

payments to Juvenile Probation while James was in placement.

Jessica Thurston and her mother, Barbara Thurston

410.    Jessica Thurston, now twenty years old, is the daughter of Barbara

Thurston of Wilkes-Barre, Pennsylvania.

411.    In 2003, when Jessica was fourteen years old, she was adjudicated

delinquent for fighting and theft.  Jessica appeared before Ciavarella

without counsel and pled guilty.  Ciavarella did not inform Jessica that she

had a right to an attorney or that the court would appoint an attorney if she

could not afford one.  Nor did Ciavarella explain the potential

consequences to Barbara of waiving her right to counsel and of waiving her

right to trial by pleading guilty.

412.    Upon Ciavarella's order, Jessica was placed in PA Child Care for

approximately two weeks, and then she was placed at Camp Adams and

another facility in Tioga County for five to six months.

413.    Jessica's mother was ordered to pay fees and costs to the court.  Jessica

was receiving Supplemental Security Income and her SSI check was

garnished to offset the costs of supervision and placement.

<u>Michael Vitali</u>

414.    Michael Vitali, now twenty-two years old, is the son of Eugene and Joan
Vitali of Wilkes-Barre, Pennsylvania.

415.    In 2002, when Michael was fifteen years old, he was charged with assault.
At his adjudicatory hearing before Ciavarella, he was unrepresented by
counsel.  No colloquy was conducted on his waiver of counsel.  Neither
Michael nor his parents recall Michael being asked to plead guilty or not
guilty, and neither remember Ciavarella explaining to Michael his rights.

416.    Following that adjudication, Michael was placed in Camp Adams for three
months.  Later, he was in and out of various placements, including PA
Child Care, for probation violations.  He was not represented by counsel at
the probation violation hearings.

417.    As a result of his placements, both Michael and his parents received a bill
from the court to cover the costs of his supervision and placement.  They
have paid over $2,000 to the court.

418.    As a result of Michael's time in placement, he struggled when he returned
to school and opted to take the GED instead.  Michael also suffered great
psychological harm and was placed on a variety of medications while at
KidsPeace that caused him to gain significant weight.

Frank Weber and his mother Florence Myers

419.    Frank Weber, now twenty-three years old, is the son of Florence Myers of

Wilkes-Barre, Pennsylvania.

420.    In 1997, when he was thirteen years old, Frank was a passenger in a car

that was reported stolen; the driver of the car got into an accident.  Frank

was adjudicated delinquent by Ciavarella on various charges related to this

incident.  Frank was unrepresented by counsel at the adjudicatory hearing.

Ciavarella did not inform Frank that he had a right to an attorney or that the

court would appoint an attorney if he could not afford one.  Nor did

Ciavarella explain the potential consequences to Frank of waiving his right

to counsel.

421.    Until Frank turned eighteen, he spent the majority of time in various court-

ordered placements including PA Child Care.  These continued periods of

placement resulted from violations of probation on the original charge

when Frank was thirteen years old.  He was not represented by an attorney

at any of these violations hearings.

422.    Frank's father paid $400 a month in child support to Juvenile Probation for

the cost of placement for the duration of the time that Frank was in

placement.

<u>M.M.W., through and with her next friend and legal guardian, J.C.</u>

423.  M.M.W., now fourteen years of age, resides with her guardian J.C. in
      Freedland, Pennsylvania.

424.  When she was ten years old, M.M.W. was adjudicated delinquent by
      Ciavarella.  Prior to appearing before Ciavarella, M.M.W. was taken by
      police to PA Child Care, where she was held for a week without a hearing.
      M.M.W. was unrepresented at her adjudicatory hearing.  Ciavarella did not
      inform M.M.W. that she had a right to an attorney or that the court would
      appoint an attorney if she could not afford one.  Nor did Ciavarella explain
      the potential consequences to M.M.W. of waiving her right to counsel.

425.  M.M.W. returned to PA Child Care, where she spent approximately one
      month.  She was on probation for a year after she was released from PA
      Child Care.

426.  M.M.W.'s guardian had to pay at least $200 to the court.

<u>John Ashford, Jr. and his mother, Donna Ashford</u>

427.  John Ashford, Jr., now twenty-one years of age, is the son of Donna
      Ashford of Wilkes-Barre, Pennsylvania.

428.  In October 2005, John, then sixteen years old, and three of his friends were
      charged with a misdemeanor for shooting some windows with a BB gun.
      Except for this charge, John has never been in trouble with the law.

429.    John was represented at his adjudicatory hearing before Ciavarella by a

public defender.  However, each time the public defender attempted to

speak, Ciavarella cut her off.  The homeowner whose windows were

broken spoke on the boys' behalf and asked Ciavarella not to send them

away.

430.    After adjudicating John delinquent, Ciavarella ordered that John be placed

at Camp Adams, where he remained for ninety-seven days.

431.    John's parents were ordered to and paid monies to PA SCDU for John's

placement at Camp Adams.  John and his parents also were ordered to and

paid fees and costs to the court.  In total, the family paid more than $5,000.

Christian Barnes and his father, Brian Barnes

432.    Christian Barnes, now twenty-one years old, is the son of Brian Barnes of

Wilkes-Barre, Pennsylvania.

433.    In 2006, when Christian was sixteen years old, he was adjudicated

delinquent by Ciavarella for underage drinking and bringing a multi-tool to

school on his keychain.  Christian appeared before Ciavarella without

counsel on the advice of the Juvenile Probation Officer that he would wait

weeks to be appointed a public defender, during which time Christian

would have to remain in detention.  Christian pled guilty.  Ciavarella did

not conduct a colloquy to inform Christian of the rights he would be giving

up if he pled guilty, nor did he explain to Christian the potential consequences of pleading guilty.

434.   Upon Ciavarella's order, Christian was placed at Clearbrook rehabilitation facility for alcoholism treatment where he remained for six months.

435.   During the time Christian was placed at Clearbrook, the domestic relations court ordered his father to pay $520 to cover the cost of his placement. He made two separate payments to the Luzerne County to pay the amount.

436.   While Christian was on house arrest, his father was ordered to pay $20 per day, for six weeks, for use of the ankle monitor. Christian's father was also ordered to pay an additional $3000 over the course of three years while Christian was on probation. These payments were also made to Luzerne County. Christian was also ordered to pay up to $1500 in restitution.

437.   As a result of the incident and placement, Christian was expelled from school and was required to repeat tenth grade. Christian eventually returned to his school and graduated one year later than he should have had he not lost that time in placement. As a result of his adjudication, he has been unable to enlist in the military.

Shane Bly, and his parents Kevin and Linda Bly

438.    Shane Bly, now twenty years old, is the son of Kevin and Linda Bly of

Sugar Notch, Pennsylvania.

439.    In May 2005, when Shane was sixteen years old, he was adjudicated

delinquent by Ciavarella.  Represented by counsel, Shane pled guilty.

Ciavarella did not conduct a colloquy to inform Shane of the rights he

would be giving up if he pled guilty, nor did he explain to Shane the

potential consequences of pleading guilty.

440.    Upon advice of counsel, Shane requested a mental health evaluation.

Ciavarella then ordered that Shane be placed at Camp Adams for three

months and then placed on probation when he returned home.

441.    In 2006, Shane appeared with an attorney before Ciavarella at another

adjudication hearing on a separate charge.  Upon Ciavarella's order, Shane

was placed at two other facilities for a total of six months.  After being

placed for six months, Shane was ordered to pay restitution and then was

discharged from court supervision.

442.    During the three months that Shane was in Camp Adams in 2005, the court

garnished $85.38 per week from the paycheck of Shane's father.

Consequently, Shane's parents had to take out loans to cover mortgage

payments on their home.  Shane's parents were also required to pay $200

for the mental health examination. The court also ordered Shane to pay
$469 in restitution and $35 a month for six months to the court while he
was on probation.

G.B., through and with his next friends and parents, P.P. and J.B.

443.    G.B., now seventeen years old, is the son of P.P. and J.B. of Larksville,
Pennsylvania.

444.    In 2005, when G.B. was fourteen years old, he was adjudicated delinquent
by Ciavarella on a misdemeanor charge. When G.B. appeared before
Ciavarella for the first time, his case had been transferred from Wayne
County. G.B. was represented by a private attorney, but the attorney was
not permitted to present any evidence as to G.B.'s mental capacity or
learning disability. G.B. pled guilty. Ciavarella did not conduct a colloquy
to inform G.B. of the rights he would be giving up if he pled guilty, nor did
he explain to G.B. the potential consequences of pleading guilty.

445.    Upon adjudication, Ciavarella placed G.B. at PA Child Care, where he
remained for a month. He was then placed in other facilities, including
Western PA Child Care for four months.

446.    G.B.'s mother received a notice ordering her to pay a lump sum of $500 for
his placement. She was also ordered to pay $35 per month for the cost of

his supervision on probation.  She is currently making these monthly

payments.

Daryl Charles and his mother, Liza Charles

447.    Daryl Charles, now twenty-years of age, is from Wilkes-Barre,

Pennsylvania.  He is the son of Liza Charles.

448.    In October 2005, when he was seventeen years old, Daryl was adjudicated

delinquent by Ciavarella for shooting a BB gun out of a window one night.

Represented by counsel, Daryl pled guilty.  Ciavarella did not conduct a

colloquy to inform Daryl of the rights he would be giving up if he pled

guilty, nor did he explain to Daryl the potential consequences of pleading

guilty.

449.    Ciavarella ordered Daryl placed at Camp Adams, where he remained for

twenty-seven days.  After his release, Daryl was placed on probation.

450.    Daryl paid $401.42 in fees and costs to the court between November 2005

and January 2006.

William Clarke and his mother, Sharon Graaf

451.    William Clarke, now twenty-three years old, is from Bear Creek Township,

Pennsylvania. He is the son of Sharon Graaf.

452.    In March 2003, when he was seventeen years old, William was adjudicated delinquent by Ciavarella on a simple assault charge for getting into a fight. Prior to his hearing, William was taken to Northwest Academy and then transferred to PA Child Care.  William was represented by counsel when he appeared before Ciavarella.  However, the attorney was not allowed to speak.  Ciavarella read the charge and then said "you're done."  William does not recall actually pleading guilty.

453.    Upon Ciavarella's order, William spent three months at PA Child Care and three months at another facility.  He was sent home in September 2003 and placed on probation for six months.

454.    William's parents were ordered to and paid money to the court for William's placements.  William was ordered to and paid restitution in the amount of $3,000.

Glenn Cooper and his mother, Karen Cooper

455.    Glenn Cooper, now twenty-one years old, is the son of Karen and David Cooper of Meshoppen, Pennsylvania.

456.    In 2003, when he was fifteen years old, Glenn was adjudicated delinquent by Ciavarella for simple assault.  Glenn pled not guilty.  Glenn was represented by private counsel at his hearing; however, Ciavarella would not permit his attorney to speak.

457.    Ciavarella initially placed Glenn at PA Child Care and subsequently placed him at several other facilities throughout the state.

458.    Glenn's parents were ordered to pay the costs of his placements in various facilities.  To date, they have paid several hundred dollars, but they believe that they still owe approximately $1,000.

Richard Copeland II and his parents, Donna and Richard Copeland

459.    Richard Copeland II, now twenty years old, is the son of Donna and Richard Copeland of Sugar Notch, Pennsylvania.

460.    In 2005, when he was sixteen years old, Richard was adjudicated delinquent by Ciavarella when he appeared with counsel at a hearing. Ciavarella asked Richard whether he was guilty, but did not explain the legal rights Richard would relinquish or the consequences he would experience by pleading guilty.  Richard stated that he was not guilty.

461.    Ciavarella then ordered that Richard be returned to PA Child Care, where Richard was placed prior to the hearing.  Richard was kept at PA Child Care for approximately seventy-four days between August and October 2005.  After returning home from PA Child Care, Richard was placed on probation.

462.    Soon after Richard returned home, his probation officer accused him of violating his curfew.  As punishment for the alleged curfew violation, Richard was sent to a facility for two weekends.

463.    Richard's parents were ordered to and paid $2,700 to Juvenile Probation to cover the costs of Richard's placements.  Richard was ordered to and is paying $35 per month to cover the cost of his probation.  In addition, Richard was ordered to pay $30,000 for restitution.  Richard and his parents have paid approximately $275 per month for restitution over the past four years.

Chad Derhammer

464.    Chad Derhammer, now twenty-three years old, is the son of Tammy Ruger of Dallas, Pennsylvania.

465.    In November 2003, when Chad was seventeen years old, he and three other boys from his high school were charged with simple assault and harassment for an incident of hazing.  Although all the boys were represented by counsel at the adjudicatory hearing, none of the lawyers were permitted to speak and neither were the boys' parents.  Chad pled guilty.  Ciavarella did not conduct a colloquy to inform Chad of the rights he would be giving up if he pled guilty, nor did he explain to Chad the potential consequences of pleading guilty.

466.    Although Chad had no prior contact with the juvenile delinquency system, Ciavarella placed him in PA Child Care, where he remained for two weeks.

467.    Chad and his family were ordered to pay fees, costs, and restitution to the court.  His parents were also ordered to pay Juvenile Probation the cost of his placement in PA Child Care as well as his supervision while on probation.

A.D., through and with her mother and next friend, J.E.

468.    A.D., now age seventeen years old, is the daughter of J.E. of Plymouth, Pennsylvania.

469.    On or about 2004, at age thirteen, A.D. was adjudicated delinquent by Ciavarella on various charges related to being a passenger in the car of a friend that belonged to the friend's grandmother.  At the hearing, A.D. was represented by a private attorney and pled guilty.  Ciavarella did not conduct a colloquy to inform A.D. of the rights she would be giving up if she pled guilty, nor did he explain to A.D. the potential consequences of pleading guilty.

470.    Upon Ciavarella's order, A.D. spent about six hours at PA Child Care and was then placed on probation for three months.

471.    A.D. and her family were ordered to and paid $420 in supervision fees.

472.   At age sixteen, A.D. was again adjudicated delinquent by Ciavarella on a charge of terroristic threats for something she said at school.  A.D. appeared without counsel at this hearing.  A.D. tried to tell her side of the story and to present letters from teachers in her support.  She pled guilty. Ciavarella did not inform A.D. that she had a right to an attorney or that the court would appoint an attorney if she could not afford one.  Nor did Ciavarella explain the potential consequences to A.D. of waiving her right to counsel and of waiving her right to trial by pleading guilty.

473.   A.D. was sent to Camp Adams for three months.  A.D.'s mother's wages were garnished.  She paid about $300 to Juvenile Probation for the cost of placement.

Matthew Dougherty

474.   Matthew Dougherty, now twenty-one years old, is the son of Joelle Dougherty of Pittston, Pennsylvania.

475.   In May 2006, when he was eighteen years old, Matthew was adjudicated delinquent for graffiti writing, stemming from an incident that allegedly occurred before Matthew turned eighteen.

476.   Matthew appeared with private counsel before Ciavarella.  Matthew's mother recalls that the attorney said very little during the hearing and that there was no opportunity to contest the charges.  Matthew did not plead

guilty or make an admission on the record. Ciavarella did not conduct a colloquy informing Matthew of his right to go to trial or the potential consequences of pleading guilty. Nevertheless, Ciavarella adjudicated him delinquent.

477.    Upon Ciavarella's order, Matthew was placed at Camp Adams for approximately six weeks.

478.    Matthew and his mother were ordered to and paid various fees and costs to the Juvenile Probation department.

E.E., through and with her next friend and mother, H.E.

479.    E.E., now fourteen years old, is the daughter of H.E. of Wilkes-Barre, Pennsylvania.

480.    In 2007, when she was thirteen years old, E.E. was adjudicated delinquent by Ciavarella on charges of disorderly conduct and harassment after getting in a fight on a school bus on her way to elementary school. E.E. was represented by a public defender. Ciavarella presumed E.E. was guilty and asked her why she did it. When E.E. did not respond, but instead started crying, Ciavarella told her that he was going to send her to Camp Adams for three months because she would not respond to his questions. Ciavarella did not conduct a colloquy informing E.E. of her right to go to trial or the potential consequences of pleading guilty.

481.    Even though this was E.E.'s first offense, Ciavarella ordered her placed at
Camp Adams for three months.  Though E.E. is in special education and
has an IEP, she did not receive any special education services while at
Camp Adams.

482.    H.E. was charged a total of $450 for psychological testing and maintenance
fees.  She still owes $350.

K.E., through and with her next friend and mother, H.E.

483.    K.E., now fifteen years old, is the daughter of H.E. of Wilkes-Barre,
Pennsylvania.

484.    In 2007, when she was fourteen years old, K.E. was adjudicated delinquent
by Ciavarella on charges of criminal trespass, simple assault, and
harassment after getting into a fight on school grounds.  K.E. was
represented by a public defender.  K.E. pled guilty.  H.E. recalls Ciavarella
asking questions when K.E. pled guilty, but he asked them so quickly that
K.E. could not understand what he was asking.

485.    Even though this was K.E.'s first offense, Ciavarella ordered her placed at
Camp Adams for three months, followed by three months of probation.
She was not allowed to return to public school after her placement.

486.    H.E. was charged $310 in maintenance fees and for psychological
evaluations.  She still owes this money.

L.E., through and with his next friend and mother, H.E.

487.    L.E., now seventeen years old, is the son of H.E. of Wilkes-Barre,

Pennsylvania.

488.    In 2007, when he was fifteen years old, L.E. was adjudicated delinquent by

Ciavarella for a giving false identification to a police officer.  L.E. was

represented by a public defender and put on probation.  When he missed

curfew a couple of times, he was charged with violating his probation.  At

the hearing, Ciavarella automatically treated him as guilty.  H.E. does not

recall if L.E. pled guilty.

489.    Ciavarella ordered that L.E. be placed in Camp Adams for three months.

L.E. was sent to PA Child Care for a week or two before going to Camp

Adams.  He was placed on probation upon his release from Camp Adams.

490.    In May 2008, when L.E. was sixteen years old, L.E. was adjudicated

delinquent by Ciavarella for simple assault and theft for allegedly hitting a

child and taking his basketball.  H.E. does not recall L.E. pleading guilty to

the charges or Ciavarella conducting a colloquy informing L.E. of his right

to go to trial or the potential consequences of pleading guilty.

Nevertheless, Ciavarella adjudicated him delinquent.

491.    L.E. was sentenced to one to three years in placement.  He expects to be

released in June 2009.

492.    L.E. had to pay money upon his release from Camp Adams. A portion of H.E.'s child support payments also paid for his subsequent placement.

A.F. and L.F., through and with their mother and next friend, M.F.

493.    A.F., seventeen years old, and her sister, L.F., nineteen years old, reside with their mother, M.F., in Drums, Pennsylvania.

494.    In July 2007, A.F., then sixteen years old, and L.F., then seventeen years old, were adjudicated by Ciavarella on charges of criminal mischief. Although A.F. and L.F. were represented by counsel, neither their attorney nor their mother was allowed to say anything at the adjudicatory hearing. A.F. and L.F. both pled guilty. Ciavarella did not conduct a colloquy to inform A.F. and L.F. of the rights they would be giving up if they pled guilty, nor did he explain to A.F. and L.F. the potential consequences of pleading guilty.

495.    Ciavarella committed A.F. and L.F. to Camp Adams; they remained there from July 24, 2007 through October 23, 2007. When they returned home, they were placed on probation.

496.    A.F., L.F., and their mother were ordered to and paid approximately $7500 in restitution and $2,325.57 in various fees and costs to the court. Their mother also paid $1,000 to retain a private attorney.

<u>J.D.F., through and with his next friend and mother, M.W.</u>

497.    J.D.F., now sixteen years old, is the son of M.W of Exeter, Pennsylvania.

498.    In 2006, J.D.F. was adjudicated delinquent in Montgomery County and his case was transferred to Luzerne County.  Ciavarella placed him in PA Child Care for over two years.

499.    The county sought payment from M.W. to cover the costs of her son's placement.  However, because she is unemployed, M.W. has not been able to make any payment.

500.    J.D.F. has now been in placement for almost three years.

<u>J.F., through and with his next friend and mother, A.I.K.</u>

501.    J.F., now fourteen, is the son of A.I.K. of Nanticoke, Pennsylvania.

502.    In 2008, J.F. was adjudicated delinquent by Ciavarella.  J.F. was represented by private counsel who entered a guilty plea on J.F.'s behalf.  J.F. and his mother told the attorney that J.F. would not plead guilty, especially after they were informed by a representative of the District Attorney that the only witness recanted his statement.  Private counsel told J.F. and his mother not to speak in court.  Ciavarella did not explain to J.F. the consequences of pleading guilty or his right to a trial.

503.    J.F. was placed on probation and house arrest for eight months.

504.    J.F. and his mother were ordered to and paid to Juvenile Probation about

$375 for supervision fees.  J.F.'s mother still owes $200 for the cost of a

court-ordered evaluation completed by Dr. Vita.

Alexandra Fahey

505.    Alexandra Fahey, now nineteen years old, is the daughter of Robert II and

Maria Fahey of Pittston, Pennsylvania.

506.    In 2004, when she was fourteen years old, Alexandra was adjudicated

delinquent by Ciavarella for assaulting a police officer who had detained

her.  Alexandra, who was represented by a private attorney at the hearing,

pled guilty.  Ciavarella did not conduct a colloquy to inform Alexandra of

the rights she would be giving up if she pled guilty, nor did he explain to

Alexandra the potential consequences of pleading guilty.

507.    Despite having no prior record, Alexandra was placed on house arrest and

was made to wear an ankle bracelet for three months.  She was

subsequently on probation for six months.

508.    Alexandra's family was ordered to and paid costs to Juvenile Probation

during both her house arrest and her probation.

L.H., through and with her next friend and mother, J.M.

509.    L.H., now sixteen, is the daughter of J.M. of Wilkes-Barre, Pennsylvania.

510.    When she was fifteen, L.H. was adjudicated delinquent by Ciavarella for

disorderly conduct after she was in an argument in school that escalated.

Although L.H. was represented by the public defender, she did not

understand what was going on at the hearing or what her rights were.  L.H.

and her mother are not sure if she pled guilty.

511.    Upon Ciavarella's order, L.H. was shackled and sent to Camp Adams,

where she remained committed from August to November 2007.

512.    Juvenile Probation garnished J.M.'s Supplemental Security Income for the

cost of placement; to the best of her recollection this totaled more than

$2,000.  L.H. and her mother were also ordered to and paid about $300 in

fees to Juvenile Probation.

Michael Haines and his mother, Barbara Haines

513.    Michael Haines is nineteen years old and is the son of Barbara Haines of

Dallas, Pennsylvania.

514.    In July 2007, when he was seventeen, Michael was adjudicated delinquent

by Ciavarella on a theft charge for using a snow board that was on a rack

outside of a ski lodge.  Michael appeared with an attorney, but neither his

lawyer nor his mother was allowed to speak.  Michael pled guilty.

Ciavarella did not conduct a colloquy to inform Michael of the rights he

would be giving up if he pled guilty, nor did he explain to Michael the potential consequences of pleading guilty.

515.     Michael was ordered to Camp Adams for thirty days.

516.     Michael's mother paid approximately $400 to Juvenile Probation for the placement.  Michael and his mother were ordered to and are still paying fees and costs to Juvenile Probation; they estimate that to date they have paid $630.

Tiffany Harrison and her mother, Bernadette Harrison

517.     Tiffany Harrison, now twenty years old, is the daughter of Bernadette Harrison of Pittston, Pennsylvania.

518.     In 2005, when she was fifteen years old, Tiffany was accused of biting a boy in a scuffle after school and was charged with simple assault.

519.     Tiffany was represented by a public defender at her hearing. While she intended to plead not guilty, the public defender entered a guilty plea. Tiffany's mother does not recall Ciavarella ever informing Tiffany of her rights during the hearing or the potential consequences of pleading guilty.

520.     Despite having no prior record, Tiffany was adjudicated delinquent and led out of the courtroom in shackles. Ciavarella sentenced her to six months of probation, during which she reported to a probation officer at school and

had counseling sessions at home two to three times every week as part of a forensic program.

521. Tiffany's mother was ordered to and paid fees and costs to the court and Juvenile Probation. She was also ordered to and paid additional costs for the forensic program.

522. Tiffany's mother believes that Tiffany, who has both ADHD and dyslexia, was unable to get into a private school for children with learning disabilities because of her juvenile record.

Edward Kane Jr.

523. Edward Kane Jr., now twenty-two years old, is the grandson of Joanne Golden of Swoyersville, Pennsylvania.

524. In 2003, when Edward was sixteen years old, he was adjudicated delinquent on a misdemeanor charge by Ciavarella. Edward was represented by a public defender. The youth who pressed a simple assault charge against Edward did not appear, so that charge was dismissed. A second charge of criminal trespass was reduced to a misdemeanor. Ciavarella also told Edward that he had an unpaid fine. Edward does not recall pleading guilty to any charge.

525. Ciavarella sent Edward to Camp Adams for ninety days and ordered Edward to pay the unpaid fine. Edward's grandmother immediately paid

the fine on Edward's behalf.  Edward was put on probation after his

release.

526.    In spring 2003, two or three weeks after his release from Camp Adams,

Edward was picked up by his probation officer and taken to PA Child Care.

He was transferred among three different facilities, including PA Child

Care, for three to four weeks before having a hearing.

527.    When Edward appeared before Ciavarella for his probation violation

hearing, he did not have a lawyer, and no one advised him that he should

have an attorney.  Ciavarella remanded Edward to Camp Adams for six

months based on an accusation that Edward had been drinking while on

probation.

528.    In 2004, Edward was again placed in PA Child Care due to a probation

violation.

529.    Within a month of being placed there, he had a hearing before Ciavarella.

He was not represented by counsel at that hearing, nor did anyone advise

him that he should have an attorney.  Ciavarella issued an order placing

Edward at Northwestern Boot Camp.  Before Edward left the courthouse

that day, a probation officer spoke with Edward's mother about his lack of

representation in the hearing.  Edward had another hearing before

Ciavarella that same day.  At the later hearing, the probation officer stated

that Edward was entitled to have a lawyer represent him and that the earlier hearing should be postponed until Edward had a lawyer. Ciavarella vacated the order placing Edward at Northwestern Boot Camp and scheduled another hearing. Edward was sent back to PA Child Care.

530. A few weeks later, Edward appeared before Ciavarella again and was represented by private counsel. Edward was placed in PA Child Care for another month and a half and then sent to Manose House for six months. Edward was released from Manose House in October 2004.

531. Edward, his parents, and his grandmother were ordered to and paid fees and costs to the court. Edward believes that his parents each still owe approximately $400 to $500. Edward was ordered to pay more than $750 to Juvenile Probation in supervision fees, processing fees, court costs, and fines. He was also ordered to pay $535.50 to Juvenile Probation in restitution fees.

Brianna Kee

532. Brianna Kee, age eighteen, is the daughter of Cheral and Talif Thomas of Wilkes-Barre, Pennsylvania.

533. In 2007, when Brianna was seventeen years old, she and two other children were adjudicated delinquent on criminal trespass and misdemeanor theft charges for going into an unlocked, empty building.

534.    By the time Brianna appeared with an attorney before Ciavarella, the two

other children had already been adjudicated and received their

dispositions – one was sent to Camp Adams, the other was put on a work

program.  When Brianna's attorney addressed Ciavarella, Ciavarella asked

and was told by courtroom personnel what disposition the two other

children received.  Ciavarella immediately ordered that Brianna be placed

at Camp Adams, where she remained for three months, from September 5

through November 27, 2007.

535.    Brianna and her mother do not recall that Brianna actually pled guilty

before Ciavarella.  Ciavarella never explained to Brianna her rights or the

consequences of pleading guilty.

536.    Brianna and her parents were ordered to and paid fees and costs to the

court; the court garnished the paychecks of both of Brianna's parents.

Matthew Kopetchny

537.    Matthew Kopetchny is the twenty-year-old son of Angelique Ronchetti of

Kingston, Pennsylvania.

538.    In 2005, when he was sixteen years old, Matthew was adjudicated

delinquent by Ciavarella for shoplifting videos and video games.  Matthew

appeared with an attorney before Ciavarella and pled guilty.  Ciavarella did

not conduct a colloquy to inform Matthew of the rights he would be giving

109

up if he pled guilty, nor did he explain to Matthew the potential

consequences of pleading guilty.

539.    Matthew was initially placed on house arrest, but he violated the terms.

When he appeared before Ciavarella for a probation violation hearing at

which he was not represented by an attorney, Ciavarella ordered Matthew

placed at PA Child Care, where he remained for three months before being

sent to another facility for approximately one year.

540.    Mathew's family was ordered to and paid monies to Juvenile Probation for

his placements.  In addition, Matthew and his mother paid $300 in fees and

costs to Juvenile Probation.


Magee Mott

541.    Magee Mott, now twenty-three, is the daughter of Bill and Leann Mott of

Pittston, Pennsylvania.

542.    In 2002, when Magee was seventeen years old, she was adjudicated

delinquent by Ciavarella for drug possession.

543.    Magee was represented by the public defender at her adjudication hearing.

She believes she might have pled guilty, but she does not recall ever being

told of the consequences of pleading guilty or her right to a trial.

544.    Magee was placed at PA Child Care for a few days and then ordered to

spend ten months at another facility.

545.    Until Magee turned eighteen, she spent most of her time in placement, including three of four times at PA Child Care.  These placements were ordered as a result of probation violations, such as curfew violations and running away.

546.    Magee was never represented by an attorney at any of the probation violation hearings.  She was never informed of her right to counsel or the consequences of waiving that right.

547.    Magee's parents believe that during the course of Magee's court-ordered placement, they paid several thousand dollars to Juvenile Probation. Magee's mother had her wages garnished.  Magee's father was jailed for failing to pay the monies to Juvenile Probation, and Magee's mother had to pay $1,200 to bail him out.  Magee believes she still owes money to Juvenile Probation and that her credit report now shows this debt.

G.M., through and with his mother and next friend, F.M.

548.    G.M., now age fifteen, is the son of F.M. of Wilkes-Barre, Pennsylvania.

549.    In 2008, when G.M. was fourteen years old, he was adjudicated delinquent by Ciavarella for breaking into and entering the home of a family member. Prior to his hearing, G.M. was detained.  When he appeared before Ciavarella, he did not have an attorney.  Ciavarella did not inform G.M. that he had a right to an attorney or that the court would appoint an attorney

111

if he could not afford one.  G.M.'s mother left the courtroom and searched the building to try to get an attorney to represent G.M.  In the middle of the hearing, an attorney came up to represent G.M.  Even though the family member did not want to press charges against G.M. and it was G.M.'s first offense, G.M. pled guilty.  Ciavarella did not conduct a colloquy to inform G.M. of the rights he would be giving up if he pled guilty, nor did he explain to G.M. the potential consequences of pleading guilty.

550.    G.M. was placed for about one month at PA Child Care, one month at Western PA Child Care, and two months at Camp Adams.  G.M. is still on probation.

551.    While G.M. was in placement, the court garnished his disability checks. G.M.'s mother still owes costs and fees to the court.

Sarah Myers and Florence Myers

552.    Sarah Myers, now nineteen years old, is the daughter of Florence Myers of Wilkes-Barre, Pennsylvania.

553.    In 2003, when Sarah was thirteen years old, she was adjudicated delinquent by Ciavarella for taking a bike and change from abandoned cars.

554.    Prior to appearing before Ciavarella, Sarah was arrested and taken to PA Child Care.  Her mother was not permitted to see her despite her requests.

555. When they appeared in court before Ciavarella, Sarah's mother requested an attorney for her daughter. She was told that a particular public defender would represent Sarah. Her mother asked that another attorney be appointed because that attorney had represented Sarah's father in a protection-from-abuse proceeding in which Sarah's mother was the petitioner. This request was refused.

556. At this hearing, Sarah told her public defender that she would not plead guilty because she did not commit the crimes of which she was accused. Her public defender told her that Ciavarella would not agree to that and would send her away. Ciavarella adjudicated Sarah delinquent, but Sarah is not sure if she pled guilty or not.

557. Upon Ciavarella's order, Sarah was returned to PA Child Care and was then sent to Camp Adams for about ninety days.

558. When Sarah finally returned home from Camp Adams, she was extremely angry. She began cutting herself and was hospitalized. Due to these issues, Sarah was charged with a probation violation. Sarah's mother does not recall having counsel at that hearing despite her requests.

559. Pursuant to Ciavarella's orders, Sarah was placed in various facilities including PA Child Care and Western PA Child Care.

560.    Since leaving placement, Sarah has been in and out of hospitals because of her mental health disorders.

561.    The money that Sarah's father paid to her mother for child support went instead to Juvenile Probation for the cost of Sarah's placements.  Sarah's mother believes that Sarah's Supplemental Security Income check was also directed to Juvenile Probation for the cost of the placements.

Krystal Pope

562.    Krystal Pope, now nineteen years old, resides in Kingston, Pennsylvania.

563.    In 2006, when she was seventeen years old, Krystal was adjudicated delinquent for possession of drugs and drug paraphernalia.  At the adjudication hearing, Krystal was represented by a public defender and she pled guilty.  Ciavarella did not conduct a colloquy to inform Krystal of the rights she would be giving up if she pled guilty, nor did he explain to Krystal the potential consequences of pleading guilty.

564.    Despite having no prior record, Krystal was placed in the Youth Services Agency at Wind Gap for three months.  Following her release, Krystal was placed on probation for six months.

565.    Krystal and her mother were ordered to and paid approximately $500 in various costs and fees to Juvenile Probation.

Lisa Scarbrough and her mother, Laurie Scarbrough

566.    Lisa Scarbrough is currently a twenty-one year old college student.  She is
        the daughter of Laurie Scarbrough of Mountain Top, Pennsylvania.

567.    In 2003, Lisa, then sixteen, was arrested on a charge of making terroristic
        threats.  When Lisa was arrested, the officers took her to PA Child Care,
        where she remained for six days – including Thanksgiving weekend –
        without a hearing.  Lisa had no prior contact with law enforcement.

568.    On December 1, 2003, Lisa appeared before Ciavarella.  Lisa, who was
        represented by counsel, brought several witnesses to testify on her behalf at
        the hearing; however, Ciavarella did not allow them to speak.  Lisa's
        principal, however, was permitted to testify on behalf of the state.

569.    Ciavarella placed Lisa at Camp Adams for an indefinite period; she stayed
        there for nine days.

570.    Lisa and her parents were ordered to and paid fees and costs to the court.

Marshonda Seward

571.    Marshonda Seward, now nineteen years old, is the daughter of Olanda
        Carter of Wilkes-Barre, Pennsylvania.

572.    In 2006, when she was sixteen years old, Marshonda was adjudicated
        delinquent on an assault charge that arose out of a neighborhood fight.  At
        the adjudication hearing, Marshonda was represented by a public defender.

Marshonda never entered a guilty plea, but she and all the other children involved in the fight were adjudicated delinquent by Ciavarella.

573.    Marshonda was placed at Camp Adams for three months, after which she was sent home and placed on probation for six months.

574.    Marshonda's family was ordered to and paid fees and costs to the court, as well as $30 monthly to Juvenile Probation during her six months of probation.

J.S., through and with his next friend and mother C.S.

575.    J.S. is fifteen years old and resides with his mother C.S. in Plymouth, Pennsylvania.

576.    In March of 2007, when he was thirteen years old, J.S. was adjudicated delinquent by Ciavarella on charges of burglary, criminal trespass, theft by unlawful taking, receiving stolen property, and criminal conspiracy.

577.    When J.S. appeared before Ciavarella, a public defender with whom J.S. had not previously spoken represented J.S.  Ciavarella adjudicated J.S. delinquent after J.S. admitted to the charges.  Ciavarella did not conduct a colloquy to inform J.S. of the rights he would be giving up if he pled guilty, nor did he explain to J.S. the potential consequences of pleading guilty.

578.    Ciavarella ordered J.S. into placement at Camp Adams, where he remained for four months.

579.    J.S.'s Access Card was taken away from him and he was removed from his mother's food stamps.  His mother received approximately $130 less a month in food stamps.  J.S. is currently back on food stamps, but his Access Card has not been returned to him.

580.    J.S. worked at Camp Adams during his time there; the money he earned there will go towards paying his probation costs.

Chad Uca

581.    Chad Uca, now eighteen years old, is the son of Ruby Uca of Hazleton, Pennsylvania.

582.    In 2005, when Chad was fifteen years old, he was adjudicated delinquent on a simple assault charge for pushing a fellow student who was bothering a classmate.  At the brief hearing, Chad was represented by a public defender who spoke very little.  Ciavarella did not permit anyone involved, including the victim, to speak.  Chad pled guilty.  Ciavarella did not conduct a colloquy to inform Chad of the rights he would be giving up if he pled guilty, nor did he explain to Chad the potential consequences of pleading guilty.

583.    Chad was ordered to Camp Adams, where he remained for more than ninety days.

584.    Chad and Chad's mother were ordered to pay monies to the court to cover various costs and fees, including the cost of Chad's placement.  Over the course of six to nine months, Chad's mother paid $600 to $700.

W.U., through and with his next friend and mother, D.S.

585.    W.U., now fifteen years old, is the son of D.S. of Wilkes-Barre, Pennsylvania.

586.    In 2007, when he was fourteen years old, W.U. was adjudicated delinquent by Ciavarella for aggravated assault.  At the adjudication hearing, W.U. was represented by a private attorney and initially pled not guilty. Ciavarella pressured W.U. for an admission of guilt, and W.U. ultimately pled guilty.  Ciavarella did not conduct a colloquy to inform W.U. of the rights he would be giving up if he pled guilty, nor did he explain to W.U. the potential consequences of pleading guilty.

587.    W.U. was placed on indefinite probation after the hearing, but he was finally taken off probation after six months.

588.    During the six months of probation, D.S. was ordered to and paid $35 monthly to Juvenile Probation.  Furthermore, she was ordered to and paid approximately $110 in initial court fees and costs after the hearing.

B.R.W., through and with his next friends and parents, C.W. and S.W.

589.    B.R.W. is the fifteen-year-old son of C.W. and S.W. of Wilkes-Barre,

Pennsylvania.

590.    On March 21, 2006, B.R.W., then thirteen years old, was adjudicated

delinquent by Ciavarella.  B.R.W., who denied the charge, was represented

by private counsel.  While the complaining witness was allowed to testify,

B.R.W.'s attorney was not allowed to speak or cross examine the witness.

591.    At the end of a "trial" that took less than three minutes, B.R.W. was

handcuffed and shackled and placed at PA Child Care, where he remained

until April 17, 2006.

592.    When he returned home, B.R.W. was placed on intensive probation.

B.R.W. remained on probation until October 2, 2006, when probation

recommended that B.R.W.'s probation be terminated because he had

complied with all the terms and had no further violations.

593.    B.R.W. and his parents C.W. and S.W. were ordered to and have paid

approximately $870 in costs and fees to the court.

William Conway

594.     William Conway, now twenty-three years old, resides in Ashley,

Pennsylvania.

595.     On approximately March 2, 2003, William Conway, then seventeen years
         old, appeared before Ciavarella and was adjudicated delinquent for
         violating his probation by staying out past his curfew.

596.     William appeared in court without a lawyer.  Upon information and belief,
         William was not advised of his right to counsel, nor did Ciavarella
         administer a colloquy with William on the record to explain the
         consequences of proceeding without counsel.

597.     The hearing was very brief and William was not permitted to explain what
         happened.  Ciavarella placed William at PA Child Care for approximately
         six months.

598.     William was ordered to and paid monies to Juvenile Probation to cover the
         cost of his placement at PA Child Care; William continues to pay for his
         placement.

Christian Ryan and his father, Kevin Ryan

599.      Christian Ryan, now twenty-three years old, is the son of Kevin Ryan and
         resides in Hanover Township, Pennsylvania.

600.     In approximately 2003, when he was sixteen years old, Christian was
         adjudicated delinquent by Ciavarella and sentenced to approximately one
         year in PA Child Care.

601.    Christian's father attempted to speak on behalf of his son during the hearing, however Ciavarella would not allow him to speak.

602.    Christian and his father were ordered to and paid monies to Juvenile Probation to cover costs for Christian's stay in PA Child Care

Tracey Rowlands and her mother, Mary Seville

603.    Tracey Rowlands, now nineteen years old, is the daughter of Mary Seville and resides in Laporte, Pennsylvania.

604.    In approximately 2003, when Tracey was approximately thirteen years old, Tracey was adjudicated delinquent by Ciavarella for indirect criminal contempt.

605.    Tracey was not represented by counsel.  Upon information and belief, Ciavarella did not inform Tracey that she had a right to an attorney, or that the court would appoint an attorney if she could not afford one.  Nor did Ciavarella explain the potential consequences to Tracey of waiving her right to counsel and of waiving her right to trial by pleading guilty.

606.    Tracey was adjudicated delinquent by Ciavarella and sentenced to approximately two months in PA Child Care.  Tracey spent time in other facilities as well.

607.    Tracey and her mother were ordered to and paid monies to Juvenile

Probation to cover the costs for Tracey's stay in PA Child Care.

Paige Circardo and her father, William Circardo

608.     Paige Cicardo, now eighteen years old, is the daughter of William Cicardo

and resides in Tobyhanna, Pennsylvania.

609.    In July of 2005, when she was fourteen years old, Paige appeared before

Ciavarella for an adjudicatory hearing.  The charge arose out of an

argument Paige had with her mother in which she threw a shoe.

610.    Paige did not have private counsel, nor was she appointed counsel.  Upon

information and belief, Ciavarella did not inform Paige that she had a right

to an attorney, or that the court would appoint an attorney if she could not

afford one. Further, Ciavarella did not explain the potential consequences

to Paige of waiving her right to counsel.

611.    Ciavarella told Paige to "kiss your parents goodbye" and ordered Paige to

approximately six months placement in PA Child Care.  Prior to being

placed in PA Child Care, Paige spent some time in Western PA Child Care.

612.    Paige and her father were ordered to and paid monies to Juvenile Probation

to cover the costs for Paige's stay in PA Child Care.

Angelia Karsko and her mother, Rosemary Karsko

613.     Angelia Karsko, now nineteen years old, is the daughter of Rosemary

Karsko and resides in Wyoming, Pennsylvania.

614.     In approximately 2005, when she was fourteen years old, Angelia appeared

before Ciavarella for an adjudicatory hearing for writing on a street sign

with a felt pen.  Ciavarella adjudicated Angelia delinquent and placed her

for an indefinite term at PA Child Care.

615.     At the time of her placement, Angelia had a medical condition which pre-

disposed her to having severe seizures.  Angelia had a seizure after a few

days in PA Child Care from the stress of being incarcerated and was

subsequently released from PA Child Care.

616.     Angelia and her mother were ordered to and paid monies to Juvenile

Probation to cover the costs for Paige's stay in PA Child Care.

Elizabeth Habel and her parents, Gloria and Richard Habel

617.     Elizabeth Habel, now eighteen years old, is the daughter of Richard Habel

and Gloria Habel of Plymouth, Pennsylvania.

618.     In February 2006, when she was fifteen years old, Elizabeth appeared

before Ciavarella for drinking alcohol before school.

619.    Elizabeth appeared in court without a lawyer. Elizabeth was not advised of her right to counsel, nor did Ciavarella administer a colloquy with Elizabeth on the record to explain the consequences of proceeding without counsel and the consequences of waiving her rights.

620.    Ciavarella was informed that her conduct resulted from a serious assault which had been committed upon her.  Ciavarella silenced Elizabeth's parents as they attempted to explain this, and instructed them not to discuss the assault in the courtroom.  Ciavarella then adjudicated Elizabeth delinquent and placed her at PA Child Care for approximately three months in 2006, and for approximately one month additional month in 2007.

621.    Elizabeth and her parents were ordered to and paid monies to Juvenile Probation to cover the costs for Elizabeth's stays in PA Child Care.

A.L, through and with her parents E.L. and T.L.

622.    A.L., now seventeen years old, is the daughter of E.L. and T.L.

623.    In May 2006, A.L. appeared before Ciavarella for an adjudicatory hearing for a charge of simple assault resulting from a fight in school while she was in eighth grade.

624.    A.L. did not have private counsel, nor was she appointed counsel.  A.L. was not advised of her right to counsel, nor did Ciavarella administer a

colloquy with A.L. on the record to explain the consequences of proceeding without counsel.

625. Ciavarella ordered A.L. to be placed at PA Child Care from June 27, 2006 until July 17, 2006, Western PA Child Care from July 17, 2006 until July 23, 2006, back to PA Child Care for one day, and then to Camp Adams.

626. Ultimately, Ciavarella ordered A.L. to be placed at Clearbrook for drug and alcohol treatment despite the fact that A.L. did not have a drug and alcohol problem and there was no evidence of such a problem. A.L. and her family were told that A.L. would be held indefinitely unless she admitted to being cross-addicted to both drugs and alcohol. At first, A.L. and her family refused to falsely admit to such addictions. Eventually, in order to be released, A.L.'s family convinced her to state that she had such cross-addiction.

627. A.L. remained on probation and was told that she was not being released from probation because her family owed $317.00.

628. A.L. and her parents were ordered to and paid monies to Juvenile Probation to cover costs for her placements in PA Child Care and Western PA Child Care.

Tiffany Murphy and her father, James Murphy

629.    Tiffany Murphy, now nineteen years old, is the daughter of James Murphy
        and resides in Nanticoke, Pennsylvania.

630.    In 2004, when Tiffany Murphy was fourteen years old, she appeared before
        Ciavarella for an adjudicatory hearing on a charge of unauthorized use of
        an automobile.  The charge related to taking her mother's car around the
        block.  Her mother did not wish for the charges to be pursued.

631.    Prior to the hearing, Tiffany was interviewed by a Luzerne County Juvenile
        Probation Officer, who recommended that Tiffany receive probation.

632.    Despite the Probation Officer's recommendation, Ciavarella adjudicated
        Tiffany delinquent and placed her for 33 days at PA Child Care and 90
        days at Camp Adams.

633.    In 2007, Tiffany was charged with contempt of court.  Defendant Conahan
        originally heard the matter and referred Tiffany to his "partner" Ciavarella
        for adjudication.  Ciavarella found Tiffany to be in contempt and ordered
        her to placement.  This time, Tiffany spent approximately two-and-a-half
        weeks at PA Child Care, two weeks at Camp Adams, and 90 days at Vision
        Quest.

634.    Tiffany and her father were ordered to and paid monies to Juvenile
        Probation to cover costs for Tiffany's placement.

Stephen Fino and his mother, Lynn Fino

635.    Stephen A. Fino, now twenty-one years old, is the son of Lynn Fino and

        resides in Mountaintop, Pennsylvania.

636.    In 2003, in the midst of his parents divorce, Stephen Fino became

        depressed.  His mother found a gun in his room.  The chief of police, a

        personal friend, recommended that Stephen Fino be charged so that he

        could get help through the juvenile justice system.

637.    In approximately 2003, Stephen appeared before Ciavarella and was

        adjudicated delinquent.  Ciavarella placed Stephen at PA Child Care for

        one to two months.

638.    Stephen and his mother were ordered to and paid monies to Juvenile

        Probation to cover costs for Stephen's stay in PA Child Care.


Jared Padden and his father John Padden

639.    Plaintiff Jared Padden, now twenty-one years old, is the son of John

        Padden and resides in Ashley, Pennsylvania.

640.    In approximately 2003, when he was then fifteen years old, Jared appeared

        before Ciavarella for misdemeanor and summary charges of simple assault,

        disorderly conduct, harassment and possession of drug paraphernalia.

641.    Jared did not have counsel.  Upon information and belief, Ciavarella did

        not inform Jared that he had a right to an attorney or that the court would

appoint an attorney if he could not afford one.  Nor did Ciavarella explain the potential consequences to Jared of waiving his right to counsel.

642.   Ciavarella adjudicated Jared delinquent and placed him at PA Child Care for approximately one month.

643.   Jared and his father were ordered to and paid monies to Juvenile Probation to cover costs for Jared's stay in PA Child Care.

Paul Schweizer

644.   Paul Schweizer, now twenty years old, lives in Harvey's Lake, Pennsylvania and State College, Pennsylvania to attend college.

645.   In 2003, when he was approximately fifteen years old, Paul was charged with harassment and appeared before Ciavarella.

646.   Paul was represented by private counsel at his hearing.

647.    Paul was adjudicated delinquent and was ordered to two weeks at PA Child Care.

648.   Paul and his father were ordered to and paid monies to Juvenile Probation to cover costs for Paul's stay in PA Child Care.

**B.      SECRET AGREEMENTS AND CONSTRUCTION OF DETENTION FACILITIES**

649.    Beginning in June 2000, Ciavarella, in his administrative capacity as a juvenile court judge, and defendant Powell, an attorney in Luzerne County, began discussions about constructing a new juvenile detention facility in Luzerne County. Powell was interested in constructing such a facility. Ciavarella introduced Powell to his friend, defendant Mericle, the owner of defendant Mericle Construction.  Together, Powell and Mericle worked to locate land for the construction of such a facility.

650.    Powell and defendant Zappala, doing business as defendant PA Child Care, acquired land in Luzerne County.  They then entered into an agreement with Mericle and Mericle Construction to build a juvenile detention facility, and Mericle and Mericle Construction controlled the building of the facility.

651.    In July 2001, PA Child Care sent Luzerne County an unsolicited proposal to build a juvenile detention facility in Pittston Township and to lease the facility to the county for $37 million over 30 years.

652.    Specifically, on or about January 29, 2002, Conahan signed a secret "Placement Guarantee Agreement" between PA Child Care and the Court of Common Pleas for Luzerne County to house juvenile offenders at the PA Child Care facility.  Under this agreement, the court would pay Child

Care an annual sum of $1,314,000.  At the time, Conahan, as President

Judge of Luzerne County, oversaw the administration of the court and its

departments.  Conahan also had final decision-making authority with

regard to defendant Luzerne County's funding of the county-run River

Street juvenile detention center ("River Street facility").

653.    As President Judge, Conahan had supervisory authority and responsibility

over the other judges, including Ciavarella, on the Luzerne County Court

of Common Pleas. Under Pennsylvania law, the president judge of a court

shall "[b]e the executive and administrative head of the court, supervise the

judicial business of the court, promulgate all administrative rules and

regulations, make all judicial assignments, and assign and reassign among

the personnel of the court available chambers and other physical facilities."

42 Pa. Cons. Stat. § 325(e)(1) (2008). The president judge also has the

power to appoint personnel, including the power to set the compensation

and duties of administrative staff.  *See* 42 Pa. Cons. Stat. § 325(e)(2)

(2008); 42 Pa. Cons. Stat. § 2301(a)(2) (2008).  Pursuant to Rule 16 of the

Pennsylvania Rules of Criminal Procedure, "[t]he President Judge shall be

responsible for ensuring that the judicial district is in compliance with the

Pennsylvania Rules of Criminal Procedure, other rules, and statutes,

applicable to the minor judiciary, courts, clerks of courts, and court

130

administrators." The Comment to this rule notes that "the Supreme Court is imposing on the president judges the responsibility of supervising their respective judicial districts to ensure compliance with the statewide Rules of Criminal Procedure, other rules, and statutes." Pa. R. Crim. P. 116 cmt. When Ciavarella became president judge, he similarly assumed these duties and responsibilities.

654.    In October 2002, Conahan, acting in his administrative role as President Judge, announced that judges would no longer send youth to the River Street facility. Ciavarella and Conahan publicly maintained that conditions there were deplorable. In November 2002, however, the state Department of Public Welfare deemed the River Street facility "safe and satisfactory" to house juveniles. The state Labor and Industry Department and the Wilkes-Barre Health Department also determined that the building met applicable standards.

655.    In December 2002, Conahan, acting in his administrative role as President Judge and with his authority to make final decisions with regard to defendant Luzerne County's funding of the River Street facility, took official steps to remove funding from the Luzerne County budget for the River Street facility, effectively closing the county-run detention center. The closing of this detention center helped ensure that youth in Luzerne

County would be detained at the detention facility being built by Mericle and PA Child Care.

656. In or before January 2003, defendants agreed that Powell and Mericle would pay $997,600 to Ciavarella and Conahan for their roles in facilitating the construction of the PA Child Care facility. Powell understood the payments to be a *quid pro quo* for the judges' exercise of their judicial authority to send juveniles to PA Child Care and Western PA Child Care and other discretionary acts.

657. This payment was concealed through a series of financial transactions as described in paragraphs 701 through 707, below.

658. In February 2003, the PA Child Care facility opened in Pittston. Luzerne County commissioners agreed to allow county juvenile offenders to be housed in the facility. However, as of March 2003, Luzerne County commissioners were continuing to pursue plans to construct a new county-run juvenile detention facility, alleging that Powell, Zappala, and PA Child Care wanted to charge the county too much. By 2004, newly-elected majority commissioners put these construction plans on hold.

659. Due to the success of the PA Child Care facility, Powell and Zappala, doing business as defendant Western PA Child Care, constructed a juvenile detention facility in Butler County, Pennsylvania. Powell and Zappala

again contracted with Mericle and Mericle Construction to build the
Western PA Child Care facility, and Mericle and Mericle Construction
again controlled the building of the facility. Conahan and Ciavarella were
financially rewarded upon the completion of the facility in July 2005, when
they received a $1,000,000 payment from Powell through defendant
Pinnacle Group.

660.    This payment, too, was concealed as described in paragraphs 708 and 709,
below.

661.    Powell and Zappala also built an addition to the PA Child Care detention
facility in Luzerne County, again contracting with Mericle and Mericle
Construction. When the addition was completed in February 2006, Powell
and Mericle made another payment, this time of $150,000, to Conahan and
Ciavarella through defendant Pinnacle Group. After this payment was
made, Ciavarella began sending juveniles to PA Child Care and Western
PA Child Care. The payment was concealed as described in paragraphs
710 and 711, below.

662.    In addition to these payments, between February 2003 and January 1, 2007,
Powell made hundreds of thousands of dollars in concealed payments to
Ciavarella and Conahan for their past and future acts relating to PA Child
Care and Western PA Child Care. These payments were made through

Pinnacle Group and Vision Holdings, as described in paragraphs 712 through 717, below.

663.    In sum, Ciavarella and Conahan, in their administrative roles as judges in Luzerne County, caused Luzerne County to contract with PA Child Care and Western PA Child Care. Conahan and Ciavarella assisted PA Child Care and Western PA Child Care to secure agreements with Luzerne County worth tens of millions of dollars over a period of years for the placement of juvenile offenders in the PA Child Care Facility, including an agreement in late 2004 worth approximately $58,000,000.

664.    Through the conspiracy described above, Conahan and Ciavarella received approximately $2.6 million in return.

C.      **IMPLEMENTATION OF CONSPIRACY TO DENY CLASS MEMBERS THEIR CONSTITUTIONAL RIGHTS**

665.    For defendants' scheme to succeed, Ciavarella and Conahan had to ensure that youth were placed at the facilities and that youth were not aware of Ciavarella's or Conahan's financial stake in their placement.  All defendants therefore acted in concert to conceal and disguise the existence, nature, location, source, ownership, and control of the money paid to Ciavarella and Conahan.

666.    In February 2003, Ciavarella began placing plaintiff youth in the PA Child Care facility.

667.    Ciavarella never informed plaintiffs that he had done business with PA Child Care or that he had a pecuniary interest in ensuring that youth were placed in PA Child Care.  Throughout the relevant time period, Ciavarella continued to receive payments from Powell, Mericle and PA Child Care. Ciavarella and Conahan concealed their financial relationship with PA Child Care from plaintiffs by, for example, filing materially false annual statements of financial interest with the Administrative Office of the Pennsylvania Courts, as described below in paragraphs 718 through 721.

668.    After the construction of PA Child Care, defendants' ability to maintain their association and continue their ongoing conspiracy depended on the continued profitability and viability of this private, for-profit facility.

669.    The consistent placement of youth at PA Child Care facilitated the
        subsequent construction of Western PA Child Care and the expansion of
        PA Child Care, directly benefiting PA Child Care, Western PA Child Care,
        and their owners and operators, as well as the contractor, Mericle, and
        Mericle Construction.  All defendants had a financial interest in placing
        juveniles in PA Child Care and Western PA Child Care.

670.    If youth from Luzerne County were not placed in PA Child Care or
        Western PA Child Care, the County would have discontinued contracting
        with PA Child Care and its private operators.  The owners and operators
        received a per diem reimbursement from the county for every child placed
        in the facilities.

671.    Ciavarella and Conahan received $997,600 from and through the other
        defendants for facilitating the construction of PA Child Care.  Upon the
        completion of Western PA Child Care and of the PA Child Care addition,
        Ciavarella and Conahan received $1,000,000 and $150,000, respectively.
        In addition to these payments, between February 2003 and January 1, 2007,
        Powell made hundreds of thousands of dollars in concealed payments to
        Ciavarella and Conahan for their past and future acts relating to PA Child
        Care and Western PA Child Care.  These payments were made through
        Pinnacle Group and Vision Holdings.  In total, Ciavarella and Conahan

received more than $2.6 million in payments.  These payments were directly tied to the success of the detention facilities.

672.    Because Ciavarella had a concealed financial interest in placing youth in detention, the adjudication of every juvenile adjudicated delinquent or referred for placement by him from February 2003 through May 2008 was tainted.  Each adjudication and placement occurred in violation of each child's constitutional right to be adjudicated by an impartial tribunal.  *See Tumey v. Ohio*, 273 U.S. 510, 535 (1927); *Aetna Life Ins. Co. v Lavoie*, 475 U.S. 813, 825 (1986). Moreover, any order by Ciavarella concerning the disposition of a youth during that time period, even if the youth had been adjudicated delinquent prior to 2003 or by a different judge, was also tainted and violative of the youth's constitutional right to appear before an impartial tribunal.

673.    From the opening of PA Child Care in February 2003 until May 23, 2008 (when Ciavarella ceased hearing juvenile cases), Ciavarella took steps to ensure that youth were routinely placed in detention, even in situations where detention was plainly not appropriate or over the objection of some probation officers.  These steps were taken as part of the conspiracy with all other defendants.

674.    The defendants had an interest in increasing overall adjudications and placements, not just adjudications that resulted in placements at PA Child Care and Western PA Child Care.  Youth who were adjudicated delinquent and placed at other facilities because of a lack of available space at PA Child Care or Western PA Child Care were transferred into PA Child Care or Western PA Child Care when space opened at PA Child Care or Western PA Child Care.  Youth were also often placed in PA Child Care or Western PA Child Care while they were awaiting placement in a longer-term placement facility.

675.    To increase the number of out-of-home placements of youth adjudicated delinquent, Ciavarella exerted pressure on Luzerne County probation staff to recommend detention of juveniles even when detention was not appropriate.  Ciavarella at times pressured probation officers to change recommendations of release to recommendations of detention, which resulted in additional juveniles being detained.  Even when probation officers did not recommend detention, Ciavarella often ordered youth detained.

676.    Additionally, Ciavarella and Conahan individually and in conspiracy with each other created "zero tolerance" policies, including zero tolerance for curfew violations and for missing school.

677.    These "zero tolerance" policies were designed to make it virtually

impossible for juveniles not to violate terms of probation and thereby to

increase the number of youth placed.

678.    In addition to the "zero tolerance" policies, Ciavarella and/or Conahan

engaged or acquiesced in a practice of detaining juveniles solely for failure

to pay their court-assessed fines.

679.    In effort to increase the number of detained youth, Conahan and/or

Ciavarella directed juvenile probation office employees to "ramp up

admissions" to PACC for the primary purpose of ensuring that juveniles

would be placed at PACC, WPACC and/or other juvenile detention

facilities in which they had an interest.  Ciavarella and Conahan also

encouraged the "ramping up" of the treatment side of PACC, unrelated to

treatment needs, in order to place more juveniles in PACC.

680.    Conahan and Ciavarella suspended, demoted, or otherwise punished some

employees who questioned how they operated or treated juveniles.

681.    In spite of the clear mandate from the United States Supreme Court and

Ciavarella's own pledge, the defendants' interest in this conspiracy also led

Ciavarella to regularly deny, for a period of years, many of the plaintiff

youth, specifically Subclass A1, herein represented by named plaintiffs

H.T., B.W., Kevin Williamson, M.Y., R.S. and S.S., their most basic

constitutional rights. These rights include the right to appear before an
impartial tribunal, the right to counsel, the right against self-incrimination,
and the right to be advised of the consequences of waiving counsel or
entering a guilty plea such that waivers and pleas are knowing, intelligent
and voluntary, as required by due process.

682.    The United States Constitution requires that valid guilty pleas must be
knowing and voluntary because a guilty plea constitutes a waiver of the
Fifth Amendment right against compulsory self-incrimination and the Sixth
Amendment right to confront one's accusers. It has been settled for more
than forty years that these rights apply to youth in juvenile delinquency
proceedings. *See In re Gault*, 387 U.S. at 55, 56. To enter into a knowing
and voluntary guilty plea, a youth must be informed of and then must
affirmatively state that he understands the consequences of pleading guilty
and the rights he is giving up as a consequence thereof. He must also admit
to each and every element of the offenses with which he is charged. The
decision to plead guilty must be made freely and without threat or coercion.

683.    As a regular matter, Ciavarella took no steps to ensure that Subclass A1
plaintiffs' guilty pleas were knowing and voluntary as required. He
regularly failed to inform youth of their right to a trial, their right to
confront and cross-examine witnesses, and the government's burden of

140

proving every element of its case beyond a reasonable doubt. He also regularly failed to ask if youth understood they were giving up these rights before pleading guilty. Ciavarella did not confirm that youth understood the acts to which they were pleading guilty. In some cases, Ciavarella adjudicated youth delinquent without even inquiring as to the youth's plea of guilt or innocence, and he then placed the youth in a detention facility. At other times, even if the youth pled not guilty, Ciavarella adjudicated the youth delinquent in a hearing lasting no more than a few minutes, with no trial or opportunity for the youth to speak on his or her own behalf or to present testimony or evidence.

684. In addition to Ciavarella's obligation under the Constitution to accept only knowing and voluntary guilty pleas in the absence of trial, since 2005, the Pennsylvania Supreme Court, through its rule making authority, has specifically required that juvenile court judges go through an eight question colloquy with any juvenile seeking to enter an admission (guilty plea) to a charge of delinquency. Rule 407 of the Pennsylvania Rules of Juvenile Court Procedure provides, in part, as follows:

> A. Admissions. At any time after a petition is filed, the juvenile may tender an admission to the facts, adjudication of delinquency, and/or disposition.
>
> > 1) Requirements. Before the court can accept an admission, the court shall determine that the admission is made voluntarily and

knowingly. The court, at a minimum, shall ask questions to elicit the following information:

> a) Does the juvenile understand the nature of the allegations to which he or she is admitting?
>
> b) Is there a factual basis for the admission?
>
> c) Does the juvenile understand that he or she has the right to a hearing before the judge?
>
> d) Does the juvenile understand that he or she is presumed innocent until found delinquent?
>
> e) Is the juvenile aware of the dispositions that could be imposed?
>
> f) Is the juvenile aware that the judge is not bound by the terms of any agreement tendered unless the judge accepts such agreement?
>
> g) Has the juvenile spoken with his or her attorney or waived the right to counsel in accordance with Rule 152?
>
> h) Does the juvenile have any questions about admitting to the facts or delinquency based on the allegations?
>
> i) Has the juvenile had the opportunity to speak with a guardian about his or her decision?

685.    Even when plaintiffs retained private counsel to represent them in their adjudicatory hearings before Ciavarella, Ciavarella regularly gave the privately retained counsel little or no opportunity to speak on behalf of their clients at the hearing.

686.    These gross violations of the youth plaintiffs' constitutional rights were

part and parcel of the defendants' scheme to ensure that youth were

adjudicated delinquent and placed in detention, in furtherance of their

scheme to line their own pockets through financial payments or kickbacks

from other defendants named herein.  Additionally, in furtherance of his

scheme to deny children their constitutional right to counsel, Ciavarella

directed Sandra Brulo, then Chief Juvenile Probation Officer for Luzerne

County, to draft a waiver form which on its face failed to advise youth or

their parents of the serious consequences of giving up their right to counsel.

*See* Waiver of Counsel Form, attached hereto as Exhibit A. This form was

routinely provided to children and their parents prior to entering

Ciavarella's courtroom by court personnel or other probation officers at

Ciavarella's direction, and also expressly allowed parents to waive counsel

for their children.  Ciavarella continued to direct the use of this form even

after the Pennsylvania Supreme Court's adoption of a rule in 2005 that only

children may waive their right to counsel; parents may not waive a youth's

right to counsel.  *See* Pa. R. Juv. Ct. P. 152.  The Comments to Rule 152

state:

> It is recommended that, at a minimum, the court ask questions to elicit
> the following information in determining a knowing, intelligent, and
> voluntary waiver of counsel:

1) Whether the juvenile understands the right to be represented by counsel;

2) Whether the juvenile understands the nature of the allegations and the elements of each of those allegations;

3) Whether the juvenile is aware of the dispositions, community service, or fines that may be imposed by the court;

4) Whether the juvenile understands that if he or she waives the right to counsel, he or she will still be bound by all the normal rules of procedure and that counsel would be familiar with these rules;

5) Whether the juvenile understands that there are possible defenses to these allegations that counsel might be aware of, and if these defenses are not raised at the adjudicatory hearing, they may be lost permanently;

6) Whether the juvenile understands that, in addition to defenses, the juvenile has many rights that, if not timely asserted, may be lost permanently; and if errors occur and are not timely objected to, or otherwise timely raised by the juvenile, these errors may be lost permanently;

7) Whether the juvenile knows the whereabouts of absent guardians and if they understand they should be present; and

8) Whether the juvenile has had the opportunity to consult with his or her guardian about this decision.

687.   Denying plaintiffs their fundamental right to counsel increased the number of youth adjudicated delinquent and placed in detention while minimizing the likelihood that the adjudications and placement decisions would be questioned or appealed.

688.    Data from Luzerne County confirm that this strategy had an impact.

        According to data collected by the Juvenile Court Judges' Commission,

        from 2003 through 2006 (the most recent year for which data is available),

        the Luzerne County Juvenile Court handled 5,160 delinquency

        dispositions; twenty-two percent of these dispositions resulted in

        placement, almost double the Pennsylvania state average.  *See*

        Pennsylvania Juvenile Court Judges' Commission, *Pennsylvania Juvenile*

        *Court Dispositions* (2003-2006), available at http://www.jcjc.state.pa.us/

        jcjc/cwp/browse.asp?A=3&BMDRN=2000&BCOB=0&C=41835.

689.    In 2003, approximately seven percent of all children who waived counsel

        in Pennsylvania were placed outside the home; in Luzerne County, more

        than half of the children who waived counsel were placed outside the home

        (177 of 301 total waivers).  In 2004, approximately twelve percent of all

        children who waived counsel in Pennsylvania were placed outside the

        home; in Luzerne County, over half of the children who waived counsel

        were placed outside the home (132 of 252 total waivers).  Luzerne County

        data from 2005 and 2006 show that more than 250 children who were

        unrepresented at juvenile court hearings were adjudicated delinquent and

        removed from their homes.  In Luzerne County, nearly sixty percent of

        delinquency dispositions for youth without counsel in both 2005 and 2006

resulted in out-of-home placement. Additionally, while the statewide annual average for waiver of counsel in all counties was about five percent during the relevant time period, the average annual rate of waiver of counsel in Luzerne County reached as high as ten times the state average during the relevant time period.

690. The foregoing actions of Ciavarella and Conahan, as well as other of their actions, were undertaken by Ciavarella and Conahan without recusing themselves from matters in which they had a conflict of interest and without disclosing to parties involved in court proceedings their conflict of interest and the financial relationship that existed between Ciavarella and Conahan, on the one hand, and Powell, Zappala, Mericle, PA Child Care, and Western PA Child Care, on the other hand, which were material matters.

691. By failing to recuse themselves from acting in matters in which they had a material conflict of interest and by failing to disclose to parties appearing before the court their conflict of interest and their financial relationship with Powell, Mericle, Zappala, PA Child Care, and Western PA Child Care, which were material matters, Ciavarella and Conahan violated their duties of independence, impartiality, and integrity in the exercise of their

discretionary actions on behalf of the Court of Common Pleas for Luzerne County.

692.    Additionally, in deliberately conducting juvenile proceedings without regard to the mandates of the United States Constitution, the Pennsylvania Juvenile Act, or the Pennsylvania Supreme Court Rules of Juvenile Court Procedure, Ciavarella acted outside the law and without lawful jurisdiction to adjudicate the youth who appeared before him and without lawful jurisdiction to place the youth who appeared before him. By denying the children who appeared before him their fundamental constitutional rights, Ciavarella effectively operated an illegitimate courtroom; further, by taking money as part of his scheme to deny children their constitutional rights, he operated this illegitimate courtroom for illegitimate purposes.

693.    County actors with responsibility for ensuring the lawful and constitutional operation of the Luzerne County juvenile court – including, but not limited to, the Luzerne County District Attorney and the Luzerne County Public Defender – routinely acted outside the law by participating in and sanctioning these illegitimate proceedings that failed to comply with the mandates of the United States Constitution, the Pennsylvania Juvenile Act, or the Pennsylvania Supreme Court Rules of Juvenile Court Procedure.

694.    As a result of unconstitutional adjudications and placements described

above, youth plaintiffs suffered emotional trauma, including removal from

their homes and families, disruptions in their education, loss of educational

credits and delayed completion – or in some case loss of the opportunity to

complete – their high school education.  Additionally, all plaintiffs – youth

and their parents or guardians – were forced to pay the costs or some

portion of the costs of placement at PA Child Care, Western PA Child

Care, or other facilities, as well as other court costs, probation fees, fines,

restitution, and attorneys' fees.

695.    On January 26, 2009, the United States Attorney for the Middle District of

Pennsylvania filed a Bill of Information alleging two counts of fraud

against Ciavarella and Conahan.  The Bill of Information describes, *inter

alia*, a conspiracy among the judges and at least two other unnamed parties,

presumed to be Powell and Mericle, to conceal $2.6 million in payments to

the judges from owners of juvenile correctional facilities, in exchange for,

*inter alia*, referring children who appeared before Ciavarella to these

juvenile correctional facilities.  On February 12, 2009, Ciavarella and

Conahan pled guilty to these counts.  In their guilty pleas, Ciavarella and

Conahan agreed to serve more than seven years in federal prison.  A formal

sentencing hearing is pending, following a federal pre-sentence
investigation.

696.    On June 9. 2009, the United States Attorney for the Middle District of
Pennsylvania filed a Bill of Information alleging two charges against
Powell.  The Bill of Information affirms that Powell knowingly and
intentionally cooperated in the creation of false records designed to hide,
disguise, and mis-characterize income received by Ciavarella and Conahan
and that Powell transferred tens of thousands of dollars in cash to Conahan
with the intent that the cash not be traceable as income.  A plea agreement
was filed along with the Bill of Information.  Powell agreed to plead guilty
to both charges which carry a total penalty of up to five and one-half years
of imprisonment and fines of up to $500,000.  Additionally, Powell agreed
to forfeit his ownership in a $1.3 million yacht named "Reel Justice" and a
$2.6 million private jet.

697.    On February 11, 2009, the Pennsylvania Supreme Court assumed plenary
jurisdiction and granted Juvenile Law Center's Amended Application for
the Exercise of King's Bench Power or Extraordinary Jurisdiction arising
out of Ciavarella's denial of youth's constitutional right to counsel and
acceptance of guilty pleas without due process during the period from 2003
through May 2008.  Pursuant to that order, and citing the recently revealed

149

criminal allegations and plea agreement entered into by Ciavarella, among others, the court appointed Special Master Arthur Grim, Senior Judge, Berks County Court of Common Pleas, to act on its behalf.  Specifically, the court authorized Judge Grim to review all juvenile court adjudications and dispositions affected by the recently revealed criminal charges, including all cases in which children were committed to PA Child Care and Western PA Child Care, as well as all cases in which it is alleged that youth appearing before Ciavarella were denied their right to counsel, and to make recommendations to the court concerning appropriate remedial actions.

698.   Among the remedial actions the Special Master may recommend, on an individual basis, class basis, or both, are orders to expunge records, grant new juvenile proceedings, or find that the affected juvenile proceedings were void *ab initio*.  The request for relief was limited to injunctive or other equitable relief.

699.   On March 26, 2009, Special Master Grim entered the first of several anticipated orders vacating the adjudications and expunging the records of hundreds of juveniles who appeared before Ciavarella between 2003 and May 2008.  In his Order, Judge Grim specifically noted that his own investigation "point[ed] to the conclusion that a very substantial number of juveniles who appeared without counsel before Judge Ciavarella for

delinquency or related proceedings did not knowingly and intelligently
waive their right to counsel.  My investigation also has uncovered evidence
that there was routine deprivation of children's constitutional rights to
appear before an impartial tribunal and to have an opportunity to be heard."
First Interim Report and Recommendations of the Special Master, at ¶ 10,
*approved and adopted by* Order, No. 81 MM 2008 (Pa. Mar. 26, 2009),
attached hereto as Exhibit B.

### D.    FINANCIAL TRANSACTIONS IN FURTHERANCE OF THE CONSPIRACY

700.    Ciavarella, Conahan, Powell, Zappala, and Mericle entered into agreements
for constructing and guaranteeing placements in the PA Child Care and
Western PA Child Care facilities in return for concealed payments to
Ciavarella and Conahan.

701.    In or before January 2003, Ciavarella and Conahan arranged with Powell
and Mericle to receive a payment from Powell and Mericle in the amount
of $997,600 to compensate them for the roles they played in accomplishing
the construction of the PA Child Care facility.

702.    In order to conceal the $997,600 payment, Powell and Mericle signed a
written "Registration and Commission Agreement" prepared by Mericle
and backdated to February 19, 2002, which purported to be an agreement

for Mericle to pay a broker's fee of $997,600 to Powell. In fact, however, a large portion of the money was intended to be paid to Ciavarella and Conahan.

703.    Ciavarella and Conahan engaged in a series of financial transactions, over time, which were also designed to conceal the $997,600 payment made to them. On January 21, 2003, Mericle wire transferred $610,000 to an attorney trust account of an attorney other than Powell. The remaining $387,600 was wire transferred by Mericle to a bank account under the control of Powell on or about January 24, 2003.

704.    Thereafter, on January 28, 2003, the $610,000 in the attorney trust account was wire transferred to a bank account of defendant Beverage Marketing of Pa., a business entity controlled by Conahan.

705.    In a series of financial transactions thereafter, a portion of the $610,000 payment was passed from Conahan to Ciavarella. For example, on or about January 28, 2003, Conahan directed that $330,000 of the $610,000 be wire transferred to a bank account controlled by Ciavarella; on or about April 30, 2003, Conahan directed that an additional $75,000 of the $610,000 be wire transferred to a bank account controlled by Ciavarella; on or about July 15, 2003, Conahan directed that an additional $75,000 of the $610,000 be wire transferred to a bank account under the control of

Ciavarella; on or about August 13, 2003, Conahan directed that an additional $25,000 of the $610,000 be wire transferred to a bank account under the control of a third party; and, on or about August 20, 2003, Conahan directed that an additional $105,000 be transferred to a bank account under the control of Conahan.

706.   To conceal the payments to Ciavarella and Conahan, Conahan directed that false entries be made in the books and records of Beverage Marketing of Pa. That direction was followed, and false entries were in fact made in the books and records of Beverage Marketing of Pa.

707.   To further conceal the $997,600 payment made to Ciavarella and Conahan, a portion of the $387,600 wire transfer made by Mericle to Powell on January 28, 2003 was paid to Ciavarella and Conahan in a series of financial transactions which occurred over time. One of those transactions occurred on or about August 29, 2003, when a check in the amount of $326,000, drawn on a bank account under the control of Powell, was deposited into a bank account under the control of Conahan but maintained in the name of another person.

708.   With respect to the $1,000,000 payment made by Powell to Ciavarella and Conahan in July 2005, after completion of the construction of Western PA Child Care, defendants attempted to hide the compensation they paid,

transferred, and/or received by causing that compensation to pass through Pinnacle Group, Vision Holdings, and/or Beverage Marketing of Pa., and by creating false records and/or by causing false records to be created.

709.    In order to conceal the payment to Ciavarella and Conahan, Powell and Mericle signed a written "Registration and Commission Agreement" prepared by Mericle which purported to be an agreement for Mericle to pay a broker's fee of $1,000,000 to Powell.  In fact, however, the money was wire transferred by Mericle to a bank account of the Pinnacle Group, a business entity owned by defendants Cindy Ciavarella and Barbara Conahan, but controlled by Mark Ciavarella and Michael Conahan.

710.    With respect to the $150,000 payment made to Ciavarella and Conahan by Powell and Mericle in February 2006 upon completion of the construction of an addition to PA Child Care by Mericle, the same contractor who built the facility, defendants attempted to hide the compensation they paid, transferred, and/or received by causing that compensation to pass through Pinnacle Group, Vision Holdings, and/or Beverage Marketing of Pa., and by creating false records and/or by causing false records to be created.

711.    Specifically, in order to conceal the payment to Ciavarella and Conahan, Powell and Mericle signed a written "Registration and Commission Agreement" prepared by Mericle, which purported to be an agreement for

Mericle to pay a broker's fee of $150,000 to Powell. In fact, however, the money was wire transferred by Mericle to a bank account of the Pinnacle Group, a business entity owned by Cindy Ciavarella and Barbara Conahan, but controlled by Mark Ciavarella and Michael Conahan.

712.    Between approximately February of 2003 and January 1, 2007, Ciavarella and Conahan received from Powell hundreds of thousands of dollars in payments for their past and future official actions relating to PA Child Care and Western PA Child Care. Again, they took steps to conceal and disguise the existence, nature, location, source, ownership, and control of these payments.

713.    Some of the payments were made by checks drawn on one or more bank accounts under the control of Powell and were made payable to Pinnacle Group. The payments included, but were not necessarily limited to, the following: $18,000 paid on or about January 13, 2004; $52,000 paid on or about January 13, 2004; $78,000 paid on or about February 15, 2004; $75,000 paid on or about February 15, 2004; $47,000 paid on or about February 15, 2004; $75,000 paid on or about April 30, 2004; and $25,000 paid on or about April 30, 2004.

714.    To conceal the payments to Ciavarella and Conahan, Powell made false notations on the checks. For example, Powell, through Vision Holdings,

issued a check on or about February 15, 2004 identified on its face as "Reserving Lease" to Pinnacle Group.  Around or on the same day, Powell, through Vision Holdings, issued one check identified on its face as "Slip Rental Fees and another identified as "Lease Expenses April, May, June" to Pinnacle Group.

715.    Ciavarella and Conahan directed that false entries be made in the books and records of Pinnacle Group.  False entries were made in the books and records of Pinnacle Group.

716.    In addition to payments by check, some of the payments were made by wire transfers from one or more bank accounts under the control of Powell, through Vision Holdings, and transferred to an account of Pinnacle Group.  The payments included, but were not necessarily limited to, the following:  $120,000 transferred on July 12, 2004; and $100,000 transferred on September 23, 2004.

717.    Between approximately August and December 2006, Powell caused a series of checks to be cashed and then gave the proceeds to the defendant judges.  For example, on or about August 16, 2006 Powell cashed a series of checks for $42,000 and gave the proceeds to the judges.  This occurred again on or about the following dates in the following amounts:  October 13, 2006: $30,000; November 1, 2006: $20,000, November 20, 2006:

$50,000, and December 18, 2006: $31,500.  On or about December 1, 2006, Powell paid Conahan $9,000 in cash from a check that was cashed as a referral fee for a case that was settled.

718.    In order to conceal the more than $2.6 million in unlawful payments they received, Ciavarella and Conahan knowingly and intentionally filed materially false annual statements of financial interests with the Administrative Office of the Pennsylvania Courts, in which they failed to disclose the source of these payments, the source of the income they received, and their financial relationship with Powell, Zappala, Mericle, PA Child Care and Western PA Child Care, all of which were material matters.

719.    Ciavarella made the following materially false filings with the Administrative Office of the Pennsylvania Courts on or about the following dates:

(a)    April 2004:  Materially false annual statement of financial interests for calendar year 2003 submitted to the Pennsylvania Administrative Office of the Courts;

(b)    March 2005:  Materially false annual statement of financial interests for calendar year 2004 submitted to the Pennsylvania Administrative Office of the Courts;

(c)     April 2006:  Materially false annual statement of financial interests for calendar year 2005 submitted to the Pennsylvania Administrative Office of the Courts; and

(d)     March 2007:  Materially false annual statement of financial interests for calendar year 2006 submitted to the Pennsylvania Administrative Office of the Courts.

720.     Conahan made the following materially false filings with the Administrative Office of the Pennsylvania Courts on or about the following dates:

(a)     April 2004:  Materially false annual statement of financial interests for calendar year 2003 submitted to the Pennsylvania Administrative Office of the Courts;

(b)     March 2005:  Materially false annual statement of financial interests for calendar year 2004 submitted to the Pennsylvania Administrative Office of the Courts;

(c)     February 2006:  Materially false annual statement of financial interests for calendar year 2005 submitted to the Pennsylvania Administrative Office of the Courts; and

(d)     April 2007:  Materially false annual statement of financial interests

for calendar year 2006 submitted to the Pennsylvania Administrative

Office of the Courts.

721.     Furthermore, Ciavarella and Conahan, acting on behalf of the Court of

Common Pleas for Luzerne County in matters in which they had

discretionary decision-making authority, knowingly and intentionally

issued written, oral and wire communications which were materially false

to the extent that the defendants did not disclose their sources of income,

their conflict of interest, and their financial relationship with Powell,

Zappala, Mericle, PA Child Care, and Western PA Child Care, which were

material matters.

## CLAIMS

## COUNT I

**VIOLATION OF PLAINTIFFS' RIGHT TO AN
IMPARTIAL TRIBUNAL AS GUARANTEED BY THE
FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS
TO THE UNITED STATES CONSTITUTION (42 U.S.C. § 1983)**

**All Youth Plaintiffs (Class A) v. Defendants Ciavarella and Conahan**

722.     Each of the preceding paragraphs is incorporated herein.

723.     Ciavarella and Conahan are "persons" within the meaning of 42 U.S.C.

§ 1983.

724.    Ciavarella and Conahan were acting "under color of state law" and their conduct was subject to 42 U.S.C. § 1983.

725.    Ciavarella and Conahan received payments by and through the other defendants in connection with the construction of new detention facilities. Their receipt of these payments was not in furtherance of their roles and responsibilities as judges, nor did the receipt of these monies fall within their administrative responsibilities. Their receipt of these payments was criminal and completely outside the law. In return for these unlawful payments, Ciavarella and Conahan agreed to and did act in their administrative capacities to ensure that detention facilities would be constructed and expanded and that plaintiff youth would be placed in detention. Ciavarella and Conahan knowingly hid these payments from the County of Luzerne, the Administrative Office of the Pennsylvania Courts, and the public – in particular the named plaintiffs and class members – thereby concealing Ciavarella's and Conahan's conflicts of interest, pecuniary interest, bias, and partiality in adjudicating plaintiff youth delinquent and ordering their placement in detention facilities.

726.    "It is axiomatic that '[a] fair trial in a fair tribunal is a basic requirement of due process.'" *Caperton v. A.T. Massey Coal Co.,* No. 08-22, 2009 U.S.

Lexis 4157, at *15 (June 8, 2009) (citing *In re Murchison*, 329 U.S. 133, 136 (1955)).

727.   Conahan's and Ciavarella's actions described above preclude the possibility of an impartial tribunal.  Rather, an unconstitutional probability of bias is plainly present.  *See id.*  Plaintiff youth were deprived of their right to an impartial tribunal as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

728.   As a result of their actions, the United States Attorney filed a Bill of Information alleging two counts of fraud against Ciavarella and Conahan.  As described above, the Bill of Information describes*, inter alia*, a conspiracy among the judges and unnamed parties to conceal $2.6 million in payments to the judges from owners of juvenile correctional facilities, in exchange for, *inter alia*, referring children who appeared before Ciavarella to these juvenile correctional facilities.  On February 12, 2009, Ciavarella and Conahan pled guilty to these two counts of fraud.

729.   As a result of these constitutional violations, plaintiffs suffered injuries and damages, including but not limited to emotional trauma and costs, fines, fees, and other expenses arising out of their unconstitutional adjudications or placement.

## COUNT II

### CONSPIRACY TO VIOLATE PLAINTIFFS' RIGHT TO AN IMPARTIAL TRIBUNAL AS GUARANTEED BY THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION (42 U.S.C. § 1983)

**All Youth Plaintiffs (Class A) v. Defendants Ciavarella; Conahan; Powell; Mericle; Zappala; Cindy Ciavarella; Barbara Conahan; Mericle Construction, Inc.; Mid-Atlantic Youth Services Corp.; PA Child Care, LLC; Western PA Child Care, LLC; Pinnacle Group of Jupiter, LLC; Vision Holdings, LLC; and Beverage Marketing of Pa., Inc.**

730.     Each of the preceding paragraphs is incorporated herein.

731.     Each defendant is a "person" within the meaning of 42 U.S.C. § 1983.

732.     All defendants were acting "under color of state law" and their conduct was subject to 42 U.S.C. § 1983.

733.     Defendants knowingly and willfully entered into a conspiracy and agreement by which Ciavarella and Conahan would and did receive payments by and through the other defendants in connection with the construction of new detention facilities.  Their receipt of these payments was not in furtherance of their roles and responsibilities as judges, nor did the receipt of these monies fall within their administrative responsibilities.  Their receipt of these payments was criminal and completely outside the law.  In return for these unlawful payments, Ciavarella and Conahan agreed to and did act in their administrative capacities to ensure that plaintiff youth would be placed in detention facilities by, *inter alia*, securing a contract

from Luzerne County to use these facilities and ordering placement of plaintiffs in these facilities. All defendants knowingly hid these payments from the County of Luzerne, the Administrative Office of the Pennsylvania Courts, and the public – in particular the named plaintiffs and class of youth they represent – thereby concealing the defendants' conflict of interest, pecuniary interest, bias, and partiality in adjudicating plaintiff youth delinquent and ordering their placement in detention facilities.

734. Because of this conspiracy, plaintiff youth therefore were deprived of their right to an impartial tribunal as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

735. As a result of these constitutional violations, plaintiffs suffered injuries and damages, including but not limited to emotional trauma and costs, fines, fees, and other expenses arising out of their unconstitutional adjudications or detention.

## COUNT III

### DEPRIVATION OF PLAINTIFFS' RIGHT TO COUNSEL AND/OR TO A KNOWING, INTELLIGENT, AND VOLUNTARY GUILTY PLEA IN VIOLATION OF THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION (42 U.S.C. § 1983)

### Subclass A1 Plaintiffs v. Defendant Ciavarella

736. Each of the preceding paragraphs is incorporated herein.

737. Ciavarella is a "person" within the meaning of 42 U.S.C. § 1983.

738.    Ciavarella was acting "under color of state law" and his conduct was subject to 42 U.S.C. § 1983.

739.    Ciavarella received payments by and through the other defendants in connection with the construction of new detention facilities. In return for these payments, Ciavarella agreed to misuse his judicial office to ensure that plaintiff youth would be placed in detention facilities.

740.    Acting completely outside the law and in derogation of and contrary to his role and responsibilities as a judge, Ciavarella intentionally and knowingly, in a pervasive and persistent scheme ongoing throughout the relevant time period herein, denied Subclass A1 plaintiffs their constitutionally protected right to counsel. When Subclass A1 plaintiffs appeared before Ciavarella without an attorney, he failed to inquire as to whether they were knowingly, intelligently, and voluntarily waiving their right to counsel, as required by the Sixth and Fourteenth Amendments to the United States Constitution. Accordingly, as Ciavarella was effectively operating an illegitimate courtroom for illegitimate purposes, Ciavarella was without lawful jurisdiction to adjudicate these plaintiff youth. Yet this pervasive pattern of intentionally denying Subclass A1 plaintiffs their constitutional rights substantially enhanced Ciavarella's ability to adjudicate the Subclass

A1 plaintiffs as delinquent and place them in detention facilities or placement facilities.

741. Also acting completely outside the law and in derogation of and contrary to his role and responsibilities as a judge, Ciavarella intentionally and knowingly, in a pervasive and persistent scheme ongoing throughout the relevant time period from 2003 through May 2008, failed to engage in any colloquy with Subclass A1 plaintiffs pleading guilty to ensure that their admissions and guilty pleas were knowing and voluntary. Accordingly, as Ciavarella was effectively operating an illegitimate courtroom for illegitimate purposes, Ciavarella was without lawful jurisdiction to adjudicate these youth. Ensuring that a guilty plea is knowing, intelligent, and voluntary is constitutionally required because a guilty plea constitutes a waiver of important constitutional rights, including the Fifth Amendment right against compulsory self-incrimination and the Sixth Amendment right to a trial and to confront one's accusers. Ciavarella's pervasive pattern of intentionally denying Subclass A1 plaintiffs their constitutional rights substantially enhanced his ability to adjudicate the Subclass A1 youth as delinquent and place them in detention facilities or other placement facilities.

## COUNT IV

**CONSPIRACY TO DEPRIVE YOUTH OF THEIR RIGHT TO
COUNSEL AND/OR TO A KNOWING, INTELLIGENT, AND
VOLUNTARY GUILTY PLEA IN VIOLATION OF THE
FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS
TO THE UNITED STATES CONSTITUTION (42 U.S.C. § 1983)**

**Subclass A1 Plaintiffs v. Defendants Ciavarella; Conahan;
Powell; Mericle; Zappala; Cindy Ciavarella; Barbara Conahan;
Mericle Construction, Inc.; Mid-Atlantic Youth Services Corp.;
PA Child Care, LLC; Western PA Child Care, LLC; Pinnacle Group of
Jupiter, LLC; Vision Holdings, LLC; and Beverage Marketing of Pa., Inc.**

742.    Each of the preceding paragraphs is incorporated herein.

743.    Each defendant is a "person" within the meaning of 42 U.S.C. § 1983.

744.    All defendants were acting "under color of state law" and their conduct was

subject to 42 U.S.C. § 1983.

745.    Defendants knowingly and willfully entered into an agreement by which

Ciavarella and Conahan would receive payments by and through the other

defendants in connection with the construction of new detention facilities.

In return for these payments, Ciavarella and Conahan agreed to misuse

their judicial offices to ensure that plaintiff youth would be placed in

detention facilities.  All defendants knowingly hid these payments from the

County of Luzerne, the Administrative Office of the Pennsylvania Courts,

and the public – in particular the plaintiffs – thereby concealing the

defendants' conflict of interest, pecuniary interest, bias and partiality in

adjudicating plaintiff youth and placing plaintiff youth in detention
facilities.

746.    As part of this conspiracy and agreement, Ciavarella denied Subclass A1
        plaintiffs their constitutionally protected right to counsel.  Acting
        completely outside the law and in derogation of and contrary to his role and
        responsibilities as a judge, when Subclass A1 plaintiffs appeared before
        Ciavarella without an attorney, he intentionally and knowingly, in a
        pervasive and persistent scheme ongoing throughout the relevant time
        period from 2003 through May 2008, failed to inquire as to whether the
        youth were knowingly, intelligently, and voluntarily waiving their right to
        counsel, as required by the Sixth and Fourteenth Amendments to the
        United States Constitution.  This denial substantially enhanced Ciavarella's
        ability, pursuant to the conspiracy, to adjudicate the Subclass A1 plaintiff
        youth as delinquent and to order their placement in detention facilities.

747.    As part of this conspiracy and agreement, and also acting completely
        outside the law and in derogation of and contrary to his role and
        responsibilities as a judge, defendant Ciavarella intentionally and
        knowingly, in a pervasive and persistent scheme ongoing throughout the
        relevant time period 2003 through 2008, failed to engage in any colloquy
        with Subclass A1 plaintiff youth pleading guilty to ensure that the Subclass

A1 plaintiff youth's admissions and guilty pleas were knowing and voluntary. Ensuring that a guilty plea is knowing, intelligent, and voluntary is constitutionally required because a guilty plea constitutes a waiver of important constitutional rights, including the Fifth Amendment right against compulsory self-incrimination and the Sixth Amendment right to a trial and to confront one's accusers. Accordingly, as Ciavarella was effectively operating an illegitimate courtroom for illegitimate purposes, Ciavarella was without lawful jurisdiction to adjudicate these youth delinquent. Ciavarella's pervasive denial of these rights to Subclass A1 youth significantly enhanced his ability, pursuant to the conspiracy, to adjudicate Subclass A1 youth delinquent and order their placement in detention facilities.

## COUNT V

## CIVIL RICO (18 U.S.C. § 1962(c))

**Class B Plaintiffs v. Defendants Ciavarella; Conahan; Powell; Mericle; Zappala; Cindy Ciavarella; Barbara Conahan; Mericle Construction, Inc.; Mid-Atlantic Youth Services Corp.; PA Child Care, LLC; Western PA Child Care, LLC; Pinnacle Group of Jupiter, LLC; Vision Holdings, LLC; and Beverage Marketing of Pa., Inc.**

748.    Each of the preceding paragraphs is incorporated herein.

749.    Each youth or parent plaintiff who paid money as a result of his or her having been adjudicated delinquent or placed by Ciavarella, or his or her

child having been adjudicated delinquent or placed by Ciavarella, between 2003 and May 23, 2008 is a "person" as that term is defined in 18 U.S.C. § 1961(3).

750.   Each defendant is a "person" as that term is defined in 18 U.S.C. § 1961(3).

751.   Ciavarella, Conahan, PA Child Care, Western PA Child Care, Powell, Zappala, Mericle, and Mericle Construction together constituted an association-in-fact "enterprise" within the meaning of 18 U.S.C. § 1961(4).

752.   This enterprise, an ongoing organization that functioned as a continuing unit for the purpose of adjudicating and housing juveniles adjudicated delinquent in Luzerne County and elsewhere, at all times relevant hereto was engaged in interstate commerce or its activities affected interstate commerce.

753.   Specifically, on or about each date listed below, in the Middle District of Pennsylvania and elsewhere, Ciavarella and Conahan, aided and abetted by each other and other defendants for the purpose of executing the scheme to defraud and the conspiracy to violate plaintiffs' constitutional rights described herein, transmitted and/or caused to be transmitted by means of wire communication in interstate commerce, the following writings, signals and sounds:

(a)     July 12, 2004:  Electronic funds transfer of $120,000 transferred from an account of Vision Holdings to an account of the Pinnacle Group;

(b)     September 23, 2004:  Electronic funds transfer of $100,000 transferred from an account of Vision Holdings to an account of Pinnacle Group;

(c)     July 15, 2005:  Electronic funds transfer of $1,000,000 transferred from an account of Mericle Construction to an account of Pinnacle Group; and

(d)     February 3, 2006:  Electronic funds transfer of $150,000 transferred from an account of Mericle Construction to an account of Pinnacle Group.

754.   Each defendant, along with others known and unknown, was employed by or associated with the enterprise identified in paragraphs 664 and 665.

755.   Each defendant, along with others known and unknown, conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

756.   The pattern of racketeering activity, which each defendant conducted or in which each defendant participated, included the following "racketeering

acts" within the meaning of 18 U.S.C. § 1961(1) which occurred from in or about June 2000 to on or about April 30, 2007:

(a)     Devising or intending to devise a scheme or artifice to defraud by means of wire communication in interstate commerce, in violation of 18 U.S.C. § 1343, in particular as described above, including, without limitation, in Parts B and D;

(b)     Devising or intending to devise a scheme or artifice to defraud the citizens of the Commonwealth of Pennsylvania, including plaintiffs, and to deprive those citizens – and particularly plaintiffs – of the intangible right of honest services by means of wire communication in interstate commerce, in violation of 18 U.S.C. §§ 1343 and 1346, in particular as described above, including, without limitation, in Parts B and D;

(c)     Offering, conferring, or agreeing to confer on another a pecuniary benefit as consideration for the decision, opinion, recommendation, or other exercise of discretion as a public servant by the recipient, in violation of 18 Pa. Cons. Stat. § 4701(a)(1), in particular as described above, including, without limitation, in Parts B and D;

(d)     Soliciting, accepting, or agreeing to accept from another a pecuniary benefit as consideration for the decision, opinion, recommendation,

or other exercise of discretion as a public servant by the recipient, in violation of 18 Pa. Cons. Stat. § 4701(a)(1), in particular as described above, including without limitation, in Parts B and D; and

(e)    Soliciting, accepting, or agreeing to accept from another any benefit as consideration for a violation of a known legal duty as public servant, in violation of 18 Pa. Cons. Stat. § 4701(a)(3), in particular as described above, including without limitation, in Parts B and D.

757.    The aforementioned instances of racketeering activity constitute a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5). The aforementioned acts occurred continuously from on or about June 2000 to on or about April 30, 2007, as part of defendants' regular way of conducting and participating in the ongoing RICO enterprise. These acts had the same or similar participants, victims, and method of commission. Specifically, these acts were all related to the common purpose of enriching various defendants by constructing and expanding juvenile detention facilities, namely PA Child Care and Western PA Child Care; contracting with Luzerne County to use those juvenile detention facilities; and keeping the beds at PA Child Care and Western PA Child Care full. These purposes were accomplished by denying youth who appeared before Ciavarella the right to an impartial judiciary, by obtaining guilty pleas from

youth who appeared before Ciavarella in violation of the juveniles' due process rights, and by denying youth who appeared before Ciavarella the right to assistance of counsel.

758. Ciavarella and Conahan accepted compensation from and/or through PA Child Care, Western PA Child Care, Mid-Atlantic Youth Services, Mericle, Mericle Construction, Zappala, Pinnacle Group, Beverage Marketing of Pa., and Vision Holdings in exchange for official actions.

759. Additionally, defendants attempted to hide the compensation they paid, transferred, and/or received by causing that compensation to pass through Pinnacle Group, Vision Holdings, and Beverage Marketing of Pa., by creating false records, and/or by causing false records to be created.

760. As a direct and proximate result and by reason of each of the defendants' conduct of or participation in the affairs of the previously described enterprise, along with others known and unknown, the Class B plaintiffs have been injured in their business or property.

761. Such injuries consist, *inter alia*, of the following:

   (a)    Payments made by the youth plaintiffs and/or the parent plaintiffs to defense attorneys;

173

(b)    Payments made by the youth plaintiffs and/or the parent plaintiffs to

Luzerne County for the cost of placements, court costs and fees, and

costs for probation; and

(c)    Loss of the youth plaintiffs' employment, scholarships, and/or

financial aid as a result of the youth plaintiffs having been

adjudicated delinquent and/or committed to PA Child Care, Western

PA Child Care, or other juvenile detention facilities.

762.    The aforementioned conduct and practices were specifically devised to

injure the plaintiffs.

## COUNT VI

## CIVIL RICO (18 U.S.C. § 1962(b))

**Class B Plaintiffs v. Defendants Ciavarella; Conahan;
Powell; Mericle; Zappala; Cindy Ciavarella; Barbara Conahan;
Mericle Construction, Inc.; Mid-Atlantic Youth Services Corp.;
PA Child Care, LLC; Western PA Child Care, LLC; Pinnacle Group of
Jupiter, LLC; Vision Holdings, LLC; and Beverage Marketing of Pa., Inc.**

763.    Each of the preceding paragraphs is incorporated herein.

764.    The defendants, along with others known and unknown, acquired and

maintained interests in and control of the enterprise identified in paragraphs

664 and 665, *supra*, through their pattern of racketeering activity, in

violation of 18 U.S.C. § 1962(b).

174

765.    They did so through a pattern of violations of 18 U.S.C. §§ 1343 and 1346

and 18 Pa. Cons. Stat. § 4701(a)(1) and (3) in constructing juvenile

detention facilities, namely PA Child Care and Western PA Child Care; in

contracting with Luzerne County to use those juvenile detention facilities;

and in keeping the beds at PA Child Care  and Western PA Child Care full.

766.    As a direct and proximate result and by reason of each of the defendants'

acquisition and maintenance of interests in and control of the enterprise, the

constitutional rights of youth plaintiffs who appeared before Ciavarella to

due process, counsel, and an impartial judiciary were violated.

767.    As a direct and proximate result and by reason of each of the defendants'

acquisition and maintenance of interests in and control of the enterprise, the

plaintiffs have been injured in their business or property.

768.    Such injuries consist, *inter alia*, of the following:

(a)    Payments made by the youth plaintiffs and/or the parent plaintiffs to

defense attorneys;

(b)    Payments made by the youth plaintiffs and/or the parent plaintiffs to

Luzerne County for the cost of placements, court costs and fees, and

costs for probation; and

(c)    Loss of employment, scholarships, and/or financial aid as a result of

the youth plaintiffs having been adjudicated delinquent and/or

175

committed to PA Child Care, Western PA Child Care, or other

juvenile detention facilities.

769.    The aforementioned conduct and practices were specifically devised to

injure the plaintiffs.

## COUNT VII

## CIVIL RICO (18 U.S.C. § 1962(d))

**Class B Plaintiffs v. Defendants Ciavarella; Conahan;
Powell; Mericle; Zappala; Cindy Ciavarella; Barbara Conahan;
Mericle Construction, Inc.; Mid-Atlantic Youth Services Corp.;
PA Child Care, LLC; Western PA Child Care, LLC; Pinnacle Group of
Jupiter, LLC; Vision Holdings, LLC; and Beverage Marketing of Pa., Inc.**

770.    Each of the preceding paragraphs is incorporated herein.

771.    As set forth above, defendants agreed and conspired to violate 18 U.S.C.

§ 1962(b) and (c), all in violation of 18 U.S.C. § 1962(d).

772.    In particular, the defendants intentionally conspired and agreed to acquire

or maintain interests in and control of the enterprise through a pattern of

racketeering activity, as described in Count VI.  Additionally, the

defendants intentionally conspired and agreed to conduct and participate in

the conduct of the affairs of the enterprise through a pattern of racketeering

activity, as described in Count V.

773.    The defendants took overt acts in furtherance of the conspiracy as described above including, but not limited to, those acts described in Counts V and VI.

774.    The defendants knew that their predicate acts were part of a pattern of racketeering activity, and the defendants agreed to the commission of those acts to further the schemes described in Counts V and VI.

775.    As a direct and proximate result of the defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(b) and (c), the plaintiffs have been injured in their business or property.

776.    Such injuries consist, *inter alia*, of the following:

(a)    Payments made by the youth plaintiffs and/or the parent plaintiffs to defense attorneys;

(b)    Payments made by the youth plaintiffs and/or the parent plaintiffs to Luzerne County for the costs of placements, court costs and fees, costs for probation; and

(c)    Loss of the youth plaintiffs' employment, scholarships, and/or financial aid as a result of the youth plaintiffs having been adjudicated delinquent and/or committed to PA Child Care, Western PA Child Care, or other juvenile detention facilities.

777.    The aforementioned conduct and practices were specifically devised to

injure the plaintiffs.

## COUNT VIII

**VIOLATION OF PLAINTIFFS' RIGHTS TO COUNSEL
AND TO A KNOWING, INTELLIGENT, AND
VOLUNTARY GUILTY PLEA PURSUANT TO THE
FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS
TO THE UNITED STATES CONSTITUTION (42 U.S.C. § 1983)**

### Subclass A2 Plaintiffs v. Defendant Luzerne County

778.    Each of the preceding paragraphs is incorporated herein.

779.    Luzerne County is a "person" within the meaning of 42 U.S.C. § 1983.

780.    At all relevant times, all defendants were acting "under color of state law"

and their conduct was subject to 42 U.S.C. § 1983.

781.    As described in detail in paragraphs 588 through 615 herein, Ciavarella

instituted a custom, policy and practice in the Luzerne County juvenile

court from 2003 through 2008 of denying plaintiffs their constitutional

rights, including the right to counsel, the right against self-incrimination,

and the right to be advised of the consequences of waiving counsel or

entering a guilty plea such that waivers and pleas are knowing, intelligent,

and voluntary, as required by the due process provisions of the United

States Constitution.

782.    These practices ran contrary to and were in violation of controlling United

States Supreme Court case law, Pennsylvania statutory law, and

Pennsylvania Rules of Juvenile Court, as described in paragraphs 595 through 604 herein.

783.    From 2003 through 2008, county actors with responsibility for ensuring the lawful and constitutional operation of the Luzerne County juvenile court – including, but not limited to, the Luzerne County District Attorney and the Luzerne County Public Defender – were routinely non-compliant with controlling United States Supreme Court case law, Pennsylvania statutory law, and Pennsylvania court rules regarding plaintiffs' due process rights.

784.    The practices of these county officials in the Luzerne County juvenile court, which deprived the plaintiffs of their constitutional rights, were "so permanent and well settled" as to have the "force of law." *Monell v. Department of Social Services of New York City*, 436 U.S. 658, 691 (1978).

785.    That Ciavarella was the presiding judge in the Luzerne County juvenile court does not excuse county officials from complying with controlling United States Supreme Court case law, Pennsylvania statutory law, or Pennsylvania Rules of Juvenile Court regarding plaintiffs due process rights, as "[p]rivate citizens are presumed to know the law, and no less should be expected of public officials." *Anela v. Wildwood*, 790 F.2d 1063, 1067 (3d Cir. 1986) (citation omitted).

179

786.    The county's routine and persistent noncompliance with controlling United

States Supreme Court case law, Pennsylvania statutory law, and

Pennsylvania court rules over a period of five years amounted to a policy

of the county for purposes of § 1983 liability. *Anela*, 790 F.2d at 1067.

## COUNT IX

## WRONGFUL IMPRISONMENT (STATE TORT)

**Subclass A2 Plaintiffs v. Defendants Powell; Zappala; Mid-Atlantic Youth Services Corp.; PA Child Care, LLC; and Western PA Child Care, LLC**

787.    Each of the preceding paragraphs is incorporated herein.

788.    Defendants Powell, Zappala, Mid-Atlantic Youth Services, PA Child Care,

and Western PA Child Care intentionally confined Subclass A2 plaintiffs in

PA Child Care and/or Western PA Child Care, LLC and Subclass A2

plaintiffs were aware of their confinement in PA Child Care and/or

Western PA Child Care.

789.    The detentions of Subclass A2 plaintiffs were unlawful.

790.    All defendants entered into a corrupt conspiracy whereby Ciavarella and

Conahan would receive payments by and through the other defendants,

including Powell, Zappala, Mid-Atlantic Youth Services, PA Child Care,

and Western PA Child Care, in connection with the construction and

expansion of PA Child Care, and the construction of Western PA Child

Care.  In return for these payments, Ciavarella and Conahan agreed to and

did use their judicial offices to ensure that plaintiffs would be placed in detention facilities.

791.    In furtherance of this corrupt conspiracy with Powell, Zappala, Mid-Atlantic Youth Services, PA Child Care, Western PA Child Care, and the other defendants, Ciavarella adjudicated Subclass A2 plaintiffs delinquent and placed them in PA Child Care and/or Western PA Child Care. Subclass A2 plaintiffs' placements at PA Child Care and Western PA Child Care were therefore a result of corrupt and tainted delinquency adjudications and corrupt and tainted placement orders. Powell, Zappala, Mid-Atlantic Youth Services, PA Child Care, and Western PA Child Care, participated in this corrupt conspiracy and detained Subclass A2 plaintiffs in PA Child Care and Western PA Child Care in spite of the corruption and illegality underlying the detention orders.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully pray that this Court:

1.    Assume jurisdiction of this action.

2.    Certify this action as a class action.

3.    Award an aggregate compensatory damages award in an amount in excess of $150,000 exclusive of interest and costs to the entire class to be allocated to each class member through a series of individualized mini-hearings, mediations or arbitrations or any other procedure as ordered by this Court.

4.    Award punitive damages against all defendants except Luzerne County on an aggregate basis, with subsequent individual hearings to determine the individual award to each class member.

5.    Award threefold damages in accordance with 18 U.S.C. § 1964(b)-(c).

6.    Award prejudgment interest, costs of suit, and attorneys' fees.

7.    Order disgorgement and restitution of moneys obtained by defendants as a result of their conspiracy to violate plaintiffs' constitutional rights.

8.    Order such other and further relief as this court deems just and proper.

Respectfully submitted,

s/ Sol Weiss
Marsha L. Levick, Esq. (PA 22535)
Lourdes M. Rosado, Esq. (PA 77109)
JUVENILE LAW CENTER

1315 Walnut Street, Suite 400
Philadelphia, PA 19107
(215) 625-0551

Daniel Segal, Esq. (PA 26218)
Rebecca L. Santoro, Esq. (PA 206210)
HANGLEY ARONCHICK SEGAL & PUDLIN
One Logan Square, 27th Floor
Philadelphia, PA 19103
(215) 568-6200

Sol Weiss, Esq. (PA 15925)
Adrianne Walvoord, Esq. (PA 206014)
Amber Racine, Esq. (PA 208575)
ANAPOL SCHWARTZ WEISS COHAN
FELDMAN & SMALLEY, P.C.
1710 Spruce Street
Philadelphia, Pa 19103
(215) 735-1130

Barry H. Dyller, Esq. (PA 65084)
DYLLER LAW FIRM
Gettysburg House
88 North Franklin Street
Wilkes-Barre, PA 18701
(570) 829-4860

Johanna L. Gelb, Esquire (Pa ID. 49972)
GELB LAW FIRM
538 Spruce St., Suite 600
Scranton, PA 18503
(570) 343-6383

*Counsel for Plaintiffs*

Dated: June 25, 2009

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| H.T., ET AL., | CONSOLIDATED<br>Civil Action No. 3:09-cv-0286 |
|      Plaintiffs, | |
| | JURY TRIAL DEMANDED |
|      v. | |
| | MASTER COMPLAINT<br>FOR CLASS ACTIONS –<br>CERTIFICATION OF<br>SERVICE |
| MARK A. CIAVARELLA, JR., ET AL., | |
|      Defendants. | |
| | (Civil Action No. 3:09-cv-0357) |
| ------------------------------------------------- | |
| WILLIAM CONWAY, ET AL., | (Civil Action No. 3:09-cv-0291) |
|      Plaintiffs, | |
|      v. | |
| | JUDGE:  A. RICHARD<br>          CAPUTO |
| MICHAEL T. CONAHAN, ET AL., | |
|      Defendants. | [ELECTRONICALLY FILED] |

## <u>CERTIFICATION OF SERVICE</u>

I, Adrianne E. Walvoord, Esquire do hereby certify that a true and correct copy of the Master Complaint for Class Actions was filed electronically on June 25, 2009, and is available for viewing and downloading from the ECF system for the United States District Court for the Middle District of Pennsylvania. Plaintiffs also mailed a copy of the Master Complaint for Class Actions via First-Class United States Mail to:

Mark A. Ciavarella
585 Rutter Ave
Kingston, PA 18704

County of Luzerne
200 North River Street
Wilkes-Barre, PA 18711

Anapol Schwartz Weiss Cohan
Feldman & Smalley, P.C.

/s/ Adrianne E. Walvoord
Adrianne E. Walvoord, Esq.
1710 Spruce Street
Philadelphia, Pa 19103
T: (215) 825-3211
F: (215) 875-7732