**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

FLORENCE WALLACE ET AL.

     Plaintiffs,

     v.

ROBERT J. POWELL ET AL.,

     Defendants.

**CONSOLIDATED TO:**

Civil Action No. 3:09-cv-0286

(JUDGE CAPUTO)

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

WILLIAM CONWAY ET AL.,

     Plaintiffs,

     v.

MICHAEL T. CONAHAN ET AL.,

     Defendants.

Civil Action No. 3:09-cv-0291

(JUDGE CAPUTO)

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

H.T. ET AL.,

     Plaintiffs,

     v.

MARK A. CIAVARELLA, JR. ET AL.,

     Defendants.

Civil Action No. 3:09-cv-0357

(JUDGE CAPUTO)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SAMANTHA HUMANIK,

    Plaintiff,

    v.

MARK A. CIAVARELLA, JR. ET AL.,

    Defendants.

Civil Action No. 3:09-cv-0630

(JUDGE CAPUTO)

## PLAINTIFFS' RESPONSE IN OPPOSITION TO
## THE MOTIONS OF DEFENDANTS
## MARK A. CIAVARELLA AND MICHAEL T. CONAHAN
## <u>TO DISMISS PLAINTIFFS' COMPLAINTS ON IMMUNITY GROUNDS</u>

# TABLE OF CONTENTS

COUNTERSTATEMENT OF THE QUESTIONS PRESENTED ...........................1

I.   INTRODUCTION .................................................................................2

II.  STATEMENT OF FACTS ....................................................................4

    A.   Overview Of The Juvenile Justice System.............................5

    B.   The Unlawful Roles Of Ciavarella And Conahan In The
        Development And Utilization Of The PACC And WPACC
        Facilities ...............................................................................7

          1.   PACC Facility .............................................................8

          2.   WPACC Facility .......................................................11

          3.   PACC Extension ........................................................12

          4.   Additional Payoffs To Ciavarella and Conahan .......12

    C.   Implementation Of The Unlawful Plan To Funnel Juveniles To
        The PACC And WPACC Facilities ....................................14

          1.   Denial Of Right To An Impartial Tribunal ...............15

          2.   Denial Of Right To Counsel ......................................15

          3.   Invalid Guilty Pleas..................................................17

          4.   Interference With Probation Office ..........................17

    D.   Pennsylvania Supreme Court And Special Master Grim Have
        Found Evidence Of Systematic And Knowing Denial Of
        Children's Constitutional Rights ........................................19

III. SUMMARY OF ARGUMENT................................................................21

IV.  ARGUMENT........................................................................................22

    A.   Legal Standard....................................................................22

B.    Neither Ciavarella Nor Conahan Is Entitled To Absolute Judicial Immunity For His Administrative Acts.................................................23

    1.    Under The Judicial Immunity Doctrine, Judges Are Not Absolutely Immune From Liability For Their Administrative Acts ................................................................23

    2.    The Judicial Immunity Doctrine Does Not Provide Absolute Immunity To Conahan And Ciavarella For Administrative Acts They Took As Part Of The Scheme To Violate Plaintiffs' Constitutional Rights And Civil RICO Laws .........25

        (a)    The Efforts By Ciavarella And Conahan To Cause Luzerne County To Close The River Street Facility And Contract With PACC And WPACC Agencies In Return For Improper Financial Compensation Were Administrative Acts Not Protected By Absolute Judicial Immunity .........................................................27

        (b)    Ciavarella's Policy Directing The Juvenile Probation Office To Encourage And/Or Coerce Youth And Their Parents To Proceed To Court Without First Obtaining Legal Representation Was Administrative Conduct Not Covered By Judicial Immunity .................32

        (c)    Conahan And Ciavarella Are Not Absolutely Immune From Liability For Pressuring Juvenile Probation To Institute A Generalized Practice Of Recommending Detention And Placement Over Release And To "Ramp Up" Placements In PACC And WPACC ..........34

C.    Ciavarella Is Not Entitled To Absolute Judicial Immunity For His Purported "Judicial Acts" Inside His Courtroom................................35

    1.    The Modern Juvenile Court Reflects Core Constitutional Values Essential To The Legitimacy Of That Tribunal............37

    2.    Denying Ciavarella Absolute Immunity For His Courtroom Conduct Will Not Weaken Or Undermine The Policies Underlying The Judicial Immunity Doctrine............................41

(a) The Freedom To Decide Controversial Cases In A Principled Way Without Fear Of Personal Liability Would Not Be Compromised By Declining To Extend Ciavarella Absolute Judicial Immunity For His Purported "Judicial Acts" ...............................................46

(b) The Lack Of Available Appellate Remedies For Plaintiffs To Correct Ciavarella's Errors Undercuts Any Justification For Judicial Immunity In This Case...48

(c) Granting Immunity To Ciavarella Will Not Protect The Integrity Of The Judicial Process ...........................51

3. Because Ciavarella's Courtroom Misconduct So Far Exceeded The Bounds Of The Constitution That He Was Effectively Operating A Star Chamber Or "Illegal Courtroom," He Is Barred From Claiming Absolute Judicial Immunity For His Purported "Judicial Acts" Denying Plaintiffs Their Constitutional Rights ................................................53

(a) Similarities Between The Star Chamber And Ciavarella's Courtroom ..................................54

(b) Applicability Of Supreme Court's Star Chambers Analysis To Ciavarella's Courtroom.............................56

D. Legislative Immunity Does Not Apply To Any Of Conahan's Actions Alleged In The Complaints ....................................61

1. Because Plaintiffs Do Not Even Allege That Conahan Sought Funding For The PACC And WPACC Facilities, His Claim of Legislative Immunity for That Purported Conduct Is Meaningless and Should Be Rejected........................................63

2. Executing Contracts Is Not Legislative Activity; Conahan Is Not Legislatively Immune In Connection With Executing Contracts With PACC And Dr. Vita.........................................64

3. Conahan's Efforts To Eliminate Funding For The River Street Facility Were Not Legislative, But Were Political And/Or Administrative Acts And Are Not Protected By Legislative Immunity ................................................66

V.    CONCLUSION...................................................................................71

# TABLE OF AUTHORITIES

## Cases:

*Alexander v. Tarrant County*
  No. 03-1280Y, 2004 WL 1884579 (N.D. Tex. Aug. 23, 2004)...........................28

*Al-Kidd v. Ashcroft,*
  No. 06-36059, 2009 WL 2836448 (9th Cir. Sept. 4, 2009) ..................................40

*Aschcroft v. Iqbal*
  129 S. Ct. 1937 (2009)                                                     5, 23

*Baraka v. McGreevy*
  481 F.3d 187 (3d Cir. 2007) ........................................................................ passim

*Beckert v. Warren*
  439 A.2d 638 (Pa. 1981)........................................................................... 66,67

*Bell Atl. Corp. v. Twombly*
  550 U.S. 544 (2007) ...........................................................................................23

*Bogan v. Scott-Harris*
  523 U.S. 44 (1998) ...................................................................................... passim

*Boykin v. Alabama*
  395 U.S. 238 (1969) .............................................................................................6

*Bradley v. Fisher*
  80 U.S. 335 (1871) ...................................................................................... passim

*Brown v. Smythe*
  No. 90-3815, 1990 WL 180987 (E.D.Pa. Nov. 15, 1990)...................................63

*Butz v. Economou*
  438 U.S. 478 (1978) ...........................................................................................25

*Caperton v. A.T. Massey Coal Co.*
129 S.Ct. 2252 (2009) ........................................................................ 44,45,51,52

*Clinton v. Jones*
520 U.S. 681 (1997) ........................................................................24

*Commonwealth v. Monica*
528 Pa. 266, 597 A.2d 600 (1991).......................................................20

*Commonwealth v. Moyer*
444 A.2d 101 (Pa. 1982).....................................................................49

*Crymes v. DeKalb County*
923 F.2d 1482 (11th Cir. 1991)..........................................................70

*Dennis v. Sparks*
449 U.S. 24 (1980) ...........................................................................23

*Doe v. United States*
487 U.S. 201, 108 S.Ct. 2341 (1988) ..................................................57

*Ex parte Virginia*
100 U.S. 339 (1879) .........................................................................25

*Figueroa v. Blackburn*
208 F.3d 435 (3d Cir. 2000) .............................................................25

*Forrester v. White*
484 U.S. 219 (1988) ................................................................. passim

*Forrester v. White*
792 F. 2d 647 (7th Cir. 1986) ...............................................48, 50, 51

*Fowler v. UPMC Shadyside*
No. 07-4285, 2009 WL 2501662 (3d Cir. Aug. 18, 2009)..................22

*Goldhaber v. Higgins*
576 F. Supp. 2d 694 (W.D. Pa. 2007) ...............................................30

*Henderson v. Morgan*
426 U.S. 637 (1976) .............................................................6

*In re DelSignore*
375 A.2d 803 (Pa. Super. Ct. 1977) .................................49

*In re Gault*
387 U.S. 1 (1967) ...................................................... passim

*In re J.F.*
714 A.2d 467 (Pa. Super. Ct. 1998) ..................................5

*In re McFall*
617 A.2d 707 (Pa. 1992).....................................................6

*In re Thomas*
626 A.2d 150 (Pa. 1993).....................................................48

*Jones v. Schuylkill*
51 A. 762 (1902)..................................................................64

*Lavelle v. Koch*
617 A.3d 319 (Pa. 1992).....................................................66

*Lum v. Bank of America*
361 F.3d 217 (3d Cir. 2004) ...............................................4

*Mireles v. Waco*
502 U.S. 9 (1991) ...................................................... passim

*Mitchell v. Fishbein*
377 F.2d 157 (2d Cir. 2004) ..............................................34

*Morrison v. Lipscomb*
877 F.2d 463 (6th Cir. 1989) ......................... 26, 32, 33, 35

*Padgett v. Stein*
406 F. Supp. 287 (M.D. Pa. 1975)......................................29

*Pennsylvania v. Muniz*
496 U.S. 582 (1990) .................................................................. 37, 57

*Phillips v. County of Allegheny*
515 F.3d 224 (3d Cir. 2008) ........................................................ 22,23

*Pierson v. Ray*
386 U.S. 547 (1967) .............................................................. passim

*Randall v Brigham*
74 U.S. 523 (1868) ..................................................................52

*Rumsfeld v. Padilla*
542 U.S. 426 (2004) .................................................................58

*Ryan v. Burlington County, New Jersey*
889 F.2d 1286 (3d Cir. 1989) ...................................................... 63, 68

*Seitzinger v. Tamaqua Borough*
41 A. 454 (1898).....................................................................64

*Stump v. Sparkman*
435 U.S. 349 (1978) ........................................................ 25, 35, 58

*Superior Court of Virginia v. Consumers Union of United States, Inc.*
446 U.S. 719 (1980) ..................................................................33

*Three Rivers Cablevision, Inc. v. Pittsburgh*
502 F. Supp. 1118 (W.D. Pa. 1980) ............................................. 61, 64

*United States v. Brewster*
408 U.S. 501 (1972) ...................................................... 62, 65, 68, 70

*Watterson v. Page*
987 F.2d 1 (1st Cir. 1993) ...........................................................4

*Watts v. Indiana*
338 U.S. 49 (1949) ............................................................. 37, 58

*Williams v. United States*
341 U.S. 97 (1951) ............................................... 39

*Youngblood v. DeWeese*
352 F.3d 836 (3d Cir. 2004) ...................................... 62, 65

**Statutes/Codes:**

42 Pa. Cons. Stat. § 325(e)(1)-(2) (2008) ......................... 9, 66

42 Pa. Cons. Stat. § 2301(a)(2) .................................... 9

42 U.S.C. § 1983 .................................................. . 24, 42

**Rules:**

Federal Rule of Civil Procedure 12(b)(6) ........................... 22

Pennsylvania Rules of Appellate Procedure 903 ..................... 48

Pennsylvania Rules of Juvenile Court Procedure 152 ............... 16

Pennsylvania Rules of Juvenile Court Procedure 407 ............... 17, 49

**Constitution:**

Pennsylvania Constitution Article 6 ............................... 60

**Other Authorities:**

American Bar Association Model Code of Judicial Conduct (2007) ..... 6

Black's Law Dictionary 8th Ed. (2004) ........................... 54

Case of Proclamations 2 St. Tr. 723 (1611) (Chief Justice Coke) .... 55

Lewis Carroll, Alice in Wonderland (Signet Classic Printing  ed. 2000 (1865) ..... 53

Edwin Chemerinsky, Federal Jurisdiction, (4th Ed. 2003).......................................41

John Phillips Kenyon, The Stuart Constitution 1603-1688:
    Documents and Commentary 106 (2d ed. 1986)..................................................55

Geoffrey Robertson, The Tyrannicide Brief: The Story of The Man Who
    Sent Charles I to the Scaffold (Anderson Books 2007)................................ 37, 54
Thomas Pitt Taswell-Langmead, English Constitutional History
    (Stevens & Haynes, 4th Ed. (1890) ......................................................53

Neill H. Alford, Jr., *The Right of Silence*
    79 Yale Law Journal 1618 (July 1970) ................................................54

Edward P. Cheyney, *The Court of Star Chamber*
    18 American Historical Review 738 (1913).........................................54

Jay M. Feinman & Roy S. Cohen, Suing Judges: *History and Theory*
    31 South Carolina Law Review 201, 214-18 (1980) .................................. 41, 42

Edward G. Jennings, Tort Liability of Administrative Offices
    21 Minnesota Law Review 263 (1937) ................................................43

*Liability of Judicial Officers Under Section 1983*
    79 Yale Law Review 322  (1969).................................................. 41, 42

West's Encyclopedia of American Law, 2005
    http://www.encylcopedia.com/doc/1G2-3437702523.html ................................39

## COUNTERSTATEMENT OF THE QUESTIONS PRESENTED

SHOULD THE MOTIONS TO DISMISS BE DENIED BECAUSE CONAHAN AND CIAVARELLA ARE NOT ABSOLUTELY IMMUNE FOR THEIR ADMINISTRATIVE ACTIONS TAKEN AS PART OF THE SCHEME TO VIOLATE PLAINTIFFS' CONSTITUTIONAL RIGHTS AND THE FEDERAL CIVIL RICO STATUTE?

(Suggested Answer: Yes.)

SHOULD CIAVARELLA'S MOTION TO DISMISS BE DENIED BECAUSE HE CANNOT CLAIM ABSOLUTELY IMMUNITY FOR PURPORTED JUDICIAL ACTS TAKEN AS PART OF THE SCHEME TO VIOLATE PLAINTIFFS' CONSTITUTIONAL RIGHTS AND THE FEDERAL CIVIL RICO STATUTE WHERE THE ACTIONS (A) WERE UNDERTAKEN OVER THE COURSE OF FIVE YEARS, (B) INJURED 6,500 JUVENILES, AND (C) TOOK PLACE IN A COURTROOM OPERATING COMPLETELY OUTSIDE THE REQUIREMENTS OF THE CONSTITUTION?

(Suggested Answer: Yes.)

SHOULD CONAHAN'S MOTION TO DISMISS BE DENIED BECAUSE HE IS NOT ENTITLED TO LEGISLATIVE IMMUNITY FOR ACTIONS TAKEN IN FURTHERANCE OF THE SCHEME TO VIOLATE PLAINTIFFS' CONSTITUTIONAL RIGHTS AND THE FEDERAL CIVIL RICO STATUTE WHERE HIS ACTIONS WERE SOLELY ADMINISTRATIVE AND POLITICAL?

(Suggested Answer: Yes.)

## I.     __INTRODUCTION__

Plaintiffs' claims arise from what may be the worst judicial scandal in American history.  Spearheaded by Defendants Mark Ciavarella ("Ciavarella") and Michael Conahan ("Conahan"), disgraced former Luzerne County Court of Common Pleas judges, the scandal involves a complex web of multimillion dollar kickbacks, fraud and bribery, fundamental abuses of the public trust, and the systematic violation of children's most fundamental constitutional rights over a period of more than five years.  Hardly a one-victim, isolated case of government corruption, the scandal is uniquely distinguished by its duration and magnitude, the extraordinary amount of money – $2.6 million – that changed hands, and, most reprehensible of all, the fact that its victims were the most vulnerable members of our society – our children.  In their unlawful and self-dealing pursuit of personal wealth, Ciavarella and Conahan profoundly undermined core principles of our judicial system.

Ciavarella and Conahan now have the temerity to contend that their egregious conduct is fully shielded by absolute judicial immunity or legislative immunity.  They ask that the Complaints against them be dismissed in their entirety and that their thousands of victims be denied compensation from them for the serious injuries they suffered.

Their claims of absolute immunity must be denied for two reasons. First, much of Conahan's and Ciavarella's misconduct consisted of administrative, rather than judicial, acts and is therefore not even colorably cloaked with absolute immunity. Essential elements of the misconduct were wholly unrelated to the judicial activities of Ciavarella and Conahan and occurred outside of the courtroom or before any challenged adjudication. By way of example, Conahan and Ciavarella cannot seriously argue that they were acting in their judicial capacities when they worked to close the existing county-run juvenile facility, chose Defendants PA Child Care, LLC ("PACC") and Western PA Child Care, LCC ("WPACC") to build and operate new facilities at exorbitant rates, and accepted $2.6 million in payoffs.[1] The outrages in Ciavarella's courtroom were simply planned end products of all the non-judicial, unlawful conduct of Ciavarella, Conahan and their co-Defendants.

Second, as to the in-court conduct alleged in the Complaint, whatever the appropriate reach of absolute judicial immunity, neither the doctrine's policy, its history nor applicable case law can justify its application to intentionally injurious conduct inflicted by perpetrators who years ago forfeited any claim to the legitimacy of their courtroom or their actions. While thousands of juveniles

---

[1] The acceptance of the $2.6 million is, of course, neither judicial nor administrative conduct.

justifiably trusted that their cases would be determined in the courtroom by a fair and impartial judge who would accord them rights unambiguously guaranteed by the United States Constitution, they were instead "tried" in a "courtroom" where the Constitution was tossed aside and, unbeknownst to them and to their parents, their fates had often been predetermined *before* their "trials" – some lasting less than five minutes – by millions of dollars of concealed payoffs. Ciavarella "presided" not over a "courtroom," but more like a Star Chamber or kangaroo court that dispensed "justice" without regard to the basic tenets of our constitutional legal system. The application of absolute judicial immunity to this case would serve no purpose, make a mockery of the doctrine and undermine even further the public's trust in our judicial system.[2]

## II.    <u>STATEMENT OF FACTS</u>[3]

---

[2] Conahan's claim of absolute legislative immunity stands on no firmer ground than the judicial immunity claim. *See* Part IV.D, *infra*.

[3] The facts come from the Master Complaint for Class Actions in Nos. 09-0357 and 09-0291 ("CAC") and the Master Long Form Complaint and Jury Demand in Nos. 09-0357 and 09-0630 ("IC") and from documents in the public record of the criminal proceedings against Conahan and Ciavarella and of the proceedings in the Pennsylvania Supreme Court. Consideration of these public records in resolving a motion to dismiss is permissible. *See Lum v. Bank of Am.*, 361 F.3d 217, 221 n.3 (3d Cir. 2004) ("In deciding motions to dismiss pursuant to Rule 12(b)(6), courts generally consider only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim."); *see also Watterson v. Page*, 987 F.2d 1, 3-4 (1st Cir. 1993) (affirming the district court's consideration of "certain facts set out in public documents plaintiffs attached to an opposition they filed to the motion to dismiss"

(continued...)

## A.    Overview Of The Juvenile Justice System

Pennsylvania's juvenile justice system is premised on the understanding that youth who commit delinquent acts are fundamentally different than adult offenders.  (CAC ¶ 184.)  Because youth are considered less culpable, more vulnerable and more amenable to treatment and rehabilitation than adults, the system is designed to provide for the care, supervision and rehabilitation of youth committing delinquent acts.  *Id.*  Pennsylvania courts have explicitly recognized that "particular importance is . . . placed upon rehabilitating and protecting society's youth."  *In re J.F.*, 714 A.2d 467, 471 (Pa. Super. Ct. 1998).  (CAC ¶ 185.)

Youth in juvenile court are entitled to virtually all of the due process rights guaranteed to adult criminal defendants.  Three are of particular importance here.  First, juveniles, like all citizens, are entitled to be tried by an impartial tribunal.

_____

(continued...)

and treating those documents as part of the pleadings).  The documents attached to this Response update documents from the same proceedings referred to and incorporated into the Complaints; these documents have also been attached as exhibits to the proposed Amended Complaints filed on August 27, 2009; relevant portions are referenced in the proposed Amended Complaints (Doc. Nos. 249, 250).

For purposes of this Motion to Dismiss, all well-pleaded factual allegations of the Complaint must be taken as true.  *Aschcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009).

*In re McFall*, 617 A.2d 707, 714 (Pa. 1992). (CAC ¶ 672.)[4] Second, it is well-settled that juveniles in delinquency proceedings are entitled to counsel. *In re Gault*, 387 U.S. 1 (1967). (CAC ¶ 187.)[5] And third, the United States Constitution mandates that both guilty pleas and waivers of counsel by juveniles must be voluntary, knowing and informed. *Gault*, 387 U.S at 41-42; *Henderson v. Morgan*, 426 U.S. 637, 644-45 (1976); *Boykin v. Alabama*, 395 U.S. 238, 242-43 (1969). (CAC ¶ 682.)

In 2001, Ciavarella himself publicly acknowledged the importance of the right to counsel in juvenile proceedings. Following the Pennsylvania Superior Court's reversal of the adjudication of a juvenile who appeared before him unrepresented, Ciavarella promised, "I'll never do it again . . . they obviously have a right to a lawyer, and even if they come in and tell me they don't want a lawyer, they're going to have one." (CAC ¶ 190.) Tragically for Plaintiffs, he subsequently broke this unambiguous promise to more than 1,800 individual

---

[4] *See also* ABA, *Model Code of Judicial Conduct* (2007): "The United States legal system is based upon the principle that an independent, impartial, and competent judiciary, composed of men and women of integrity, will interpret and apply the law that governs our society." To that end, "Judges should maintain the dignity of judicial office at all times, and avoid both impropriety and the appearance of impropriety in their professional and personal lives."

[5] Consistent with *Gault*, Pennsylvania's General Assembly and Supreme Court have established that the right to counsel extends to juveniles through all stages of the juvenile delinquency process. (*Id.* ¶ 188.)

children from 2003 through May 2008.  (*See* CAC ¶ 699 (citing First Interim

Report and Recommendation).)  *See also* note 13, *infra*.

**B.     The Unlawful Roles Of Ciavarella And Conahan In The Development And Utilization Of The PACC And WPACC Facilities**

Conahan and Ciavarella engaged in a host of non-judicial administrative acts

in exchange for concealed and unlawful payoffs – all leading to the infliction of

substantial injury on thousands of juveniles.  Through their administrative

involvement in, among other things, (a) the closing down of the existing county-

owned juvenile detention facility, (b) the creation of two new private detention

facilities (PACC and WPACC), (c) the agreement by Luzerne County to use the

new facilities, and (d) directing that children be placed in the facilities, Conahan

and Ciavarella worked hard – and, unfortunately, effectively – to funnel juveniles

to the two new facilities, all in exchange for unlawful payoffs.[6]  (CAC ¶¶ 649-64,

668-70; IC ¶ 34; Bill of Information filed by United States Attorney Against Mark

A. Ciavarella, Jr. and Michael T. Conahan, No. 09-28 (M.D. Pa. Jan. 26, 2009)

("Information") ¶ 5.[7])  As discussed in detail below, *see* Part IV.B., all these acts,

---

[6] Conahan and Ciavarella assisted the two new facilities, PACC and WPACC, in securing placement agreements with Luzerne County worth tens of millions of dollars; this included an agreement in late 2004 worth approximately $58 million.  (CAC ¶ 663; IC ¶ 66; Information ¶ 5.)

[7] Both Complaints rely on the Information as a basis for their allegations. The Individual Complaint attaches the Information as Exhibit A.

administrative rather than judicial, are well outside the scope of the absolute judicial immunity doctrine.

### 1. PACC Facility

Beginning in June 2000, Ciavarella, in his administrative capacity as a judge in the Luzerne County Juvenile Court, and Defendant Robert J. Powell ("Powell"), a Luzerne County attorney, began discussions about constructing a new, private juvenile detention facility in Luzerne County. (CAC ¶¶ 649, 163.) (At that time, the county was operating its own juvenile facility on River Street in Wilkes-Barre (the "River Street facility")). (*Id*. ¶ 655.) Ciavarella then introduced Powell to his friend, Defendant Robert Mericle ("Mericle"), the president and owner of Defendant Mericle Construction, Inc. ("Mericle Construction"). (*Id*. ¶ 649.)

Together, Powell and Mericle worked to locate land for the construction of a new facility. (*Id*.) Ultimately, Powell and Gregory Zappala, Jr. ("Zappala"), together doing business as PACC, acquired land in Pittston Township, Luzerne County on which to build the facility. (*Id*. ¶¶ 650, 651.) They then entered into an agreement with Mericle and Mericle Construction to build it. (*Id*. ¶ 650.) In July 2001, PACC sent Luzerne County an unsolicited proposal to build a juvenile detention facility in Pittston Township, and to lease the facility to the county for $37 million over 30 years. (*Id*. ¶ 651.)

In January 2002, Conahan became president judge of the Luzerne County Court of Common Pleas.[8] As president judge, he had broad supervisory powers and responsibilities over his judicial district and over the other judges (including Ciavarella) on his court. (CAC ¶ 653.) Pennsylvania law provides that the president judge of a court shall "[b]e the executive and administrative head of the court, supervise the judicial business of the court, promulgate all administrative rules and regulations, make all judicial assignments, and assign and re-assign among the personnel of the court available chambers and other physical facilities." 42 Pa. Cons. Stat. § 325(e)(1) (2008). (CAC ¶ 653.) These administrative powers also include the power to appoint personnel and to set the compensation and duties of administrative staff. *See id.* §§ 325(e)(2), 2301(a)(2). (CAC ¶ 653.) (When Ciavarella became president judge in January 2007, he assumed the same duties and responsibilities. (*Id.*))

Subsequently, on January 29, 2002, acting in his administrative capacity on behalf of Luzerne County, Conahan signed a "Placement Guarantee Agreement" between PACC and the Luzerne County Court of Common Pleas. (*Id.* ¶ 652.) In the Agreement, Conahan agreed that juvenile offenders would be housed at the proposed PACC facility. (*Id.* ¶ 652; IC ¶ 41.) Under the Agreement, the Court

---

[8] He served in that position until January 2007. (*Id.* ¶ 162.)

would pay PACC annual rent of $1,314,000.  (CAC ¶ 652; IC ¶ 41; Information ¶ 9.)

In his administrative capacity, Conahan announced in October 2002 that judges would no longer send juveniles to the River Street facility.  (CAC ¶ 654.) Although the Pennsylvania Department of Public Welfare, the Pennsylvania Department of Labor and Industry and the Wilkes-Barre Health Department all deemed the facility safe and satisfactory to house juveniles, Ciavarella and Conahan publicly maintained that conditions at the facility were deplorable.  (*Id.* ¶ 654.)

Two months later, in December 2002, Conahan, again acting in his administrative capacity, took steps to remove funding for the River Street facility from the Luzerne County budget, effectively closing it.  (*Id.* ¶ 655.)  The facility's closing helped guarantee that Luzerne County youth, in accord with the Placement Guarantee Agreement, would be housed at the facility being built by Mericle and PACC.  (*Id.*)

Ciavarella and Conahan were richly – and secretly – rewarded for their facilitating the construction of the private for-profit detention center.  In or before January 2003, Powell, Mericle, Ciavarella and Conahan agreed that Powell and Mericle would pay Ciavarella and Conahan $997,600 for their roles in the scheme. (CAC ¶ 656; IC ¶ 43.)  Powell understood the payments to be a *quid pro quo* for

the judges' agreement to send juveniles to the PACC and WPACC facilities and other related acts.  (CAC ¶ 656.)

A complex set of financial transactions was executed in the next several months in order to transmit – and conceal – these payments.  (CAC ¶¶ 702–707; IC ¶¶ 44-45, 47-50.)  In a classic money laundering maneuver, the $997,600 was first moved from Mericle to Powell under cover of a backdated "Registration and Commission Agreement," a document which purported to be an agreement for Mericle to pay Powell a broker's fee in that amount.  (CAC ¶ 702; IC ¶ 44.)  The money was then moved in pieces from Powell's control to Conahan and Ciavarella and to corporations under their control.  (CAC ¶¶ 704-707; IC ¶¶ 47-50.)

The PACC facility opened in February 2003.  (CAC ¶ 658.)  Ciavarella immediately began placing juveniles there.  (*Id*. ¶ 666.)

## 2.      WPACC Facility

With Ciavarella and Conahan accepting unlawful payments to ensure a steady flow of children to the PACC facility, it proved to be a successful venture. (*See* CAC ¶¶ 656, 700; IC ¶ 46; Information ¶ 5.)   Because of that success, Powell decided to construct another private juvenile detention facility, this one in Butler County, Pennsylvania.  (CAC ¶ 659; IC ¶ 51.)  To that end, on June 8, 2004, Powell and Zappala, doing business as WPACC again contracted with Mericle and Mericle Construction, this time to build the WPACC facility.  (CAC ¶ 659.)

As with PACC, the WPACC arrangement also involved lucrative secret payoffs to both Conahan and Ciavarella, this time totaling $1 million. (CAC ¶ 659; IC ¶ 52; Information ¶ 18.) To launder and conceal the payoffs, Mericle and Powell signed another "Registration and Commission Agreement," this one purporting to be an agreement for Mericle to pay Powell a $1 million broker's fee. (CAC ¶ 659; IC ¶ 52.) The sum was moved from Mericle to Pinnacle Group, an entity controlled by Conahan and Ciavarella, as a financial reward for the creation of the WPACC facility. (CAC ¶¶ 708, 709; IC ¶ 51; Information ¶¶ 18, 19.)

### 3.     PACC Extension

PACC also contracted with Mericle and Mericle Construction to construct an addition to the PACC facility. (CAC ¶ 661; IC ¶ 53; Information ¶ 20.) Again, concealed payoffs to Conahan and Ciavarella were part of the deal. (CAC ¶ 661; IC ¶ 53; Information ¶ 20.) In February 2006, Powell and Mericle, again using the cover of a fraudulent "Registration and Commission Agreement," made a $150,000 payment to Conahan and Ciavarella through Pinnacle Group. (*See* CAC ¶¶ 661, 710, 711; IC ¶¶ 53, 54; Information ¶ 21.)

### 4.     Additional Payoffs To Ciavarella and Conahan

In addition to and distinct from the payoffs described above, Conahan and Ciavarella demanded payoffs from Powell himself in exchange for closing the River Street facility and sending juveniles to the PACC and WPACC facilities.

(IC ¶ 46.)  Ciavarella advised Powell that Powell had to pay for the privilege of making a substantial amount of money from the facilities.  (*Id*.)  It was understood that the payments were a *quid pro quo* for Conahan and Ciavarella using their authority to direct juveniles to the facilities.  (*Id*.)

Powell readily complied with these demands.  Between February 2003 and January 1, 2007, he made hundreds of thousands of dollars in concealed payments[9] to Ciavarella and Conahan for their past and future acts relating to PACC and WPACC.  (CAC ¶ 662; IC ¶ 55; Information ¶ 22.)  Powell made these payments both in cash directly to Ciavarella and Conahan and by check to Pinnacle Group.  (CAC ¶¶ 712-717; IC ¶¶ 55-58; Information ¶ 23.)  He believed that Ciavarella and Conahan would stop sending juveniles to the two facilities if he stopped paying them.  (IC ¶ 59.)[10]

---

[9] Ciavarella and Conahan concealed the payments by, *inter alia*, making false notations on checks and filing numerous materially false annual statements of financial interest with the Administrative Office of the Pennsylvania Courts. (CAC ¶¶ 714, 718.)

[10] In their proposed Amended Complaints, Plaintiffs allege more detail about the *quid pro quo* aspect of the scheme described above.  Specifically, they allege that the large profits generated by PACC, WPACC, and Mericle, through their contracts with each other and through PACC's and WPACC's leases and other agreements with Luzerne County, "enabled Powell and Mericle to pay Conahan and Ciavarella for the placement of youth in violation of their constitutional rights." (Proposed Am. CAC ¶ 669; *see also* Proposed Am. IC ¶¶ 30-31, 44.) Plaintiffs further allege that, "[i]n return, Conahan and Ciavarella ensured the profitability of the contracts by adjudicating juveniles delinquent in violation of

(continued...)

### C. Implementation Of The Unlawful Plan To Funnel Juveniles To The PACC And WPACC Facilities

For Defendants' unlawful scheme to succeed and be profitable, Ciavarella and Conahan had to ensure that a sufficient number of juveniles were placed at the PACC and WPACC facilities.[11]  From the opening of PACC in February 2003 until May 23, 2008, when Ciavarella ceased hearing juvenile cases, Ciavarella and Conahan, conspiring with other Defendants, took a series of unlawful steps, described below, to increase the number of juveniles placed in facilities.[12]

_____

(continued...)

their constitutional rights and thereby providing a continual flow of juveniles for the juvenile detention centers – a flow which necessitated additional development and expansion of the detention facilities." (Proposed Am. CAC ¶ 669.) Through this scheme, Plaintiffs allege, Conahan and Ciavarella received approximately $2.6 million. (Proposed Am. CAC ¶ 670.)

Additionally, in their proposed Amended Complaints, Plaintiffs allege that Conahan took steps to prevent public scrutiny of the leases and other agreements between Luzerne County and PACC and WPACC by ordering the sealing of documents showing that the leases were a bad deal for the County.  (Proposed Am. CAC ¶¶ 680-82; Proposed Am. IC ¶¶ 39-41.)  This action stalled the release of a state audit of PACC (Proposed Am. CAC ¶ 683; Proposed Am. IC ¶ 42), permitting the scheme to continue outside the public's view.

[11] If Luzerne County juveniles were not placed in the PACC or WPACC facilities, the county would have discontinued contracting with PACC. (CAC ¶ 670.)

[12] On July 31, 2009, United States District Judge Edward Kosik rejected the plea agreements of Ciavarella and Conahan in the criminal proceedings against them.  *See* Memorandum and Order, No. 09-28 (M.D. Pa. July 31, 2009).  In rejecting them, Judge Kosik pointed to "the Government's abundance of evidence

(continued...)

## 1.    Denial Of Right To An Impartial Tribunal

Neither Ciavarella nor Conahan ever disclosed to a single Plaintiff that they had a personal, pecuniary interest in ensuring that youth were placed at PACC and WPACC.  (CAC ¶¶ 667, 669.)  Thus, all the children who appeared before Ciavarella from 2003 through May 2008 were unknowingly denied their constitutional right to be tried by an impartial tribunal and were therefore unknowing victims of Ciavarella's substantial bias in favor of detaining them.

## 2.    Denial Of Right To Counsel

Ciavarella instituted a general policy that directed probation and court staff to encourage and/or coerce youth and their families to forego legal representation before or during their appearance in his court.  By thus limiting the possibility of any opposition to his decisions, the children's lack of representation increased the number of youth adjudicated delinquent and placed in facilities.  (CAC  ¶¶ 686- 97.)

_____

(continued...)

of [Ciavarella's] routine deprivation of children's constitutional rights by commitments to private juvenile facilities he helped to create in return for a 'finder's fee' in direct conflict of interest with his judicial roles."  (*Id*. at 4.)  On September 9, 2009, the U.S. Attorney's Office announced that a federal grand jury returned a 48-count indictment charging Ciavarella and Conahan with racketeering and related charges, including bribery, extortion and fraud.  *See* Indictment, *United States v. Conahan and Ciavarella*, No. 09-272 (M.D. Pa. Sept. 9, 2009).

Most particularly, Ciavarella directed Sandra Brulo, then Luzerne County Chief Juvenile Probation Officer, to draft a waiver form (containing only eight lines of text) which on its face failed to advise youth or their parents of the serious consequences of giving up their right to counsel. (*Id.* ¶ 686; *see* Waiver of Counsel form, Exhibit A to the CAC.) At Ciavarella's direction, probation officers or other court personnel asked children and their parents to sign this form before entering Ciavarella's courtroom, thus exerting pressure and/or influence on these families to proceed without counsel in the youth's hearings before Ciavarella. (*Id.*) Ciavarella continued to direct the use of this form, with its authorization for parents to waive their children's right to counsel, even after the Pennsylvania Supreme Court's 2005 adoption of a rule barring such parental waivers. *See* Pa. R. Juv. Ct. P. 152. (CAC ¶ 686.) Relying on this purported "waiver," Ciavarella regularly allowed juveniles to appear unrepresented, without undertaking a constitutionally-required colloquy to determine whether their waivers were knowing, intelligent and voluntary. (CAC ¶ 741; IC ¶ 153.)

Ciavarella's systematic denial of Plaintiffs' fundamental right to counsel for more than five years furthered Defendants' conspiracy by increasing the number of youth adjudicated delinquent and placed in facilities. (*Id.* ¶ 687.) It also virtually eliminated the possibility that the adjudications and placement decisions would be questioned or appealed. (*Id.*)

### 3. <u>Invalid Guilty Pleas</u>

From 2003 through May 2008, Ciavarella routinely accepted unconstitutional guilty pleas or admissions from juveniles who appeared before him which he knew were neither knowing nor voluntary. (*Id.* ¶ 683.) He regularly failed to inform youth pleading guilty of their right to a trial, their right to confront and cross-examine witnesses, and the government's burden of proving every element of its case beyond a reasonable doubt. (*Id.*) He also regularly failed to establish that juveniles appearing before him if they understood they were giving up these rights before pleading guilty. (*Id.*) These omissions violated not only the United States Constitution, but also Rule 407 of the Pennsylvania Rules of Juvenile Court Procedure which, since 2005, has required a colloquy on the record between the court and juvenile before a guilty plea is accepted. (CAC ¶ 684.)

In some cases, Ciavarella adjudicated juveniles as delinquent without even inquiring as to their plea, and then placed them in a facility. (*Id.* ¶ 683.) At other times, even if the juvenile pleaded not guilty, Ciavarella adjudicated him delinquent in a hearing lasting no more than a few minutes; there was no trial or opportunity for the youth to speak on his own behalf, or to present evidence. (*Id.*)

### 4. <u>Interference With Probation Office</u>

To increase the number of facility placements, Ciavarella regularly exerted pressure on Luzerne County probation staff to recommend detention and/or

placement of juveniles even when placement was inappropriate.  (CAC ¶ 675; IC ¶ 67.)  In addition, Ciavarella at times pressured probation officers to change release recommendations to detention/placement recommendations.  (CAC ¶ 675; IC ¶ 67; Information ¶ 35.)  And, even when probation officers did not recommend detention, Ciavarella often ordered youth placed.  (CAC ¶ 675; IC ¶ 71.)

In a further effort to increase the number of juveniles at the PACC facility, Ciavarella and Conahan explicitly directed probation officers to "ramp up admissions" to the facility without ever disclosing that they were receiving undisclosed payments from the facility's owners.  (CAC ¶ 679; IC ¶ 68.)  They also encouraged the "ramping up" of the treatment side of the PACC facility, unrelated to true treatment needs, in order to place more juveniles at the facility.  (CAC ¶ 679.)  And, effectively chilling any complaints or dissent, Ciavarella and Conahan suspended, demoted or otherwise punished employees who questioned their actions or treatment of juveniles.  (*Id.* ¶ 680.)

\*     \*     \*

Not surprisingly, the unlawful scheme perpetrated by Ciavarella, Conahan and the other Defendants significantly altered the fate of the children who appeared before Ciavarella from 2003 through May 2008.  From 2003 through 2006, 22% of the Luzerne County juvenile court dispositions resulted in placement, almost double the Pennsylvania state average.  (*Id.* ¶ 688.)  And, while the statewide

annual average for waiver of counsel was about 5% during the relevant time period, the average annual rate of waiver of counsel in Luzerne County was about 50% – ten times higher than the state average.  (*Id.* ¶ 689.)

### D. Pennsylvania Supreme Court And Special Master Grim Have Found Evidence Of Systematic And Knowing Denial Of Children's Constitutional Rights

The Pennsylvania Supreme Court has recognized the magnitude of the tragedy that has occurred in Luzerne County.  On February 11, 2009, the court assumed King's Bench jurisdiction over the "alleged travesty of juvenile justice in Luzerne County."  (CAC ¶ 697.)  *See* Order, No. 81 MM 2008 at 3 (Pa. Feb. 11, 2009) (Exhibit A, attached).  The court appointed Special Master Arthur Grim, Senior Judge, Berks County Court of Common Pleas, and authorized him to review all juvenile court adjudications and dispositions over which Ciavarella presided from 2003 through May 2008.  (CAC ¶ 697.)  It further authorized Special Master Grim to make recommendations as to appropriate remedial actions.  (*Id.* ¶¶ 697-98.)

On March 26, 2009, Special Master Grim entered the first of several anticipated orders vacating the adjudications of hundreds of juveniles who appeared before Ciavarella between 2003 and May 2008.  (*Id.* ¶ 699.)  In his Order, he stated that his investigation "point[ed] to the conclusion that a very substantial number of juveniles who appeared without counsel before Judge Ciavarella for

delinquency or related proceedings did not knowingly and intelligently waive their right to counsel." (*Id.* (citing First Interim Report and Recommendations ¶ 10, attached to the Master Class Action Complaint as Exhibit B).) Judge Grim further reported that his "investigation also has uncovered evidence that there was *routine deprivation of children's constitutional rights to appear before an impartial tribunal and to have an opportunity to be heard.*" (*Id.* (emphasis added).)

On August 12, 2009, Special Master Grim entered his Third Interim Report and Recommendations. In it, he recommended that the Pennsylvania Supreme Court vacate all delinquency adjudications made by Ciavarella between 2003 and 2008. *See* Third Interim Report and Recommendations of the Special Master ¶ B.1.1 (Exhibit B, attached).[13]

---

[13] In his Report and Recommendations, relying on findings of the Luzerne County Juvenile Probation Office, which was working at his direction, Special Master Grim concluded that between 2003 and May 2008, more than 1,800 juveniles appeared before Ciavarella without counsel. *Id.* ¶ 30. And, on the basis of his review of a sample of transcripts from hearings and proceedings before Ciavarella in which juveniles appeared without counsel, *id.* ¶ 31, he concluded that every single one of those more than 1,800 "waivers" were invalid:

> [T]here is clear and convincing evidence that no juvenile who appeared before Judge Ciavarella without counsel between 2003 and May 2008 knowingly and intelligently waived his/her right to counsel. Stated another way, no juvenile who appeared before Judge Ciavarella without counsel between 2003 and May 2008 waived his/her right to counsel in a manner which satisfies the standard enunciated in *Commonwealth v. Monica*, 528 Pa. 266, 597 A.2d 600 (1991).

(continued...)

### III. SUMMARY OF ARGUMENT

Conahan's and Ciavarella's motions to dismiss must be denied. First, many of the out-of-court acts taken by Conahan and Ciavarella in furtherance of the conspiracy among them and other Defendants were plainly administrative and not protected by judicial immunity. Indeed, Conahan did not take *any* relevant in-court actions. And, while some of Ciavarella's and Conahan's acts were administrative, others – for instance, their acceptance of payoffs for unlawful conduct related to building and filling the facilities – were neither judicial nor administrative; with respect to these, they stand on the same footing as the private Defendants such as Powell and Mericle.

Second, as to Ciavarella's in-court acts, the absolute judicial immunity doctrine does not apply because none of the policies supporting it – namely, judicial independence and freedom to decide cases in a principled way, the availability of traditional appellate remedies, and protection of the integrity of the judicial process – would be furthered by doing so. To the contrary, applying the doctrine to Ciavarella's in-court conduct would undermine these policies.

_____

(continued...)

*Id.* ¶ 32. Special Master Grim also concluded that "Judge Ciavarella knew he was violating the law and court rules by failing to conduct any, or legally adequate, waiver of counsel colloquies for the juveniles appearing before him." *Id.* ¶ 33.

Moreover, Ciavarella's in-court conduct, spanning five years and injuring 6,500 children, so far exceeded constitutional bounds that he was effectively operating a Star Chamber. His misconduct is sharply distinguishable from that addressed in the cases he relies on.

Finally, Conahan incorrectly asserts that he is protected by absolute legislative immunity. Because he did not create, vote on, or sign into law the county budget, but instead in all relevant instances acted administratively and/or politically in facilitating and executing county contracts, he is not immune under this doctrine either.

## IV.   ARGUMENT

### A.   Legal Standard

In reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court must "'accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" *Fowler v. UPMC Shadyside*, __ F.3d __, No. 07-4285, 2009 WL 2501662, at *5 (3d Cir. Aug. 18, 2009) (quoting *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)).

A court may not dismiss a complaint merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits. *Phillips,*

515 F.3d at 231 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). The pleading standard "'does not impose a probability requirement at the pleading stage,'" *id.* at 234 (quoting *Twombly*, 550 U.S. at 556), but instead requires only that the complaint "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 570). The court must deny a motion to dismiss "'if, in view of what is alleged, it can reasonably be conceived that the plaintiffs . . . could, upon a trial, establish a case which would entitle them to . . . relief.'" *Phillips*, 515 F.3d at 233 (quoting *Twombly*, 550 U.S. at 563 n.8).

### B. Neither Ciavarella Nor Conahan Is Entitled To Absolute Judicial Immunity For His Administrative Acts

#### 1. Under The Judicial Immunity Doctrine, Judges Are Not Absolutely Immune From Liability For Their Administrative Acts

Judicial immunity arose out of the public interest that judges be free to exercise independent judgment in their performance of the quintessential judicial act – adjudicating cases – without fear of having to defend a damages suit in another forum. *See Dennis v. Sparks*, 449 U.S. 24, 31 (1980) (citing *Pierson v. Ray*, 386 U.S. 547, 554 (1967); *Bradley v. Fisher*, 80 U.S. 335, 349-50 (1871)). The United States Supreme Court has taken a "functional" approach in determining the applicability of the judicial immunity doctrine in which they "examine the nature of the functions with which a particular official or class of officials have been lawfully entrusted, and . . . seek to evaluate the effect that exposure to

particular forms of liability would likely have on the appropriate exercise of those functions." *Forrester v. White*, 484 U.S. 219, 224 (1988). This functional approach ensures that judges may be absolutely immune only for those acts that are performed as part of their official judicial duties.[14] *Clinton v. Jones*, 520 U.S. 681, 693-95 (1997); *Mireles v. Waco*, 502 U.S. 9, 12 (1991). Thus, the Court has held that judicial immunity does not protect judges when they carry out administrative functions, because liability for such acts will not have a chilling effect on the performance of the paradigmatic judicial function – the adjudication of actual cases or controversies. *See, e.g., Forrester*, 484 U.S. at 230 (holding that judge was not shielded from liability in damages suit under 42 U.S.C. § 1983 for his decision to demote and discharge former probation officer).

Courts have drawn a clear line between judicial and administrative acts, holding that only the former may be protected by absolute judicial immunity. "Administrative decisions, even though they may be essential to the very functioning of the courts, have not . . . been regarded as judicial acts." *Id.* at 228. To determine whether an act is administrative for purposes of judicial immunity, courts must assess the following: (1) the nature of the act itself (*i.e.,* whether it is a

---

[14] And in this case, they are also not immune for their purportedly "judicial acts" of, *inter alia*, denying juveniles the right to an impartial tribunal, denying their right to counsel, and denying their right to have their guilty pleas be knowing and informed. *See* Part IV.C., *infra.*

function normally performed by a judge); and (2) the parties' expectations (*i.e.,* whether the parties dealt with the judge in a judicial capacity). *Stump v. Sparkman*, 435 U.S. 349, 362 (1978); *Figueroa v. Blackburn*, 208 F.3d 435, 443 (3d Cir. 2000) (citing *Stump*, 435 U.S. at 362). "Whether the act done by [a judge] was judicial or not is to be determined by its character, not by the character of the agent." *Ex parte Virginia*, 100 U.S. 339, 348 (1879).

Conahan and Ciavarella engaged in administrative activities pursuant to a larger conspiracy that involved taking illegal payments in return for ensuring that Luzerne County contracted with the PACC and WPACC facilities and that those facilities were full so that they would be profitable. As discussed below, examination of their conduct through the lens of the judicial immunity jurisprudence leads to the conclusion that they are not absolutely immune from liability for the unlawful administrative acts that ultimately resulted in the violation of Plaintiffs' rights.

> **2.** **The Judicial Immunity Doctrine Does Not Provide Absolute Immunity To Conahan And Ciavarella For Administrative Acts They Took As Part Of The Scheme To Violate Plaintiffs' Constitutional Rights And Civil RICO Laws**

An individual claiming immunity has the burden of demonstrating his entitlement to it. *Butz v. Economou*, 438 U.S. 478, 506 (1978). Contrary to the bald assertions of Conahan and Ciavarella, Plaintiffs' complaints allege administrative, non-judicial, deeds by the former judges (*i.e.*, actions that did not

address the resolution of a dispute between parties), that were core components of the overall scheme that harmed Plaintiffs. Conahan and Ciavarella have failed to establish that they should be absolutely immune for these acts any more than, say, Mericle or Powell should be absolutely immune for their acts in furtherance of the scheme.

The fact that several responsibilities have been given to the president judge, *see* Part II.B.1, *supra*, does not make his exercise of them "judicial." As our jurisprudence has cautioned, "simply because rule making and administrative authority has been delegated to the judiciary does not mean that acts pursuant to that authority are judicial." *Morrison v. Lipscomb*, 877 F.2d 463, 466 (6th Cir. 1989); *see also Forrester*, 484 U.S. at 227 (noting that there is "an intelligible distinction between judicial acts and the administrative, legislative, or executive functions that judges may on occasion be assigned by law to perform"). At root, Conahan and Ciavarella, in return for payoffs, utilized their authority to undertake numerous unlawful administrative actions that were at the heart of the scheme from which Plaintiffs' causes of action arise.

As part of the overall scheme that ultimately resulted in the violation of Plaintiffs' rights, Conahan and Ciavarella engaged in at least three categories of administrative activities unprotected by judicial immunity: (1) undertaking efforts to close the county-run detention center and cause Luzerne County to contract with

PACC and WPACC; (2) creating and implementing policies and protocols that directed probation staff to influence and/or coerce youth and their families to appear at adjudicatory and disposition hearings without counsel; and (3) pressuring juvenile probation as a general practice to recommend detention and/or placement over release in their pre-disposition reports, and to "ramp up" placements in the PACC and WPACC facilities. Settled case law establishes that Conahan and Ciavarella are not absolutely immune for these actions.

> **(a)** **The Efforts By Ciavarella And Conahan To Cause Luzerne County To Close The River Street Facility And Contract With PACC And WPACC Agencies In Return For Improper Financial Compensation Were Administrative Acts Not Protected By <u>Absolute Judicial Immunity</u>**

As described in more detail in the Statement of Facts, Part II, *supra*, Conahan and Ciavarella, in return for financial payoffs, took actions to close the River Street facility and contract with PACC and WPACC. Acting in his capacity as president judge, Conahan determined that judges would no longer send youth to the River Street facility and worked toward having the county defund the facility, thus shutting it down.[15] (CAC ¶¶ 654-55; IC ¶¶ 34, 42, 66.) Ciavarella and Conahan also caused Luzerne County to contract with PACC and WPACC, and

_____

[15] As alleged in Plaintiff's proposed Amended Master Class Action Complaint at paragraph 657, the River Street facility's license was returned to the state.

assisted those two entities to secure agreements with Luzerne County worth tens of millions of dollars over a period of years for the placement of youth at their facilities. (CAC ¶ 663; IC ¶ 34; Information ¶ 5.) By working to close the River Street facility and arranging the contracts with PACC and WPACC, the former judges ensured that PACC was the only local facility available for the detention of juveniles. (CAC ¶¶ 652, 663; IC ¶¶ 34, 39, 41, 66.) As described in more detail in Parts II.B.1 and B.2, *supra*, Ciavarella and Conahan were financially compensated for their conduct in facilitating the construction of the PACC and WPACC facilities and the Luzerne County contracts. Moreover, other scheme participants understood the payments to be a *quid pro quo* for the judges' agreement to send juveniles to the PACC and WPACC facilities and other related acts.

Actions involving the selection of a provider to operate a correctional facility or the establishment of contract terms with a provider are administrative acts. *See Alexander v. Tarrant County*, No. 03-1280Y, 2004 WL 1884579, at *3 (N.D. Tex. Aug. 23, 2004) (concluding judges were not entitled to absolute judicial immunity in a civil rights suit because judges' decisions pertaining to county's contract with correctional facility operator were administrative). Thus, Conahan's and Ciavarella's efforts to close the county-run River Street facility – actions taken to put PACC in place as the service provider – and in causing the county to

contract with PACC and WPACC are administrative actions unprotected by absolute judicial immunity.

Offering no case support at all, Ciavarella argues that he is entitled to absolute judicial immunity for all his conduct because Plaintiffs' claims involve his judicial orders adjudicating juveniles and placing them in the PACC and WPACC facilities. (Ciavarella Br. 8.) While Plaintiffs contend that even Ciavarella's adjudication of thousands of juveniles in violation of their constitutional rights is not shielded by absolute immunity,[16] even if Ciavarella were immune for those formal acts, that would not absolve him from liability for taking administrative actions critical to the corrupt scheme. It is recognized that actions by a judge taken in a non-judicial capacity to affect or influence where an adjudicated or convicted individual is confined may be administrative acts that are not covered by judicial immunity. *See Goldhaber v. Higgins*, 576 F. Supp. 2d 694, 707-08 (W.D. Pa. 2007).

*Goldhaber* is instructive. In addressing a situation in which the defendant judge was acting both as a judge and prison board member, the *Goldhaber* court held that any actions taken by the judge in his latter capacity to cause the plaintiff's transfers among correctional facilities were not judicial acts cloaked with absolute

---

[16] *See* Part IV.C., below, for a full analysis of why Ciavarella is not protected by absolute judicial immunity for those thousands of adjudications.

immunity.  *Id.* at 706 (citing *Padgett v. Stein*, 406 F. Supp. 287, 305 (M.D. Pa. 1975)).  The court reasoned that "merely having presided over a person's trial does not automatically render all of [a] judge's actions affecting that person judicial," and "it does not follow that an act is inherently judicial merely because it involves the interaction between a judge and someone over whom the judge possesses jurisdiction."  *Id.* at 707.

Here, Conahan and Ciavarella took the administrative actions described above as an essential part of their overall scheme to maximize the number of youth placed at PACC and WPACC.  These actions resulted in the closure of the River Street facility and the construction and utilization of the PACC facility.  Consequently, the only option for detaining youth in Luzerne County was the PACC facility, precisely what Defendants intended.

Because Conahan never presided over any of the Plaintiffs' adjudications or dispositions, all of his activities as part of the overall scheme to increase the placement of youth in PACC and WPACC were non-judicial in nature.[17]  And

-------

[17] Plaintiffs further note that while many of the non-judicial acts of Conahan and Ciavarella described in Part II.B.2, *supra*, were administrative, Conahan and Ciavarella engaged in other non-judicial activities described in that section that cannot even be classified as administrative.  These acts included conspiring with others to build the facilities and to violate Plaintiffs' rights and federal and state laws in return for improper payoffs.  Therefore, the Court must analyze their liability for these acts *outside* of the judicial immunity framework, just as the Court would assess the liability of Powell, Mericle and the others who are not judges.

(continued...)

while Ciavarella presided over the juveniles' hearings and entered detention and placement orders, that fact does not grant him absolute immunity for his separate administrative acts which were intended to, and did, increase the likelihood that the youth he adjudicated delinquent would be placed at the PACC and WPACC facilities. Neither Conahan nor Ciavarella can invoke judicial immunity to avoid liability for these actions.

"[I]mmunity is justified and defined by the *functions* it protects and serves, not by the person to whom it attaches." *Forrester*, 484 U.S. at 227. The fundamental policy underlying the judicial immunity doctrine, as articulated by the Supreme Court in *Pierson*, 386 U.S. at 554, is the protection of the judge's principled decision-making. Here, there is no reason whatsoever for judicial immunity to protect (a) the efforts to close the River Street facility, or (b) the acceptance of bribes to cause the county to contract with private facilities. These acts are not functions normally performed by judges, much less functions central to their adjudicatory duties. Because holding that Conahan and Ciavarella may be liable for such acts will not even colorably cause "timidity" among judges that

_____

(continued...)

Because Conahan, in particular, issued no orders in Plaintiffs' individual delinquency adjudications, he stands on no different legal footing than the other Defendants with respect to his liability for his performance of the same non-judicial, non-administrative acts.

"would manifestly detract from independent and impartial adjudication," *Forrester*, 484 U.S. at 227; immunity for the acts is entirely unwarranted.

> **(b)** **Ciavarella's Policy Directing The Juvenile Probation Office To Encourage And/Or Coerce Youth And Their Parents To Proceed To Court Without First Obtaining Legal Representation Was Administrative Conduct Not Covered By Judicial Immunity**

As described above in Part II.C.2, Ciavarella implemented a general policy directing probation and court staff to encourage and/or coerce youth to appear before him without legal representation. (CAC ¶ 686.) As part of that policy, Ciavarella instructed the county juvenile probation office to draft a form that purported to effect a waiver of a youth's right to counsel. (*Id.*) On Ciavarella's instructions, probation staff routinely provided this form to children and their parents to sign before entering his courtroom, thus exerting pressure and influence on these families to proceed without counsel in the youth's adjudicatory and/or disposition hearings. (*Id.*) Ciavarella's creation and implementation of this protocol was unconnected to the resolution of any one case, but instead was an administrative policy that directed court personnel to perform a task that would make all compliant youth vulnerable in their hearings; Ciavarella is not absolutely immune for this plainly administrative activity.

The Sixth Circuit's decision in *Morrison*, 877 F.2d 463, is instructive. There, the plaintiff-landlord attempted to file a writ of restitution to retrieve his

rental property from a tenant delinquent in rental payments. *Id.* at 464. However, the court clerk refused to process the writ, citing a moratorium ordered by the chief judge. *Id.* The plaintiff-landlord brought a § 1983 action alleging, *inter alia*, that the chief judge had deprived him of his constitutional rights. *Id.*

The court held that judicial immunity did not apply to the moratorium order because the action was administrative and not adjudicative. *Id.* at 466. Key to the court's holding was its finding that the moratorium was a general order unconnected to any particular litigation and only instructed court personnel on how to (or not to) process petitions. *Id.* As the court noted: "Any time an action taken by a judge is not an adjudication between parties, it is less likely that the act is a judicial one." *Id.*; *see also Supreme Court of Va. v. Consumers Union of the United States, Inc.*, 446 U.S. 719, 731 (1980) (judicial immunity does not extend to judges acting to promulgate a code of conduct for attorneys, as it is not an act of adjudication but of rulemaking).

Similarly, Ciavarella's actions in directing court personnel to take affirmative steps to ensure that youth appearing before him were unrepresented by counsel was a generalized policy unrelated to any particular case, but instead was a set of instructions as to how probation was to process the cases. Because Ciavarella's policy as to probation procedure does not fall within the paradigmatic

judicial act of adjudicating a single case before him, he is not entitled to absolute immunity from liability for the policy.

### (c) Conahan And Ciavarella Are Not Absolutely Immune From Liability For Pressuring Juvenile Probation To Institute A Generalized Practice Of Recommending Detention And Placement Over Release And To "Ramp Up" Placements In PACC And WPACC

To ensure the placement of sufficient youth in the facilities from which Ciavarella and Conahan derived improper income, Ciavarella exerted pressure on probation officers to recommend detention or placement in their reports to the court, even when the officers believed that release was more appropriate, and both Ciavarella and Conahan directed probation staff to generally "ramp up" admissions to PACC and WPACC. (CAC ¶¶ 675, 679; IC ¶¶ 67-68.) Indeed, probation staff members were compelled to follow these policies under threat of suspension, demotion or other discipline. (CAC ¶ 680.) These directives to probation, plainly designed both to increase placements at PACC and WPACC and to create a veneer of appropriateness for those placements, were an integral component of the scheme to deny Plaintiffs their constitutional rights in exchange for illegal payments.

"Functions that might be deemed integrally related to the judicial process when undertaken in the context of a particular case may be viewed as administrative when they are undertaken outside that context." *Mitchell v. Fishbein*, 377 F.3d 157, 174 (2d Cir. 2004) (holding that act of formulating a list of

attorneys deemed qualified to represent indigent defendants is an inherently administrative act, regardless of whether the actor was a judge). Ciavarella's actions in pressuring probation staff to recommend out-of-home placement over release, and Conahan's and Ciavarella's "ramping up" directives to ensure that more youth were placed at PACC and WPACC, were unrelated to the adjudication of any single case and, as such were administrative, rather than judicial. Similarly, the act of regularly instructing probation officers to change recommendations against their better judgment and under threat of punishment was a practice unrelated to a specific case but rather was a general pattern designed to increase detentions. Applying the factors described in *Morrison*, 877 F.2d at 466, the directives of Conahan and Ciavarella were therefore not judicial acts. As such, they are not subject to a claim of judicial immunity.

### C. Ciavarella Is Not Entitled To Absolute Judicial Immunity For His Purported "Judicial Acts" Inside His Courtroom

Ciavarella contends that since the core of Plaintiffs' claims against him focus on his courtroom denial of Plaintiffs' constitutional rights, he is entitled to hide behind the cloak of absolute judicial immunity. Ciavarella relies primarily on *Pierson*, 386 U.S. 547; *Stump*, 435 U.S. 349; *Bradley*, 80 U.S. 335; and *Mireles*, 502 U.S. 9, arguing that they stand for the proposition that absolute judicial immunity protects a judge's courtroom acts, regardless of their motivation, unless

the acts were taken in the absence of all jurisdiction or the acts were not "truly judicial acts." *Forrester*, 484 U.S. at 227.

As detailed below, Ciavarella's position is entirely without merit. In addition to the fact that much of Ciavarella's unlawful conduct alleged in the Complaint was administrative rather than judicial, *see* Part IV.B., above, Ciavarella's position utterly ignores the unprecedented scope and magnitude of what he did. Every single one of the cases on which he relies involved isolated instances of misconduct. It is fully consistent with those cases, and indeed compelled by the policies that underlie them, to hold that the "courtroom" conduct at issue here – the violation of 6,500 juveniles' constitutional rights over five years[18] – is not protected by absolute judicial immunity. Ciavarella's "courtroom" was *not* a true courtroom and his challenged acts were *not* "truly judicial acts"; rather, Ciavarella's court was nothing more than an assembly line to process juveniles whose unconstitutional adjudications were largely foreordained as a *quid pro quo* for millions of dollars of payoffs. Policy, history and applicable case law all mandate the rejection of Ciavarella's absolute immunity claim.

---

[18] In oral arguments before Special Master Grim, Luzerne County District Attorney Jacqueline Musto Carroll estimated that 6,500 youth appeared before Ciavarella during the relevant time period. *See* Transcript of Oral Argument at 51, *In re J.V.R.*, No. 81 M.M. 2008 (Pa. July 17, 2009).

### 1. The Modern Juvenile Court Reflects Core Constitutional Values Essential To The Legitimacy Of That Tribunal

The American legal system derives its legitimacy from core principles in the United States Constitution that govern proceedings in our civil and criminal courts. These principles reflect the country's historic commitment to protecting the rights of the accused against the unbridled power of the government and to ensuring that individuals are not stripped of liberty or property without due process of law.

Throughout our history, these fundamental concepts have been molded by emerging circumstances to give shape and definition to often abstract notions. Mindful of the abuses of the Star Chamber in seventeenth century England, *see* Geoffrey Robertson, *The Tyrannicide Brief: The Story of the Man Who Sent Charles I to the Scaffold* (Anchor Books 2007), the Founders and their successors crafted a legal system that protected rights against self-incrimination and forced confessions, *see Pennsylvania v. Muniz*, 496 U.S. 582 (1990), and that was accusatorial rather than inquisitorial, *see Watts v. Indiana,* 338 U.S. 49, 54 (1949). Ours is a justice system characterized by "[t]he requirement of specific charges, their proof beyond a reasonable doubt, the protection of the accused from confessions extorted through whatever form . . . the right to assistance of counsel, to be supplied by government when circumstances make it necessary, [and] the duty to advise an accused of his constitutional rights." *Id.* at 54.

While these principles did not initially take root in the juvenile justice system, in 1967, the United States Supreme Court, in the seminal case of *In re Gault,* abandoned decades of "unbridled discretion" for juveniles in favor of "principle and procedure."  In *Gault,* the Court extended fundamental due process rights to children accused of crimes.  In doing so, the Court underscored:

> Due process of law is the primary and indispensable foundation of individual freedom. It is the basic and essential term in the social compact which defines the rights of the individual and delimits the powers which the state may exercise. As Mr. Justice Frankfurter has said: "The history of American freedom is, in no small measure, the history of procedure."

*Id*. at 20-21.  The Court further wrote:

> Juvenile Court history has again demonstrated that unbridled discretion, however benevolently motivated, is frequently a poor substitute for principle and procedure. In 1937, Dean Pound wrote: "The powers of the Star Chamber were a trifle in comparison with those of our juvenile courts . . . ." The absence of procedural rules based upon constitutional principle has not always produced fair, efficient, and effective procedures. Departures from established principles of due process have frequently resulted not in enlightened procedure, but in arbitrariness**.**

*Id*. at 18-19.

And, in his concurrence in *Gault*, Justice Black spoke directly of the sanctity of the Constitution's safeguards and the requirement that judges abide by them:

> Whether labeled as "procedural" or "substantive," the Bill of Rights safeguards, far from being mere "tools

with which" other unspecified "rights could be fully vindicated," are the very vitals of a sound constitutional legal system designed to protect and safeguard the most cherished liberties of a free people . . . . Freedom in this Nation will be far less secure the very moment that it is decided that judges can determine which of these safeguards "should" or "should not be imposed" according to their notions of what constitutional provisions are consistent with the "traditions and conscience of our people." *Judges with such power . . . will be above the Constitution*, with power to write it, not merely to interpret it . . . .

*Id*. at 62-63 (Black, J., concurring) (emphasis added).

Justice Black's admonition that allowing judges to determine which Constitutional safeguards to extend to litigants would place them "above the Constitution" deftly forecast what happened in Ciavarella's courtroom. By eliminating the most fundamental due process guarantees – the right to counsel, the right against self-incrimination, the right to enter only knowing and voluntary guilty pleas, and the right to appear before an impartial tribunal – Ciavarella, in return for millions of dollars in payoffs, effectively re-cast his courtroom as a Star Chamber or kangaroo court.[19] For more than five years, in approximately 6,500

---

[19] The term "kangaroo court" is popularly used to describe "an unfair, biased, or hasty judicial proceeding that ends in a harsh punishment;" or "a proceeding and its leaders who are considered sham, corrupt, and without regard for the law." *Kangaroo Court*, West's Encyclopedia of American Law (2005), http://www.encyclopedia.com/doc/1G2-3437702523.html. The U.S. Supreme Court has itself used the term. *See, e.g., Gault,* 387 U.S. at 28; *Williams v. United States,* 341 U.S. 97, 101 (1951).

cases, Ciavarella repeatedly ignored the Constitution and substituted his own brand of "justice," influenced by the payoffs he received, for the children who appeared before him. After running a "courtroom" for five years that lacked the core indicia of a lawful tribunal, Ciavarella cannot now seek to immunize his conduct through a doctrine intended to protect judges acting in good faith to uphold the Constitution and to promote the integrity of the justice system.[20]

---

[20] In an opinion issued just days ago, *Al-Kidd v. Ashcroft*, the Ninth Circuit, holding that former Attorney General John Ashcroft was not entitled to either absolute or qualified immunity, used language, applicable by analogy here, to characterize Ashcroft's alleged conduct:

> The Fourth Amendment was written and ratified, in part, to deny the government of our then-new nation such an engine of potential tyranny. And yet, if the facts alleged in al-Kidd's complaint are actually true, the government has recently exercised such a "dangerous engine of arbitrary government" against a significant number of its citizens, and given good reason for disfavored minorities (whoever they may be from time to time) to fear the application of such arbitrary power to them.

> We are confident that, in light of the experience of the American colonists with the abuses of the British Crown, the Framers of our Constitution would have disapproved of the arrest, detention, and harsh confinement of a United States citizen as a "material witness" under the circumstances, and for the immediate purpose alleged, in al-Kidd's complaint . . . .We find this to be repugnant to the Constitution, and a painful reminder of some of the most ignominious chapters of our national history.

(continued...)

### 2. Denying Ciavarella Absolute Immunity For His Courtroom Conduct Will Not Weaken Or Undermine The Policies Underlying The Judicial Immunity Doctrine

As discussed below, denying Ciavarella the benefit of absolute judicial immunity for his systemic violations of Plaintiffs' constitutional rights will not weaken or undermine at all the doctrine or any of the policies it furthers.[21]  To the

---

(continued...)

__ F.3d __, No. 06-36059, 2009 WL 2836448, at *27 (9th Cir. Sept. 4, 2009) (quoting 1 William Blackstone, Commentaries on the Laws of England 131-32 (1765)).

[21] The checkered history of absolute judicial immunity is of interest by way of background.  After the mid-seventeenth century, English law began to distinguish between superior courts (later analogized to American courts of general jurisdiction) and inferior courts (later analogized to American courts of limited jurisdiction) for purposes of judicial immunity.  *See* Jay M. Feinman & Roy S. Cohen, *Suing Judges:  History and Theory*, 31 S.C. L. Rev. 201, 214-18 (1980) [hereinafter *Suing Judges*].  Only superior courts judges were immune from suit for acts taken in the absence of jurisdiction.  *Id.* at 214.

In the early United States, as in England, "[i]mmunity was the rule for some judges some of the time, but . . . American courts also held many, if not most, judicial officers liable for their wrongful acts much, if not most, of the time."  *Id.* at 237.  The United States Supreme Court created the modern test of judicial immunity in *Bradley*, 80 U.S. 335, in which it "blurr[ed] the distinction between superior and inferior courts and . . . remov[ed] the qualification of liability for malicious acts," *Suing Judges* 245.   However, at the time, "there was great divergence among the states and there were no firmly established rules . . . ."  Erwin Chemerinsky, *Federal Jurisdiction* 510-11 (4th ed. 2003) (citing Note, *Liability of Judicial Officers Under Section 1983*, 79 Yale L. Rev. 322, 326-27 (1969) [hereinafter *Liability of Judicial Officers*]).  "By 1871, thirteen states had adopted the absolute immunity rule; six states had ruled that judges were liable if they acted maliciously; in nine states, courts had faced the issue but had not ruled

(continued...)

contrary, affording Ciavarella immunity would mock the very values the doctrine aims to protect, and will only embolden the hopefully few rogue members of the judiciary to shred the Constitution with abandon as they purport to dispense "justice" in their "courtrooms."

In 1967, the Supreme Court held in *Pierson* that absolute judicial immunity applies within the context of a suit brought under 42 U.S.C. § 1983. 386 U.S. at 553-54. The Court identified the central policy considerations on which the doctrine is based: (a) protection of a judge's ability to address controversial issues

_____

(continued...)

clearly one way or the other; and nine states had apparently not yet faced the issue." *Liability of Judicial Officers* 327 (internal footnotes omitted).

Section 1983 was enacted in 1871, the year *Bradley* was argued before the Supreme Court, and "[t]he first few courts that explored the question of whether judicial immunity applied to actions under Section 1983 concluded that it did not." *Id.* at 324. However, the Supreme Court ultimately held in *Pierson* in 1967 that absolute judicial immunity applies within the context of a suit brought under § 1983. In doing so, the Court relied on an observation, criticized by some and perhaps somewhat belied by the history set forth above, that "[f]ew doctrines were more solidly established at common law than the immunity of judges from liability for damages for acts committed within their judicial jurisdiction," 386 U.S. at 553-54. *See Liability of Judicial Officers* 325-26 (internal footnote omitted); *Suing Judges* 203-04.

Significantly, the modern absolute judicial immunity doctrine developed from discrete and isolated instances of judicial misconduct. Nothing found by Plaintiffs in the history of the doctrine addresses a situation remotely like the one here, alleging thousands of constitutional violations affecting thousands of children over five years.

without fear of personal liability, (b) the adequacy of appellate review as a substitute for judicial liability, and (c) preservation of the integrity of the judicial process. It explained that the doctrine of immunity is "for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence and without fear of consequences." *Id*. at 554 (internal quotations omitted). Additionally:

> It is a judge's duty to decide all cases within his jurisdiction that are brought before him, including controversial cases that arouse the most intense feelings in the litigants. His errors may be corrected on appeal, but he should not have to fear that unsatisfied litigants may hound him with litigation charging malice or corruption. Imposing such a burden on judges would contribute not to principled and fearless decisionmaking but to intimidation.

*Id.*[22]; *see also Bradley*, 80 U.S. 335.

---

[22] Justice Douglas noted several related concerns that have been identified in defending the doctrine:

> (1) [P]reventing threat of suit from influencing decision; (2) protecting judges from liability for honest mistakes; (3) relieving judges of the time and expense of defending suits; (4) removing an impediment to responsible men entering the judiciary; (5) necessity of finality; (6) appellate review is satisfactory remedy; (7) the judge's duty is to the public and not to the individual; (8) judicial self-protection; (9) separation of powers.

*Pierson*, 386 U.S. at 564 n.4 (Douglas, J., dissenting) (citing Edward G. Jennings, *Tort Liability of Administrative Officers*, 21 Minn. L. Rev. 263, 271-72 (1937)).

The facts alleged here should be viewed in light of these policies. The story of what transpired in Ciavarella's courtroom paints an unprecedented picture of judicial corruption. Far from the isolated acts described in every reported case to date in which damages for alleged judicial misconduct were sought, Ciavarella's corruption spree spanned more than five years and touched the lives of each of the 6,500 children who appeared before him. As Plaintiffs allege, Ciavarella's conduct led directly to the violation of each of these children's constitutional rights – their right to appear before an impartial tribunal, and, in thousands of cases a violation of their constitutional rights to counsel, rights against self-incrimination and/or rights to enter only knowing and voluntary guilty pleas as well. (CAC ¶ 681.) It appears that no comparable judicial scandal has occurred in the history of the American legal system.

Given the unique and shocking characteristics of this scandal, it is hardly surprising that there is no judicial precedent directly on point to guide this Court. Yet the absence of such case law does not – and cannot – preclude a resolution that redresses the wrongs reflected in these facts. As the Supreme Court recently recognized in confronting a judicial bias claim arising from an unprecedented level of judicial campaign contributions, it could not shrink from considering the claim merely because the facts were novel. *See Caperton v. A.T. Massey Coal Co.*, 129

S. Ct. 2252 (2009).  Indeed, the very enormity of the disparity between the facts in *Caperton* and prior cases required a resolution.  The Court wrote:

> It is true that extreme cases often test the bounds of established legal principles, and sometimes no administrable standard may be available to redress the perceived wrong.  *But it is also true that extreme cases are more likely to cross constitutional limits, requiring this Court's intervention and formulation of objective standards*.  This is particularly true when due process is violated.

*Id*. at 2265 (emphasis added).

This Court likewise cannot shrink from resolving the immunity claims before it merely because the facts are novel.  That no similar demonstration of such pervasive lawlessness by a judge may have previously occurred cannot foreclose an analysis as to whether the conduct is anathema to the principles and policies which judicial immunity has been adopted to address.[23]  Evidence that Ciavarella has "cross[ed] constitutional limits" is abundant.  Here, Justice Douglas's dissent in *Pierson*, while not controlling there, has a force of logic that, we submit, would be readily endorsed by the *Pierson* majority under the extraordinary circumstances presented here:

> The immunity which the Court today grants the judiciary is not necessary to preserve an independent judiciary.  If the threat of civil action lies in the background of

---

[23] And, as in *Caperton*, this Court, of course, must look to the policies in existing case law to guide its determination of the exceptional question before it.

litigation, so the argument goes, judges will be reluctant to exercise the discretion and judgment inherent and vital to the effective operation of the judiciary. We should of course not protect a member of the judiciary "who is in fact guilty of using his powers to vent his spleen upon others, or for any other personal motive not connected with the public good" . . . . *To deny recovery to a person injured by the ruling of a judge acting for personal gain or out of personal motives would be "monstrous."*

386 U.S at 564 (Douglas, J., dissenting) (emphasis added) (internal citations omitted).

Against that background, none of the three policies set forth in *Pierson* would be furthered by the application of absolute judicial immunity to Ciavarella's courtroom conduct.

> **(a)    The Freedom To Decide Controversial Cases In A Principled Way Without Fear Of Personal Liability Would Not Be Compromised By Declining To Extend Ciavarella Absolute Judicial Immunity For His Purported "Judicial Acts"**

The Court's concern that members of the judiciary be free to decide the cases before them, independently and in a principled way, without fear of repercussions from unhappy litigants, will not be weakened or diminished by declining to grant Ciavarella immunity here. What happened every day in Ciavarella's courtroom over a period of five years bears no resemblance to the routine adjudications of controversies by judges in courtrooms elsewhere throughout the country, performed consistent with prevailing constitutional and

legal mandates, and uninfluenced by personal considerations or other unlawful factors. And, while courts have held that absolute judicial immunity for a judge engaged in discrete instances of misconduct is not lost in the face of a malicious or corrupt motive, *see, e.g.*, *Mireles*, 502 U.S. at 11, the role that corrupt motive played in the thousands of cases decided by Ciavarella between 2003 and May 2008 casts the ostensible "need" to protect him in an entirely different light; it is simply not credible that holding Ciavarella liable here for such unprecedented conduct would in any way chill the independent or "principled and fearless decisionmaking," *Pierson*, 386 U.S. at 554, of other judges.

Indeed, in holding Ciavarella potentially liable for systemic concealed misconduct present here, the concern for "principled and fearless decision-making" would be advanced, not undermined. And the related concern for "protecting judges from honest mistakes," *id.* at 564 n.4 (Douglas, J., dissenting), is absurd in this context, where *dishonest* decision making was Ciavarella's "rule" in thousands of cases. Likewise, the fear that imposing liability here will pose an "impediment to responsible men entering the judiciary," *id.*, is manifestly inapplicable; it is impossible to imagine an honest or responsible lawyer being dissuaded from seeking a judgeship based upon this Court's denial of immunity to Ciavarella.

Finally, a holding that judicial immunity does not protect Ciavarella's unlawful conduct would not open a floodgate of litigation from aggrieved parties

alleging unlawful judicial conduct. Here, Plaintiffs allege a corruption scheme unique in its scope and effect. Concluding *in this instance* that Plaintiffs' claims are not barred by judicial immunity will not cause other judges "to fear that unsatisfied litigants may hound [them] with litigation charging malice or corruption," *Pierson*, 386 U.S. at 554.[24]

> **(b)      The Lack Of Available Appellate Remedies For Plaintiffs To Correct Ciavarella's Errors Undercuts Any Justification For Judicial Immunity In This Case**

To the extent that the judicial immunity doctrine is justified by the ability of an aggrieved party to seek appellate relief, *see, e.g., Forrester v. White,* 792 F.2d at 647, 661 (7th Cir. 1986) (Posner, J., dissenting) ("[T]he victim of a wrongful judicial ruling ordinarily has a remedy by way of appeal to a higher court."), that justification loses all force when applied to Plaintiffs because they lacked any meaningful right to appeal. This is especially true of those Plaintiffs who appeared without counsel or entered "admissions" or guilty pleas without a proper colloquy.

---

[24] It is worth remembering that the Pennsylvania Supreme Court has ordered that *hundreds* of juvenile adjudications be vacated, and Special Master Grim has recommended that the Pennsylvania Supreme Court vacate *all* of the thousands of juvenile adjudications entered by Ciavarella over the relevant five-year period.

Pennsylvania Rules of Appellate Procedure require that an appellant file a notice of appeal within thirty days of the entry of an order.  *See* Pa. R.A.P. 903.[25] Since Plaintiffs had no knowledge of Ciavarella's financial interest in their adjudications until federal charges were filed against Conahan and Ciavarella in January 2009, Plaintiffs had no ability to appeal their adjudications and placements based on an impartial tribunal claim, since the thirty-day window to file a notice of appeal had already expired – in many cases years earlier. Moreover, Plaintiffs could not raise their claims through the Post-Conviction Relief Act (PCRA) because the statute does not apply to juveniles.  *See In re DelSignore,* 375 A.2d 803, 806 n.3 (Pa. Super. Ct. 1977).

Moreover, Plaintiffs who were adjudicated delinquent without counsel were not informed of their appellate rights and, without counsel, surely lacked a meaningful opportunity to seek appellate relief.  Plaintiffs adjudicated delinquent based on their admissions or guilty pleas were also particularly limited in their ability to challenge their adjudications or placement.  Pursuant to Rule 407 of the Rules of Juvenile Court Procedure, "[a]n admission cannot be withdrawn after the court enters the dispositional order."  Additionally, an appellant who pleads guilty waives all appeal grounds except challenges to the "jurisdiction of the court, the

---

[25] Appeals from juvenile court are governed by the Rules of Appellate Procedure.  *See In re Thomas*, 626 A.2d 150, 153 (Pa. 1993).

legality of the sentence and the validity of the plea." *Commonwealth v. Moyer,* 444 A.2d 101, 102 (Pa. 1982). Ciavarella, however, did not inform Plaintiffs of their limited right to appeal their admissions or guilty pleas (*see* CAC ¶ 683), and, given Plaintiffs' young age, lack of sophistication, the lack of colloquy, and in so many cases the lack of counsel, they had no meaningful notice of their right or ability to appeal.

Finally, the fact that Ciavarella's courtroom, like other juvenile courtrooms, was generally closed to the public compounded the obstacles to Plaintiffs' knowingly exercising their rights to appeal. With Ciavarella's proceedings essentially behind closed doors, the possibility that other informed members of either the legal profession or the community would alert Plaintiffs to the injustices they had experienced – or their right of appeal – was simply absent. Without counsel or other informed individual to advise them of their rights, Plaintiffs were effectively foreclosed from challenging their adjudications in a timely and meaningful way.[26]

_____

[26] The fact that Plaintiffs ultimately persuaded the Pennsylvania Supreme Court to exercise its King's Bench jurisdiction does not alter or weaken this analysis. That jurisdiction is an extraordinary and highly discretionary remedy rarely exercised by the Pennsylvania Supreme Court. Having none of the earmarks of an appeal as of right, this is hardly a substitute for the lack of traditional appellate remedies for Plaintiffs in the proceedings before Ciavarella. Moreover, the power of the Special Master appointed by the Supreme Court in the exercise of

(continued...)

### (c)　Granting Immunity To Ciavarella Will Not Protect The Integrity Of The Judicial Process

In his dissent in *Forrester*, 792 F.2d 647, a Seventh Circuit case in which the majority decision was ultimately reversed by the Supreme Court, *Forrester*, 484 U.S. 219, Judge Posner reminded his fellow judges of the delicate but critical balance that must be struck in considering claims of immunity in our constitutional legal system:

> [T]he purpose of absolute immunity is not to make life easy for officials of any branch of government; it is not to foster judicial peace of mind.  We must not allow our vocationally sharpened sensitivity to the difficulties of performing judicial duties in this contentious era to influence us to immunize ourselves and other judges from the hazards of public office.  *The only tenable rationale of absolute immunity is the need to protect officials from being seriously deflected from the effective performance of their duties. Absolute immunity is strong medicine, justified only when the danger of such deflection is very great.* Analysis thus requires careful attention to the tradeoffs involved in a judgment to grant absolute immunity.

762 F.2d at 660 (Posner, J., dissenting) (emphasis added to highlight text quoted with approval by the Supreme Court majority in *Forrester*, 484 U.S. at 230).

_____

(continued...)

its jurisdiction is limited to vacating and expunging adjudications and does not extend to the damages remedy sought here.

In the case at bar, the Court is confronted with what is the clearest example imaginable of how a *grant* of judicial immunity for purportedly judicial acts will itself distort the very values we hold dear – and how a *grant* of immunity will work to the public's detriment. Denying Ciavarella's victims the ability to seek compensation from him would profoundly undermine the public's already shaky faith in the integrity of the judicial process and would serve absolutely no public purpose.

As in *Caperton*, this is a case of exceptional conduct that has "cross[ed] constitutional limits, requiring this Court's intervention and formulation of objective standards." 129 S. Ct. at 2265. It would be ironic indeed if a doctrine rooted in the principle that judges must be spared from making rulings influenced by considerations personal to themselves, such as the threat of a lawsuit, *Randall v Brigham*, 74 U.S. 523 (1868), could spare judges from litigation when the very motivation behind their decision-making in thousands of cases over five years was their own financial gain. Such a result would flip the very principle and purpose of judicial immunity on its head.

**3.** **Because Ciavarella's Courtroom Misconduct So Far Exceeded The Bounds Of The Constitution That He Was Effectively Operating A Star Chamber Or "Illegal Courtroom," He Is Barred From Claiming Absolute Judicial Immunity For His Purported "Judicial Acts" Denying Plaintiffs Their Constitutional Rights**

At its root, the judicial immunity doctrine presupposes the existence of a judge operating a legitimate courtroom; its key purpose, to protect the integrity of the judicial process, can only be accomplished in the context of a framework of legitimacy. But what if the courtroom misconduct, as asserted here, is so extreme as to destroy the legitimacy of the tribunal in which it occurred, so extreme as to destroy the legitimacy of the judge himself? Where the judge in the daily operation of his courtroom has for five years tossed aside core indicia of a constitutional tribunal in favor of an unlawful proceeding devoid of the most fundamental earmarks of due process, he cannot then seek the protection of judicial immunity for purported "judicial acts" when the litigants, unknowingly caught up in his illegal game, finally discover it and step forward to seek redress.

In Lewis Carroll's *Alice's Adventures in Wonderland,* the Red Queen, presiding over the Knave's trial, suddenly declares "Sentence first – then Verdict afterwards." "Stuff and nonsense!" said Alice loudly. "The idea of having the sentence first!" Lewis Carroll, *Alice's Adventures in Wonderland* 115 (Signet Classic Printing ed. 2000) (1865). The book depicts a courtroom nightmare from which Alice awoke. Unfortunately, the children who appeared before Ciavarella

were not so lucky; there was nothing imagined about their experiences – only the plain reality, unabated for over five years, that when they walked through the doors of his courtroom they were unknowingly transported to what was in effect a contemporary Star Chamber, devoid of procedure, marked by arbitrariness, and corrupt to its core.

### (a) Similarities Between The Star Chamber And Ciavarella's Courtroom

The Court of Star Chamber began early during the reign of Henry VII and was abolished by Parliament in 1641 because of its despotic nature and its failure to protect the rights of citizens under the common law. Thomas Pitt Taswell-Langmead, *English Constitutional History* 194-95 (Stevens & Haynes, 4th. ed. 1890). Several of its fatal flaws are remarkably analogous to those that characterized Judge Ciavarella's courtroom. First, sentences were notoriously arbitrary. *Black's Law Dictionary* (8th ed. 2004) (explaining the Star Chamber was "noted for its secretive, arbitrary, and oppressive procedures"). Second, the right to counsel accorded all Star Chamber defendants was not meaningful because an attorney's ability to effectively represent his client was severely inhibited. For example, after a defendant submitted his plea, he would be interrogated privately by an official of the court. Edward P. Cheyney, *The Court of Star Chamber*, 18 Am. Hist. Rev. 738 (1913). The defendant's counsel was not permitted to advise his client during the interrogation. *Id.* Third, defendants could be forced to testify

as a means of compelling confessions from them.  Some Star Chamber defendants were coerced into taking the oath *ex officio*, which required them to answer all questions asked by the court (defendants had no protection against self incrimination).  Neill H. Alford, Jr., *The Right of Silence*, 79 Yale L.J. 1618, 1619-1620 (July 1970) (book review).  Finally, as judges on the Star Chamber lacked impartiality,[27] corruption in the courtroom was common.[28]

The parallels to Judge Ciavarella's courtroom are striking.  First, Ciavarella routinely imposed unduly harsh dispositions to youth for minor infractions.  For example, he ordered Plaintiff P.S. detained for approximately twelve months for stealing loose change from unlocked cars, and he sent plaintiff Angelia Karsko to the PACC facility for an indefinite term for writing on a street sign with a felt tip pen.  (CAC ¶¶ 224-31; 613-16.)  No less than with the Star Chamber, the severity and capriciousness of Ciavarella's adjudications undermined his legitimacy.

---

[27] Judges on the Star Chamber were appointed by the King; in many cases they were members of the Privy Council (the king's private council).  Geoffrey Robertson, *The Tyrannicide Brief: The Story of the Man Who Sent Charles I to the Scaffold* 47 (Anchor Books 2007).

[28] For example, while it was well outside the scope of its authority to do so, the Star Chamber often enforced royal decrees. *See* Case of Proclamations, 2 St. Tr. 723 (1611) (Coke, C.J.); John Phillips Kenyon, *The Stuart Constitution, 1603-1688: Documents and Commentary* 106 (2d ed. 1986).

Second, as with the Star Chamber, defense counsel's ability to effectively represent his client was profoundly compromised in Ciavarella's courtroom. Ciavarella's refusal to enforce Plaintiffs' settled constitutional rights systematically denied approximately 1,800 youth appearing before him their right to counsel.

Third, like the Star Chamber, Ciavarella essentially compelled confessions from those appearing before him. In failing to conduct the constitutionally mandated colloquy to ensure that the juveniles before him fully understood the meaning of a guilty plea and its consequences, Ciavarella unconstitutionally extracted confessions of guilt. The fact that the pleas were from vulnerable and presumably unsophisticated children, often unaided by counsel, only makes the conduct more egregious.

Finally, the corruption that characterized the Star Chamber was mirrored in Ciavarella's courtroom. For over five years, he concealed the fact that he was receiving millions of dollars in return for denying thousands of juveniles their constitutional rights and funneling them to the PACC and WPACC facilities. A clearer and more reprehensible case of corruption would be hard to imagine.

### (b) Applicability Of Supreme Court's Star Chambers Analysis To Ciavarella's Courtroom

The Supreme Court's frequent references to the historical abuses of the Star Chamber in its defense of our own constitutional safeguards also have striking analogies in the present case. For example, the Star Chamber's abuses are

considered to have been a primary motivating force behind the development of the

protections against compelled self-incrimination contained in the Fifth

Amendment:

> This definition of testimonial evidence reflects an
> awareness of the historical abuses against which the
> privilege against self-incrimination was aimed.
> "Historically, the privilege was intended to prevent the
> use of legal compulsion to extract from the accused a
> sworn communication of facts which would incriminate
> him. Such was the process of the ecclesiastical courts and
> the *Star Chamber* – the inquisitorial method of putting
> the accused upon his oath and compelling him to answer
> questions designed to uncover uncharged offenses,
> without evidence from another source. The major thrust
> of the policies undergirding the privilege is to prevent
> such compulsion."

*Pennsylvania v. Muniz*, 496 U.S. 582, 595-96 (1990) (emphasis added) (quoting

*Doe v. United States*, 487 U.S. 201, 212 (1988)).

Ciavarella's deliberate and routine reliance on uncounseled and otherwise

unconstitutional guilty pleas led precisely to "the use of legal compulsion to extract

from the accused a sworn communication of facts which would incriminate him."

Like the suspects called before the Star Chamber, the children in Ciavarella's

courtroom were given no real choice but to reveal incriminating conduct that

would lead to their adjudication.

Similarly, the Supreme Court has referenced the Star Chamber to illustrate the distinction between our modern accusatorial system and the antiquated inquisitorial system:

> *Ours is the accusatorial as opposed to the inquisitorial system. Such has been the characteristic of Anglo-American criminal justice since it freed itself from practices borrowed by the Star Chamber from the Continent* whereby an accused was interrogated in secret for hours on end.  Under our system society carries the burden of proving its charge against the accused not out of his own mouth. …'The law will not suffer a prisoner to be made the deluded instrument of his own conviction.'  The requirement of specific charges, their proof beyond a reasonable doubt, the protection of the accused from confessions extorted through whatever form of police pressures, the right to a prompt hearing before a magistrate, the right to assistance of counsel, to be supplied by government when circumstances make it necessary, the duty to advise an accused of his constitutional rights-these are all characteristics of the accusatorial system and manifestations of its demands.

*Watts v. Indiana,* 338 U.S. 49, 54 (1949) (emphasis added) (internal citations omitted).

Ciavarella's courtroom, hardly "freed" from the practices of the Star Chamber, had many of the characteristics of an inquisitorial system.  Confessions were not willful or meaningful; the right to counsel was routinely violated; and children were not advised of the consequences of either waiving their constitutional right to counsel or of giving up their right to a trial.  *See Rumsfeld v. Padilla*, 542 U.S. 426, 465 (2004) ("Access to counsel for the purpose of

protecting the citizen from official mistakes and mistreatment is the hallmark of due process.") (Stevens, J., dissenting,); *Gault*, 387 U.S. at 18-19 ("In 1937, Dean Pound wrote: 'The powers of the Star Chamber were a trifle in comparison with those of our juvenile courts . . . . Departures from established principles of due process have frequently resulted not in enlightened procedure, but in arbitrariness.'" (quoting Roscoe Pound, *Foreword* to Pauline V. Young, *Social Treatment in Probation and Delinquency* xxvii (1937)).

None of the cases cited by Ciavarella alter the above analysis. Each involved a single act of alleged judicial misconduct. *See Stump*, 435 U.S. 349 (order to sterilize a young girl at the request of her mother); *Pierson*, 386 U.S. 547 (illegal arrest and conviction of civil rights protesters); *Mireles*, 502 U.S. 9 (directive by a judge to police officers to use excessive force to bring a public defender to his courtroom); *Bradley*, 80 U.S. 335 (order that the plaintiff-attorney be barred from practicing in the judge's courtroom). None of these cases involved a judge's repeated flouting of the constitutional rights of litigants *in thousands of cases over several years.*

Imagine situations in which a criminal court judge (a) simply rolled the dice to decide the guilt or innocence of every defendant who appeared before him over a five year period, (b) declared his decision at the beginning of each proceeding before hearing any evidence, or (c) refused to allow defendants to be represented

by counsel in his courtroom. The first example is far-fetched – but describes conduct most of us would agree could not be considered "judicial acts" shielded by judicial immunity. Rolling the dice is so anathema to our constitutional system that no benefit would be derived nor purpose served by protecting such conduct from liability under § 1983. But the remaining examples – equally far-fetched and anathema to our fundamental values – are effectively what happened here. The pattern of adjudicating children (a) where outcomes were unduly influenced or pre-determined by illegal payoffs, and (b) without waiver, without counsel, and without other constitutional safeguards continued unabated by Ciavarella for over five years. To suggest that such a pattern of illegal decision-making leaves the corrupt judge immune from suit by injured juveniles widely misses the mark of judicial immunity's policies and history. None of the authorities relied upon by Ciavarella suggest otherwise.

*   *   *

While the concept of the Star Chamber today remains steeped in myth and lore, it remains a guidestar against which our own constitutional legal system is measured. To the many judges who have referred to it in striking down or condemning illegal practices by public officials, it stands as an enduring symbol of arbitrariness and the absence of the rule of law. Sadly for the children and families of Luzerne County, Ciavarella operated his courtroom like the Star Chamber,

forfeiting any arguable claim to legitimacy. His acts were *not* "truly judicial acts." *Forrester*, 484 U.S. at 227.

Ciavarella's flagrant refusal to enforce the Constitution he swore to uphold[29] is corrupt and unlawful conduct of the most outrageous nature. Perhaps never before seen – and, hopefully, never repeated – his conduct has crossed a constitutional boundary which this court cannot ignore. In 6,500 cases spanning more than five years, Ciavarella ruled with utter disregard – indeed contempt – for the law. Having so profoundly disgraced the robe he wore, he may not now hide behind the cloak of absolute judicial immunity.

### D. Legislative Immunity Does Not Apply To Any Of Conahan's Actions Alleged In The Complaints

In a last ditch effort to avoid liability exposure, Conahan argues that if the Court does not find that he is entitled to judicial immunity, it should classify certain of his acts described in the Complaints as "legislative acts" to which legislative immunity applies. (Conahan Br. 17.) Specifically, he argues that the following four acts were legislative: (1) "s[eeking] funding for the private [PACC and WPACC] detention centers in the budget that he proposed to the County Commissioners"; (2) "execut[ing] the necessary agreement" that resulted in "juveniles [being] sent to the private detention center"; (3) "contracting with Dr.

_____

[29] *See* Pa. Const. art. 6, § 3.

Vita" "to assist the court in obtaining psychological evaluations" of juveniles;[30] and (4) "eliminat[ing] funding to the county-run [River Street] detention facility." (*Id.* at 21.) While Conahan attempts to recast the Complaints to make it appear that his acts were legislative and that he is, therefore, entitled to immunity, his efforts fail completely.[31] The acts do not even colorably fall within the ambit of legislative immunity.

Legislative immunity attaches to acts "taken in the sphere of legitimate legislative activity." *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998) (internal quotation omitted). As with judicial immunity, whether an act is legislative turns on the nature of the act. *Id.* While officials outside the legislative branch may be entitled to legislative immunity when they perform legislative functions, *id.* at 55, acts that are only "casually or incidentally related to legislative affairs but not a part of the legislative process itself" cannot be the basis for immunity. *Youngblood*

---

[30] Conahan further asserts that he acted legislatively in making the *decision* to use Dr. Vita's services. (Conahan Br. 21.) That decision is clearly an administrative act. *Cf. Three Rivers Cablevision, Inc. v. Pittsburgh*, 502 F. Supp. 1118, 1136 (W.D. Pa. 1980) (holding that the decision of which bidder to award a contract is "clearly an administrative act"). Conahan also asserts that he is legislatively immune in connection with "budgeting for [Dr. Vita's] services" (Conahan Br. 21), but Plaintiffs nowhere allege Conahan's involvement in budgetary matters in connection with Dr. Vita.

[31] Conahan attempts to cast all of his enumerated activities as "budgetary actions." (*Id.* at 21.) This is a plain misreading of Plaintiffs' allegations, which center not on budgeting but rather on Conahan's facilitation of contracts between Luzerne County and PACC.

*v. DeWeese*, 352 F.3d 836, 840 (3d Cir. 2004) (quoting *United States v. Brewster*, 408 U.S. 501, 528 (1972)). Moreover, acts are generally not legislative unless they involve "policy-making" or "line-drawing" and are "passed by means of established legislative procedures." *Baraka v. McGreevy*, 481 F.3d 187, 198 (3d Cir. 2007) (quoting *Ryan v. Burlington County*, 889 F.2d 1286, 1290-91 (3d Cir. 1989)). As set forth below, one of the acts pointed to by Conahan is not even alleged in the Complaint and the other three are plainly not legislative.

   1. **Because Plaintiffs Do Not Even Allege That Conahan Sought Funding For The PACC And WPACC Facilities, His Claim of Legislative Immunity for That Purported Conduct Is Meaningless and Should Be Rejected**

   A defendant can obviously claim legislative immunity only for acts that are alleged in the complaint and on which a claim of liability is based. *See, e.g.*, *Brown v. Smythe*, No. 90-3815, 1990 WL 180987, at *3 (E.D. Pa. Nov. 15, 1990) (noting that the relevant inquiry is "whether the actions *alleged in the plaintiffs' complaint* fall within the ambit of legislative acts" (emphasis added)). However, the Complaints nowhere allege the first purported act as to which Conahan claims immunity, *i.e.,* "s[eeking] funding for the private detention centers in the budget that he proposed to the county commissioners." (Conahan Br. 21). Accordingly,

his legislative immunity claim as to this first purported act falls of its own weight.[32]

### 2. Executing Contracts Is Not Legislative Activity; Conahan Is Not Legislatively Immune In Connection With Executing Contracts With PACC And Dr. Vita

The second and third acts for which Conahan claims legislative immunity are his executing two contracts – an agreement that resulted in juveniles being sent to the PACC facility, and a contract with Dr. Vita to assist the juvenile court in obtaining psychological evaluations of juveniles. (Conahan Br. 21.) While these acts are in fact alleged in the Complaints, the law is clear that contracting is *not* a legislative act. *Three Rivers Cablevision, Inc.*, 502 F. Supp. at 1136. Accordingly, Conahan's legislative immunity claim as to these two acts is without merit.

*Three Rivers Cablevision* is instructive. In that case, a disappointed bidder for a municipal cable television contract sued the city, the city council, and individual council members, alleging deprivations of its civil rights during the process by which the contract was awarded. *Id.* at 1119. In response to the municipal defendants' assertion of legislative immunity in connection with the act

---

[32] Even if Plaintiffs had made the allegation, legislative immunity would not apply for the reasons explained here in connection with the other acts alleged by Plaintiffs. Seeking funding for PACC, like facilitating contracts between Luzerne County and PACC, is plainly political and not legislative. *See Baraka*, 481 F.3d at 202 (distinguishing legislative actions taken by the governor and his appointees from "basic lobbying activity," which is not a basis for legislative immunity).

of awarding the contract, the court held that awarding the contract "was clearly an administrative act."  *Id.* at 1136.[33]

Conahan's acts in executing an agreement with PACC and executing a contract with Dr. Vita, like the awarding of the contract in *Three Rivers Cablevision*, are plainly not legislative.  With Conahan citing not a single case to the contrary, his legislative immunity claim fails completely.

While Conahan does not attempt broadly to claim that *facilitation* – as well as execution – of contracts between Luzerne County and PACC (*see* CAC ¶ 656; IC ¶ 34) was legislative, it is worth noting that facilitation of contracts has been held to be political – and not legislative.  In evaluating a claim of legislative immunity from criminal prosecution, the Supreme Court explained that legislators "engage in many activities other than the purely legislative activities protected by" legislative immunity, including "assistance in securing Government contracts."[34]

---

[33] The federal court found persuasive that "long ago the Pennsylvania courts explicitly ruled that the award of a governmental contract pursuant to previously granted authority so to do was an administrative rather than a legislative act."  *Id.* (citing *Jones v. Schuylkill*, 51 A. 762 (1902); *Seitzinger v. Tamaqua Borough*, 41 A. 454 (1898)).

[34] The complete list of political – and hence non-legislative – activities enumerated by the Supreme Court includes "a wide range of legitimate 'errands' performed for constituents, the making of appointments with Government agencies, *assistance in securing Government contracts*, preparing so-called 'news letters' to constituents, news releases, and speeches delivered outside the Congress."  *Brewster*, 408 U.S. at 512 (emphasis added).  These are contrasted

(continued...)

*Brewster*, 408 U.S. at 512.  And the Third Circuit has applied the same political-legislative distinction in evaluating claims of legislative immunity from civil liability.  *See, e.g.*, *Youngblood*, 352 F.3d at 840.  Conahan's acts of "facilitating" contracts between PACC and Luzerne County are thus clearly not entitled to legislative immunity.

> **3.** **Conahan's Efforts To Eliminate Funding For The River Street Facility Were Not Legislative, But Were Political And/Or Administrative Acts And Are Not Protected By Legislative Immunity**

Finally, Conahan asserts that he is entitled to legislative immunity for acting to eliminate funding for the county-run River Street facility, an act he construes as municipal budgeting.  (Conahan Br. 21.)  While municipal budgeting, *i.e.*, introducing a budget, voting on it, and signing it into law, is a legislative act to which immunity may apply, *see Bogan*, 523 U.S. at 55, the Complaints do not allege that Conahan helped to create a county budget, voted on a county budget, or signed a county budget into law.  Rather, they allege simply that Conahan took steps to "remove funding" for the River Street facility from the county budget.

---

(continued...)

with paradigmatic legislative activities such as "voting for a resolution, subpoenaing and seizing property and records for a committee hearing, preparing investigative reports, addressing a congressional committee, and, of course, speaking before the legislative body in session."  *Youngblood*, 352 F.3d at 840.  In the same discussion, the Court reiterated that "for sure legislative immunity does not extend to accepting bribes."  *See id.*

(CAC ¶ 655; IC ¶¶ 34, 42.)  For two separate reasons, Conahan is not legislatively immune for this conduct.

First, placed in the context of Pennsylvania law and the Complaints' factual allegations, Conahan's acts were political, not legislative.  Pennsylvania law does not vest a president judge with the power to create, vote on, or sign into law a county budget.  *See* 42 Pa. Con. Stat. § 325(e) (enumerating the duties of a president judge); *see also Lavelle v. Koch*, 617 A.3d 319, 321 (Pa. 1992) (explaining that, consistent with the doctrine of separation of powers, the judiciary has the power to compel expenditures only to "prevent the impairment of its exercise of the judicial power or the proper administration of justice"); *Beckert v. Warren*, 439 A.2d 638, 642-34 (Pa. 1981) (same).[35]  For this reason, *Baraka*, on which Conahan relies heavily, is plainly distinguishable.  There, the Third Circuit, in holding a governor legislatively immune for his budgetary acts, based its discussion primarily on the fact that the state constitution (1) authorizes the governor to recommend legislation and to convene the legislature, and (2) requires legislation to be presented to the governor for his signature or veto.  481 F.3d 187,

---

[35] Conahan purports to rely on *Lavelle* and *Beckert* for his assertion that "[t]he process of the court of common pleas of a particular county submitting its budget to the county commissioners is supported by history, custom and is recognized in law."  (Conahan Br. 20.)  To the contrary, however, these cases are about the judiciary's very limited official role in the budgetary process – that the courts can compel expenditures in only extraordinary circumstances.

197 & n.6 (3d Cir. 2007). Similarly, the mayor in *Bogan*, pursuant to his authority, introduced a budget and then signed it into law. 523 U.S. at 973. Plaintiffs do not even allege that Conahan took – and the law does not support any suggestion that he had the authority to take – any such formal actions. [36]

Instead, because in the acts at issue here Conahan simply facilitated the replacement of the River Street facility with the PACC facility, those acts are plainly political. Conahan's acts to eliminate funding for the River Street facility, taken *after* signing an agreement with PACC and announcing that judges would no longer send youth there (*see* CAC ¶¶ 654-55; IC ¶¶ 34, 41-42), were mechanisms to provide to PACC "assistance in securing Government contracts," *Brewster*, 408 U.S. at 512. As explained above in Part IV.D.2, it is settled that acts of this type are political and *not* legislative.

Second, and separately, because Conahan's acts at issue were simply aimed at moving detention services from one facility to another rather than promulgating a county-wide policy, they are administrative rather than legislative. The courts

---

[36] Conahan himself recognizes that the legislative authority rests with the County Commissioners and not the president judge. He notes that "Plaintiffs' [Class Action Complaint] impliedly concedes that the county commissioners, acting as the legislative body, approve funding for the court of common pleas, through [the commission's] budgetary process." (Conahan Br. 20.) Plaintiffs agree that the county commission – and not Conahan – approved and enacted the Luzerne County budget that eliminated funding for the River Street facility (and, in its place, made provision for payments to PACC).

distinguish between broad, generally applicable acts (which are legislative) and narrow, targeted acts (which are administrative).  *See Ryan*, 889 F.2d at 1290-91 (distinguishing legislative and administrative acts, explaining that legislative acts involve "policy-making decision[s] of a general scope or . . . linedrawing" and administrative acts "affect[] a small number or a single [entity]").

This distinction has been most clearly delineated in the public employment context, in which the courts "have drawn a distinction between the total elimination of a position and the termination of an individual employee," holding the former and not the latter act to be legislative.  *Baraka*, 481 F.3d at 199.  For example, in *Bogan*, the mayor of Fall River, Massachusetts called for the total elimination of the city's Department of Health and Human Services and the city council thereafter approved and adopted an ordinance eliminating the department. 523 U.S. at 47.  The department's sole employee then sued the mayor, the vice president of the city council, and other city officials.  *Id.*  The court held the mayor and city council vice president legislatively immune because the ordinance "reflected a discretionary, policymaking decision implicating the budgetary priorities of the city" and "involved the termination of a position, which, unlike the hiring or firing of a particular employee, may have prospective implications that reach well beyond the particular occupant of the office."  *Id.* at 55-56; *see also*

*Baraka*, 481 F.3d at 193 (holding the total elimination of New Jersey's poet laureate position to be legislative, despite its effect on only a single individual).

Plaintiffs have *not* alleged that Conahan acted to remove funding for juvenile detention facilities *in general* from the county budget (which would arguably be analogous to the elimination of Fall River's Department of Health and Human Services or New Jersey's poet laureate position), but only that Conahan acted to terminate a *specific* facility, having already contracted with another, replacement facility. Moreover, before acting to eliminate funding for the River Street facility from the county budget, Conahan "publicly maintained that conditions there were deplorable." (CAC ¶ 654.) Thus, he purportedly acted on the basis of facts specific to the River Street facility, leading to the conclusion that his actions must be administrative.[37] *Cf. Crymes v. DeKalb County*, 923 F.2d 1482, 1485-86 (11th Cir. 1991) (per curiam) (contrasting zoning regulation, which is legislative, and denial of a specific permit, which is not, and explaining that "[i]f the facts utilized in making a decision are specific, rather than general, in nature, then the decision is more likely administrative").

---

[37] Plaintiffs allege that Conahan moved to defund the River Street facility not for his publicly stated purpose, but for the purpose of effectuating his scheme to receive payoffs from others. The Supreme Court has been clear that the sphere of legitimate legislative activity does not include accepting bribes. *Brewster*, 408 U.S. at 526.

In sum, Conahan's acts to remove funding from the county budget for the River Street facility were either political or administrative; they were clearly not legislative. Conahan did not even have the power to create, vote on, or sign into law the county budget, and the Complaints do not allege otherwise. Instead, the Complaints simply allege that Conahan, having already executed a contract with PACC for its provision of services, moved to defund the River Street facility, thereby facilitating the transition of juvenile detention services in the county from one provider to another. Conahan is not entitled to hide behind legislative immunity for these acts.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, the motions to dismiss of Conahan and Ciavarella should be denied.[38]

---

[38] While the briefs of both Conahan and Ciavarella substantively address only Plaintiffs' claims brought pursuant to § 1983 and the federal civil RICO statute, Ciavarella specifically asks the Court to dismiss the claims against him in their entirety. In addition to the § 1983 and RICO claims, the Individual Complaint asserts a claim against Conahan and Ciavarella, among others, for civil conspiracy in violation of state law. (IC ¶¶ 160-164.) The Motions should be denied with respect to this claim, too, for the same reasons enumerated in Plaintiffs' Brief with respect to the § 1983 and RICO claims.

Respectfully submitted,

By: ___s/_____

Marsha L. Levick (PA 22535)
Lourdes M. Rosado (PA 77109)
Neha Desai (PA 205048)
Emily Keller (PA 206749)
JUVENILE LAW CENTER
1315 Walnut Street, Suite 400
Philadelphia, PA 19107
(215) 625-0551

Daniel Segal (PA 26218)
Rebecca L. Santoro (PA 206210)
HANGLEY ARONCHICK SEGAL &PUDLIN
One Logan Square, 27th Floor
Philadelphia, PA 19103
(215) 568-6200

*Attorneys for Plaintiffs*
*Case No. 09-cv-0357*

By: ___s/_____
David S. Senoff (PA 65278)
Richard C. Defrancesco (PA 87902)
Lauren C. Fantini (PA 93862)
CAROSELLI BEACHLER
MCTIERNAN & CONBOY
1500 Walnut Street, Suite 507
Philadelphia, Pa 19102
(215) 609-1350

William R. Caroselli
Timothy Conboy
Susan A. Meredith
Kelly L. Enders
CAROSELLI BEACHLER
MCTIERNAN & CONBOY
20 Stanwix Street, 7th Floor
Pittsburgh, Pa 19522
(412) 391-9860

Michael J. Cefalo
James J. Albert
CEFALO & ASSOCIATES
309 Wyoming Avenue
West Pittston, PA 18643
(570) 655-5555

*Attorneys for Plaintiffs*
*Case No. 09-cv-0286*

By: \_\_\_\_s/_____
Sol Weiss (PA 15925)
Amber Racine (PA 208575)
Adrianne Walvoord (PA 206014)
ANAPOL SCHWARTZ WEISS
COHAN FELDMAN &
SMALLEY, P.C.
1710 Spruce Street
Philadelphia, Pa 19103
(215) 735-1130

Barry H. Dyller (PA 65084)
DYLLER LAW FIRM
Gettysburg House
88 North Franklin Street
Wilkes-Barre, PA 18701
(570) 829-4860

Johanna L. Gelb (PA 49972)
GELB LAW FIRM
538 Spruce Street, Suite 600
Scranton, PA 18503
(570) 343-6383

*Attorneys for Plaintiffs*
*Case No. 09-cv-0291*

By: ____s/_____

Daniel E. Kleiner
Metzger & Kleiner
Two Penn Center, Suite 1204
15th Street & JFK Boulevard
Philadelphia, PA 19102
(215) 567-6616

Richard G. Freeman
924 Cherry Street, 4th Floor
Philadelphia, PA 19107
(215) 574-8818

*Attorneys for Plaintiff*
*Case No. 09-0630*