IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FLORENCE WALLACE ET AL.,                :        **CONSOLIDATED TO:**
                                        :
                    Plaintiffs,         :        CIV. A. NO. 3:09-cv-0286
                                        :
          v.                            :
                                        :        JUDGE CAPUTO
ROBERT J. POWELL ET AL.,                :
                                        :
                    Defendants          :
                                        :

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

WILLIAM CONWAY ET AL.,                  :
                                        :
                    Plaintiffs,         :        CIV. A. NO. 3:09-cv-0291
                                        :
          v.                            :
                                        :        JUDGE CAPUTO
MICHAEL T. CONAHAN, ET AL.,             :
                                        :
                    Defendants          :
                                        :

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| H.T. ET AL., | : | |
| | : | |
| Plaintiffs, | : | CIV. A. NO. 3:09-cv-0357 |
| | : | |
| v. | : | |
| | : | JUDGE CAPUTO |
| MARK A. CIAVARELLA, JR. ET AL., | : | |
| | : | |
| Defendants | : | |
| | : | |

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SAMANTHA HUMANIK, | : | |
| | : | |
| Plaintiff, | : | CIV. A. NO. 3:09-cv-0630 |
| | : | |
| v. | : | |
| | : | JUDGE CAPUTO |
| MARK A. CIAVARELLA, JR. ET AL., | : | |
| | : | |
| Defendants | : | |
| | : | |

## BRIEF OF *AMICI CURIAE* IN OPPOSITION TO THE MOTIONS TO DISMISS OF DEFENDANTS MICHAEL CONAHAN AND MARK CIAVARELLA

# TABLE OF CONTENTS

PAGE

I.     INTRODUCTION AND STATEMENT OF INTEREST..............................1

II.    STATEMENT OF FACTS ............................................................................2

III.   ARGUMENT .................................................................................................7

   A.  Public policy demands that Conahan and Ciavarella be denied judicial immunity for their admittedly criminal conduct.............................................7

   B.  Judicial immunity does not apply because the admittedly criminal conduct in this case was nonjudicial.............................................................................10

IV.    CONCLUSION ..........................................................................................15

# TABLE OF AUTHORITIES

**CASES**                                                                 **PAGE(S)**

Blumenthal v. United States, 332 U.S. 539 (1947) .................................. 14

Dennis v. Sparks, 449 U.S. 24 (1980) ........................................... 14

Forrester v. White, 484 U.S. 219 (1988) .......................................... 11

Gregoire v. Biddle, 177 F.2d 579 (2d Cir. 1949) ................................... 8

In re J.V.R., No. 81 M.M. 2008 (Pa. July 17, 2009) ................................ 7

Mireles v. Waco, 502 U.S. 9 (1991) .......................................... 8, 10, 12

Pierson v. Ray, 386 U.S. 547 (1967) ............................................ 8, 9

Sherman v. Almeida, 747 A.2d 470 (R.I. 2000) ................................... 8

Stump v. Sparkman, 435 U.S. 349 (1978) ..................................... 10, 11

U.S. v. Carbo, 572 F.3d 112 (3d Cir. 2009) ...................................... 14


**OTHER AUTHORITIES**

Fed. R. Crim. P. 11(c) ....................................................... 2

Jeffrey M. Shaman, Judicial Immunity From Civil and Criminal Liability,
    27 San Diego L. Rev. 1, 12 (1990) ....................................... 11

## I.    INTRODUCTION AND STATEMENT OF INTEREST

The extraordinary circumstances of this case have compelled the *amici curiae*, comprised of former judges and legal scholars,[1] to submit this brief in an effort to maintain integrity and public trust in an independent judiciary. Defendants, former Luzerne County Judges Michael Conahan and Mark Ciavarella, under oath admitted to engaging in a 5 year criminal scheme that included Conahan entering into placement agreements with certain detention facilities and Ciavarella detaining juveniles in those facilities. Both Conahan and Ciavarella received and concealed payments from the owner of those facilities during the course of the scheme. Despite their admittedly criminal conduct, Conahan and Ciavarella have moved to dismiss the complaint on the basis that their acts are immune from civil suit under the doctrine of judicial immunity. This case – because of the nature, scope, and admission of criminal conduct – is one of first impression in the federal courts.

Judicial immunity has deservedly broad scope to protect judges as they act in their judicial capacity, which is presumed to be always for the benefit of the public interest. However, the public policy underlying judicial immunity – the protection of judicial independence and integrity – would be severely undermined by bowing to defendants' assertions in this case. For Conahan and Ciavarella to

---

[1] A list of the *Amici* is attached as Exhibit A.

argue that their admitted criminal conduct was in the public interest makes a

mockery of the necessary doctrine of judicial immunity.  It is hard to imagine

conduct less deserving of immunity protection than the wholesale sale of children

into detention.  The judicial immunity doctrine should never extend to acts which

judges have admitted are criminal.  Because Conahan and Ciavarella have admitted

to committing criminal acts knowingly under the guise of judicial acts and proper

jurisdiction, they should be denied immunity by this Court.

## II.    STATEMENT OF FACTS

On February 12, 2009 Michael Conahan and Mark Ciavarella pled

guilty under oath[2] to a scheme to commit honest services wire fraud against the

citizens of Pennsylvania and to conspiracy to defraud the United States and to

conceal the scheme, as charged in the Information filed against them on January

26, 2009.  See Transcript of 2.12.09 Guilty Plea hearing at 4 (Exhibit B).[3]

---

[2] Though Conahan and Ciavarella have since been permitted to withdraw
their guilty pleas pursuant to Fed. R. Crim. P. 11(c) following Judge Kosik's
rejection of their plea agreement with the prosecution, their criminal court
admissions under oath are indelible and for civil liability purposes suffice as
incontrovertible admissions no matter the outcome of the criminal trial which is
now expected.

[3] In his Order rejecting the stipulated sentence as set forth in the plea
agreements, Judge Kosik summarized the charges against Conahan and Ciavarella
as follows: "The defendants were charged with defrauding the citizens of
Pennsylvania, by depriving them of their right to honest services through deceit,
self-dealing and conflict of interest, when the defendants accepted compensation in
millions of dollars in exchange for particularized official actions and anticipated

(continued...)

Defendant Conahan served as president judge for Luzerne County between January 2002 and January 2007. Exhibit B at 19. Between approximately 1996 and June, 2008 defendant Ciavarella presided as judge of the juvenile court for Luzerne County. Id. These charges against Conahan and Ciavarella were based on a scheme hatched in 2000, and carried out through 2008. See Information ¶¶ 3, 5, 7. As detailed by the government's proffered factual bases for the charges, the criminal scheme to which defendants pled guilty included the following acts:

> During the time period the judges agreed to accept and accepted the more than $2,600,000…related to the construction and operation of juvenile detention facilities owned by PA Child Care, LLC and Western PA Child Care, LLC, the judges acted as judges of the Court of Common Pleas for Luzerne County with discretionary decision-making authority in multiple matters related to PA Child Care and Western PA Child Care, LLC without recusing themselves or disclosing to the parties their material conflict of interest and their material financial relationship with [] an owner of PA Child Care, LLC, and Western PA Child Care, LLC and with [a person] who was involved in the construction of the juvenile detention facilities owned and operated by PA Child Care, LLC and Western PA Child Care, LLC.

> [W]ith regard to Judge Ciavarella, the evidence would have shown that, beginning in approximately February of 2003, when construction of the PA Child Care, LLC juvenile detention facility in Luzerne County was

(continued…)

official actions, in violation of their fiduciary duty as judges and as required by law." July 30, 2009 Memorandum and Order.

-3-

completed, and continuing through April 30, 2007, Judge
Ciavarella, in his capacity as a juvenile court judge,
presided over numerous matters in Luzerne County in
which he had discretionary decision-making authority
and in which the potential existed for juvenile offenders
to be ordered detained at detention facilities owned by
PA Child Care, LLC and Western PA Child Care, LLC.
The juvenile court matters over which Judge Ciavarella
presided included, but were not limited to, proceedings
relating to pre-hearing detention of juveniles,
proceedings relating to juvenile disposition, and
proceedings relating to revocation of juvenile probation.
In fact, testimony and court records would have shown
that numerous juvenile offenders ordered detained by
Judge Ciavarella during this time period were, in fact,
lodged at facilities owned and operated by PA Child
Care, LLC and Western PA Child Care, LLC.

With regard to Judge Conahan, the trial evidence would
have shown that on or about January 29, 2002, Judge
Conahan, acting in his capacity as President Judge of
Luzerne County, signed a "Placement Guarantee
Agreement" between PA Child Care and the Court of
Common Pleas for Luzerne County to house juvenile
offenders at the PA Child Care facility.  The "Placement
Guarantee Agreement" provided that the Court of
Common Pleas for Luzerne County would pay PA Child
Care the annual "Rental Installment" sum of $1,314,000
and stipulated that "[t]he obligation of the Court to make
payment of the Rental Installments shall be absolute and
unconditional."

\*\*\*

The evidence at trial would have shown that, in none of
the aforementioned examples of matters related to PA
Child Care, LLC and Western PA Child Care, LLC did
Judge Ciavarella or Judge Conahan recuse himself or
disclose to the parties his material conflict of interest and
his material financial relationship with [] an owner of PA
Child Care, LLC, and Western PA Child Care, LLC and

-4-

> with [a person] who was involved in the construction of
> the juvenile detention facilities owned and operated by
> PA Child Care, LLC and Western PA Child Care, LLC.

<u>See</u> Statements to the Court by Government Counsel in Connection with the Plea

Colloquy at 7-8 (Exhibit C).  At their plea hearing, Conahan and Ciavarella

admitted that the government could prove the factual bases offered.  Exhibit B at

32; <u>see also</u> Exhibit C (signed by Conahan and Ciavarella).

Conahan and Ciavarella implemented their scheme by knowingly

abandoning their duties as honest and independent judges upon first making their

illegal agreement.  In order to carry out their scheme, which necessarily involved

keeping their co-conspirators' institutions sufficiently populated, Ciavarella

ordered children detained without regard for the nature of the offense or the

recommendation of the probation officer and without affording the juveniles their

most basic constitutional rights.  <u>See</u> Information ¶ 35.  He routinely denied

children their right to counsel by persuading them to sign a constitutionally

deficient waiver.  <u>See</u> Third Interim Report and Recommendation of Special

Master Arthur Grim (Exhibit D).  He denied counsel to children who appeared

before him even after being admonished by the Pennsylvania Superior Court for

the same conduct in 2001.  The Superior Court overturned Ciavarella's

adjudication of a child who was unrepresented, but had not signed a

constitutionally adequate waiver of counsel.  Ciavarella responded by saying, "I'll

never do it again…They obviously have a right to a lawyer, and even if they come in and tell me they don't want a lawyer, they're going to have one." Master Complaint for Class Actions ¶ 190.  He knowingly abandoned his judicial oath for private gain hundreds, if not thousands, of times over the next several years.  The Pennsylvania Supreme Court is currently considering Special Master Arthur Grim's recommendation that "all cases in which Judge Mark A. Ciavarella, Jr. entered adjudications of delinquency or consent decrees between January 1, 2003 and May 31, 2008" be vacated.  See Exhibit D.

By reason of their own aforesaid admissions, Conahan and Ciavarella ensured the success of PA Child Care and Western PA Child Care by conspiring to send juveniles to these facilities.  Exhibit B at 24.  They arranged lucrative contracts with the county, kept the populations high at the detention facilities, and received more than $2.6 million from those who operated the detention facilities over the course of several years.  Exhibit B at 21.[4]  Conahan and Ciavarella conspired to conceal their scheme by laundering the millions of dollars they were paid through other people and businesses.  Exhibit B at 21-22, 27.  Ultimately,

---

[4] Robert Powell, owner of PA Child Care, LLC and Western PA Child Care, LLC, has admitted under oath to paying kickbacks to the former judges.  See July 1, 2009 Transcript of Arraignment of Robert Powell at 11, 14 , Case No. 09-CR-189.

**6500** children were affected by their criminal conduct.[5] Despite their admitted wrongdoing, Conahan and Ciavarella now ask this Court to declare their criminal acts judicial and dismiss the civil claims of those children whose lives were forever changed by their conduct. This Court should deny their request. Judicial immunity simply cannot extend to behavior so in conflict with the public interest.

## III.  ARGUMENT

The actions of Conahan and Ciavarella have rightfully caused public outrage, tarnished the reputation of the Luzerne County judiciary, and diminished the public trust in the courts. In order to maintain judicial integrity and the public's faith in a fair and impartial judiciary, it is imperative that the limits of judicial immunity be adhered to in this case. We urge this Court to deny Conahan and Ciavarella the protection of judicial immunity. Both public policy and the admitted criminal conduct require such a result.

### A.  **Public policy demands that Conahan and Ciavarella be denied judicial immunity for their admittedly criminal conduct.**

The purpose of judicial immunity is to safeguard the public interest in an effective judiciary by ensuring that "a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without

---

[5] Luzerne County District Attorney Jacqueline Musto Carroll estimated that 6500 children appeared before Ciavarella during the course of the criminal scheme. See Transcript of Oral Argument at 51, In re J.V.R., No. 81 M.M. 2008 (Pa. July 17, 2009).

apprehension of personal consequences to himself." <u>Mireles v. Waco</u>, 502 U.S. 9

(1991) (quoting <u>Bradley v. Fisher</u>, 13 Wall. 335, 347 (1872)); <u>see also</u> <u>Pierson v.</u>

<u>Ray</u>, 386 U.S. 547, 554 (1967) ("The immunity is not for the benefit of a malicious

or corrupt judge, but for the benefit of the public, whose interest it is that the

judges should be at liberty to exercise their functions with independence and

without fear of consequences..."). Judicial immunity protects judges from

harassing, meritless lawsuits brought by dissatisfied litigants, leaving them free to

make judicial determinations based on the facts and law before them rather than

intimidation. Judicial immunity, though, could never have been intended to

immunize judges from acts that they admit were criminal, for to do so would be to

say that even admittedly criminal acts are judicial acts.[6]  Certainly, such a

preposterous stance could not be in the public interest, or promote public respect

for the judiciary, upon which judicial independence, and the exercise thereof,

depends.

     As Judge Learned Hand stated in <u>Gregoire v. Biddle</u>, 177 F.2d 579,

581 (2d Cir. 1949):

---

     [6] In <u>Sherman v. Almeida</u>, 747 A.2d 470 (R.I. 2000), the Rhode Island
Supreme Court extended judicial immunity to an act that was admittedly criminal,
ignoring the guilty plea without explanation. We have found no other case to make
the same leap, and we encourage this Court to reject the non-precedential position
taken by the <u>Almeida</u> Court.

> It does indeed go without saying that an official, who is in fact guilty of using his powers…for any…personal motive not connected with the public good, should not escape liability for the injuries he may so cause; and if it were possible in practice to confine such complaints to the guilty, it would be monstrous to deny recovery. The justification for doing so is that it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties.

Justice Douglas echoed this sentiment in his dissent in <u>Pierson v. Ray</u>: "We should of course not protect a member of the judiciary 'who is in fact guilty of using his powers to vent his spleen upon others, or for any other personal motive not connected with the public good.' To deny recovery to a person injured by the ruling of a judge acting for personal gain or out of personal motives would be 'monstrous.'" 386 U.S. at 564 (Douglas, J., dissenting) (quoting <u>Gregoire</u>).

Application of immunity to judges who admitted under oath to engaging in a criminal scheme that lasted for years would indeed be "monstrous." To find immunity would denigrate the respect of the public for the judiciary, which is dependent upon judges making decisions based on the law and the facts, rather than personal, corrupt motives. Moreover, denying Conahan and Ciavarella the privilege of judicial immunity in this case would not risk a flood of civil claims against other judges. Denial would not erode the immunity protection that ought to

be afforded judges, but would be consistent with the concepts and limits of judicial immunity already recognized by the United State Supreme Court.

**B.     Judicial immunity does not apply because the admittedly criminal conduct in this case was nonjudicial.**

Though judicial immunity has been liberally extended to protect allegations of erroneous, malicious, and even conspiratorial judicial actions – limits that we acknowledge and accept – courts have always recognized that judicial immunity is not without limitations.  "A judge is not immune from liability for nonjudicial actions, *i.e.*, actions not taken in the judge's judicial capacity." Mireles v. Waco, 502 U.S. 9, 11 (1991) (citing Forrester v. White, 484 U.S. 219, 227-29 (1988); Stump v. Sparkman, 435 U.S. 349, 360 (1978)).[7]  If these limits have any practical meaning, they must be applied in this case where there has been an admission, under oath, of criminal conduct that necessarily falls outside the scope of judicial conduct and jurisdiction.

There is simply no way that Conahan's and Ciavarella's admittedly criminal arrangements with the detention facilities or their predetermination to

---

[7] Likewise, "a judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction." Id. (citing Stump, 435 U.S. at 356-57; Bradley v. Fisher, 13 Wall. 335, 351 (1872)).  Because Conahan and Ciavarella's admittedly criminal conduct was nonjudicial, we need not address this second limitation on judicial immunity.  We believe, though, that where, as here, a judge abdicates his judicial duties and acts in a knowingly criminal manner for his own personal gain, he cannot be acting within the jurisdiction conferred upon him.

detain juvenile offenders before any judicial proceeding even existed, can be considered judicial acts.[8]  Conahan's and Ciavarella's arguments to the contrary are disingenuous.  They necessarily conceded that they acted non-judicially when they admitted to criminal conduct in violation of their judicial oath.  Those admissions cannot be reconciled with their present assertion that they acted in a judicial capacity.

"A judge is not free, like a loose cannon, to inflict indiscriminate damage whenever he announces that he is acting in his judicial capacity."  Stump, 435 U.S. at 346 (Stewart, J., dissenting).  The mere fact that they were judges at the time they committed their crimes is of no consequence.  It is "the nature of the function performed, not the identity of the actor who performed it, that informs [the] immunity analysis."  Forrester v. White, 484 U.S. 219, 229 (1988).  "[A] prior, private agreement with a judge to rule in a particular way is totally incompatible with the judicial role of deciding cases impartially on the basis of evidence and arguments presented in court with all parties present."  Jeffrey M. Shaman, Judicial Immunity From Civil and Criminal Liability, 27 San Diego L. Rev. 1, 12 (1990).  Simply put, an admittedly criminal act cannot be a judicial act.

---

[8] Some of the acts comprising the criminal scheme should properly be characterized as administrative acts, to which judicial immunity does not apply. Because Plaintiffs have thoroughly addressed this issue in their brief, we do not revisit it here.  See Pls. Resp. Opp. Mot. to Dismiss at 23-34.

Neither the cloak of the judicial robe nor the courtroom setting transforms the criminal acts at issue in this case into legitimate judicial conduct. In their motions to dismiss, Conahan and Ciavarella focus on the adjudication and placement proceedings that occurred in the courtroom, arguing that they acted in their judicial capacity. Their focus is misplaced. The adjudication and placement of the juveniles occurred long before the children appeared in court. It occurred when Conahan and Ciavarella agreed to place children in detention in exchange for money. All of their feigned judicial actions following that criminal agreement – including the courtroom proceedings – were criminal acts, not judicial acts. They were acts in furtherance of the criminal scheme. As Justice Stevens pointed out in his dissent in <u>Mireles</u>, this temporal distinction is important as it highlights the non-judicial nature of the act.

In <u>Mireles</u>, Justice Stevens astutely noted that the defendant judge "issued two commands to the police officers. He ordered them to bring respondent into his courtroom, and he ordered them to commit a battery. The first order was an action taken in a judicial capacity; the second clearly was not. Ordering a battery has no relation to a function normally performed by a judge. If an interval of a minute or two had separated the two orders, it would be undeniable that no immunity would attach to the latter order." <u>Mireles</u>, 502 U.S. at 14 (Stevens, J.,

dissenting).  In <u>Mireles</u>, the Court was not faced with an interval between two acts, leaving the majority to find that judicial immunity applied.

In contrast, the temporal separation of events in this case only highlights the non-judicial nature of the acts.  Conahan and Ciavarella entered into an agreement to send juvenile offenders to certain detention facilities from which they were receiving (and concealing) cash payments.  Ciavarella then sent hundreds, if not thousands, of children to those facilities, regardless of their wrongdoing and without affording them their constitutional rights.  The mere fact that the juveniles were ultimately informed of their predetermined adjudication in a courtroom is of no consequence.  The courthouse was merely a staging area, a brief stop for the children that Conahan and Ciavarella had long before decided to send to a detention facility.  As stated above, wholesale predetermination of the outcome of hundreds, if not thousands, of cases "has no relation to a function normally performed by a judge."  Nor does negotiating and concealing kickbacks.  Rather than exercise judgment, Conahan and Ciavarella abdicated all judgment.[9]  They should not be entitled to protection under the judicial immunity doctrine.

Furthermore, Conahan and Ciavarella also face liability for the acts of their co-conspirators and co-schemers, for which they share equal responsibility.

---

[9] Indeed, the Special Master has recommended that all of the adjudications made during the course of the criminal scheme should be vacated.

Judicial immunity cannot shield them from that. Where a person has admitted to a

conspiracy or to aiding and abetting another in a criminal scheme, that person is

responsible for the actions of his co-conspirators or co-schemers. See Blumenthal

v. United States, 332 U.S. 539, 557 (1947) ("[I]t must be noted that one conspirator

is responsible for the actions of the other co-conspirators even if he does not

engage in them personally and even if he had no knowledge that the other

conspirators were doing what they did."); U.S. v. Carbo, 572 F.3d 112, 115 (3d

Cir. 2009) (a person who aids and abets honest services fraud by a public official

can also be responsible for the fraud) (citing U.S. v. Kemp, 500 F.3d 257 (3d Cir.

2007)). Here, Conahan and Ciavarella admittedly engaged in a criminal scheme

and conspiracy by and between themselves, and with others that lasted several

years. Indeed, Robert Powell, owner of PA Child Care, LLC and Western PA

Child Care, LLC, has admitted under oath to paying kickbacks to Conahan and

Ciavarella as part of the criminal scheme. As co-schemers, Conahan and

Ciavarella are liable for the wrongdoing of Powell, as well as the wrongdoing of

each other and others involved in the criminal scheme.[10] Those actions – which

---

[10] This position is not inconsistent with Dennis v. Sparks, 449 U.S. 24
(1980), which extended judicial immunity to a judge who had been accused of
conspiring to issue an improper injunction, but did not extend judicial immunity to
the private persons who had conspired with the judge. The Dennis Court found
that the judge's act was judicial. As described throughout this brief, that is not the
case here. In addition, the Dennis Court expressly declined to shield the private

(continued...)

the judge did not personally commit – cannot be taken with jurisdiction and cannot be judicial.[11] Thus, Conahan and Ciavarella should be denied the protection of judicial immunity for their own non-judicial acts, as well as the acts of each other and their other co-conspirators and co-schemers.

## IV.   Conclusion

We acknowledge and accept the guiding principles of judicial immunity. Those principles do not reach the conduct here because the conduct at issue, admittedly criminal, was not a judicial act. We also acknowledge and accept that where there are mere allegations of wrongdoing – even allegations of corruption – a judge should enjoy the protection of judicial immunity. But, where, as here, a judge has admitted under oath to a criminal scheme or conspiracy, he has forfeited any claim to judicial immunity, for his criminal actions could not have been judicial and could not have been taken with jurisdiction. Where there is no jurisdiction or judicial act, the policy reasons for judicial immunity simply do not

(continued...)

individuals from liability. In this case, Conahan is in the same position as the private individuals in Dennis. Conahan did not act from the bench. Instead, he acted outside the courtroom, entering into placement agreements and conspiring with Ciavarella to fill the detention facilities.

[11] Moreover, there is no policy reason to extend judicial immunity to these acts. The purpose of judicial immunity is to encourage judicial independence by protecting a judge's judicial decisions. There is no threat to independence if the acts of others are not protected.

apply.  For these reasons, the Court should deny Conahan and Ciavarella the

judicial immunity they seek and deny their motions to dismiss.  This is necessary

in order to maintain integrity and public trust in the judiciary.

Dated: September 21, 2009                    Respectfully submitted,

                                             /s/ Sara B. Richman
                                             James T. Giles
                                             gilesj@pepperlaw.com
                                             Barbara Mather
                                             matherb@pepperlaw.com
                                             Sara B. Richman
                                             richmans@pepperlaw.com
                                             PEPPER HAMILTON LLP
                                             3000 Two Logan Square
                                             Eighteenth & Arch Streets
                                             Philadelphia, PA  19103-2799
                                             (215) 981-4000
                                             (215) 981-4750 (fax)

                                             *Counsel to the Amici Curiae*

## <u>CERTIFICATE OF COMPLIANCE WITH WORD-COUNT LIMIT</u>

   I, Sara B. Richman, hereby certify, pursuant to Local Rule 7.8 that the foregoing brief complies with the word-count limit of this Court.  Relying on the word-count feature of Microsoft Word, the text of the brief contains 3,889 words.


        <u>/s/ Sara B. Richman   </u>

## CERTIFICATE OF SERVICE

I, Sara B. Richman, hereby certify that, on this 21st day of September, 2009,

the foregoing Brief of *Amici Curiae* in Opposition to the Motions to Dismiss of

Defendants Michael Conahan and Mark Ciavarella was filed and made available

via CM/ECF to all counsel of record.  Additionally, the foregoing Response was

served by First Class Mail upon the following:

> Mark Ciavarella
> 585 Rutter Avenue
> Kingston, PA 18704
>
> Michael T. Conahan
> 301 Deer Run Drive
> Mountaintop, PA 18707
>
> Beverage Marketing of PA, Inc.
> P.O. Box 17
> Pottsville Road
> Seltzer, PA 17974

/s/ Sara B. Richman