**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| FLORENCE WALLACE, et al., | **CONSOLIDATED TO:** |
| Plaintiffs, | |
| | CIVIL ACTION NO. 3:09-cv-286 |
| v. | |
| ROBERT J. POWELL, et al., | (JUDGE CAPUTO) |
| Defendants. | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| WILLIAM CONWAY, et al., | |
| Plaintiffs, | |
| | CIVIL ACTION NO. 3:09-cv-0291 |
| v. | |
| JUDGE MICHAEL T. CONAHAN, et al., | (JUDGE CAPUTO) |
| Defendants. | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| H.T., et al., | |
| Plaintiffs, | |
| | CIVIL ACTION NO. 3:09-cv-0357 |
| v. | |
| MARK A. CIAVARELLA, JR., et al., | (JUDGE CAPUTO) |
| Defendants. | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

SAMANTHA HUMANIK,

     Plaintiff,

        v.

MARK A. CIAVARELLA, JR., et al.,

     Defendants.

CIVIL ACTION NO. 3:09-cv-0630


(JUDGE CAPUTO)


## <u>MEMORANDUM</u>

Presently before the Court are five (5) motions to dismiss: (1) Defendant Perseus House's Motion to Dismiss (Doc. 170) on grounds of immunity for complying with a court order; (2) Defendant Vita's Motion to Dismiss (Doc. 188) on grounds of absolute immunity as an "arm of the court;"[1] (3) Defendant Mark Ciavarella's Motion to Dismiss (Doc. 210) on grounds of absolute judicial immunity; (4) Defendant Michael Conahan's Motion to Dismiss (Doc. 216) on grounds of absolute judicial and legislative immunity; and (5) Defendant Luzerne County's Motion to Dismiss on grounds of immunity imputed from the other actors. These motions will be granted in part and denied in part as discussed below.


## BACKGROUND

The individual and class action plaintiffs in this case bring federal and state law

---

[1] Vita also argues issues with respect to *Heck v. Humphrey* and the *Rooker-Feldman* doctrine. These arguments will be disposed in a separate order along with the remaining Defendants' motion on those issues. (Doc. 221.)

claims against a number of defendants for an alleged scheme involving the corruption of the Luzerne County Common Pleas and Juvenile Courts. The Plaintiffs' allegations relevant to the present motions are as follows:

Defendants Michael Conahan ("Conahan") and Mark Ciavarella ("Ciavarella") abused their positions as judges of the Luzerne County Court of Commons Pleas by accepting compensation in return for favorable judicial determinations. (Ind. Amend. Compl. ("Ind.") ¶ 30, Doc. 134; Class Action Amend. Compl. ("CA") ¶ 2, Doc. 136.) As part of this conspiracy, Conahan and Ciavarella acted with Defendants Robert Powell, Robert Mericle, Mericle Construction, Pennsylvania Child Care ("PACC"), Western Pennsylvania Child Care ("WPACC"), Pinnacle Group of Jupiter, LLC, Beverage Marketing of PA, Inc., Vision Holdings, LLC, and perhaps others. (Ind. ¶ 31.) The basic outline of the conspiracy was that Conahan and Ciavarella used their influence as judicial officers to select PACC and WPACC as detention facilities, and that they intentionally filled those facilities with juveniles to earn the conspirators excessive profits. (*Id.* ¶ 81.) In return, approximately $2.6 million was paid to Conahan and Ciavarella for their influence. (*Id.* ¶ 37.)

Conahan took official actions to remove funding from the Luzerne County budget from the Luzerne County facility, and he exerted influence to facilitate the construction, expansion, and lease of the PACC facility. (Ind. ¶ 34.) Conahan also signed a secret "Placement Guarantee Agreement" with PACC on behalf of Luzerne County. (*Id.* ¶ 41.) Conahan had "final decision-making authority with regard to Luzerne County's funding of the county-run River Street juvenile detention center." (*Id.*) Conahan also granted an injunction which prevented the results of an audit of the PACC facility by the Pennsylvania

3

Department of Public Welfare from being disclosed to the public.[2]

Ciavarella sentenced thousands of juveniles to detention in violation of their constitutional rights such as the right to counsel, the right to an impartial tribunal, and the right to a free and voluntary guilty plea.  (CA ¶¶ 177-78.)  Ciavarella acted "in his administrative capacity" when he began discussions with Powell about constructing a new facility.  (*Id.* ¶ 650.)  Conahan and Ciavarella also pressured court probation officers to make recommendations in favor of incarcerating juvenile offenders, even when they would have otherwise recommended release.  (Ind. ¶ 67.; CA ¶ 679.)  Conahan and Ciavarella also executed a number of schemes to conceal the unlawful proceeds of this conspiracy. (Ind. ¶ 35.)  They failed to disclose their financial relationship to the other Defendants, and knowingly and intentionally filed materially false annual statements of financial interests. (*Id*. ¶ 60.)

Dr. Frank Vita ("Vita") contracted with Conahan and Ciavarella to be the exclusive provider of psychological evaluations for juvenile offenders.  (Ind. ¶ 23.)  Due to the large number of evaluations Vita was required to perform based upon this exclusive agreement, a backlog developed which necessitated that juveniles be detained and/or lodged at PACC and/or WPACC for extended periods while awaiting evaluations.  (*Id*. ¶ 24.)  Vita conspired to bring PACC and WPACC more fees by creating this backlog to lengthen the duration of the juvenile detentions.  (*Id*. ¶ 25.)

Defendant Perseus House wrongly kept Plaintiff Samantha Humanik ("Humanik") in

---

[2] This allegation was in the proposed amended complaints of the Individual and Class Action Plaintiffs (Docs. 249, 250).  While leave to file those amendments was denied, this Court will consider this specific allegation for purposes of examining the boundaries of judicial immunity.

custody and subjected her to an unnecessary medical regimen against her will.  (Ind. ¶ 158.)  Humanik was incarcerated pursuant to a delinquency order signed by Ciavarella which stated that Humanik was to be detained for treatment.  (*Id.*)  Humanik was forcibly medicated and subjected to other cruel and unusual punishment while detained by Perseus House.  (*Id*. ¶ 159.)

The present motions have been fully briefed and argued orally, and are now ripe for disposition.

## LEGAL STANDARDS

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, for failure to state a claim upon which relief can be granted.  FED. R. CIV. PRO. 12(b)(6).  Dismissal is appropriate only if, accepting as true all the facts alleged in the complaint, a plaintiff has not pleaded "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), meaning enough factual allegations "'to raise a reasonable expectation that discovery will reveal evidence of'" each necessary element, *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 556); *see also Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993) (requiring a complaint to set forth information from which each element of a claim may be inferred).  In light of Federal Rule of Civil Procedure 8(a)(2), the statement need only "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Twombly*, 550 U.S. at 555).  "[T]he factual detail in a complaint [must not be] so undeveloped that it does

not provide a defendant [with] the type of notice of claim which is contemplated by Rule 8." *Phillips*, 515 F.3d at 232; *see also Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*, 499 F.3d 663, 667 (7th Cir. 2007).

In deciding a motion to dismiss, the Court should consider the allegations in the complaint, exhibits attached to the complaint, and matters of public record. *See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). The Court may also consider "undisputedly authentic" documents when the plaintiff's claims are based on the documents and the defendant has attached copies of the documents to the motion to dismiss. *Id.* The Court need not assume the plaintiff can prove facts that were not alleged in the complaint, *see City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 263 & n.13 (3d Cir. 1998), or credit a complaint's "'bald assertions'" or "'legal conclusions,'" *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir. 1997) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1429-30 (3d Cir. 1997)). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009).

## DISCUSSION

Under 42 U.S.C. § 1983, "'every person' who acts under color of state law to deprive another of a constitutional right shall be answerable to that person in a suit for damages." *Imbler v. Pachtman*, 424 U.S. 409, 417 (1976). Despite these broad terms, the Supreme Court has held consistently that the Section 1983 did not abolish long-standing common law immunities from and defenses to civil suits. *McArdle v. Tronetti*, 961 F.2d 1083, 1084 (3d

Cir. 1992) (citing *Burns v. Reed*, 500 U.S. 478(1991)).  Such common law immunities also apply to RICO and state law actions.  *Slater v. Jokelson*, No. 96-cv-672, 1997 WL 164236, at *8 (E.D. Pa. Mar. 26, 1997) (no evidence of legislative intent to abrogate judicial immunity in civil RICO statute); *see Pullman v. Allen*, 466 U.S. 552, 529 (1984) (The Supreme Court has indicated that its cases "have proceeded on the assumption that common-law principles should not be abrogated absent clear legislative intent to do so.").  "[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Burns v. Reed*, 500 U.S. 478, 486 (1991).  The present motions to dismiss address three types of absolute immunity: judicial, quasi-judicial, and legislative. Finally, the extension of immunity to a municipality for the actions of an "immune" employee will also be discussed.

### I.  Absolute Judicial Immunity

A.  Background

The doctrine of judicial immunity has long been recognized in both the American and English legal systems.  *See* Jeffrey Shaman, *Judicial Immunity from Civil and Criminal Liability*, 27 SAN DIEGO L. REV. 1 (1990).

> As a historical matter, the doctrine of judicial immunity arose in response to the creation of the right of appeal. In the tenth and eleventh centuries in England, when no right of appeal existed, losing litigants could challenge unfavorable judgments on the ground that they were false. The litigant was entitled to both the nullification of a false judgment and a fine (known as an amercement) against the judge who had rendered it. As the right to appeal became available, it replaced amercements against judges, and gradually the doctrine of judicial immunity developed. . . . [O]nce appeal became available, judicial immunity was gradually accepted under the common law. In the seminal case of *Floyd v. Barker*, decided by Lord Coke in 1607,

> judicial immunity was established for judges who served on English courts of record. In that decision, Lord Coke discussed for the first time what are now considered some of the modern policies that underlie the doctrine of judicial immunity. Judicial immunity serves the following purposes according to Lord Coke: (1) It insures the finality of judgments; (2) it protects judicial independence; (3) it avoids continual attacks upon judges who may be sincere in their conduct; and (4) it protects the system of justice from falling into disrepute.

*Id.* at 3.

The doctrine of judicial immunity provides that judges are immune from suit for their judicial acts so long as the judicial acts are not in the "clear absence of jurisdiction." *Bradley v. Fisher*, 80 U.S. 335, 351 (1871). The first major application of judicial immunity by the United States Supreme Court occurred in *Bradley*. Attorney Joseph Bradley brought suit against Judge George Fisher after the judge effectively disbarred him for rude and contemptuous behavior in the courtroom. *Id.* at 344-45. The Supreme Court found that this sanction was too harsh, but that the doctrine of judicial immunity shielded Judge Fisher from any monetary liability. *Id.* at 357. After discussing the decision in *Floyd v. Barker*, the Court stated that "[j]udges of courts of superior or general jurisdiction are not liable to civil actions for their judicial acts, even when such acts are in excess of their jurisdiction, and are alleged to have been done maliciously or corruptly." *Id.* at 351. Bradley alleged that immunity was not appropriate because Fisher "wantonly, corruptly, arbitrarily, and oppressively" acted to remove him from the practice of law without any notice. *Id.* at 338. The Court stated that "[n]or can this exemption of the judges from civil liability be affected by the motives with which their judicial acts are performed. The purity of their motives cannot in this way be the subject of judicial inquiry." *Id*. at 348.

In *Pierson v. Ray*, 386 U.S. 547 (1967), *reversed on other grounds in Harlow v. Fitzgerald*, 457 U.S. 800 (1982), the Supreme Court held that judicial immunity applies to actions under § 1983.  In that case, the plaintiffs were members of a group of white and African-American Episcopal clergymen who attempted to use segregated facilities at an interstate bus terminal in Jackson, Mississippi in 1961.  *Id*. at 549.  They brought suit against local police officers and a municipal police justice for false imprisonment after they were convicted of disturbing the peace.  *Id*.  The plaintiffs alleged that the judge's findings of guilt and sentences were based upon racial discrimination.  *Id.* at 551.  The Court again stated that "[judicial] immunity applies even when the judge is accused of acting maliciously and corruptly, and it is not for the protection or benefit of a malicious or corrupt judge, but for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence and without fear of consequences."  *Id.* at 554 (quoting *Bradley v. Fisher*, 80 U.S. at 349 n.16).

Judicial immunity was again the focus of the Supreme Court in *Stump v. Sparkman*, 435 U.S. 349 (1978).  In *Stump*, an Indiana circuit court judge granted a mother's petition to sterilize her fifteen (15) year old daughter.  *Id.* at 349.  The petition was approved *ex parte* without a hearing and without notice to the daughter or appointment of a guardian *ad litem*.  *Id.*  The daughter was sterilized without her knowledge under the pretext of having her appendix removed.  *Id.*  After the daughter discovered the sterilization, she brought suit against the mother, the judge, the doctors, and others.  *Id.*  The Court clarified the two-part inquiry for determining whether judicial immunity applied: (1) a judicial act, (2) within the scope of the judge's jurisdiction.  *Id*. at 356.  The Court stated, "[a] judge will not be deprived

of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the 'clear absence of all jurisdiction.'" *Id.* at 356-57 (citation omitted). There was no question that the granting of a petition, even an unusual one such as this, was within the general jurisdiction of the Indiana circuit court. *Id.* at 350. The Court also expanded upon the requirement of a "judicial act" stating that it is "the nature of the function performed, not the identity of the actor who performed it" that informs the immunity analysis. *Id.* at 362. When determining if the act is a judicial, it is appropriate to consider "the nature of the act itself, *i.e.*, whether it is a function normally performed by a judge," and "the expectations of the parties, *i.e.*, whether they dealt with the judge in his official capacity." *Id.* The daughter argued that the judge's act was "so unfair and so totally devoid of judicial concern for the interests and well-being of the young-girl involved as to disqualify it as a judicial act." *Id* at 363. The Court, however, rejected this argument and granted judicial immunity. *Id.* 364.

In *Dennis v. Sparks*, 449 U.S. 24 (1980), the Supreme Court addressed judicial immunity in relation to specific allegations of corruption. A judge of the District Court of Duval County, Texas granted an injunction preventing the production of minerals from certain oil leases by the plaintiffs. *Id.* at 26. The injunction was dissolved by an appellate court as being illegally issued. *Id.* The plaintiffs alleged that the order was corruptly issued as a result of a conspiracy between the judge and two other defendants. *Id.* The Court had no difficulty in affirming the lower court's ruling that the judge was immune from suit. *Id.* at 28. While the judge was immune from suit, the Court found that the conspiring parties could still be held liable under § 1983, stating:

10

> Under these allegations, the private parties conspiring with the judge were acting under color of state law; and it is of no consequence in this respect that the judge himself is immune from damages liability.  Immunity does not change the character of the judge's action or that of his co-conspirators.

*Id.* at 28.  Because the granting of an injunction was within the jurisdiction of the judge, and it was a judicial act, judicial immunity shielded the judge from liability for damages.  *Id.*

The Supreme Court's most recent discussion on judicial immunity came in *Mireles v. Waco*, 502 U.S. 9 (1991).  The Court again considered whether the judge acted within his jurisdiction, and whether the alleged conduct was a judicial act.  *Id.* at 11.  The plaintiff was a public defender who was scheduled to appear before the judge.  *Id.* at 10.  The plaintiff alleged that when he failed to appear for the initial call of the morning calendar, the judge ordered several police officers to forcibly bring him from another courtroom where he was waiting to appear.  *Id.*  The plaintiff further alleged that the judge instructed the officers to use unreasonable force, that they slammed him through the doors and swinging gates, and that the judge called him vulgar and offensive names.  *Id.*  The Court of Appeals for the Ninth Circuit had found that the alleged conduct was not a judicial act, and therefore that judicial immunity did not apply.  *Id.* at 11.  The Supreme Court summarily reversed the Ninth Circuit Court of Appeals, and held that such conduct was a judicial act.  *Id.* at 12.  The Court again focused on the nature of the alleged act, in this case that the judge issued an order to the officers.  *Id.* at 13.  The Court held that this type of conduct was a judicial act, and therefore judicial immunity applied, regardless of any bad faith which might have motivated it.  *Id.* at 12.  The Court again repeated the justification behind judicial immunity:

> Although unfairness and injustice to a litigant may result on occasion, it is a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself.

*Id.* at 10 (citing *Bradley v. Fisher*) (quotation marks omitted).

The Supreme Court has decided two cases where the doctrine of judicial immunity did not apply; in both cases because of the non-judicial nature of the acts involved.  In *Forrester v. White*, 484 U.S. 219 (1988), the Court focused on the requirement of a judicial act.  *Id.* at 227.  In *Forrester*, the plaintiff was a former probation officer who was fired by a state court judge, allegedly because of the probation officer's sex.  *Id.* at 221.  The Court held that the decision to demote and fire an employee was taken in the capacity as an employer, rather than a judge.  *Id.*  The judge was not entitled to judicial immunity because the act was administrative, rather than judicial.  *Id.*  The Court stated, "this Court has never undertaken to articulate a precise and general definition of the class of acts entitled to immunity.  The decided cases, however, suggest an intelligible distinction between judicial acts and the administrative, legislative, or executive functions that judges may on occasion be assigned by law to perform."  *Id*.  The Supreme Court also denied judicial immunity in *Cleavinger v. Saxner*, 474 U.S. 193 (1985).  In *Cleavinger*, the plaintiff sued a committee of prison officials who had a judicial-like function of adjudicating prison disciplinary violations.  *Id.* at 194.  The Court noted that judicial immunity has been extended to those "functionally comparable" to a judge, such as a federal hearing examiner or administrative law judge.  *Id*. at 200 (citing *Butz v. Economou*, 438 U.S. 678, 513 (1978)).  The Court found, however, that the officials were not independent decision-makers, only employees

12

of the prison temporarily diverted from their normal duties. *Id*. at 204. The doctrine of judicial immunity, therefore, did not extend to them as they did not have impartial decision-making power which should be protected for the public benefit. *Id.*

Judicial immunity, however, does not "insulate the judiciary from all aspects of public accountability." *Dennis v. Sparks*, 449 U.S. 24, 31 (1980). Judges are immune from damages actions, but they may be removed by from office for their misconduct. *See* U.S. Const. art. III, § 1 (impeachment); Pa. Const. art. V, § 18 (removal from office). Judges are also subject to criminal prosecutions. *O'Shea v. Littleton*, 414 U.S. 488, 503 (1974). Indeed, the judges here have been indicted by a federal grand jury for the conduct for which damages are sought in this case. Similarly, judges are not immune from all hassle created by civil litigation; for example, they may be called as witnesses. *Dennis*, 449 U.S. at 31.

B.  Application

Judges have absolute judicial immunity for conduct pursuant to their role as judicial officers. *See Stump*, 435 U.S. at 359 ("A judge is absolutely immune from liability for his judicial acts even if his exercise of authority is flawed by the commission of grave procedural errors."). "Although unfairness and injustice to a litigant may result on occasion, 'it is a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions without apprehension of personal consequences to himself.'" *Mireles*, 502 U.S. at 10 (quoting *Bradley*, 80 U.S. at 347).

For judicial immunity to apply, only two requirements need to be met: jurisdiction over the dispute, and a judicial act. As to the first, a judge is not immune only when he has acted

13

in the "clear absence of all jurisdiction." *Stump* 435 U.S. at 349 (citation omitted). Second, a judicial immunity extends only to "judicial acts," not administrative, executive, or legislative ones. *Id.* at 360-61.

1.  Jurisdiction

"[T]he necessary inquiry in determining whether a defendant judge is immune from suit is whether at the time he took the challenged action he had jurisdiction over the subject matter before him . . . . [T]he scope of the judge's jurisdiction must be construed broadly where the issue is the immunity of the judge." *Stump*, 435 U.S. at 356 (citation omitted). The fact that the judge was incorrect about the status of jurisdiction or that there were procedural errors causing the judge to act without jurisdiction does not satisfy the requirements for defeating immunity. *Gallas v. Supreme Court of Pennsylvania*, 211 F.3d 760, 771 (3d Cir. 2000). Under 42 Pa.C.S. § 931(a), "the courts of common pleas shall have unlimited original jurisdiction of all actions and proceedings by law and usage in the court of common pleas." In the present case, the courtroom actions[3] of Ciavarella and Conahan were not taken in "clear absence of all jurisdiction." Decisions to grant a preliminary injunction, as Conahan did, or in adjudicating juveniles delinquent and imposing sentences, as Ciavarella did, are both well within the jurisdiction of a Pennsylvania common pleas judge.

The Plaintiffs argue that because Ciavarella's acts contravened the Constitution of the United States, he was acting in the "clear absence of jurisdiction" and therefore is not immune from suit. The Plaintiffs cite no authority for this proposition, nor is there any. They

---

[3] I focus on the courtroom conduct of Ciavarella and Conahan given the discussion below of a judicial act, *infra* Part I. B. 2.

allege that Ciavarella violated the constitutional rights of the juveniles brought before him in the following ways: (1) his court or tribunal was not impartial; (2) he failed to advise them of the right to counsel and therefore assure that any waiver of counsel was knowing and voluntary; and (3) he failed to determine that the pleas of guilty were knowing and voluntary. While these acts constitute egregious, unjustifiable judicial behavior, they do not make out a case for the absence of jurisdiction. If unconstitutional acts by a judge deprived the court of jurisdiction, and hence eliminated judicial immunity, it could be argued that all erroneous decisions in constitutional tort cases would subject the judge to civil liability. Such is not, and should not be, the case. As to their courtroom behavior, I conclude that both Ciavarella and Conahan had jurisdiction.

    2.  Judicial Act

    When determining if the act is a judicial, it is appropriate to consider "the nature of the act itself, *i.e.*, whether it is a function normally performed by a judge," and "the expectations of the parties, *i.e.*, whether they dealt with the judge in his official capacity." *Stump*, 435 U.S. at 362. It is the nature of the function performed, not the identify of the actor who performed it, that informs the immunity analysis. *Id.* "A judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of authority." *Bradley*, 80 U.S. at 351. There is an intelligible distinction between judicial acts and the administrative, legislative, or executive functions that judges may on occasion be assigned by law to perform. *Forrester*, 484 U.S. at 227. There must be an evaluation of each alleged act to determine if it is "judicial" in nature. Acts which are traditionally done by judges include issuing orders, resolving cases and controversies, making rulings, and

sentencing criminal defendants. Other actions such as sending a fax, or hiring and firing subordinates, have been found to be administrative, rather than judicial, acts. Note, however, that even if an act is not judicial, there may be still be immunity if the act is legislative or executive in nature.

Plaintiffs argue that because the decisions were made corruptly or in a pre-determined fashion that they were not judicial acts. Plaintiffs, however, cite no cases in support of this position. In fact, a judicial act "does not become less judicial by virtue of an allegation of malice or corruption of motive." *Forrester*, 484 U.S. at 227. Judges are not liable even when they have allegedly acted maliciously or corruptly. *Bradley*, 80 U.S. at 351. In *Stump v. Sparkman*, a similar argument was made by the plaintiffs and rejected. In that case, Judge Stump ordered that a young girl be sterilized without her knowledge or consent at her mother's request. The Court stated:

> [R]espondents argue that Judge Stump's action was "so unfair" and "so totally devoid of judicial concern for the interests and well-being of the young girl involved" as to disqualify it as a judicial act. Disagreement with the action taken by the judge, however, does not justify depriving the judge of his immunity.

*Stump*, 435 U.S. at 363. The Court went on to find that Judge Stump had absolute judicial immunity. *Id.* at 364. The inquiry at this step is not the intent of the judge, nor the extent of the error. The only question is objectively whether the alleged action is one that traditionally a judge would perform or that the parties expected would come from the judge in an official capacity.

Conahan's issuance of an injunction for an alleged corrupt motive is identical to the conduct the Supreme Court considered when granting immunity in *Dennis v. Sparks*.

16

*Dennis*, 449 U.S. at 28 (illegal injunction allegedly based upon corruption). As to Ciavarella, focusing only on the nature of the act performed, as I am required to do by law, I also find that the determinations of delinquency and the sentences imposed were judicial acts. As the Supreme Court has made clear, the alleged motivations, be they corrupt or with malice, are irrelevant to this determination. As to the courtroom acts of Conahan and Ciavarella, I find that they are protected by judicial immunity.

That is not to say, however, that *every* act alleged of the two was judicial in nature. For example, Conahan's signing of a "Placement Agreement" would be an administrative, not a judicial act. Similarly, any acts in making budget requests to the Luzerne County commissioners would also be administrative or executive in nature. And the actions of Conahan and Ciavarella in coercing probation officers to change their recommendations is outside of the role of a judicial officer. Probation officers are to advise the court, not the other way round, on sentencing matters. The nature of these acts are not judicial in nature, and therefore judicial immunity does not shield such conduct.

In finding that the courtroom conduct of Conahan and Ciavarella is shielded by the doctrine of judicial immunity, I am not unmindful of the egregious nature of the alleged conduct presented by this case. This is, however, about the rule of law. It is about the rule of law in the face of popular opinion which would seek a finding directly contrary to the result the rule of law dictates. Indeed, the Plaintiffs have argued that such egregious actions demand a contrary result. They argue that the conduct is so contemptible that immunity should not be available. They also note Ciavarella's admission that he did some, if not all, of the acts for which he was indicted and suggest that this fact renders judicial immunity unavailable. They argue further that immunity should be available only for honest mistakes

17

and that failing such, the doctrine of immunity should not apply.[4]

As previously noted, the doctrine of judicial immunity is grounded on notions dating back to Lord Coke.  These notions are: the finality of judgments, the protection of judicial independence, the avoidance of continual acts on judges who may be sincere, and the protection of the justice system from falling into disrepute.  Shaman, 27 SAN DIEGO L. REV. at 3.  These concerns are as valid today as they were four hundred years ago.  Moreover, the case law establishes that the availability of immunity is not determined by a sliding scale.  The degree of corrupt behavior is not the touchstone of the immunity doctrine's application.  The doctrine holds that judges with bad intentions, as well as those with good intentions, are immune from suit.

Egregious conduct is immune to assure that honest mistakes will be immune. Subjecting judges to a determination of the existence of good faith on a case by case basis is not desirable.  It would create chaos and undermine judicial independence.  It would eliminate the finality of judgments and destroy public confidence in the judiciary.  Every decision by every judge would be subject to attack (in court) on the basis that it was not an honest mistake.  Even though almost all erroneous decisions – and history proves this – are honest mistakes, subjecting each decision to judicial scrutiny as to whether it was motivated by good faith, would render the justice system unstable, ineffective and would destroy public confidence in the judiciary.  It would turn the justice system upside-down.  Imagine the continuum of litigation over decisions to determine whether they were rendered in good faith.  Even the decisions that determined they had been rendered in good faith would be

---

[4] These contentions were also advanced in an *amicus curae* brief filed by a group of twenty former judges, law school deans, law professors, and practitioners.

subject to attack themselves, and so on.  The notion of the stability provided by the finality of judgments would perish.  Moreover, it is not as though judicial decisions are not scrutinized.  Mistakes are dealt with on appeal, and egregious behavior by judges is subject to prosecution under the criminal law and removal from office.  It is readily apparent that the doctrine of judicial immunity, as it has developed and exists today, creates an environment which permits judges to be independent of the other branches of government, the will of the majority, and designing persons; it provides stability through finality; and, it has the confidence of the public.  THE FEDERALIST No. 78 (Alexander Hamilton).

Because the law requires that judges no matter how corrupt, who do not act in the clear absence of jurisdiction while performing a judicial act, are immune from suit, former Judge Ciavarella will escape liability for the vast majority of his conduct in this action.  This is, to be sure, against the popular will, but it is the very oath which he is alleged to have so indecently, cavalierly, baselessly and willfully violated for personal gain that requires this Court to find him immune from suit.  Former Judge Conahan, however, is not immune for the majority of his conduct, as the Plaintiffs' allegations pertain to non-judicial acts.  The shielding blanket of judicial immunity does not cover his actions simply because of his former status.  The doctrine of judicial immunity need not, and does not, shelter Ciavarella and Conahan's non-judicial conduct.

The Motions to Dismiss by Ciavarella and Conahan will be granted as to their courtroom conduct.  Specifically, Conahan's motion will be granted as to his action granting injunctive relief preventing the release of the PACC audit.  Ciavarella's motion will be granted as to his juvenile delinquency determinations and the sentences he imposed.  As to the remaining allegations against each, the doctrine of judicial immunity does not shield

them from liability, because the other allegations relate to non-judicial acts.  I will deny their

Motions to Dismiss as to such non-judicial conduct.

## II.  Quasi-Judicial Immunity

A.  Witness/Psychologist Immunity

Persons functioning as integral parts of the judicial process are immune from suits

under § 1983.  *McArdle v. Tronetti*, 961 F.2d 1083, 1085 (3d Cir. 1992).  This immunity

extends to a psychologist retained or appointed by the court to evaluate an individual and

to report back to the court.  *Id.*  This immunity does not extend, however, to actions taken

beyond the assistance to the court in making its ruling.  *Id.* at 1086 (immunity does not

extend to filing a petition for involuntary commitment which was full of lies, since any person

could file such a request).  Dr. Vita argues that because he acted as a psychologist to assist

the court, he cannot be held liable for his actions advising the court.  Plaintiffs respond that

it was not the recommendations by Vita which furthered the conspiracy, rather that he

intentionally created a backlog of recommendations so that juveniles remained incarcerated

for a longer period of time.  The signing of a contract and the management of one's

caseload are administrative actions to which quasi-judicial immunity does not apply.  The

delays would not assist the court in making any determinations about the juveniles.  As the

Plaintiffs' allegations focus only on these administrative acts, Dr. Vita's Motion to Dismiss

will be denied.

B.  Compliance with a Court Order

"[A]ction taken pursuant to a facially valid court order receives absolute immunity

from § 1983 lawsuits for damages." *Hamilton v. Leavy*, 322 F.3d 776, 782-83 (3d Cir. 2003);

20

*see Wolfe v. City of Pittsburgh*, 140 F.3d 236, 240 (3d Cir. 1998); *Richman v. Sheahan*, 270 F.3d 430, 437 (7th Cir. 2001). Immunity has been granted to a group-home for complying with a court order. *Von Schlichten v. County of Northampton*, 279 Fed. Appx. 176, 179 (3d Cir. 2008). In the present case, Perseus House claims that their incarceration of plaintiff Humanik was based upon a court order. To the extent that Perseus House was simply complying with the court order, they are immune. Plaintiff Humanik's allegations, however, extend beyond mere incarceration to mistreatment, abuse, and forced medication during her incarceration. (Ind. ¶ 158-59.) For any conduct *beyond* the court order, there is no immunity. Perseus House argues that because Ciavarella's order declared that "treatment" was to be given, it shields them from liability from subsequent conduct. This is simply too broad of a reading of quasi-judicial immunity for acting pursuant to a court order. This would give them *carte blanche* to treat incarcerated juveniles in any manner which they believed was effective treatment. Only that conduct specifically demanded by the court order is shielded by absolute immunity; any remaining conduct can still create liability. As to the allegations of false imprisonment, I find that Perseus House is entitled to quasi-judicial immunity because a facially valid court order directed Humanik's incarceration. As to the allegations of mistreatment at the facility, I find that such conduct would be beyond compliance with the order, and therefore immunity does not attach. The Motion to Dismiss will be granted as to false imprisonment, and denied as to the remaining counts.

### III. Absolute Legislative Immunity

"Absolute legislative immunity attaches to all actions taken 'in the sphere of legitimate legislative activity.'" *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998) (quoting *Tenney v.*

*Brandhove*, 341 U.S. 367, 376 (1951)). "Legislative immunity shields from suit not only legislators, but also public officials outside of the legislative branch when they perform legislative functions." *Baraka v. McGreevey*, 481 F.3d 187, 195-96 (3d Cir. 2007) (citation omitted). There is a two-part test to determine whether actions are to be regarded as legislative for immunity purposes: (1) the action must be "substantively" legislative, which requires that it involve a policy-making or line-drawing decision; and (2) the action must be "procedurally" legislative, which requires that it be undertaken through established legislative procedures. *Acierno v. Cloutier*, 40 F.3d 597, 610 (3d Cir. 1994) (citing *Ryan v. Burlington County*, 889 F.2d 1286, 1290-91 (3d Cir. 1989)).

The Supreme Court has recognized that judges sometimes perform legislative actions. *Gallas v. Supreme Court of Pennsylvania*, 211 F.3d 760, 773 (3d Cir. 2000); *see Forrester,* 484 U.S. at 227 (noting a distinction "between judicial acts and the administrative, legislative, or executive functions that judges may on occasion be assigned by law to perform"). "Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it." *Bogan*, 523 U.S. at 54. Generally legislative acts are those which apply generally to the entire community, while acts specifically directed at one or a few individuals are administrative. *Acierno*, 40 F.3d at 611. Again, like judicial immunity the question is *not* the intent of the actor. Only the type of action taken is considered to determine if an act is legislative. There must be an analysis made of each alleged action to determine if immunity applies. Conahan alleges that legislative immunity applies only to his conduct with respect to the court's budget.

22

There appears to be no legal basis for the argument that the president judge has the legislative power to control and administer even a portion of the county budget.[5]  As the Plaintiffs argue in their brief in opposition, "Pennsylvania law does not vest a president judge with the power to create, vote on, or sign into law a county budget."  (Doc. 282 at 67.)  The cases which address the interaction between the president judge and the county commissioners instead suggest that the president judge makes budget *recommendations* to the commissioners, but that the commissioners must make the final spending allocations.  *See, e.g.*, *Lavelle v. Koch*, 617 A.2d 319 (Pa. 1992) (president judge seeking to compel commissioners to disperse funds); *Becket v. Warren*, 439 A.2d 638 (Pa. 1981) (same).  This type of political lobbying is distinct from legislative activity.  Because Conahan's activity with respect to the Luzerne County budget was not legislative in nature, I find that absolute legislative immunity does not apply.

### IV. Extension to a Municipality

Luzerne County argues that because the relevant actors, such as the county commissioners or judges, may be entitled to immunity, so too should the county be immune.  This argument, however, ignores the nature of absolute immunity.  Absolute immunity such as legislative or judicial immunity is to protect the *actor* to make them capable of completing

---

[5] Not only is the power to directly control budgetary matters not specifically given to president judges, it would likely violate the separation of powers under the Pennsylvania Constitution to give this type of legislative spending power to a judicial officer.  *See Leahey v. Farrell*, 362 Pa. 52, 57 (Pa. 1949) ("The function of the judiciary to administer justice does not include the power to levy taxes in order to defray the necessary expenses in connection therewith. It is the legislature which must supply such funds.");  *Commonwealth ex rel. Schnader v. Liveright*, 308 Pa. 35, 161 A. 697 (Pa. 1932) (Control of state finances rests with the legislature, subject only to constitutional limitations).

their task, not to vacate all responsibility for such conduct. *See Dennis v. Sparks*, 449 U.S. 24 (1980) (conspirators liable "under color of state law" even where judge was immune). The Supreme Court has specifically held that "municipalities have no immunity from damages flowing from their constitutional violations." *Hynson By and Through Hynson v. City of* Chester, 827 F.2d 932, 934 (3d Cir. 1987) (citing *Owen v. City of Independence*, 445 U.S. 622, 657 (1980)). Luzerne County is therefore not protected by any of the aforementioned immunity doctrines.

## CONCLUSION

Motions to Dismiss will be granted in part and denied in part as discussed above. An appropriate Order follows.


  November 20, 2009                              /s/ A. Richard Caputo
Date                                          A. Richard Caputo
                                              United States District Judge

24

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

FLORENCE WALLACE, et al.,

      Plaintiffs,

          v.

ROBERT J. POWELL, et al.,

      Defendants.

**CONSOLIDATED TO:**

CIVIL ACTION NO. 3:09-cv-286

(JUDGE CAPUTO)

*************************************************************************************

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

WILLIAM CONWAY, et al.,

      Plaintiffs,

          v.

JUDGE MICHAEL T. CONAHAN, et al.,

      Defendants.

CIVIL ACTION NO. 3:09-cv-0291

(JUDGE CAPUTO)

*************************************************************************************

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

H.T., et al.,

      Plaintiffs,

          v.

MARK A. CIAVARELLA, JR., et al.,

      Defendants.

CIVIL ACTION NO. 3:09-cv-0357

(JUDGE CAPUTO)

*************************************************************************************

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

SAMANTHA HUMANIK,

    Plaintiff,

       v.

MARK A. CIAVARELLA, JR., et al.,

    Defendants.

CIVIL ACTION NO. 3:09-cv-0630

(JUDGE CAPUTO)

## ORDER

**NOW**, this   20th   day of November, 2009, **IT IS HEREBY ORDERED** that:

1.    Defendant Perseus House's Motion to Dismiss (Doc. 170) is **GRANTED IN PART** and **DENIED IN PART** as follows:
    a.    As to the claim of false imprisonment, the motion is **GRANTED**.
    b.    As to the remainder the motion is **DENIED**.

2.    Defendant Vita's Motion to Dismiss (Doc. 188) is **DENIED**.

3.    Defendant Mark Ciavarella's Motion to Dismiss (Doc. 210) is **GRANTED IN PART** and **DENIED IN PART** as follows:
    a.    As to judicial immunity for the courtroom adjudications and sentences imposed, the motion is **GRANTED**.
    b.    As to the remainder the motion is **DENIED**.

4.    Defendant Michael Conahan's Motion to Dismiss (Doc. 216) is **GRANTED IN PART** and **DENIED IN PART** as follows:
    a.    As to judicial immunity for the granting of injunctive relief, the motion is **GRANTED**.
    b.    As to the remainder the motion is **DENIED**.

5.    Defendant Luzerne County's Motion to Dismiss (Doc. 218) is **DENIED**.

        /s/ A. Richard Caputo
        A. Richard Caputo
        United States District Judge