**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

FLORENCE WALLACE, et al.,

     Plaintiffs,

        v.

ROBERT J. POWELL, et al.,

     Defendants.

CIVIL ACTION NO. 3:09-cv-286

(JUDGE CAPUTO)

************************************************************************************************

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

WILLIAM CONWAY, et al.,

     Plaintiffs,

        v.

MICHAEL T. CONAHAN, et al.,

     Defendants.

CIVIL ACTION NO. 3:09-cv-0291

(JUDGE CAPUTO)

************************************************************************************************

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

H.T., et al.,

     Plaintiffs,

        v.

MARK A. CIAVARELLA, JR., et al.,

     Defendants.

CIVIL ACTION NO. 3:09-cv-0357

(JUDGE CAPUTO)

************************************************************************************************

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| SAMANTHA HUMANIK, | |
| Plaintiff, | CIVIL ACTION NO. 3:09-cv-0630 |
| v. | |
| MARK A. CIAVARELLA, JR., et al., | (JUDGE CAPUTO) |
| Defendants. | |

**********************************************************************************************

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| RAUL CLARK, et al., | |
| Plaintiffs, | CIVIL ACTION NO. 3:09-cv-0357 |
| v. | |
| MICHAEL T. CONAHAN, et al., | (JUDGE CAPUTO) |
| Defendants. | |

**********************************************************************************************

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| WAYNE DAWN, et al., | |
| Plaintiffs, | CIVIL ACTION NO. 3:09-cv-2535 |
| v. | |
| MARK A. CIAVARELLA, JR., et al., | (JUDGE CAPUTO) |
| Defendants. | |

**********************************************************************************************

2

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

ANGELA RIMMER BELANGER, et al.,

  Plaintiffs,

    v.

MARK A. CIAVARELLA, et al.,

  Defendants.

CIVIL ACTION NO. 3:10-cv-1405

(JUDGE CAPUTO)

## MEMORANDUM

  Presently before the Court are Plaintiffs' Partial Motion for Summary Judgment Against Robert Powell, PA Child Care, LLC, Western PA Child Care, LLC, Mid-Atlantic Youth Services Corp., and Vision Holdings, LLC (Doc. 1024) and Defendants Mid-Atlantic Youth Services Corp., PA Child Care, LLC, and Western PA Child Care, LLC's Cross-Motion for Partial Summary Judgment (Doc. 1079) and Supplemental Cross-Motion for Partial Summary Judgment Out of Time. (Doc. 1080.)[1] Plaintiffs seek summary judgment as to liability against Private Defendants on their 42 U.S.C. § 1983 denial of an impartial tribunal claims. Provider Defendants, on the other hand, seek summary judgment on all of Plaintiffs' § 1983 claims. Because a dispute of fact exists as to whether Private Defendants, through Robert Powell, willfully participated in a conspiracy with state actors to cause the deprivation of Plaintiffs' constitutional rights, Plaintiffs' motion and Provider Defendants' cross-motions will be denied.

## I. Factual Background

  This civil action arises out of the alleged conspiracy related to the construction of

---

[1]  Defendants Powell, Vision Holdings, PA Child Care ("PACC"), Western PA Child Care ("WPACC"), and Mid-Atlantic Youth Services ("MAYS") will be referred to collectively as the "Private Defendants." "Provider Defendants" will refer to PACC, WPACC, and MAYS.

juvenile detention facilities, and subsequent detainment of juveniles in these facilities, orchestrated by two former Luzerne County Court of Common Pleas judges, Michael Conahan ("Conahan") and Mark Ciavarella ("Ciavarella").   Plaintiffs in this action, juveniles or the parents of juveniles who appeared before Ciavarella, seek redress from the former judges, as well as the individuals and business entities involved in the construction and operation of these facilities, for the alleged unlawful conspiracy and resulting deprivations of Juvenile Plaintiffs' rights.   These motions for partial summary judgment all implicate Private Defendants' liability for Plaintiffs' 42 U.S.C. § 1983 claims.

## A.      The Construction of the Facilities and the Concealed Payments

The idea of constructing a new juvenile detention center in Luzerne County was first mentioned to Robert Powell ("Powell") by Ciavarella at some time in 2000. (Doc. 1025, *Plfs.' Statement Material Facts,* "*Plfs.' SMF*", ¶ 55.) Ciavarella suggested that Powell discuss the idea of constructing a juvenile detention center with Gregory Zappala ("Zappala"). (*Id*.)  On June 9, 2000, Powell, Robert Mericle ("Mericle"), John Kimball, and Keith Frederick, a financial specialist who worked for Zappala, attended a kick-off meeting about the juvenile detention center project at Mericle's office. (*Id*. at ¶ 56, Ex. 21, *Powell Tr.*, 113:7-114:25.) Mericle subsequently acquired property at the Pittston Industrial Park for the purpose of constructing a juvenile detention center, and Powell and Zappala formed PACC to build the facility. (*Plfs.' SMF*, ¶¶ 57-58.)

Thereafter, Powell and Zappala sought financing for the construction of the facility. (*Powell Tr.*, 117:7-24.)  However, obtaining financing was difficult for Powell and Zappala because neither individual had experience constructing juvenile detention facilities. (*Id*.)  As such, Powell informed Conahan and Ciavarella, on or about July 11, 2001, that PACC would not be able to build a detention facility unless it had an agreement with Luzerne County or some other entity that could ensure that juveniles would be sent to the newly constructed facility. (*Id*. at 118:10-119:3.)  On December 21, 2001, the Court of Common Pleas of Luzerne County and PACC entered into a Placement Guarantee Agreement which required any juvenile determined to be committed to a detention facility to be sent to the

PACC facility, provided that the facility had vacancy for the juvenile. (Doc. 1120, *Provider Defs.' Corrected Statement Material Facts*, "*Prov. Defs.' SMF*", Ex. 10.)  Conahan signed the Placement Guarantee on behalf of Luzerne County as president judge. (*Id*.)  At this time, Powell was aware that the Luzerne County Commissioners were also trying to construct a juvenile detention facility, but he did not show the Commissioners the Placement Guarantee at Conahan's direction. (*Powell Tr.*, 122:3.)

After Conahan became president judge in January of 2002, he informed the Luzerne County Commissioners that the court would no longer send juveniles to the then-existing detention center. (*Plfs.' SMF*, ¶ 66.)  Conahan, Ciavarella, and their staff then arranged for the existing detention center's employees to be hired to work at the PACC facility. (*Id*. at ¶ 68.)

On February 19, 2002, Mericle Construction, Inc. and PACC entered into an agreement for the construction of a juvenile detention center in Pittston. (*Id*. at ¶ 70.)  The facility was completed approximately eleven months later, in or about January of 2003. (*Id*. at ¶ 72.)  Upon completion of the facility, Powell became aware that Mericle intended to pay Conahan and Ciavarella a fee of close to one million dollars ($1,000,000.00) in connection with the construction of the facility. (*Id*. at ¶ 73.)

On or about January 3, 2003, Powell signed an agreement which provided that he would be paid a referral fee upon completion of the PACC facility. (*Powell Tr.*, 130:22.)  Powell received the agreement from Mericle, and after he signed the agreement, he returned it to Mericle. (*Id*. at 131:13.)  The agreement, however, was not dated as of January 3, 2003, but was instead back-dated to February 19, 2002. (*Id.*, at 130:22.)  And, the referral fee referenced in the back-dated agreement was not for Powell, but was intended for Ciavarella and Conahan. (*Id*. at 131:10-12.)

On January 28, 2003, Mericle wired $610,000.00 to Attorney Robert Matta ("Matta"). (*Powell Tr.*, 132:20-133:12.)  Matta then transferred the same sum of money to Beverage Marketing of PA, Inc., *(Plfs.' SMF*, Ex. 24, *Matta Tr.*, 95:19-23,), a company owned by Conahan. (*Powell Tr.*, 135:1-2.)  Powell also accepted $387,000.00 of the initial payment

from Mericle. (*Id.* at 133:24-134:4.)   Powell paid taxes on the sum before giving Conahan a check from Vision Holdings for $326,000.00. (*Powell Tr.*, 136:3.)

In 2004, Mericle Construction, Inc. and WPACC entered into a construction agreement with a stated price of $9,745,300.00 for the construction of a juvenile detention facility in Western Pennsylvania. (*Plfs.' SMF*, ¶ 85.) Construction of the WPACC facility was completed in July of 2005. (*Id.* at ¶ 88.)  Upon completion of the WPACC facility, Conahan and Ciavarella were paid one million dollars ($1,000,000.00) by Mericle. (*Id.* at ¶ 90.)

Thereafter, in February of 2006, an addition to the PACC facility was completed which increased the number of beds available in the detention center by twelve. (*Id.* at ¶¶ 93, 96.)  Mericle paid Conahan and Ciavarella a fee of $150,000.00 to build the addition to the PACC facility. (*Id.* at ¶ 95.)

Powell also made multiple payments to the Pinnacle Group of Jupiter, LLC, a company which was formed by Conahan, Ciavarella, and their wives. (*Powell Tr.*, 142:1-2.) The payments to the Pinnacle Group were noted as being paid for reasons such as "rent prepay," "marina prepay," "reserving lease," "rental," and "slip rental fee." (*Id.* at 145:15-152:21.)  The sum paid by Powell to Conahan and Ciavarella included $590,000.00 from draws that were taken from PACC. (*Id.* at 150:14-18; *Prov. Defs.' SMF*, ¶ 173.)  Ultimately, from January of 2003 until January 1, 2007, Conahan and Ciavarella accepted a total of more than $2.1 million dollars from Mericle.  (*Plfs. SMF*, ¶ 114.)  And, Conahan accepted $590,000.00 by check and wire from Powell for rent, and Conahan and Ciavarella accepted $142,000.00 in cash from Powell. (*Id.* at ¶ 115.)

**B.     The Business Entities**

PACC is a Pennsylvania limited liability company that was formed by Powell and Zappala. (Doc. 1099, *Plfs.' Answer Prov. Defs.' Statement Material Facts*, "*Plfs.' Answer*", ¶ 150).  The members of PACC are Vision Holdings, LLC, and Consulting and Information Services, Inc. ("CIS"). (*Id.*)  The members of Vision Holdings are Powell and his wife. (*Id.* at ¶ 143.)  CIS was formed by Zappala. (Doc. 1119, *Prov. Defs.' Corrected Answer Plfs.' SMF*, "*Prov. Defs.' Answer*", ¶ 47.)  As with PACC, the members of WPACC are Vision

6

Holdings and CIS. (*Plfs. Answer*, ¶ 149.)  As such, Powell himself, as opposed to through Vision Holdings, was not a member of PACC or WPACC, nor was he a manager of PACC or WPACC. (*Id*. at ¶¶ 151-152.)

Mid-Atlantic Youth Services Corp. ("MAYS") is a Pennsylvania corporation. (*Id*. at ¶ 144.)[2]  In November of 2004, Luzerne County entered into an agreement to lease the PACC facility from PACC and the contract was ultimately awarded to MAYS to operate the PACC facility. (*Id*. at ¶¶162-163.)  And, in May of 2005, MAYS entered into an agreement with WPACC to operate the WPACC facility. (*Id*. at ¶ 161.)

In addition to his involvement in the construction of the detention facilities, Powell was also an attorney and owner, officer, shareholder, and/or operator of the Powell Law Group. (Doc. 1060, *Powell Answer Plfs.' SMF*, ¶ 46.)  Beginning in July of 2003, Patrick Owens ("Owens") became the Chief Financial Officer and Treasurer of the Powell Law Group. (*Prov. Defs.' SMF, Owens Decl.*, ¶ 1.)  In or about September of 2003, the Powell Law Group began to sell Owens' accounting and bookkeeping services to PACC for a fee. (*Id*. at ¶¶ 10-11.)  The Powell Law Group also sold Owens' services to WPACC for a fee. (*Id*. at ¶ 12.)  And, in May of 2005, MAYS entered into an agreement with the Powell Law Group to contract for Owens' accounting and bookkeeping services. (*Id*. at ¶ 15.)  Despite these arrangements, Owens received his wages from the Powell Law Group, and not from PACC, WPACC, and/or MAYS. (*Id.* at ¶ 43.)

In or around 2006, Owens began to transfer money from PACC and/or WPACC to other corporate entities owned by Powell and record the transfers as loans. (*Id*. at ¶ 29.)  Typically, Owens would move the funds from PACC or WPACC to Vision Holdings, and then the money would be transferred to other Powell entities. (*Id*. at ¶ 32.)  Owens also obtained large amounts of cash by writing checks from the Powell Law Group, Vision

---

[2]     Provider Defendants assert that Jeffrey Giovino was the sole shareholder of MAYS. (Prov. Defs.' SMF, ¶ 145.)  Plaintiffs, however, dispute this claim and argue that Powell had a fifty percent (50%) interest in MAYS. (Plfs.' Answer, ¶¶ 145, 147.)

Holdings, and/or PACC and then cashing the checks. (*Id.* at ¶ 40.)  While Owens never informed Zappala of the fund transfers between the companies and he never sent Zappala financial information about the entities, the financial information was available to Zappala. (*Id.* at ¶ 49.)

## C.    The Pennsylvania Supreme Court Expunges Juvenile Plaintiffs' Records

On January 26, 2009, the United States Attorney for the Middle District of Pennsylvania filed a Bill of Information alleging two counts of fraud against Conahan and Ciavarella. (*Plfs.' SMF*, Ex. 9, *Bill of Information*.)[3]  Thereafter, on February 11, 2009, the Pennsylvania Supreme Court assumed plenary jurisdiction and appointed the Honorable Arthur E. Grim as Special Master "to review all Luzerne County juvenile court adjudications and dispositions that have been affected by the recently-revealed criminal allegations." (*Id.* at Ex. 27, *In re: J.V.R.*, No. 81 MM 2008, Feb. 11, 2009 Order.)  At the conclusion of the case, the Court determined:

> Ciavarella admitted under oath that he had received payments from Robert Powell, a co-owner of the PA Child Care and Western PA Child Care facilities, and from Robert K. Mericle, the developer who constructed the juvenile facilities, during the time that Ciavarella was presiding over juvenile matters in Luzerne County.  It is a matter of record that Ciavarella routinely committed juveniles to one or another of these facilities.  It is also a matter of record that

---

[3]       Conahan and Ciavarella, pursuant to plea agreements they reached with the United States, pled guilty to these counts.  The plea agreements, however, were rejected by the Court.  Subsequently, a federal grand jury returned a 48-count Indictment against Ciavarella and Conahan.  Conahan ultimately pled guilty to a RICO conspiracy charge, which was accepted by the Court.  He was sentenced on September 23, 2011.  The grand jury issued a 39-count Superseding Indictment against Ciavarella on September 23, 2010.  Ciavarella pled not guilty and he went to trial on the charges in February of 2011.  The jury returned a verdict of guilty on 12 of the 39 counts of the Superceding Indictment.

Powell and Mericle have also faced criminal prosecution.  Powell pled guilty to misprison of a felony and accessory after the fact to conspiracy to commit income tax evasion.  On November 4, 2011, he was sentenced to serve eighteen months in prison.  Mericle also pled guilty to a Bill of Information charging him with misprison of a felony (filing a false tax return).  Mericle has not yet been sentenced.

Ciavarella failed to disclose his ties to Powell, much less the financial benefits he received in connection with the facilities to which he routinely committed Luzerne County juveniles.  Ciavarella's admission that he received these payments, and that he failed to disclose his financial interests arising from the development of the juvenile facilities, thoroughly undermines the integrity of all juvenile proceedings before Ciavarella.  Whether or not a juvenile was represented by counsel, and whether or not a juvenile was committed to one of the facilities which secretly funneled money to Ciavarella and Conahan, this Court cannot have any confidence that Ciavarella decided any Luzerne County juvenile case fairly and impartially while he labored under the specter of his self-interested dealings with the facilities.

In short, there is ample support before us to assess the bases cited by Judge Grim for his finding that **all** juvenile adjudications and consent decrees entered by Ciavarella between January 1, 2003 and May 31, 2008, are tainted.

(*Id.* at Ex. 28, *In re: J.V.R.*, No. 81 MM 2008, Slip. Op. (Oct. 29, 2009) (per curiam)).

Accordingly, the Supreme Court ordered the expungement of the records of all juveniles "whether final or not, where a juvenile either proceeded before Ciavarella without counsel, or was committed by Ciavarella to PA Child Care or Western PA Child Care." (*Id.*)

**D.      Procedural History and the Instant Motions for Summary Judgment**

Pursuant to the Court's May 14, 2009 Case Management Order, the present actions have all been consolidated for purposes of discovery. (Doc. 82.)  Thereafter, on June 25, 2009, Class Plaintiffs filed a Master Complaint. (Doc. 136.)  Individual Plaintiffs also filed a Master Long Form Complaint on the same day. (Doc. 134.)

Subsequently, Private Defendants filed multiple motions to dismiss Plaintiffs' Complaints, which were granted in part and denied in part.  As to the Master Complaint for Class Actions, the claims remaining in this case against Private Defendants are: (1) Count II- Conspiracy to Violate Plaintiffs' Right to an Impartial Tribunal pursuant to 42 U.S.C. § 1983; (2) Count IV- Conspiracy to Deprive Youth of their Right to Counsel and/or a Knowing, Intelligent, and Voluntary Guilty Plea pursuant to 42 U.S.C. § 1983; (3) Count V- Civil RICO against Powell and Vision Holdings only; (4) Count VII- Civil Rico Conspiracy against all Private Defendants; and (5) Count IX- Wrongful Imprisonment against Powell, PACC, WPACC, and MAYS only. (*Plfs.' SMF*, ¶ 9.)  The Individual Plaintiffs' Master Long Form Complaint contains the following non-dismissed claims against Private Defendants: (1) Count I- RICO against Powell and Vision Holdings only; (2) Count II- Conspiracy to

Violate RICO against all Private Defendants; (3) Count III- Deprivation of Substantive and Procedural Due Process Rights pursuant to the Civil Rights Act of 1871 against all Private Defendants; (4) Count IV- Deprivation of Rights pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983 against all Private Defendants; (5) Count VIII- Civil Conspiracy against Powell, PACC, WPACC, and MAYS only; and (6) Count IX- False Imprisonment against Powell, PACC, WPACC, and MAYS only. (*Id*. at ¶ 10.)

### 1.   Plaintiffs' Motion for Partial Summary Judgment

On January 5, 2012, Plaintiffs filed a Motion for Partial Summary Judgment as to liability on their § 1983 impartial tribunal claims against Private Defendants. (Doc. 1024, *Plfs. Mot. Partial Summ. J.*)  Plaintiffs argue that they were deprived of their constitutional right to an impartial tribunal by Private Defendants acting "under color of state law," which caused Plaintiffs' injuries. (Doc. 1041, *Plfs.' Br. Supp. Mot. Partial Summ J.*)

In opposition, Powell and Vision Holdings assert that none of the "Private Defendants acted with the intent to violate the rights of the Plaintiffs," and that there is no evidence of record "which in any way shows that Robert Powell by his actions, or those reasonably foreseeable from his actions would have implicated the rights of the Plaintiffs." (Doc. 1059, *Powell Br. Opp'n Plfs.' Mot. Partial Summ. J.*, "*Powell Opp'n*".)  Thus, Powell and Vision Holdings argue that "at most, all Plaintiffs have shown is that the Private Defendants conspired with the former judges for the construction and operation of a detention facility." As a result, they argue that genuine issues of fact exist in this case mandating denial of Plaintiffs' motion for partial summary judgment.

Provider Defendants also oppose Plaintiffs' motion. (Doc. 1074, *Prov. Defs.' Br. Opp'n Plfs.' Mot. Partial Summ. J.*, "*Prov. Defs.' Opp'n*".)  Among other arguments, Provider Defendants assert that: (1) Plaintiffs failed to establish a Provider Defendant custom or policy caused the violation of Plaintiffs' constitutional rights; (2) Powell was not a Provider Defendant policymaker; (3) and Powell was not acting as Provider Defendants' agent when he made payments to the former judges. (*Id*.)  Thus, Provider Defendants argue that, at a minimum, a jury should determine whether Plaintiffs have established a case for the

violation of their right to an impartial tribunal. (*Id*.)

### 2.    Provider Defendants' Cross-Motions for Partial Summary Judgment

Provider Defendants have also filed a Cross-Motion for Partial Summary Judgment (Doc. 1079) and a Supplemental Cross-Motion for Partial Summary Judgment. (Doc. 1080.) The cross-motion, filed on February 24, 2012, requests summary judgment on all of Plaintiffs' § 1983 claims because "Plaintiffs are unable to show that any alleged agent of Provider Defendants acted pursuant to the policy of any Provider Defendant." (*Prov. Defs.' Cross-Mot. Partial Summ. J*.)  The supplemental cross-motion, filed on February 27, 2012, seeks summary judgment on all of Plaintiffs' § 1983 claims because "Individual Plaintiffs admitted that Ciavarella and Conahan coerced Powell to make the alleged payments to them." (*Prov. Defs.' Supplement Cross-Mot. Summ. J*.)

In opposition to Provider Defendants' cross-motion, Plaintiffs assert that, "at the bare minimum, a question of fact exists as to whether Powell was a 'policymaker' when he took the relevant actions on behalf of PACC, WPACC, and MAYS." (Doc. 1097, *Plfs.' Consolidated Reply Br.*, "*Plfs.' Reply*".)  And, as to the supplemental cross-motion, Plaintiffs argue that it is undisputed that some of the payments at issue were not coerced by Conahan or Ciavarella. (*Id*.)  Accordingly, Plaintiffs assert that both the cross-motion and supplemental cross-motion must be denied. (*Id*.)

Plaintiffs' Motion for Partial Summary Judgment, Provider Defendants' Cross-Motion for Partial Summary Judgment, and Provider Defendants' Supplemental Cross-Motion for Partial Summary Judgment have all been fully briefed.  As such, they are now ripe for disposition.

### II. Discussion

### A.    Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c) (2). A fact is material if proof of its existence or nonexistence might affect the outcome of the

suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c)(2).  Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one. *Anderson*, 477 U.S. at 248.  An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id*. Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law. *See* 2D Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2727 (2d ed.1983).  The moving party may present its own evidence or, where the nonmoving party has the burden of proof, simply point out to the court that "the nonmoving party has failed to make a sufficient showing on an essential element of her case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

"When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007).  Once the moving party has satisfied its initial burden, the burden shifts to the non-moving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law. *Anderson*, 477 U.S. at 256–57. The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990).

"To prevail on a motion for summary judgment, the non-moving party must show specific facts such that a reasonable jury could find in that party's favor, thereby establishing a genuine issue of fact for trial." *Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265,

270 (3d Cir. 2007) (citing Fed.R.Civ.P. 56(e)).  "While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla." *Id*. (quoting *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005)). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

**B.     Section 1983**

Plaintiffs seek summary judgment on their § 1983 right to an impartial tribunal claims against Private Defendants.  Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage ... subjects, or causes to be subjected, any citizen ... or any other person ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *City of Monterey v. Del Monte Dunes*, 526 U.S. 687, 749 n. 9, 119 S. Ct. 1624, 143 L. Ed. 2d 882 (1999) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3, 99 S. Ct. 2689, 61 L. Ed. 2d 433 (1979)).  "To establish liability under 42 U.S.C. § 1983, a plaintiff must show that the defendants, (1) acting under color of law, (2) violated the plaintiff's federal constitutional or statutory rights, (3) and thereby caused the complained of injury." *Elmore v. Cleary*, 299 F.3d 279, 281 (3d Cir. 2005) (citing *Sameric Corp. of Del., Inc. v. City of Phila.*, 142 F.3d 582, 590 (3d Cir. 1998)).  The Court will begin its analysis with the second element, violation of Plaintiffs' federal constitutional right to an impartial tribunal.

**1.     Right to an Impartial Tribunal**

Plaintiffs argue that it is uncontroverted that the juveniles that appeared before Ciavarella were denied their constitutional right to an impartial tribunal. *(Plfs.' Br. Supp. Partial Mot. Summ. J.)*  The Fourteenth Amendment prohibits a state from "depriv[ing] any

13

person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.  The Sixth Amendment provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, . . ." U.S. Const. amend. VI. Although the Sixth Amendment applies only to the federal government, the right to an impartial jury guaranteed by the Sixth Amendment has been "made applicable to the States through the Fourteenth Amendment, . . ." *Turner v. Murray*, 476 U.S. 28, 36 n.9, 106 S. Ct. 1683, 90 L. Ed. 2d 27 (1986) (citing *Ristaino v. Ross*, 424 U.S. 589, 595 n.6, 96 S. Ct. 1017, 47 L. Ed. 2d 258 (1976)).

"The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases." *Marshall v. Jericho*, 446 U.S. 238, 242, 100 S. Ct. 1610, 64 L. Ed. 2d 182 (1980).  Indeed, "it is axiomatic that '[a] fair trial in a fair tribunal is a basic requirement of due process.'" *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 129 S. Ct. 2252, 173 L. Ed. 2d 1208 (2009) (quoting *In re Murchinson*, 349 U.S. 133, 136, 75 S. Ct. 623, 99 L. Ed. 2d 942 (1955)).  As such, "a criminal defendant is guaranteed the right to a fair and impartial tribunal." *Richardson v. Quarterman*, 537 F.3d 466, 474 (5th Cir. 2008) (citing *Bracy v. Gramley*, 520 U.S. 899, 117 S. Ct. 1793, 138 L. Ed. 2d 97 (1997)); *Alley v. Bell*, 307 F.3d 380, 386 (6th Cir. 2002); *United States v. Farhad*, 190 F.3d 1097, 1105 (9th Cir. 1999); *United States v. Cross*, 128 F.3d 145, 148 (3d Cir. 1997).

Embodied in the guarantee of an impartial tribunal is the absolute right to a criminal proceeding conducted by a judge free of bias or pecuniary motivation. *See, e.g., Ward v. Village of Monroeville*, 409 U.S. 57, 61-62, 93 S. Ct. 80, 34 L. Ed. 2d 267 (1972); *Tumey v. Ohio*, 273 U.S. 510, 532, 47 S. Ct. 437, 71 L. Ed. 749 (1927).  In that regard, the Supreme Court has held:

> [I]t certainly violates the Fourteenth Amendment and deprives a defendant in a criminal case of due process of law to subject his liberty or property to the judgment of a court, the judge of which has a direct, personal, substantial pecuniary interest in reaching a conclusion against him in his case.
>
> . . .

> . . . [T]he requirement of due process of law in judicial procedure is not satisfied by the argument that men of the highest honor and the greatest self-sacrifice could carry it on without danger of injustice. Every procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear, and true between the state and the accused denies the latter due process of law.

*Tumey*, 273 U.S. at 523, 532.  Stated differently, "[o]ne of the fundamental canons of our jurisprudence is that a criminal trial must be free not just from demonstrative impropriety on the part of the judge, *but also from the appearance of impropriety that leads to substantial doubt about the fairness of the proceedings.*" *United States ex rel. Perry v. Cuyler*, 584 F.2d 644, 650 (3d Cir. 1978) (Adams, J., dissenting) (emphasis added); *see also Hurles v. Ryan*, 650 F.3d 1301, 1309 (9th Cir. 2011) ("an appearance of impropriety, regardless of whether such impropriety is actually proven, erodes that confidence and weakens our system of justice"); *Crane v. Sparkman*, 165 F.3d 26 (6th Cir. 1998) (fair trial in a fair tribunal requires avoiding "the appearance of impropriety when it may reasonably cause impartiality to be questioned"); *Mitchell v. Maynard*, 80 F.3d 1433, 1450 (10th Cir. 1996) ("it is not solely the reality of actual bias or prejudice but also the appearance of impropriety that we must guard against"); *United States v. Jordan*, 49 F.3d 152, 155-56 (5th Cir. 1995) ("avoiding the appearance of impropriety is as important in developing public confidence in our judicial system as avoiding impropriety itself").  And, the Supreme Court has recently stated that the inquiry as to a judge's bias in the due process context requires an objective determination considering "not whether the judge is actually, subjectively biased, but whether the average judge in his position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.'" *Caperton*, 556 U.S. at 2262.

Here, Plaintiffs have sufficiently established a violation of their federal constitutional rights for purposes of their § 1983 impartial tribunal claims.  In particular, the Court is persuaded that this determination has already been made by the Pennsylvania Supreme Court in *In re: J.V.R.*  The Court will therefore adopt the Pennsylvania Supreme Court's reasoning and conclusion: "this Court simply cannot have confidence that any juvenile matter adjudicated by Ciavarella during this period was tried in a fair and impartial manner."

It is apparent that Juvenile Plaintiffs, as criminal defendants, were denied the right to a fair and impartial tribunal before a disinterested judge. Specifically, the concealment of Ciavarella's role in the development and construction of the detention facilities is sufficient evidence to create an appearance of impropriety that casts serious doubt as to the fairness of Juvenile Plaintiffs' criminal proceedings.[4] And, as a potential for bias existed that would prejudice an average judge in Ciavarella's position, Plaintiffs have made the required objective showing of the denial of their constitutional right to a fair and impartial tribunal.

## 2. Under Color of State Law

To prevail on a § 1983 claim, Plaintiffs must establish that Private Defendants acted under color of state law. *See Elmore*, 299 F.3d at 281. Plaintiffs argue that the state actor requirement is satisfied in this matter because Private Defendants, through Powell, willfully participated in joint activity with two state officials, Conahan and Ciavarella. (*Plfs.' Br. Supp. Mot. Summ. J.*) Conversely, Private Defendants argue that they are not state actors because Powell was an unwilling participant in the deprivation of Plaintiffs' rights. (*Powell Opp'n.*)

It is well-settled that private actors may be regarded as acting under color of state law pursuant to § 1983. *See, e.g., Donnell v. Corr. Health Servs.*, Inc., 405 F. App'x 617, 622 n.5 (3d Cir. 2010). "'To act under color of law does not require that the accused be an officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents.'" *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S. Ct. 1598, 26 L. Ed. 242 (1970) (quoting *United States v. Price*, 383 U.S. 787, 794, 86 S. Ct. 1152, 16 L. Ed. 2d 267

---

[4]     Because the Court has determined that Juvenile Plaintiffs' right to a fair tribunal was deprived by an appearance of impropriety with regard to Ciavarella's involvement in the juvenile detention facilities, the Court makes no determination on whether Ciavarella was actually biased, or whether Ciavarella committed juveniles to these facilities for pecuniary gain. Instead, the Court's holding is predicated solely on Ciavarella's disguised interest in the detention centers which created *an appearance* of impropriety and eroded the public's confidence in the Luzerne County juvenile justice system.

(1966)).  "[C]ompelled participation by a private actor may fall outside of the contours of state action." *Harvey v. Plains Twp. Police Dep't*, 421 F.3d 185, 195 (3d Cir. 2005).  Thus, a private actor willfully participates if his participation is voluntary and without coercion. *See Benta v. Bryan*, 420 F. App'x 214, 217 (3d Cir. 2011) (citing *Harvey*, 421 F.3d at 196).  And,

> "Joint action" has been explained as follows: [t]he requirement of action under color of law is satisfied . . . when a private person willfully participates in joint action with a state official . . . . Thus, [to survive the defendant's motion for summary judgment,] plaintiff must demonstrate a genuine issue of material fact that there existed between the private defendant and the state official an understanding, agreement, or conspiracy to deprive the plaintiff of a federal right. He must show a genuine factual issue of a combination, agreement, or understanding among the defendants.... There must also be a genuine factual issue that the defendants plotted, planned, or conspired together to carry out the chain of events.

*Bates v. MHM Corr. Servs.*, No. 05-2285, 2008 WL 396225, at *3-*4 (M.D. Pa. Feb. 11, 2008) (quoting *Drum v. Nasuti*, 648 F. Supp. 888, 897 (E.D. Pa. 1986)).  To establish a § 1983 conspiracy claim against a private actor, the plaintiff must show that a private actor and at least one of the state actors named as a defendant "somehow reached an understanding to deny" the plaintiff his or her rights. *See Kost*, 1 F. 3d at 185; *see also McCleester v. Mackel*, No. 06-120, 2008 WL 821531, at *11 (W.D. Pa. Mar. 27, 2008).

Recently, the Third Circuit has provided guidance on what does *not* satisfy the "willful participant in joint activity" requirement for private actor liability under § 1983.  For example, in *Harvey*, the Third Circuit emphasized that "a private citizen acting at the orders of a police officer is not generally acting in a willful manner, especially when that citizen has no self-interest in taking the action," because "compulsion by the state negates the presence of willfulness." *Harvey*, 421 F.3d at 196.  Similarly, in *Benta*, the Third Circuit found an absence of willful participation in joint activity where private security officers acted at the direction of a state official in preventing an individual from climbing a stage at a public event. *See Benta*, 420 F. App'x at 217.  The court reasoned that the plaintiff failed to demonstrate that the private defendants helped plan the public event, that they had a contract or agreement with the state, or that they received renumeration from the state for their efforts. *See id.*

Plaintiffs' partial motion for summary judgment and Provider Defendants' cross-

motions for summary judgment will be denied because a genuine issue of material fact exists as to whether Powell conspired or engaged willfully in joint activity with Conahan and Ciavarella to render him, as well as PACC, WPACC, MAYS, and Vision Holdings, liable under § 1983.  Private Defendants argue that Powell's participation in the conspiracy to deny Plaintiffs their constitutional rights was unwillful or coerced participation because he repeatedly testified that he only made the payments to Ciavarella and Conahan since they had the power to destroy his investment in the detention centers. (*Powell Opp'n*.)   In opposition, Plaintiffs assert that it is undisputed that some of the payments to the former judges were not coerced, and that Powell knew from the outset that Ciavarella and Conahan would expect to be paid for their role in the construction of the detention centers. (*Plfs.' Reply*.)

Here, a reasonable jury could conclude that Powell, as well as the other Private Defendants, had an interest in making the payments to Ciavarella and Conahan- which would be indicative of willful participation in the alleged conspiracy.  Specifically, a jury could conclude that Private Defendants had an interest in ensuring that the detention facilities remained operational, and, therefore, had an interest in making payments to the former judges to guarantee that juveniles would be committed to the facilities.[5]  Thus, a jury could believe that the payments were made to the former judges because the judges possessed the power to destroy the financial viability of the facilities.  On the other hand, a reasonable finder of fact could conclude that Powell made the payments to Ciavarella and Conahan, as sitting judges, out of fear that they could ruin his law firm and his private practice. Alternatively, the trier of fact could find that the payments were made to the former judges simply for their assistance in getting the facilities constructed.  In addition, because "the existence or nonexistence of a conspiracy is essentially a factual issue that the jury, not the

---

[5]     And, as noted below, it is disputed whether Provider Defendants received per diem payments for juveniles detained at the PACC or WPACC facilities, or whether Provider Defendants received fixed payments regardless of the facilities' occupancy rates.

trial judge, should decide," *Adickes*, 398 U.S. at 176 (Black, J., concurring), the Court will deny the summary judgment motions and allow a jury to determine whether Powell conspired with state officials rendering Private Defendants state actors for purposes of § 1983.[6]

### 3.     Causation

The third element Plaintiffs must establish for their § 1983 fair tribunal claims is that Private Defendants "caused the complained of injury." *Elmore*, 399 F.3d at 281.  Plaintiffs argue that the causation element is satisfied as to Powell because he set into motion a series of acts that he reasonably should have known would violate Plaintiffs' constitutional rights. (*Plfs.' Br. Supp. Mot. Partial Summ. J.*)   Plaintiffs also contend that Provider Defendants and Vision Holdings caused Plaintiffs' injuries because Powell was acting on their behalf, as they benefitted from Powell and Owens' conduct, or because they ratified Powell's conduct. (*Id*.)  Conversely, Powell asserts that no evidence demonstrates that he set in motion a series of events that he knew or reasonably should have known would deprive Plaintiffs of their constitutional rights. (*Powell Opp'n*.)  And, Provider Defendants argue that Powell was not their agent and they cannot be liable because Plaintiffs have failed to demonstrate that there was a policy or custom that caused the constitutional violation. (*Prov. Defs.' Opp'n*.)

### a.     Powell

As to the causation element of Plaintiffs' § 1983 claim against Powell, the applicable

---

[6]     Provider Defendants' Supplemental Cross-Motion for Partial Summary Judgment will also be denied because Plaintiffs did not admit that Ciavarella and Conahan coerced Powell to make the payments.  Instead, Individual Plaintiffs' Complaint simply alleges "upon information and belief" that Powell "believed" that Conahan and Ciavarella would have retaliated against him had he stopped making payments and that Conahan and Ciavarella "demanded" payments for closing the former Luzerne County detention center and for sending juveniles to PACC and WPACC.  These averments do not constitute admissions that Powell was coerced into making payments to Ciavarella and Conahan.  As such, a jury will be permitted to determine whether Powell willfully participated in the alleged conspiracy with Conahan and Ciavarella.

inquiry is whether Powell set in motion a series of events that he knew, or should have reasonably known, would cause the constitutional injury suffered by Plaintiffs.  Because a genuine issue of material fact exists, the Court will deny Plaintiffs' motion for partial summary judgment against Powell.

In a § 1983 case, a plaintiff must establish that the defendant was personally involved in the deprivation of the plaintiff's constitutional rights, *see Argueta v. U.S. I.C.E.*, 643 F.3d 60, 71–72 (3d Cir. 2011), and that "the defendant's actions were the proximate cause of the violation of [the plaintiff's] federally protected right." *Rivas v. City of Passaic*, 365 F.3d 181, 193 (3d Cir. 2004) (citing *Martinez v. California*, 444 U.S. 277, 284-85, 100 S. Ct. 553, 62 L. Ed. 2d 481 (1980)).  The Third Circuit has not squarely addressed the issue of causation in § 1983 cases. *See, e.g., Burnsworth v. PC Lab.*, 364 F. App'x 772, 775 (3d Cir. 2010).  However, this Court, other district courts in this Circuit, and other Circuit Courts of Appeals have applied the "setting in motion" theory of causation. *See id*.  This Circuit, though, has not specifically adopted or rejected this causation standard. *See id*.

The "setting in motion" theory of causation, as previously applied by this Court, provides:

> A person 'subjects' another to the deprivation of a constitutional right, within the meaning of § 1983, if [that person] does an affirmative act, participates in another's affirmative acts, or omits to perform an act which [that person] is legally required to do that causes the deprivation of which complaint is made. Indeed, the requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by *setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury*.

*Pilchesky v. Miller*, No. 05-2074, 2006 WL 2884445, at *4 (M.D. Pa. Oct. 10, 2006) (quoting *Hydrick v. Hunter*, 449 F.3d 978 (9th Cir. 2006) *rev'd on other grounds*, 466 F.3d 646 (9th Cir. 2006), *and* 500 F.3d 978, 988 (9th Cir. 2007)) (emphasis added).  This standard has been accepted by multiple Circuit Courts of Appeals. *See, e.g., Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011); *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 51 (1st Cir. 2009); *Morris v. Dearborne*, 181 F.3d 657, 672 (5th Cir. 1999); *Sales v. Grant*, 158 F.3d 768, 776 (4th Cir. 1998); *Waddell v. Forney*, 108 F.3d 889, 894 (8th Cir. 1997); *Conner v. Reinhard*,

847 F.2d 384, 396-97 (7th Cir.1988).

Based on this precedent, the "setting in motion" standard provides the proper framework for determining Powell's liability on Plaintiffs' § 1983 impartial tribunal claims. Applying this standard to the evidence of record, a reasonable jury could find that Powell did not know, or reasonably should have known, that Plaintiffs' constitutional rights would be violated.

Here, the undisputed facts include: Powell discussed constructing a detention center with Ciavarella in 2000; Powell concealed the former judges' role in the development and subsequent construction of the detention facilities; Powell, as a Luzerne County attorney, knew that Ciavarella served as the judge of the juvenile court; Powell knew that Conahan, once he became president judge, could ensure that juveniles would no longer be sent to the former Luzerne County Detention Center; Powell facilitated payments to Conahan and Ciavarella after the construction of the PACC facility; shortly thereafter, Powell facilitated payments to the former judges after the WPACC facility was constructed and the PACC facility was expanded; Powell disguised thousands of dollars in payments to Ciavarella and Conahan; and Powell signed sham agreements that were designed to filter money from Mericle to Conahan and Ciavarella.

Plaintiffs argue that, based on this evidence, Powell "should have known" that his conduct would violate the juveniles' rights to an impartial tribunal. Yet, missing from the record is any evidence that Powell was aware that the former judges were depriving juveniles of their constitutional right to an impartial tribunal. Indeed, there is no undisputed evidence that a minimum number of juveniles were required to be detained at either the PACC or WPACC facility. Nor has there been any evidence presented demonstrating that the former judges admitted to wrongfully imprisoning juveniles. Furthermore, it is unclear from the evidence of record whether the WPACC facility was constructed and the PACC facility expanded because of the legitimate demand for bed space in detention centers from various counties besides Luzerne County, or if the increased bed space can be attributed to the alleged conspiracy to detain Luzerne County juveniles for pecuniary gain. Thus, it

21

is uncertain whether a market for bed space existed without the necessity of detaining Luzerne County juveniles in violation of their constitutional rights.  Although Plaintiffs suggest that Powell, as a practicing lawyer, logically should have known that the payments would impermissibly tempt Ciavarella to deny juveniles an impartial tribunal, the absence of concrete evidence demonstrating a need to detain a minimum number of juveniles is sufficient to allow a reasonable jury to find in Powell's favor and that Powell should not have known that juvenile rights were being violated.[7]

Plaintiffs, as the moving party with the burden of proof, have failed to establish a lack of genuine issues of material fact for trial.  Plaintiffs have established that Powell conspired with the former judges to conceal their role in the construction of juvenile detention facilities.  This alone, however, does not establish that Powell should have known that his conduct would set in motion a series of acts resulting in the deprivation of constitutional rights.  And, because in § 1983 cases "the presence of the requisite causation is normally a question of fact for the jury," *Rivas*, 365 F.3d at 193; *see also Heggenmiller v. Edna Mahan Corr. Inst. for Women*, 128 F. App'x 240, 250 (3d Cir. 2005) (Fuentes, J., dissenting) ("the causation element in a § 1983 claim, like other difficult questions of fact, is normally reserved for a jury"), the trier of fact will be permitted to determine whether Powell should have known that Juvenile Plaintiffs' constitutional rights would be violated based on his dealings with the former judges.

### b.    MAYS, PACC, WPACC, and Vision Holdings

Although Plaintiffs argue that the applicable causation standard to apply to Provider Defendants and Vision Holdings is the "setting in motion" theory discussed above, the Court agrees with Provider Defendants that the causation inquiry for these Defendants is governed by *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).  Nevertheless, Plaintiffs assert that even under *Monell*, causation is satisfied

---

[7]     As noted, there is a dispute of fact over whether MAYS, PACC, or WPACC received per diem compensation for detained juveniles, or, instead, whether these payments were received by Luzerne County.

because Powell acted as a "policymaker" for PACC, MAYS, WPACC, and Vision Holdings. Conversely, Provider Defendants argue in opposition that Plaintiffs have presented no evidence indicating that Powell was a Provider Defendant "policymaker." Because the Court cannot determine from the evidence of record whether Powell was a "final policymaker" for Provider Defendants, Plaintiffs' motion and Defendants' cross-motions will be denied.

In *Monell*, the Supreme Court held that "a municipality cannot be held liable solely because it employs a tortfeasor-or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691. Instead, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id*. at 694.

Although *Monell* applied to municipal governments and not to private entities acting under color of state law, the Third Circuit has extended the *Monell* doctrine to private § 1983 defendants. *See Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 583 (3d Cir. 2003) (citing *Monell*, 436 U.S. at 691).[8] Thus, for a private employer defendant to be liable under § 1983, the plaintiff must establish an employer policy or custom, and that the policy caused the constitutional violation alleged. *See id*. at 584 (citing *Bd. of Cnty Comm'rs v. Brown*, 520 U.S. 397, 404, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997)). The *Natale* court set forth three scenarios where the acts of an employee may be attributed to his or her private employer rendering the entity liable under § 1983:

> The first is where the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply

---

[8]     In addition to the Third Circuit, multiple other Circuit Courts of Appeals have applied *Monell* to § 1983 claims against private defendants. *See, e.g., Clark v. Md. Dep't of Pub. Safety & Corr. Servs.*, 316 F. App'x 279 (4th Cir. 2009); *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216 (10th Cir. 2003); *Jackson v. Ill. Medi-Car, Inc.*, 300 F.3d 760, 766 (7th Cir. 2002); *Harvey v. Harvey*, 949 F.2d 1127, 1129 (11th Cir. 1992); *Rojas v. Alexander's Dep't Store, Inc.*, 924 F.2d 406, 408-09 (2d Cir. 1990).

23

an implementation of that policy. *The second occurs where no rule has been announced as policy but federal law has been violated by an act of the policymaker itself.* Finally, a policy or custom may also exist where the policymaker has failed to act affirmatively at all, [though] the need to take some action to control the agents of the government is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.

*Natale*, 318 F.3d at 584 (internal citations omitted) (emphasis added).

Relevant to the matter before the Court is whether Powell was a PACC, WPACC, MAYS, and/or Vision Holdings "policymaker." "In order to ascertain who is a policymaker, 'a court must determine which official has final, unreviewable discretion to make a decision or take action.'" *Kneipp v. Tedder*, 95 F.3d 1199, 1212 (3d Cir. 1996) (citing *Andrews v. City of Phila.*, 895 F.2d 1469, 1480 (3d Cir. 1990)). According to the Supreme Court, "'whether a particular official has final policymaking authority is a question of state law.'" *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737, 109 S. Ct. 2702, 105 L. Ed. 2d 598 (1989) (quoting *St. Louis v. Praprotnik*, 485 U.S. 112, 108 S. Ct. 915, 99 L. Ed. 2d 107(1988) (plurality opinion)).[9] Thus, to ascertain if an official has "final policymaking" authority, the Court must determine "(1) whether as a matter of state law, the official is responsible for making policy in the particular area of . . . business in question, and (2) whether the official's authority to make policy in that area is final and unreviewable." *Hill v. Borough of Kutztown*, 455 F.3d 225, 245 (3d Cir. 2006) (internal citations omitted).

In the private employer context, "the relevant 'policymaker' inquiry is whether [the employee], as a matter of state and local positive law, or custom or usage having the force of law, exercised final policymaking authority." *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 729 (4th Cir. 1999). And, the Third Circuit has indicated that an individual, even

---

[9]     In *Jett*, the Supreme Court indicated that the identification of officials whose decisions represent official policy is "a legal question to be resolved by the trial judge before the case is submitted to the jury." *Jett*, 491 U.S. at 737. However, "once those officials who have the power to make official policy on a particular issue have been identified, it is for the jury to determine whether their decisions have caused the deprivation of rights at issue by policies which affirmatively command that it occur." *Id*. (citing *Monell*, 436 U.S. at 661 n.2).

without final policymaking authority, can bind his or her employer when the entity delegates authority or acquiesces in the individual's conduct. *See Laverdure v. Cnty. of Montgomery*, 324 F.3d 123, 125 (3d Cir. 2003).

According to *Jett*, the Court is tasked with making the legal determination of whether Powell was a "policymaker" for the other Private Defendants.  *See Jett*, 491 U.S. at 737. Thus, as a preliminary matter, the Court must ascertain what relevant "state law" governs this inquiry.

Initially, the Court rejects Provider Defendants' position that whether Powell was a "policymaker" for PACC, WPACC, and MAYS is controlled by Pennsylvania corporate law, 15 Pa. C.S.A. § 8942 and 15 Pa. C.S.A. § 1721.  Specifically, section 8942(a) provides: "the affirmative vote or consent of a majority of the members or managers of a limited liability company entitled to vote on a matter shall be required to decide any matter to be acted upon by the members or managers." *Id*.   Provider Defendants assert that because Powell was at most a twenty-five percent (25%) owner of PACC and WPACC, this is an insufficient interest to make Powell a "policymaker" for these entities. (*Prov. Defs.' Opp'n*.)  Similarly, Provider Defendants argue that an individual cannot be a "policymaker" of a corporation unless he or she is a member of the board of directors because corporations are managed or controlled by their directors. *See* 15 Pa. C.S.A. § 1721(a).  Since Plaintiffs have not presented evidence that Powell was a MAYS director, Provider Defendants argue that Powell could have not been MAYS' "policymaker." (*Prov. Defs.' Opp'n*.)

The Court disagrees with Provider Defendants' "policymaker" analysis.  Provider Defendants imply that a member of a limited liability company can never be a policymaker of the company unless the individual has a controlling interest in the company. (*Prov. Defs.' Opp'n*.)  Essentially, Provider Defendants posit that no member of an LLC could be considered a "policymaker" if the company had multiple members (because no individual member would have a controlling interest), and, also, that only a majority director could be a company's "policymaker."  This analysis defines who can be a "policymaker" for § 1983 too narrowly.  The proper inquiry to determine whether an individual is a "policymaker" for

private entity liability under § 1983 does not depend on the individual's corporate title and/or his or her ownership interest in the entity.   Instead, the Court must determine whether Powell had "unreviewable discretion to make a decision or take action," *Kneipp*, 95 F.3d at 1212, which, in turn, requires the Court to consider whether Powell had the final authority to bind Provider Defendants.   Accordingly, the controlling "question of state law," *Jett*, 491 U.S. at 737, in this case, is whether Powell, pursuant to Pennsylvania law,[10] was an agent of PACC, WPACC, MAYS, and/or Vision Holdings with final "policymaking" authority.   Thus, Plaintiffs must make two showings.   First, that Powell was an agent acting within the scope of his authority on behalf of Provider Defendants.   And, second, that Powell had "final policymaking" authority.

Pennsylvania law is well-settled that a corporation, as a legal fiction, can act only through its employees, agents, and officers. *See Tayar v. Camelback*, 957 A.2d 281, 289 (Pa. Super. 2008) (citing *Lokay v. Lehigh Valley Co-op. Farmers, Inc.*, 492 A.2d 405, 408-410 (Pa. Super. 1985)).   The determination of a principal-agent relationship involves considerations of the "manifestations by the principal that the agent shall act for him, the agent's acceptance of the undertaking, and the understanding of the parties that the principal is to be in control of the undertaking.'" *Karas v. Jackson*, 582 F. Supp. 43, 45-46 (E.D. Pa. 1983) (quoting *Scott v. Purcell*, 490 Pa. 409, 117, 415 A.2d 56, 60 (1980)).

An agency relationship exists when the alleged agent has express or actual authority to act, implied authority, apparent authority, or authority that the principal is estopped from

---

[10]     Typically, the "question of state law" inquiry is resolved by applying a state statute or local regulation governing the conduct or operation of a municipality. *See, e.g., Santiago v. Warminster Twp.*, 629 F.3d 121, 134 n.11 (3d Cir. 2010) (township Police Chief not final policymaker according to 53 Pa. C.S.A. § 66902); *McGreevy v. Stroup*, 413 Pa. 359, 368-69 (3d Cir. 2005) (24 Pa. C.S. § 11-1123 established school superintendent was final policymaker); *LaVerdure*, 324 F.3d at 125 (resolving question of state law by applying 16 Pa. C.S. § 504). However, as this case raises issues relating to the policymaking authority of an agent in a private business setting, the "question of state law" inquiry requires a slightly different application.

26

denying. *See Bolus v. United Penn Bank*, 525 A.2d 1215, 1221 (Pa Super. 1987) (quoting *SEI Corp. v. Norton & Co.*, 631 F. Supp. 497 (E.D. Pa. 1986)).  Actual authority exists when directly granted by the principal. *See id*.  Apparent authority, on the other hand, "exists where a principal, by words or conduct, leads people with whom the alleged agent deals to believe that the principal has granted the agent authority he purports to exercise." *Turner Hydraulics, Inc. v. Susquehanna Const. Corp.*, 606 A.2d 532, 534 (Pa. Super. 1992) (citing *Stallo v. Ins. Placement Facility of Pa.*, 518 A.2d 827 (Pa. Super. 1986)).  Nevertheless, a principal is generally not liable for an agent's actions made out of the scope of the agent's authority. *See Universal Computer Sys., Inc. v. Med. Servs. Ass'n of Pa.*, 474 F. Supp. 472, 476 (M.D. Pa. 1979) (citing *Revere Press, Inc. v. Blumberg*, 431 Pa. 370, 246 A.2d 407 (1968)).  But, "the nature and extent of an agent's authority is a question of fact for the trier, [and the trier-of-fact] is [also] to evaluate the conduct of the parties in light of all the circumstances in determining the existence of apparent authority." *Turner Hydraulics*, 606 A.2d at 534-35 (internal citations omitted); *see also Regis Ins. Co. v. All American Rathskeller, Inc.*, 976 A.2d 1157, 1169 (Pa. Super. 2009) ("[t]he question of whether a principal-agent relationship exists is ordinarily one of fact for the jury").

The Court will reserve judgment on whether Powell was an agent with "final policymaking" authority for PACC, WPACC, MAYS, and/or Vision Holdings until evidence is submitted at trial due to the competing evidence presented in these motions.[11]  Evidence indicative of Powell's "final policymaking" authority for these entities includes that Powell signed the following: the February 19, 2002 Agreement Between Owner and Contractor on behalf of PACC; the February 15, 2003 and January 1, 2004 Placement Guarantees with Luzerne County as PACC's representative; the June 8, 2004 Agreement Between Owner and Contractor for the construction of WPACC on behalf of PACC; and the November 17, 2004 lease agreement between PACC and Luzerne County as a member of PACC. (*Plfs.'*

---

[11]     As mandated by the Supreme Court, however, this issue will be resolved by the Court before the case is submitted to the jury. *See Jett*, 491 U.S. at 737.

*Answer*, ¶ 143.)  Additionally, Powell, through Owens, could direct funds between the entities and even withdraw substantial sums from the companies without recourse or oversight from Zappala or any other Provider Defendant officer, member, or employee. Such unfettered access to Provider Defendants' funds suggests that Powell had the authority to create final policy and dictate Provider Defendants' course of business.

On the other hand, Provider Defendants have set forth evidence which indicates that Powell lacked "final policymaking" authority.  In particular, the Agreements signed on behalf of Powell for Provider Defendants were not made with the former judges, nor do the Agreements discuss payments to the former judges.  Furthermore, while Powell's signature on these Agreements could indicate that he had "final policymaking" authority to enter the Agreements on behalf of the entities, it could also imply that he simply had authority to sign agreements on behalf of Provider Defendants as their representative.

Based on the evidence before the Court, genuine issues of material fact exist and neither Provider Defendants nor Plaintiffs are entitled to judgment as a matter of law on Plaintiffs' § 1983 claims.  In particular, the issues that the Court cannot resolve based on the evidence as presented includes: (1) the extent of Powell's involvement in Provider Defendants' affairs; (2) Zappala's role in controlling Provider Defendants' operations; and (3) Powell's specific connection with MAYS.  Additionally, the Court cannot determine from the record before it whether PACC or WPACC received per diem payments for detaining Luzerne County juveniles, or, instead, whether Provider Defendants received only set, fixed payments.  To the extent that Provider Defendants received per diem compensation for detained juveniles, this evidence may suggest that Powell paid the former judges for the benefit of PACC and WPACC as "final policy" to keep the facilities at or near full occupancy. And, this factual issue is specifically in dispute as Private Defendants repeatedly emphasize that per diem payments were received by Luzerne County and not MAYS[12] or PACC, (*Prov.*

---

[12]     Provider Defendants argue that the MAYS Operating Agreement provided that Luzerne County received all per diem payments for children treated or detained at the PACC facility. (*Prov. Defs.' SMF*, ¶ 245.)  However, the Operating

*Defs.' SMF*, *Owens Decl.*), but Plaintiffs have identified other agreements which provide that Luzerne County would pay PACC for "services rendered on a per diem or unit of service basis." (*Plfs.' Answer*, ¶ 246.)   Accordingly, in light of these unresolved issues, both Plaintiffs' motion for partial summary judgment and Provider Defendants' cross-motions for partial summary judgment will be denied because the evidence before the Court presents a genuine issue of whether Powell was Private Defendants' "final policymaker."

### III. Conclusion

For the above stated reasons, Plaintiffs' motion for partial summary judgment, Provider Defendants' cross-motion for partial summary judgment, and Provider Defendants' supplemental cross-motion for partial summary judgment will all be denied.

An appropriate order follows.


 July 3, 2012                          /s/ A. Richard Caputo
Date                                        A. Richard Caputo
                                         United States District Judge

---

Agreement attached to Provider Defendants' submission appears to be an incomplete version of the Agreement. (*Id*. at Ex. 6, Exs. E & L.)