**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

FLORENCE WALLACE, et al.,

      Plaintiffs,

          v.

ROBERT J. POWELL, et al.,

      Defendants.

CIVIL ACTION NO. 3:09-cv-286

(JUDGE CAPUTO)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

WILLIAM CONWAY, et al.,

      Plaintiffs,

          v.

MICHAEL T. CONAHAN, et al.,

      Defendants.

CIVIL ACTION NO. 3:09-cv-0291

(JUDGE CAPUTO)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

H.T., et al.,

      Plaintiffs,

          v.

MARK A. CIAVARELLA, JR., et al.,

      Defendants.

CIVIL ACTION NO. 3:09-cv-0357

(JUDGE CAPUTO)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

SAMANTHA HUMANIK,

    Plaintiff,

        v.

MARK A. CIAVARELLA, JR., et al.,

    Defendants.

CIVIL ACTION NO. 3:09-cv-0630

(JUDGE CAPUTO)

*************************************************************************************************

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

RAUL CLARK, et al.,

    Plaintiffs,

        v.

MICHAEL T. CONAHAN, et al.,

    Defendants.

CIVIL ACTION NO. 3:09-cv-0357

(JUDGE CAPUTO)

*************************************************************************************************

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

WAYNE DAWN, et al.,

    Plaintiffs,

        v.

MARK A. CIAVARELLA, JR., et al.,

    Defendants.

CIVIL ACTION NO. 3:09-cv-2535

(JUDGE CAPUTO)

*************************************************************************************************

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

ANGELA RIMMER BELANGER, et al.,

      Plaintiffs,

             v.

MARK A. CIAVARELLA, et al.,

      Defendants.

CIVIL ACTION NO. 3:10-cv-1405

(JUDGE CAPUTO)

## MEMORANDUM

Plaintiffs in this consolidated action comprising both individual cases and putative class actions have moved for final approval of a settlement agreement (the "Settlement") between Plaintiffs and Defendants Robert K. Mericle and Mericle Construction, Inc. (collectively "Mericle"). (Doc. 1227.)  The Settlement received preliminary approval on February 28, 2012.  Now, following the final approval hearing held on November 19, 2012, Plaintiffs seek final certification of the Classes for settlement, approval of the Settlement, and an award of attorneys' fees and costs.  For the reasons that follow, the Classes will be certified, the Settlement will be approved, and attorneys' fees and costs will be awarded as requested.

### I. Background

#### A.    Facts

This civil action arises out of the alleged conspiracy related to the construction of two juvenile detention facilities, and subsequent detainment of juveniles in these facilities, orchestrated by two former Luzerne County Court of Common Pleas judges, Michael

Conahan ("Conahan") and Mark Ciavarella ("Ciavarella"). The juvenile detention facilities, PA Child Care ("PACC") and Western PA Child Care ("WPACC"),[1] were both constructed by Mericle. Plaintiffs in this action, juveniles or the parents of juveniles who appeared before Ciavarella, seek redress from the former judges, as well as the individuals and business entities involved in the construction and operation of these facilities, for the alleged unlawful conspiracy and resulting deprivations of Juvenile Plaintiffs' rights.

The individual and class complaints assert, in part, the following causes of action against Mericle: (1) 42 U.S.C. § 1983 claims alleging a conspiracy to violate Plaintiffs' constitutional rights; (3) violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, *et seq*.; (3) conspiracy to violate RICO; and (4) state-law civil conspiracy.

## B. Procedural History

The first of these consolidated cases, *Wallace v. Powell*, No. 09-CV-286, was filed on February 13, 2009 against multiple Defendants, including Mericle. Although the case was originally filed as a class action, the *Wallace* complaint was subsequently amended in May 2009 to proceed on behalf of a number of individual juvenile and parent Plaintiffs. Shortly thereafter, *Conway v. Conahan*, No. 09-CV-291, and *H.T. v. Ciavarella*, No. 09-CV-

---

[1]     PACC, WPACC, and Mid-Atlantic Youth Services, Inc. ("MAYS") are the Provider Defendants. Provider Defendants, along with Consulting Innovations and Services, Inc., Gregory R. Zappala, Robert J. Powell, Powell Law Group P.C., Perseus House, Inc. d/b/a Andromeda House, Beverage Marketing of PA., Inc., Pinnacle Group of Jupiter, LLC, Vision Holdings, LLC, Mark A. Ciavarella, Jr., Michael T. Conahan, Barbara Conahan, and Cindy Ciavarella, and all of the aforesaids' lawyers, agents, and employees, and subsidiary and parent organizations in their capacities as such, are "Non-Released Parties" under the terms of the Settlement Agreement.

357, were filed as putative class actions, both naming Mericle, among others, as Defendants. Subsequently, *Humanik v. Ciavarella*, No. 09-CV-630, was filed on behalf of a single individual Plaintiff. Collectively, these four cases are the "Civil Actions."

The *Conway* and *H.T.* Plaintiffs filed the Master Complaint for Class Actions in June 2009. (Doc. 136.) At the same time, the *Wallace* and *Humanik* Plaintiffs filed the Master Long Form Complaint for Individual Actions. (Doc. 134.)

With respect to the Mericle Defendants, they filed various motions to dismiss the actions in 2010 and 2011. The most recent motion to dismiss filed by Mericle and resolved by the Court was granted in part and denied in part on November 30, 2011. (Doc. 1002.) Shortly thereafter, on December 16, 2011, Plaintiffs and Mericle filed a Joint Motion for Preliminary Approval of Class Action Settlement. (Doc. 1005.) On February 28, 2012, following a preliminary approval hearing, the Court issued an order conditionally certifying the Settlement Classes, preliminarily approving the class action settlement, and approving the notice plan. (Doc. 1084.) On November 19, 2012, the Court held a final Settlement approval hearing.

## C.     The Settlement Agreement

Under the terms of the Settlement Agreement, Mericle and Plaintiffs agree to settle the Civil Actions (*i.e.*, the *H.T.*, *Conway*, *Wallace*, and *Humanik* Actions) to provide a final resolution of Plaintiffs' claims against Mericle and the Luzerne County Parties. Solely for the purposes of settlement, two settlement classes are established: (1) the "Juvenile Settlement Class," which consists of "all juveniles who appeared before former Luzerne County Court of Common Pleas Judge Mark A. Ciavarella between January 1, 2003 and

May 28, 2008 [the "Class Period"] who were adjudicated or placed by Ciavarella"; and (2) the "Parent Settlement Class," which is comprised of the parents and/or guardians of juveniles who appeared before Ciavarella between January 1, 2003 and May 28, 2008, and, who in connection with the juvenile's appearance: "(i) made payments or had wages, social security or other entitlements garnished; (ii) had costs, fees, interest and/or penalties assessed against them or their child; (iii) suffered any loss of companionship and/or family integrity." (Doc. 1005, Ex. 1, *Master Settlement Agreement*, "*MSA*", ¶ I.A.)  The Juvenile Settlement Class and the Parent Settlement Class are referred to collectively as the "Settlement Classes," and the members of the Settlement Classes are the "Settlement Class Members." (*Id.*)

Pursuant to the terms of the Settlement Agreement, Mericle agrees to pay $17,750,000.00, which will be used to pay settlement costs and claims by Class Members. (*Id.* at ¶ II.A.)

Under the proposed Allocation Plan, both basic and enhanced benefits are available to qualifying Plaintiffs.

### 1. Basic Benefits

Basic settlement payments to the Juvenile Settlement Class will be provided as follows: (1) each qualifying Juvenile that was adjudicated by Ciavarella during the Class Period but never spent time in any juvenile detention facility shall receive a payment of $500.00; (2) each qualifying Juvenile who was placed in a detention facility besides PACC or WPACC as a result of an adjudication or placement by Ciavarella during the Class Period shall receive a payment of $1,000.00; and (3) each qualifying Juvenile who was placed in

PACC or WPACC as a result of an adjudication or placement by Ciavarella during the Class Period shall receive a payment of $5,000.00.[2]

Basic settlement payments with respect to the Parent Settlement Class under the Allocation Plan provide each qualifying Parent Settlement Class Member who, as a result of a juvenile's adjudication or placement by Ciavarella during the period of January 1, 2003 and May 28, 2008, (i) made payments to Luzerne County or had wages, social security or other entitlements garnished or withdrawn by Luzerne County; or (ii) had court-ordered services or paid court-ordered costs, fees, interests, and/or penalties assessed against them or their child, shall receive the actual amount of monies paid, garnished, or withdrawn. Due to the overwhelming response of the Parent Settlement Class Members, the proposed allocation to the benefit fund will be insufficient to compensate all qualifying Parent Settlement Class Members' claims. As such, Plaintiffs' counsel seeks approval to contribute a portion of their requested fee to the Parent benefit fund to make up any shortfall.

## 2. Enhanced Benefits

The Allocation Plan also provides that certain qualifying Juveniles will be entitled to enhanced benefits from the Enhanced Benefit Fund ("EBF"). The EBF will initially contain $8,035,000.00. And, any funds remaining after the basic settlement fund is fully funded will be added to the EBF.

---

[2]       Based on the response to the Notice of Class Action Settlement, Plaintiffs request a modification of the Allocation Plan to have the remaining balances of the Probation and Non-PACC/WPACC Benefit Funds transferred to the PACC/WPACC Benefit Fund. (Doc. 1228, 10.)

The Allocation Plan consists of seven categories for which a Juvenile may qualify to receive enhanced benefits under the Settlement Agreement.

### a.   Non-PACC/WPACC Enhancement

The first enhancement is the non-PACC/WPACC enhancement.  Under this category, any Juvenile who was placed in a detention facility for ninety (90) days or more as a result of an adjudication or placement by Ciavarella during the Class Period but never spent any time at PACC and/or WPACC shall receive a flat $4,000.00 enhancement payment.

### b.   Age Enhancement

The second enhancement relates to the age of the Juvenile when adjudicated or placed.  Any Juvenile that was thirteen (13) years or younger at the time of his or her first adjudication or placement by Ciavarella during the Class Period shall receive 20 EBF points.[3]

### c.   Petition and Detention Days Enhancement

The third enhancement category is the petition and detention days enhancement. Juveniles that were adjudicated delinquent only once during the Class Period (based on only one juvenile petition) and that were also detained or placed at PACC/WPACC for more than ten (10) days as a result of their appearance before Ciavarella shall receive 4 EBF points.  And, if the single petition was a first offense, the Juvenile shall receive 8 additional EBF points.  Any Juvenile that, during the Class Period, was adjudicated delinquent only twice (based on no more than two separate juvenile petitions) and was detained or placed

---

[3]    The value of each EBF point awarded will be discussed in detail below.

at PACC/WPACC for more than twenty-five (25) days as a result of that Juvenile's appearance before Ciavarella, shall receive 5 EBF points. Lastly, under the petition and detention days enhancement, if, at any time prior to May 28, 2008, including before January 1, 2003, the Juvenile was adjudicated three (3) times or fewer (based on three or fewer separate juvenile petitions), and the Juvenile was detained or placed at PACC/WPACC for at least one (1) day as a result of his or her appearance before Ciavarella during the Class Period, and the Juvenile was detained or placed at a non-PACC/WPACC facility for more than one hundred eighty days (180) as a result of the appearance(s) before Ciavarella during the Class Period, then the Juvenile shall receive 4 EBF points.

### d.    Physical Injury or Illness Enhancement

The fourth enhancement category is the physical injury or illness enhancement. A Juvenile that suffered a physical injury or illness, for which he or she received documented treatment from a healthcare professional, either while detained or placed at PACC/WPACC or as a result of the detention or placement at PACC/WPACC during the Class Period, shall receive 3 EBF points. If the physical injury or illness is determined to be severe, the Juvenile shall receive 10 EBF points.

### e.    Psychological or Emotional Harm Enhancement

The fifth enhancement is for any Juvenile that suffered psychological or emotional harm. Any Juvenile that suffered psychological or emotional harm for which he or she received documented treatment from a licensed mental health professional, either while detained or placed at PACC/WPACC or as a result of the detention or placement at PACC/WPACC by Ciavarella during the Class Period, shall receive 3 EBF points. If the

psychological or emotional harm is found to be severe, the Juvenile shall receive 10 EBF points.

### f.    Adverse Educational Harm Enhancement

The sixth enhancement provides that if a Juvenile's educational progress was adversely affected, including, but not limited to, a documented loss of education credits or loss of a full or partial class year, as a result of having been detained or placed at PACC/WPACC by Ciavarella during the Class Period, the Juvenile shall receive 2 EBF points.  If the harm to the Juvenile's educational progress is determined to be severe, the Juvenile shall receive 8 EBF points.

### g.    Juvenile Suicide Enhancement

Lastly, any Juvenile that committed suicide as a result of having been detained or placed at PACC/WPACC by Ciavarella during the Class Period shall receive 100 EBF points.  No verified claims fall into this category according to Plaintiffs.

### 3.    Allocation Plan

Based on these enhancements, the Allocation Plan provides that the EBF will be distributed pursuant to a point system, with the exception of the $4,000.00 flat benefit enhancement to Juveniles that were placed in a non-PACC/WPACC facility for more than ninety (90) days.  The EBF points were calculated by the Claims Committee based on its review of the Proof of Claim Forms submitted by each Claimant and a review of all documentation submitted by the Claimant and/or released at the request of the Claimant.  And, upon completion of the still ongoing process of calculating the total EBF points, the Claims Committee will tabulate the grand total of all EBF points for all Claimants.  This total

will then be divided into the total value of the EBF to determine the dollar value of each EBF point.

Settlement Class Members who submitted timely Proof of Claims Forms will receive a "proposed payment amount with a written explanation" from the Claims Committee. If the Settlement Class Member believes the value assigned to his or her claim has been wrongly determined, the Claimant has the option to appeal to the Court-appointed Special Master.

In exchange for the relief provided under the Settlement Agreement, the named Plaintiffs and the Settlement Class Members will release all claims against Mericle and the Luzerne County Parties.[4] In addition, Settlement Class Members agree and covenant not to sue Mericle or the Luzerne County Parties over any matter which could have been alleged in these Civil Actions.

**4.    Notice**

Notice of the Settlement was disseminated to potential Settlement Class Members through a variety of means, including direct mailings, a toll-free call center, publication in newspapers, and a website. With respect to direct mailings, Class Counsel mailed a total of 7,354 copies of the Notice of Settlement and Proof of Claim Form to the last known addresses of potential Class Members by first-class and certified mail. Additionally, the toll-free call center established by Class Counsel, which was open to receive calls twenty-four (24) hours a day, seven (7) days a week, received 873 calls regarding the litigation and the

---

[4]    The Luzerne County Parties include the County of Luzerne and all departments and instrumentalities thereof, any current or former employee, official or agent of the County of Luzerne, and all related parties, successors, and assigns, and all of the aforesaids' lawyers, agents, and employees. (*MSA*, ¶ I.B.12.)

terms of the Settlement. And, when the call center's customer service representatives were unable to answer questions about the Settlement, the representatives arranged for the callers to speak with Class Counsel. In addition to direct mailings of the Class Notice, Class Counsel also caused the Notice of Settlement to be published in the *Times Leader* and the *Citizens' Voice*. Finally, Class Counsel maintained a website containing information about the Settlement. Since April 1, 2012, the website has received 907 visits.

## II. Discussion

### A. Class Certification

Even though the Settlement Agreement has already been preliminarily approved, there must still be a final determination as to whether to certify the class and grant final approval of the Settlement. *See In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 797 (3d Cir. 1995). The Federal Rules of Civil Procedure provide that class action settlements must be approved by the Court. *See* Fed. R. Civ. P. 23(e) ("The claims, issues, or defenses of a certified class may be settled . . . only with the court's approval."); *see also Ripley v. Sunoco, Inc.*, - - - F.R.D. - - -, 2012 WL 2402632, at *1 (E.D. Pa. June 26, 2012). However, "the ultimate inquiry into the fairness of the settlement under Fed. R. Civ. P. 23(e) does not relieve the court of its responsibility to evaluate Rule 23(a) and (b) considerations." *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 299 (3d Cir. 2005).

As such, "before approving a class settlement agreement, 'a district court first must determine that the requirements for class certification under Rule 23(a) and (b) are met.'" *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 296 (3d Cir. 2011) (en banc) (quoting *In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 341 (3d Cir. 2010)). Rule 23(a) of the Federal Rules

12

of Civil Procedure contains four threshold requirements which every putative class must satisfy:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). These requirements are referred to as numerosity, commonality, typicality, and adequacy of representation. If these four prerequisites are satisfied, "a district court must then determine that the proposed class fits within one of the categories of class actions enumerated in Rule 23(b)." *Sullivan*, 667 F.3d at 296. Plaintiffs seek certification pursuant to Rule 23(b)(3), under which certification is proper where "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

The "[f]actual determinations necessary to make Rule 23 findings must be made by a preponderance of the evidence. In other words, to certify a class the district court must find that the evidence more likely than not establishes each fact necessary to meet the requirements of Rule 23." *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 257–58 (3d Cir. 2009) (quoting *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 320 (3d Cir. 2008)).

## 1. Rule 23(a)

### a. Numerosity

The first requirement for a class action is that the class is so numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a). "'No single magic number exists

13

satisfying the numerosity requirement." *Logory v. Cnty. of Susquehanna*, 277 F.R.D. 135, 140 (M.D. Pa. 2011) (quoting *Florence v. Bd. of Chosen Freeholders*, No. 05–3619, 2008 WL 800970 at *6 (D. N.J. Mar. 20, 2008)).  However, the Third Circuit has opined that while there is technically no minimum class size, "generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001).

Here, the Settlement Classes are comprised of over three thousand members.  As such, the numerosity requirement is satisfied. *See, e.g., Williams v. City of Phila.*, 270 F.R.D. 208, 215 (E.D. Pa. 2010) (numerosity requirement satisfied where putative class could number in the hundreds or thousands); *Zeno v. Ford Motor Co.*, 238 F.R.D. 173, 184 (W.D. Pa. 2006) (proposed class of 2,100 claimants sufficient to satisfy numerosity requirement of Rule 23(a)).

### b.    Commonality

To satisfy Rule 23(a)(2), there must be "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a).  Satisfaction of the commonality requirement requires that plaintiffs demonstrate that their claims "depend upon a common contention," the resolution of which "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal–Mart Stores, Inc. v. Dukes*, - - - U.S. - - -, 131 S. Ct. 2541, 2551, 180 L. Ed. 2d 374 (2011).  "Commonality does not require an identity of claims or facts among class members; instead, [t]he commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 184 (3d Cir. 2001) (internal quotation

marks omitted); *see also Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 597–98 (3d Cir. 2012). But, the Supreme Court recently indicated that "[c]ommonality requires the plaintiff to demonstrate that the class members have suffered the same injury." *Wal–Mart*, 131 S.Ct. at 2551 (citations and internal quotation omitted). That is, "[t]heir claims must depend upon a common contention. . . . That common contention, moreover must be capable of classwide resolution- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id*.

The commonality requirement is sufficiently satisfied in this case. In particular, the claims of the Juvenile Settlement Class and the Parent Settlement Class stem from the construction, and subsequent operation, of two juvenile detention facilities. Specifically, their claims turn on whether Defendants, including Mericle, acted in conspiracy with Conahan and Ciavarella to deprive Juvenile Plaintiffs of their constitutionally guaranteed rights, whether Defendants organized an association-in-fact enterprise, and whether Defendants participated in the affairs of an entity through a pattern of racketeering activity. These claims are capable of classwide resolution, as they all "arise from the same nucleus of operative facts and involve the same legal theories" against Mericle. *In re Processed Egg Prods. Antitrust Litig.*, 284 F.R.D. 249 (E.D. Pa. 2012). Thus, the commonality prong of Rule 23(a)(2) is met.

### c. Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The concepts of typicality and commonality are closely related and often tend to merge." *Marcus*, 687 F.3d

at 597 (citing *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir.1994)). "The typicality criterion is intended to preclude certification of those cases where the legal theories of the named plaintiffs potentially conflict with those of the absentees by requiring that the common claims are comparably central to the claims of the named plaintiffs as to the claims of the absentees." *Baby Neal*, 43 F.3d at 57. "Factual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory." *Id.* at 58 (citation omitted). When analyzing typicality, a court must compare the situation of the proposed representative to that of the class as a whole by considering "the similarity of the legal theory and legal claims; the similarity of the individual circumstances on which those theories and claims are based; and the extent to which the proposed representative may face significant unique or atypical defenses to her claims." *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 597 (3d Cir. 2009).

The claims of the Representative Plaintiffs, as identified in the Settlement Agreement, are typical of the Juvenile Settlement Class Members and the Parent Settlement Class Members. With respect to the Juvenile Settlement Class, the gravamen of the Representative Plaintiffs' claims is that, as a result of the alleged conspiracy, Ciavarella and Conahan had an undisclosed financial interest and conflict-of-interest in adjudicating children delinquent and sending them to placement. And, like all other Juvenile Settlement Class Members, the Representative Plaintiffs were denied their constitutional right to an impartial tribunal when they appeared before Ciavarella. As such, the legal theories for all Juvenile Plaintiffs, that their adjudications were unconstitutional, will be the

same. Thus, the typicality requirement is satisfied as to the Juvenile Settlement Class.

The claims of the Parent Settlement Class Representatives are also typical of all Parent Settlement Class Members. Specifically, all Parent Settlement Class Members assert RICO claims based on the alleged conspiratorial conduct of Defendants, which resulted in the payment of court fees, fines, interest, and penalties. As the legal theories for all Parent Settlement Class Members will be the same, the typicality requirement for class certification under Rule 23(a)(3) is satisfied.

### d. Adequacy of Representation

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "The adequacy requirement has two components: (1) concerning the experience and performance of class counsel; and (2) concerning the interests and incentives of the representative plaintiffs." *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 181 (3d Cir. 2012) (citing *In re Cmty. Bank of N. Va.*, 418 F.3d at 303). Essentially, the adequacy inquiry considers whether "the putative named plaintiff has the ability and the incentive to represent the claims of the class vigorously, that he or she has obtained adequate counsel, and that there is no conflict between the individual's claims and those asserted on behalf of the class." *Hassine v. Jeffes*, 846 F.2d 169, 179 (3d Cir. 1988) (citations omitted).

The qualifications and performance of class counsel under Rule 23(a)(4) is based upon the factors set forth in Rule 23(g). *See Sheinberg v. Sorensen*, 606 F.3d 130, 132 (3d Cir. 2010) ("Although questions concerning the adequacy of class counsel were traditionally analyzed under the aegis of the adequate representation requirement of Rule 23(a)(4) . .

17

. those questions have, since 2003, been governed by Rule 23(g).").  That subsection lists several non-exclusive factors that a district court must consider in determining "counsel's ability to fairly and adequately represent the interests of the class," Fed. R. Civ. P. 23(g)(1)(B), including: (1) "the work counsel has done in identifying or investigating potential claims in the action," (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action," (3) "counsel's knowledge of the applicable law," and (4) "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A).

Here, Class Counsel has the experience, skill, and qualification necessary to conduct this litigation.  In particular, the individual attorneys in this action have extensive experience in complex class action litigation involving mass actions and civil rights claims.  Consistent with their impressive qualifications, Class Counsel, throughout this litigation, has demonstrated considerable ability in prosecuting this case.  Specifically, Class Counsel has performed substantial work, and expended considerable time and resources, in presenting the facts and complex legal issues implicated in this litigation, as Class Counsel has prepared multiple complaints, responded to numerous motions to dismiss, engaged in mediation, and reviewed discovery.  Class Counsel has pursued this action vigorously and with great dedication on behalf of all Plaintiffs.  Thus, based on Class Counsel's work to date in this litigation, it is apparent that these attorneys have fairly and adequately represented the interests of the Settlement Class Members.

With respect to the second prong of the adequacy inquiry, the Third Circuit has "recognized that the linchpin of the adequacy requirement is the alignment of interests and

18

incentives between the representative plaintiffs and the rest of the class." *Dewey*, 681 F.3d at 183 (citations omitted). The adequacy requirement "is designed to ferret out" intra-class conflicts, and to ensure that the named plaintiffs have the incentive to represent the claims of the class. *Id*. at 184 (citations omitted). If any conflicts "undercut the representative plaintiffs' ability to adequately represent the class" they are "fundamental," such that class representation is structurally faulty and Rule 23(a)(4) cannot be satisfied. *Id*. at 184–85.

The Representative Plaintiffs fairly and adequately protected the interests of the Juvenile Settlement Class and the Parent Settlement Class in this action. Here, the interests of the Representative Plaintiffs are consistent with the Settlement Class Members, and there appears to be no conflicts between or among the groups. As discussed, the Representative Juvenile Plaintiffs were damaged as a result of Defendants' allegedly unlawful conduct, including Mericle's alleged conduct, and the Representative Juvenile Plaintiffs would have to prove the same wrongdoing as the Juvenile Settlement Class Members to establish Defendants' (and Mericle's) liability. Similarly, the Representative Parent Plaintiffs were damaged as a result of the alleged conspiratorial conduct of Defendants, including Mericle, which resulted in the payment of court fees, fines, interest, and penalties, and which would require all Parent Plaintiffs to demonstrate the same wrongdoing to establish Defendants' liability. Thus, as "the interests of the named plaintiffs are not antagonistic to those of the class[es]," *Marsden v. Select Med. Corp.*, 246 F.R.D. 480, 485 (E.D. Pa. 2007) (citing *In re Cmty. Bank of N. Va.*, 418 F.3d at 303), and nothing in the record suggests that the Representative Plaintiffs acted in conflict with the Settlement Classes or failed to vigorously pursue the claims of all Class Members, *see, e.g., Esslinger*

*v. HSBC Bank Nev., N.A.*, No. 10-3213, 2012 WL 5866074, at *4 (E.D. Pa. Nov. 20, 2012), the adequacy requirement is satisfied by the Representative Plaintiffs.

**2.    Rule 23(b)(3)**

Besides meeting the four threshold requirements under Rule 23(a), a proposed class must also satisfy one of the three sub-parts of Rule 23(b). *See In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 527 (3d Cir. 2004).  Here, Plaintiffs seek to maintain this class action under Rule 23(b)(3), which allows for a class action to proceed if "questions of law or fact common to class members predominate over any questions affecting only individual members, and [ ] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  These requirements are commonly separated into the "predominance" and "superiority" requirements. *See In re Cmty. Bank of N. Va.*, 418 F.3d at 308-09.

**a.    Predominance**

The predominance inquiry under Rule 23(b)(3) "'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Sullivan*, 667 F.3d at 297 (quoting *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 266 (3d Cir. 2009)).  "Parallel with Rule 23(a)(2)'s commonality element, which provides that a proposed class must share a common question of law or fact, Rule 23(b)(3)'s predominance requirement imposes a more rigorous obligation upon a reviewing court to ensure that issues common to the class predominate over those affecting only individual class members." *Id*. (citing *Ins. Brokerage*, 579 F.3d at 266).  Thus, the Third Circuit "'consider[s] the Rule 23(a) commonality requirement to be incorporated into the more stringent Rule 23(b)(3) predominance requirement, and therefore deem it appropriate to analyze the two factors together, with

particular focus on the predominance requirement.'" *Id*. (quoting *Ins. Brokerage*, 579 F.3d at 266). And, Third Circuit precedent "provides that the focus of the predominance inquiry is on whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct." *Id*. at 298.

In assessing predominance, "a court at the certification stage must examine each element of a legal claim 'through the prism' of Rule 23(b)(3)." *Marcus*, 687 F.3d at 600 (quoting *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 630 (3d Cir. 2011)). Thus, "[a] plaintiff must 'demonstrate that the element of [the legal claim] is capable of proof at trial through evidence that is common to the class rather than individual to its members.'" *Id*. (quoting *Hydrogen Peroxide*, 552 F.3d at 311).

With respect to the 42 U.S.C. § 1983 claims brought by the Juvenile Settlement Class Members, Juvenile Plaintiffs would have to demonstrate that Mericle "(1) acting under color of law, (2) violated the plaintiff[s'] federal constitutional or statutory rights, (3) and thereby caused the complained of injury." *Elmore v. Cleary*, 299 F.3d 279, 281 (3d Cir. 2005) (citing *Sameric Corp. of Del., Inc. v. City of Phila.*, 142 F.3d 582, 590 (3d Cir. 1998)). As to the "state actor" inquiry, proof of this element would focus solely on Mericle's conduct, specifically whether Mericle willfully participated in joint activity with Ciavarella and Conahan. And, due to the alleged conspiratorial conduct, each member of the Juvenile Settlement Class claims that they appeared before a partial tribunal, depriving them of their constitutional rights. Because the § 1983 claims against Mericle rely on the same course of conduct, common proof of such conduct, and damage as a result of that conduct, the predominance requirement of Rule 23(b)(3) is met for these claims.

21

Next, "[t]he elements of a civil RICO claim under § 1962(c) are (1) the conducting of, (2) an enterprise, (3) through a pattern, (4) of racketeering activity, (5) which results in injury to the plaintiffs' business or property." *Tapp v. Proto*, 718 F. Supp. 2d 598, 625 (E.D. Pa. 2010) (citing *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S. Ct. 3275, 87 L. Ed. 2d 346 (1985)). For a § 1962(d) claim, a plaintiff must establish "(1) an agreement to commit the predicate acts of fraud, and (2) knowledge that those acts were part of a pattern of racketeering activity conducted in such a way as to violate section 1962(a), (b), or (c)." *Rose v. Bartle*, 871 F.2d 331, 366 (3d Cir. 1989) (citing *Odesser v. Continental Bank*, 676 F.Supp. 1305, 1312 (E.D. Pa. 1987)).

Proving the first element of the § 1962(c) RICO claims in this case would involve common questions about the activities of Mericle, and, whether Mericle participated or engaged in conduct with other Defendants. *See Ins. Brokerage*, 579, F.3d at 269. The second element also involves common legal and factual questions, specifically whether an enterprise existed. *See id*. at 269-70. Likewise, proof of the third and fourth elements would encompass common questions of law and fact, notably whether activities that constitute racketeering were occurring through the enterprise, and whether these racketeering activities were occurring in a pattern that could be established. *See id*. at 270. And, "[w]hile establishing an injury is not as conducive to common proof," "plaintiffs have presented a plausible theory for proving a class-wide injury as a result of the racketeering activities of the alleged enterprise." *Id*. For the same reasons, the § 1962(d) claim focuses on the conduct of Defendants, and whether Defendants "conspire[d] to violate § 1962(c)." *Id*. at 269. Thus, all elements of the alleged RICO violations involve common questions of law

and fact.  Therefore, Plaintiffs adequately satisfy the predominance requirement of Rule 23(b)(3).

> **b.      Superiority**

According to Rule 23(b)(3), the considerations relevant to the superiority inquiry include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).  "The superiority requirement asks a district court 'to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication.'" *In re Cmty. Bank of N. Va.*, 418 F.3d at 309 (quoting *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 632 (3d Cir. 1996), *aff'd*, 521 U.S. 591, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997)).  And, when "confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, *see* Fed. Rule Civ. Proc. 23(b)(3)(D), for the proposal is that there be no trial." *Amchem*, 521 U.S. at 620, 117 S. Ct. 2231.

A class resolution in the manner proposed in the Mericle Settlement is superior to other available methods for resolution of this action against Mericle.  First, proceeding as a class action in this case is far superior to allowing piecemeal litigation of the exact same claims in countless lawsuits. *See, e.g., Logory*, 277 F.R.D. at 146 (quoting *Stanford v. Foamex L.P.*, 263 F.R.D. 156, 174 n. 22 (E.D. Pa. 2009)).  Second, where a claim is small in comparison to the costs of prosecuting a lawsuit, a class action allows for litigation costs to be spread among the injured parties. *See Processed Egg Prods.*, 284 F.R.D. 249.

23

Indeed, "[a]ddressing the rights of those who would not otherwise be appropriately incentivized to bring their own singular claims was precisely the aim of the Advisory Committee in promulgating Rule 23(b)(3)." *Logory*, 277 F.R.D. at 146 (citing *Amchem*, 521 U.S. at 617, 117 S. Ct. 2231). Third, this is an appropriate forum for concentrating the claims of the Settlement Classes because the Court has subject matter jurisdiction over the claims and personal jurisdiction over the parties. *See Esslinger*, 2012 WL 5866074, at *5. Lastly, the difficulties in managing a class action need not be considered since the Settlement will avoid trial. *See Amchem*, 521 U.S. at 620, 117 S. Ct. 2231. For these reasons, the superiority requirement is satisfied.

### 3. Conclusion as to Class Certification for Settlement Purposes

Because all of the Rule 23(a) and (b)(3) requirements have been met, the Classes will be certified for settlement purposes.

## B. Notice

"In the class action context, the district court obtains personal jurisdiction over the absentee class members by providing proper notice of the impending class action and providing the absentees with the opportunity to be heard or the opportunity to exclude themselves from the class." *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 326 (3d Cir. 1998) (citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12, 105 S. Ct. 2965, 86 L. Ed. 2d 628 (1985)). Rule 23 contains two distinct notice provisions. *See id*. at 326. First, Rule 23(c)(2) requires that class members be given the best notice practicable, including individual notice to all members who can be identified

through reasonable efforts. Fed. R. Civ. P. 23(c)(2).[5]  Second, Rule 23(e) requires all class members to be notified of the terms of any proposed settlement. Fed. R. Civ. P. 23(e).  This "notice is designed to summarize the litigation and the settlement" and "to apprise class members of the right and opportunity to inspect the complete settlement documents, papers, and pleadings filed in the litigation." *Prudential*, 148 F.3d at 327 (citation omitted).

Here, the Notice of the Mericle Settlement contained the information required by Rules 23(c)(2) and 23(e).  Specifically, the Notice detailed the nature of the action, the definition of the Juvenile Settlement Class and the Parent Settlement Class, the claims of the Settlement Classes, the terms of the Settlement Agreement, and the right to object or request exclusion from the terms of the Settlement.  The Notice also informed members of their opportunity to be heard at the fairness hearing, to enter an appearance through an attorney of their choice, and that the Settlement would be binding on members that did not opt out.

Additionally, Plaintiffs' efforts to notify the Settlement Class Members satisfied the requirements of Rule 23 and due process.  The Notice was sent to potential Settlement Class Members by first-class and certified mail based on the last known addresses of these

---

[5]      The notice, in clear and concise language, must state:

> (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2).

individuals. Notice was also published in two local newspapers, and information about the proposed Settlement was available through a detailed website. Based on the extensive individual notice, as well as the published notice, the notice requirements of both Rule 23 and the Due Process Clause have been satisfied. *See Zimmer Paper Prods., Inc. v. Berger & Montague, P.C.*, 758 F.2d 86, 90 (3d Cir. 1985) ("first-class mail and publication regularly have been deemed adequate under the stricter notice requirements . . . of Rule 23(c)(2).").

## C.    Fairness of the Settlement

Certified federal class actions may only be settled with court approval. *See* Fed. R. Civ. P. 23(e). While the approval of a class action settlement is committed to the sound discretion of the district court, "it can endorse a settlement only if the compromise is fair, adequate, and reasonable.'" *Eichenholtz v. Brennan*, 52 F.3d 478, 482 (3d Cir. 1995) (quoting *Walsh v. Great. Atl. & Pac. Tea Co.*, 726 F.2d 956, 965 (3d Cir. 1983)). This is especially true in cases such as this "where settlement negotiations precede class certification, and approval for settlement and certification are sought simultaneously." *Warfarin*, 391 F.3d at 535 (citing *Gen. Motors*, 55 F.3d at 805).

The Third Circuit has identified nine factors, known as the *Girsh* factors, to be considered when determining whether a proposed class action settlement is fair, reasonable, and adequate. *See Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975). These factors are:

> (1) The complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement

fund to a possible recovery in light of all the attendant risks of litigation. *Warfarin*, 391 F.3d at 534-35 (citing *Girsh*, 521 F.3d at 157). "The settling parties bear the burden of proving that the *Girsh* factors weigh in favor of approval of the settlement." *Pet Food*, 629 F.3d at 350 (citing *Gen. Motors*, 55 F.3d at 785).

**1.     Complexity, Expense, and Duration of Litigation**

The first *Girsh* factor "captures the probable costs, in both time and money, of continued litigation." *Warfarin*, 391 F.3d at 535-36. This litigation was commenced almost four years ago, and it encompasses a Class Period dating back to 2003. In order to prepare this action to proceed to trial against Mericle, Plaintiffs would be required to expend considerable financial resources conducting depositions and drafting and responding to further motions. And, as recognized by Plaintiffs, this case raises complex legal issues with respect to the RICO and § 1983 claims. Additionally, a trial on the merits would require hours of attorney preparation and the expenditure of hundreds of thousands of dollars. Likewise, even if this case proceeded to trial against Mericle, a "complicated, lengthy trial," would ensue, and the "inevitable . . . post-trial motions and appeals would not only further prolong the litigation but also reduce the value of any recovery to the class." *Warfarin*, 391 F.3d at 536. As such, the first *Girsh* factor weighs in favor of approving the Mericle Settlement.

**2.     Reaction of the Class to the Settlement**

"The second *Girsh* factor 'attempts to gauge whether members of the class support the settlement.'" *Warfarin*, 391 F.3d at 536 (quoting *Prudential*, 148 F.3d at 318). The Third Circuit has noted that a vast disparity between the number of potential class members who

received notice of a proposed settlement and the number of objectors "creates a strong presumption that this factor weighs in favor of the Settlement." *In re Cendant Corp. Litig.*, 264 F.3d 201, 235 (3d Cir. 2001). Similarly, "[c]ourts have generally assumed that 'silence constitutes tacit consent to the agreement.'" *Gen. Motors*, 55 F.3d at 812 (quoting *Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1313 n.15 (3d Cir. 1993).

The reaction of the class strongly favors approval of the Settlement. Here, following extensive notice, both to potential Settlement Class Members individually and by general publication, none of the class of approximately 3,910 Members objected to the proposed Settlement.[6] Furthermore, only fourteen (14) Settlement Class Members opted out the Settlement, and, since that time, Mericle has resolved all of the opt out claims. The lack of objections and the low number of opt outs demonstrate a general acceptance of the Settlement by Class Members. *See, e.g., Stoetzner v. U.S. Steel Corp.,* 897 F.2d 115, 118–19 (3d Cir.1990) (approving settlement where "only" 29 objections were made in a 281–member class); *Alexander v. Washington Mut., Inc.*, No. 07-4426, 2012 WL 6021098, at *8 (E.D. Pa. Dec. 4, 2012) (reaction of class favored approval of settlement where only five class members opted out and no formal objections were filed to the settlement); *Ripley v. Sunoco, Inc.*, - - - F.R.D. - - -, 2012 WL 2402632, at *1 (E.D. Pa. June 26, 2012) (reaction of the class favored approval of settlement where "less than 1 percent of the eligible class members opted out of the settlement"). The second *Girsh* factor thus strongly counsels in favor of settlement approval.

---

[6]     Indeed, the only "objection" to the Settlement was filed by Provider Defendants. However, for the reasons discussed in greater detail below, Provider Defendants lack standing to object to the Settlement.

### 3.    Stage of the Proceedings and Amount of Discovery Completed

The third *Girsh* factor "captures the degree of case development that class counsel had accomplished prior to settlement," and allows the court to "determine whether counsel had an adequate appreciation of the merits of the case before negotiating." *Warfarin*, 391 F.3d at 537 (citation, quotations, & alterations omitted); *see also Gen. Motors*, 55 F.3d at 813 ("Given the purpose of this inquiry, . . . it is . . . appropriate to measure the stage by reference to the commencement of proceedings either in the class action at issue or in some related proceeding.").

When analyzing this *Girsh* factor, courts also examine whether the settlement resulted from arm's-length negotiations. *See In re Corel Corp. Sec. Litig.*, 293 F. Supp. 2d 484, 491 (E.D. Pa. 2003). When the settlement results from arm's-length negotiations, the court will "afford[ ] considerable weight to the views of experienced counsel regarding the merits of the settlement." *McAlarnen v. Swift Transp. Co., Inc.*, Civ. A. No. 09–1737, 2010 WL 365823, at *8 (E.D. Pa. Jan. 29, 2010); *see also Corel Corp. Sec. Litig.*, 293 F. Supp. 2d at 491 ("Courts generally recognize that a proposed class action settlement is presumptively valid where, as in this case, the parties engaged in arm's length negotiations after meaningful discovery."); *In re Gen. Instrument Sec. Litig.*, 209 F.Supp.2d 423, 431 (E.D. Pa. 2001) ("Significant weight should be attributed to the belief of experienced counsel that the settlement is in the best interests of the class.").

The Settlement was preliminarily approved in February 2012, almost three years after the commencement of this litigation. Arm's-length settlement discussions lasted for one year, and an agreement was reached only after a failed mediation and numerous

telephone conferences and face-to-face meetings between counsel for the parties. During that time, considerable time, effort, and money was expended by both parties, including the production and review of over 200,000 pages of documents and hundreds of Plaintiff Fact Sheets. Numerous pleadings and motions were also filed, and responded to, by Plaintiffs and Mericle in this action, including a motion to stay (Doc. 221), motions to dismiss (Docs. 442; 704; 932), and a motion to amend. (Doc. 749.) As such, at this stage of the proceedings "'the parties certainly had a clear view of the strengths and weaknesses of their cases.'" *McCoy v. Health Net, Inc.*, 569 F. Supp. 2d 448, 461 (D. N.J. 2008) (quoting *Bonett v. Educ. Debt Servs., Inc.*, No. 01-6528, 2003 WL 21658267, at *6 (E.D. Pa. May 9, 2003)). The third *Girsh* factor therefore weighs in favor of settlement approval.

### 4. Risks of Establishing Liability

"The fourth *Girsh* factor 'examines what the potential rewards (or downside) of litigation might have been had class counsel decided to litigate the claims rather than settle them.'" *Sullivan*, 667 F.3d at 322 (quoting *Cendant*, 264 F.3d at 237). "[T]he more risks that Plaintiffs may face during litigation the stronger this factor favors approving a settlement." *Esslinger*, 2012 WL 5866074, at *9 (citing *Prudential*, 148 F.3d at 319). "The inquiry requires a balancing of the likelihood of success if 'the case were taken to trial against the benefits of immediate settlement.'" *In re Safety Components, Inc. Sec. Litig.*, 166 F. Supp. 2d 72, 89 (D. N.J. 2001) (quoting *Prudential*, 148 F.3d at 319).

As previously noted, Plaintiffs face a difficult task of proving all elements of their claims should these actions proceed to trial. While Plaintiffs did not provide, in detail, the risks of establishing liability in this case, this is understandable in this case "[g]iven that the

litigation [will] continue against other defendants, [and] the parties may [have been] reluctant to disclose fully and candidly their assessment of the proposed settlement's strengths and weaknesses that led them to settle separately. *Processed Egg Prods.*, 284 F.R.D. 249 (quoting David F. Herr, *The Manual for Complex Litigation* § 21.651, at 505 (4th ed. 2011)).

In addition, possible appeals, summary judgment motions, and trial still remain if the Settlement is not approved. Thus, as "this case involves difficult factual and legal issues which would have translated into protracted litigation and accumulating expenses, in both time and money," *In re. Ins. Brokerage Antitrust Litig.*, 282 F.R.D. 92, 104 (D. N.J. 2012), this factor weighs in favor of approval.

### 5. Risks of Establishing Damages

This factor "attempts to measure the expected value of litigating the action rather than settling it at the current time." *Cendant*, 264 F.3d at 239 (quoting *Gen. Motors*, 55 F.3d at 816). "This factor, like the last, involves a balancing of risks." *In re CertainTeed Corp. Roofing Shingle Prods. Liab. Litig.*, 269 F.R.D. 468, 488 (E.D. Pa. 2010).

In this case, even if Plaintiffs were able to establish liability, they would still be tasked with proving the appropriate amount of damages against Mericle. For Juvenile Plaintiffs that only seek presumed damages with respect to the § 1983 claims, proving damages may not present a daunting task. However, Juvenile Plaintiffs seeking more than presumed damages may face significant obstacles in establishing individual damages. The issue of individualized damages could very well lead to a "battle of the experts" with no guarantee whom the jury would believe. *See Cendant*, 264 F.3d at 236. Furthermore, even if damages are established, post-trial motions and appeals present increased risk to the recovery of

damages.

In the instant case, the risks of establishing damages factor is neutral. Although some Plaintiffs may face difficulty in establishing individualized or special damages, establishing presumed damages suffered by the Juvenile Settlement Class as a whole would not present the same risks. As such, this factor does not weigh for or against approval.

### 6. Risks of Maintaining the Class Action through Trial

The sixth *Girsh* factor "measures the likelihood of obtaining and keeping a class certification if the action were to proceed to trial" in light of the fact that "the prospects for obtaining certification have a great impact on the range of recovery one can expect to reap from the class action." *Sullivan*, 667 F.3d at 322. "The value of a class action depends largely on the certification of the class because, not only does the aggregation of the claims enlarge the value of the suit, but often the combination of the individual cases also pools litigation resources and may facilitate proof on the merits." *Gen. Motors*, 55 F.3d at 817. However, a "district court retains the authority to decertify or modify a class at any time during the litigation if it proves to be unmanageable." *Id*. (citing *Prudential*, 148 F.3d at 321).

If the Settlement was rejected, Mericle would likely vigorously oppose class certification. Indeed, Mericle specifically reserved the right to challenge any type of class certification other than certification for settlement purposes. And, the Court of Appeals for the Third Circuit has recognized: "There will always be a 'risk' or possibility of decertification, and consequently the court can always claim this factor weighs in favor of settlement." *Prudential*, 148 F.3d at 321. The sixth *Girsh* factor therefore slightly favors settlement

approval.

### 7. Ability of Defendants to Withstand a Greater Judgment

The seventh *Girsh* factor considers "whether the defendants could withstand a judgment for an amount significantly greater than the settlement." *Warfarin*, 391 F.3d at 537–38 (citation, quotations, & alteration omitted). Mericle Construction, a large commercial real estate corporation, may conceivably be able to withstand a greater judgment. However, "'in any class action against a large corporation, the defendant entity is likely to be able to withstand a more substantial judgment, and, against the weight of the remaining factors, this fact alone does not undermine the reasonableness of the instant settlement.'" *Sullivan*, 667 F.3d at 323 (quoting *Weber v. Gov't Empl. Ins. Co.*, 262 F.R.D. 431, 447 (D. N.J.2009)). Furthermore, "the settling defendant's ability to pay greater amounts [may be] outweighed by the risk that the plaintiffs would not be able to achieve any greater recovery at trial." *In re Linerboard Antitrust Litig.*, 321 F. Supp. 2d 619, 632 (E.D. Pa. 2004) (citing *Lazy Oil Co. v. Witco Corp.*, 95 F. Supp. 2d 290, 318 (W.D. Pa. 1997)).

Based on the lack of information submitted with respect to this factor, the Court is not in a position to determine whether Mericle could withstand a greater judgment than that provided under the Settlement. Thus, the seventh *Girsh* factor is neutral. However, it is significant to note that there is no insurance coverage with respect to the claims in this case, the benefits owed under the Settlement have been placed in escrow, and all opt outs from the Settlement have been resolved. As such, even though Mericle may be able to pay a greater sum, the Court is satisfied that the Settlement is still fair, reasonable, and adequate. *See, e.g., In re Auto. Refinishing Paint Antitrust Litig.*, 617 F. Supp. 2d 336, 344 (E.D. Pa.

2007) (finding the settlement figure fair, reasonable, and adequate despite defendants' ability to withstand greater judgment, in light of the substantial benefits provided to class members); *In re Cendant Corp. Sec. Litig.*, 109 F. Supp. 2d 235, 262–63 (D. N.J. 2000), *aff'd*, *In re Cendant Corp.*, 264 F.3d 201 (approving settlement despite lack of evidence of defendant's ability to withstand greater judgment).

### 8. Range of Reasonableness of the Settlement in Light of the Best Possible Recovery and the Attendant Risks of Litigation

"The last two *Girsh* factors evaluate whether the settlement represents a good value for a weak case or a poor value for a strong case. The factors test two sides of the same coin: reasonableness in light of the best possible recovery and reasonableness in light of the risks the parties would face if the case went to trial." *Warfarin*, 391 F.3d at 538 (citing *Prudential*, 148 F.3d at 322). "Notably, in conducting the analysis, the court must guard against demanding too large a settlement based on its view of the merits of the litigation; after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution." *Sullivan*, 667 F.3d at 324.

To assess the reasonableness of a settlement in a case, such as this, seeking primarily monetary relief, a court should compare "'the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing . . . with the amount of the proposed settlement.'" *Warfarin*, 391 F.3d at 538 (quoting *Prudential*, 148 F.3d at 322).

The Settlement provides for $17,750,000.00 to be distributed to the Settlement Classes, less attorneys' fees and costs. Although Plaintiffs do not set forth an exact estimation of the damages they would likely recover if successful, Plaintiffs discuss the

obstacles that must be surmounted before any damages may be awarded. These hurdles could substantially reduce, if not eliminate, any recovery by Plaintiffs. Additionally, Plaintiffs retained an ethics expert, Professor Lynn A. Baker, to offer an opinion as to fairness and reasonableness of the Settlement. Professor Baker has served as an ethics expert in multiple large-dollar, large-group settlements. Professor Baker, based upon her experience, opined that all of the components of the Settlement Agreement were fair, reasonable, and appropriate under the circumstances.

Here, "while the exact maximum possible recovery in this case may be unclear, the extensive risks of litigation are not." *Esslinger*, 2012 WL 5866074, at *10 (finding eighth and ninth *Girsh* factors favored settlement approval despite lack of exact estimation as to likely recovery). Based on these attendant risks, the final two *Girsh* factors weigh in favor of approval of the Settlement.

### 9.    *Prudential* Factors

In addition to the *Girsh* factors, courts in the Third Circuit also consider the following factors outlined in *Prudential*:

> the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other facts that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved-or likely to be achieved-for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.

*Prudential*, 148 F.3d at 323.

In this case, none of the *Prudential* factors weigh against approval, and three (3) factors weigh in favor of settlement: (1) whether members are accorded the right to opt out;

(2) whether any provisions for attorneys' fees are reasonable; and (3) whether the procedure for processing individual claims under the Settlement is fair and reasonable.  As noted, the Settlement Class Members were given the opportunity to opt out.  The attorneys' fees sought by Class Counsel, as discussed below, are reasonable in light of the time expended litigating this action.  And, finally, the procedure for processing individual claims under the Settlement is fair and reasonable, and the procedure has been explained clearly in forms available to Settlement Class Members.

### 10.    Summary of *Girsh* and *Prudential* Factors

After consideration of the *Girsh* factors and the relevant *Prudential* factors, I conclude that the Settlement is fair, reasonable, and adequate under Rule 23(e).  As discussed, a few factors do not weigh in favor of settlement.  Not every factor need weigh in favor of settlement, however, in order for the Settlement to be approved. *See Cendant*, 264 F.3d at  242-43 (affirming final settlement approval when not all factors weighed in favor of approval).   Because the ultimate balance of the *Girsh* and *Prudential* factors when considered together weigh in favor of settlement, the Settlement will be approved.

### D.    Provider Defendants Lack Standing to Object to the Settlement

While no Plaintiffs filed objections to the Settlement, Provider Defendants oppose approval of the Mericle Settlement.  Non-settling defendants, such as Provider Defendants, generally "lack standing to object to a partial settlement, because they are ordinarily not affected by such a settlement." *Eichenholtz v. Brennan*, 52 F.3d 478, 482 (3d Cir. 1995) (citing *In re Sch. Asbestos Litig.*, 921 F.2d 1330, 1332 (3d Cir. 1990) *cert. denied*, 499 U.S. 976, 111 S. Ct. 1622, 113 L. Ed. 2d 720 (1991)).   "There is, however, a recognized

exception to this general rule, which permits non-settling defendants to object to a partial settlement where they can demonstrate that they will suffer some formal legal prejudice as a result of the partial settlement." *Id*. (citing *Zupnick v. Fogel*, 989 F.2d 93, 98 (2d Cir. 1993); *Asbestos Litig.*, 921 F.2d at 1332). For example, "'a non-settling defendant has standing to object to a partial settlement which purports to strip it of a legal claim or cause of action, an action for indemnity or contribution for example,' or to invalidate its contract rights." *Id*. (quoting *Waller v. Fin. Corp. of Amer.*, 828 F.2d 579, 583 (9th Cir. 1987)). But, when a "settlement agreement . . . specifically recognizes the existence of indemnification and contribution rights of non-settling defendants and the Order approving the settlement contains no ruling purporting to limit any claims non-settling defendants may have," non-settling defendants lack standing to challenge the settlement. *Asbestos Litig.*, 921 F.2d at 1333.

Provider Defendants raise the following to establish their standing to object to the proposed Settlement: (1) the Settlement precludes them from getting evidence for their defense, namely, they will not see any documents submitted to the Claims Committee in support of enhanced claims; (2) they will be deprived of the ability to assert factual determinations made about the validity or invalidity of enhanced claims as precluding litigation of those issues as to damages in the case against them; (3) they will be deprived of knowing how much in money damages individual enhanced benefit Claimants will receive; and (4) Plaintiffs will determine whether the amount of damages attributable to the settling Mericle Defendants in the action against the Provider Defendants will be *pro rata* or *pro tanto*. None of these contentions establishes standing.

First, since the personal histories of Juvenile Plaintiffs have been precluded by the Court as irrelevant (*Memorandum and Order dated October 31, 2012*; Docs. 1222; 1223), this basis for standing lacks merit.

Second, since this is a settlement, the factual determinations made by a settlement tribunal for settlement purposes cannot be the basis of collateral estoppel in claims against Provider Defendants, they would be covered by Federal Rule of Evidence 408 and precluded from use by or against Provider Defendants. That is, but for the Settlement with the Mericle Defendants, there would be no settlement tribunal or settled claims. The fact that Rule 408 precludes such evidence is manifest.

Third, the amount of settlement recovery by an individual Plaintiff or Class Member will not be concealed. Such amounts will have to be known for any determination of the amount of liability of Provider Defendants. The Court will require the disclosure of such sums assuming the settling parties do not wish to make such disclosures.

Lastly, it is clear that Plaintiffs will not determine the *pro rata*/*pro tanto* issue. The Court will do so.

Given the foregoing analysis of Provider Defendants' proffered bases for standing, it is clear that none meet the test for standing, as Provider Defendants have not demonstrated "that they will suffer some formal legal prejudice as a result of the partial settlement." *Eichenholtz*, 52 F.3d at 482. Therefore, Provider Defendants do not have standing to object to the Mericle Settlement, and their objections to the Settlement will be

denied by way of separate Order.[7]

**E.      Attorneys' Fees and Costs**

Under Rule 23(h) of the Federal Rules of Civil Procedure, "[i]n a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h).  A district court must conduct a "thorough judicial review of fee applications . . . for all class action settlements." *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 299 (3d Cir. 2005) (quoting *Prudential*, 148 F.3d at 333 (internal quotations omitted)).

> In assessing attorneys' fees, courts typically apply either the percentage-of-recovery method or the lodestar method. The percentage-of-recovery method is generally favored in common fund cases because it allows courts to award fees from the fund "in a manner that rewards counsel for success and penalizes it for failure." *Prudential*, 148 F.3d at 333 (internal quotations omitted).  The lodestar method is more typically applied in statutory fee-shifting cases because it allows courts to "reward counsel for undertaking socially beneficial litigation in cases where the expected relief has a small enough monetary value that a percentage-of-recovery method would provide inadequate compensation" or in cases where the nature of the recovery does not allow the determination of the settlement's value required for application of the percentage-of-recovery method. *Id*.  Regardless of the method chosen, we have suggested it is sensible for a court to use a second method of fee approval to cross-check its initial fee calculation. *Id*.

*Id*.  As suggested by the Third Circuit, the percentage-of-recovery method will be employed to determine the proper fee to award Class Counsel, and then the lodestar will be utilized as a cross-check to ensure the reasonableness of the award. *See id*.

**1.      Application of the Percentage-of-Recovery Method**

Class Counsel requests a combined award of common benefit attorneys' fees and

---

[7]      At the fairness hearing, Provider Defendants sought to admit the exhibits attached to their opposition to the motion for final approval. (Docs. 1242-1244.)  Plaintiffs objected to the admission of the exhibits.  Because Provider Defendants lack standing to object to the Settlement, the request to admit the exhibits will be denied.

expenses of $4,335,000.00 under the percentage-of-recovery method.[8]  The Third Circuit

has instructed a district court to consider ten factors when undertaking a percentage-of-

recovery analysis: (1) the size of the fund created and the number of beneficiaries; (2) the

presence or absence of substantial objections by members of the class to the settlement

terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved;

(4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount

of time devoted to the case by plaintiffs' counsel; (7) awards in similar cases; (8) the value

of benefits attributable to the efforts of class counsel relative to the efforts of other groups,

such as government agencies conducting investigations; (9) the percentage fee that would

have been negotiated had the case been subject to a private contingent fee arrangement

at the time counsel was retained; and (10) any innovative settlement terms. *In re Diet*

*Drugs*, 582 F.3d 524, 541 (3d Cir. 2009) (citations omitted).  The award factors, however,

"'need not be applied in a formulaic way'" because each case is different, "'and in certain

cases, one factor may outweigh the rest.'" *Rite Aid*, 396 F.3d at 301 (quoting *Gunger v.*

*Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000)).

### a.    Size of the Fund and Number of Beneficiaries

The Settlement Agreement establishes a common fund of $17,750,000.00 and notice

has been disseminated to over 3,000 individuals.  In general, as the size of the settlement

fund increases the percentage of the award decreases. *See Prudential*, 148 F.3d at 339.

"The basis for this inverse relationship is the belief that '[i]n many instances the increase [in

---

[8]      As noted, Plaintiffs have requested that the total combined award be reduced by
the amount necessary to satisfy the claims of the Parent Settlement Class.

recovery] is merely a factor of the size of the class and has no direct relationship to the efforts of counsel.'" *Id.* (citing *In re First Fid. Bancorporation Sec. Litig.*, 750 F. Supp. 160, 164 n.1 (D. N.J. 1990)).  As explained below, Class Counsel's requested fees in this case represent less than twenty-five percent (25%) of the common benefit fund, well within the range of reasonable fees, on a percentage basis, in the Third Circuit.  *See, e.g., Esslinger*, 2012 WL 5866074, at *12 (thirty percent (30%) fee award reasonable considering size of the fund); *In re Processed Egg Prods. Antitrust Litig.*, No. 08-2002, 2012 WL 5467530, at *3 (E.D. Pa. Nov. 9, 2012) (approving a thirty percent (30%) fee award for $25,000,000.00 settlement).  And, while the size of the common fund "is certainly substantial, it is not a 'mega-fund' that would dictate an award at the low end of the sliding scale." *Frederick v. Range Resources-Appalachia, LLC*, No. 08-288, 2011 WL 1045665, at *10 (W.D. Pa. Mar. 17, 2011) ($22,000,000.00 settlement does not qualify as a "mega-fund").  Accordingly, this factor weighs in favor of finding the fee request reasonable.

> **b.**  **Presence or Absence of Substantial Objections by Class Members**

As discussed above with respect to the *Girsh* factors, no objections were filed to the Settlement by any Settlement Class Member.  Similarly, no objections have been filed to Class Counsel's fee application.  "The absence of objections supports the reasonableness of the fee request." *Frederick*, 2011 WL 1045665, at *10 (citing *In re Rent-Way Sec. Litig.*, 305 F. Supp. 2d 491, 514-15 (W.D. Pa. 2003)); *In re Amer. Inv. Life Ins. Co. Annuity and Mktg. & Sales Practices Litig.*, 263 F.R.D. 226, 244 (E.D. Pa. 2009) ("small number of objections and the objections' lack of merit indicate that the class is satisfied with the fee award").  This factor also weighs in favor of the requested award of attorneys' fees.

### c.    Skill and Efficiency of the Attorneys Involved

The quality of representation of Class Counsel considers "'the quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of the counsel, the skill and professionalism with which counsel prosecuted the case and the performance and quality of opposing counsel.'" *In re Ikon Office Solutions, Inc., Sec. Litig.*, 194 F.R.D. 166, 194 (E.D. Pa. 2000) (quoting *In re Computron Software, Inc.*, 6 F. Supp. 2d 313, 323 (D. N.J. 1998)).  As set forth in greater detail above, Class Counsel is highly experienced, as the individual attorneys in this action have litigated numerous complex class actions involving mass actions and civil rights claims.  Additionally, Class Counsel's ability to successfully negotiate the Settlement "demonstrates the significant skill and expertise of counsel." *Processed Egg Prods.*, 2012 WL 5467530, at *3.  Likewise, counsel for Mericle has extensive experience defending complex litigation and class actions.  Thus, this factor supports the reasonableness of the fee award.

### d.    Complexity and Duration of the Litigation

The Third Circuit has stated that "complex and/or novel legal issues, extensive discovery, acrimonious litigation, and tens of thousands of hours spent on the case by class counsel" are "the factors which increase the complexity of class litigation." *In re Cendant Corp., PRIDES Litig.*, 243 F.3d 722, 741 (3d Cir. 2001).  These factors all support the requested fee award.  Class Counsel participated in mediation, engaged in discovery, and submitted numerous, well-researched filings.  Equally significant is the complex nature of this litigation, and the alleged judicial corruption scheme for which these actions seek

redress. Furthermore, the litigation proceeded against Mericle for almost three years prior to the parties agreeing to the terms of the Settlement. Therefore, the complexity and duration of the litigation supports the requested fee award.

### e.    Risk of Nonpayment

"This factor allows courts to award higher attorneys' fees for riskier litigation." *Esslinger*, 2012 WL 5866074, at * 13. Here, Class Counsel undertook this complex civil rights/RICO litigation on a contingent fee basis without any guarantee of payment. Class Counsel, in litigating this case, incurred hundreds of thousands of dollars in costs and expenses while facing the risk of not being reimbursed. The risk of nonpayment, therefore, weighs in favor of granting the requested fee award. *See, e.g., Processed Egg Prods.*, 2012 WL 5467530, at *4 ("any contingency fee arrangement includes a risk of non-payment"); *Ripley*, 2012 WL 2402632, at *12 ("it follows, therefore, that there was a risk of nonpayment under a contingency arrangement").

### f.    Amount of Time Devoted by Class Counsel

According to the motion for attorneys' fees, Class and Plaintiffs' Counsel have spent 34,900.48 hours prosecuting this matter. Upon reviewing the declarations submitted by Class Counsel, Class Counsel alone spent 26,630.18 hours litigating this action.[9] Such a large number of hours represents a substantial commitment to this litigation. Furthermore,

---

[9]    The 26,630.18 hours consists of: 9,101.18 hours by attorneys, paralegals, and IT personnel at Anapol Schwartz, (Doc. 1230, Ex. F); 6,587.94 hours by attorneys and paralegals at Caroselli Beachler McTiernan & Conboy, (*Id*. at Ex. G); 4,673 hours by attorneys, paralegals, and IT personnel at Hangley Aronchick Segal Pudlin & Schiller, (*Id*. at Ex. H); and 6,268.06 hours by attorneys, paralegals, and law students at Juvenile Law Center. (*Id*. at Ex. I.)

the amount of time spent on this case prior to final approval of the Settlement reflects the complexity of Plaintiffs' claims, not the inefficiency of their counsel. Presumably, the thousands of hours counsel spent working on this matter prevented those individuals from litigating other cases. This factor thus strongly favors granting the motion for attorneys' fees.

### g.  Awards in Similar Cases

"In the Third Circuit, fee awards in common fund cases generally range from 19% to 45% of the fund." *Esslinger*, 2012 WL 5866074, at *15 (citing *Bredbenner v. Liberty Travel, Inc.*, No. 09–905, 2011 WL 1344745, at *15 (D. N.J. Apr. 8, 2011)). "Many courts, including several in the Third Circuit, have considered 25% to be the 'benchmark' figure for attorney fee awards in class action lawsuits, with adjustments up or down for significant case-specific factors." *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 262 (D. Del. 2002) (gathering case law and awarding 22.5% in fees on a $10.01 million settlement fund). And, courts in the Third Circuit have found a thirty percent (30%) fee reasonable in cases raising violations of constitutional rights. *See, e.g., Delandro v. Cnty. of Allegheny*, No. 06-927, 2011 WL 2039099, at *14 (W.D. Pa. May 24, 2011) ("the Court finds that a percentage of thirty percent (30%) . . . is in fact identical to, the percentage awarded in a number of other strip-search class action settlements in this Circuit"); *Boone v. City of Phila.*, 668 F. Supp. 2d 693, 714 (E.D. Pa. 2009) ("30% fee percentage is commensurate with other strip-search class actions"). Therefore, the combined award of attorneys' fees and costs which will be less than twenty-five percent (25%) of the Settlement fund is reasonable.

### h. Value of Benefits Attributed to Class Counsel

The eighth factor the Court must consider is the degree to which the benefits of the settlement are attributable to Plaintiffs' counsel as opposed to the efforts of other actors, such as, for example, government investigators. *See In re Diet Drugs*, 582 F.3d at 541. While government investigation uncovered the alleged conspiracy orchestrated by Ciavarella and Conahan which resulted in the indictment of the former judges, "[t]here is no contention . . . that the settlement could be attributed to work done by other groups, such as government agencies." *Esslinger*, 2012 WL 5866074, at *14. This factor supports the requested fee.

### i. Negotiated Fee in a Contingent Fee Arrangement

In private contingency fee cases, attorneys routinely negotiate agreements for between thirty percent (30%) and forty percent (40%) of the recovery. *See In re Ins. Brokerage Antitrust Litig.*, 282 F.R.D. 92, 123 (D. N.J. 2012); *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 194 (E.D. Pa. 2000). The requested fee is below this range.

### j. Innovative Settlement Terms

In their submission, Class Counsel did not identify any particularly "innovative" terms in the Settlement Agreement. Thus, this factor neither weighs against nor for the proposed fee request. *See, e.g, McDonough v. Toys "R" Us, Inc*., 834 F. Supp. 2d 329, 345 (E.D. Pa. 2011) ( "In the absence of any innovative terms, this factor neither weighs in favor or against the proposed fee request.").

### 2. Lodestar Cross-Check

"The lodestar crosscheck is intended to gauge the reasonableness of the attorneys'

fee award as a whole." *Milliron v. T–Mobile, USA, Inc.*, 423 F. App'x 131, 136 (3d Cir. 2011). In performing the lodestar cross-check, the court multiplies "the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys." *Rite Aid*, 396 F.3d at 305. Then, the court may apply a multiplier to "account for the contingent nature or risk involved in a particular case and the quality of the attorneys' work." *Id* at 305–06. If the multiplier that must be used in order to obtain the result reached by application of the percentage-of-recovery method "is too great, the court should reconsider its calculation under the percentage-of-recovery method." *Id*. at 306. But, because the cross-check is not the primary analysis in common fund cases, it does not require "mathematical precision [ ] or bean-counting." *Id*. In evaluating the hours reasonably spent on the case, the court does not have to "review actual billing records" but can "rel[y] on summaries submitted by the attorneys." *See id*.

According to Plaintiffs' submission, the lodestar for Plaintiffs' counsel of record is $10,754,199.35, and the lodestar for Class Counsel alone is $8,520,861.85. Based on the number of hours spent prosecuting this action, the hourly billable rate for Plaintiffs' Counsel of record is approximately $308.00, and the hourly billable rate for Class Counsel is approximately $320.00. In assessing whether the hourly billable rate is reasonable, courts should apply "blended billing rates that approximate the fee structure of all the attorneys who worked on the matter." *Rite Aid*, 396 F.3d at 306. The hourly rate should be reasonable in light of "the given geographical area, the nature of the services provided, and the experience of the attorneys." *Id*. at 305. While the requested hourly rates are higher

46

than those typically approved in cases in the Scranton-Wilkes-Barre area, *see, e.g., Supinski v. UPS, Inc.*, No. 06-CV-0793, 2012 WL 2905458, at *2 (M.D. Pa. July 16, 2012) (awarding hourly rate of $250.00); *Carey v. City of Wilkes-Barre*, No. 05-CV-2093, 2011 WL 1900169, at *2 (M.D. Pa. May 19, 2011) (awarding hourly rate of $225.00), a higher hourly billable rate is acceptable in light of the extensive experience that Class Counsel collectively shares and the complex legal services it provided in this case. Furthermore, if the additional hours that will be expended by counsel relating to the processing of claims and allocation appeals are taken into account, the hourly rate used to reach Plaintiffs' lodestar would be greatly reduced and approach the rates typically found reasonable in this community.

And, using a lodestar of $10,754,199.35, the award of $4,335,000.00 in combined fees and expenses yields a multiplier of significantly less than one. Thus, the lodestar cross-check supports the requested fee award.

### 3. Reimbursement of Costs and Expenses

In addition to an award of attorneys' fees, Plaintiffs' counsel seeks reimbursement of expenses in the amount of $707,920.32. The Federal Rules of Civil Procedure provide that a court "may award reasonable attorney's fees and nontaxable costs" to Plaintiffs' counsel. Fed. R. Civ. P. 23(h). "Reimbursement is particularly appropriate in situations where, as here, no class members have objected to it." *Processed Egg Prods.*, 2012 WL 5467530, at *7. Here, Plaintiffs' counsel are requesting a combined award of attorneys' fees and costs, meaning all expenses will be paid and then the remainder of the $4,335,000.00 will be considered the total fee. As this request is reasonable, Plaintiffs' motion for an award of fees and costs will be approved.

### 4. Allocation of Fees

Lastly, the motion seeks to allow Lead Counsel to allocate the fee among counsel entitled to share the award. "Generally, a district court may rely on lead counsel to distribute attorneys' fees among those involved." *Milliron*, 423 F. App'x at 134. Allocation of fees in this manner is rationale because counsel "are most familiar with the work done by each firm and each firm's overall contribution to the litigation," and this process "conserves the time and resources of the courts." *Processed Egg Prods.*, 2012 WL 5467530, at *7 (citation omitted). Co-Lead Counsel will therefore be permitted to distribute the fee award to those attorneys who assisted in creation of the Settlement fund. Of course, should all counsel not agree with Co-Lead Counsel's allocation of fees, the ultimate allocation will then be made by the Court. *See In re Diet Drugs Prods. Liab. Litig.*, No. 99-20593, 2002 WL 32154197, at *24 (E.D. Pa. Oct. 3, 2002).

### III. Conclusion

For the above stated reasons, the Settlement Classes will be certified, the Settlement will be approved, and the requested attorneys' fees and costs will be awarded. Furthermore, Provider Defendants' objections to the Settlement will be denied for lack of standing.

An Order approving the Settlement follows, as does a separate Order denying Provider Defendants' objections.


December 14, 2012                                    /s/ A. Richard Caputo
Date                                               A. Richard Caputo
                                                  United States District Judge