**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

FLORENCE WALLACE, et al.,

       Plaintiffs,

          v.

ROBERT J. POWELL, et al.,

       Defendants.

CIVIL ACTION NO. 3:09-cv-286

(JUDGE CAPUTO)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

WILLIAM CONWAY, et al.,

       Plaintiffs,

          v.

MICHAEL T. CONAHAN, et al.,

       Defendants.

CIVIL ACTION NO. 3:09-cv-0291

(JUDGE CAPUTO)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

H.T., et al.,

       Plaintiffs,

          v.

MARK A. CIAVARELLA, JR., et al.,

       Defendants.

CIVIL ACTION NO. 3:09-cv-0357

(JUDGE CAPUTO)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

SAMANTHA HUMANIK,

    Plaintiff,

       v.

MARK A. CIAVARELLA, JR., et al.,

    Defendants.

CIVIL ACTION NO. 3:09-cv-0630

(JUDGE CAPUTO)

*********************************************************************************************

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

RAUL CLARK, et al.,

    Plaintiffs,

       v.

MICHAEL T. CONAHAN, et al.,

    Defendants.

CIVIL ACTION NO. 3:09-cv-0357

(JUDGE CAPUTO)

*********************************************************************************************

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

WAYNE DAWN, et al.,

    Plaintiffs,

       v.

MARK A. CIAVARELLA, JR., et al.,

    Defendants.

CIVIL ACTION NO. 3:09-cv-2535

(JUDGE CAPUTO)

*********************************************************************************************

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

ANGELA RIMMER BELANGER, et al.,

     Plaintiffs,

        v.

MARK A. CIAVARELLA, et al.,

     Defendants.

CIVIL ACTION NO. 3:10-cv-1405

(JUDGE CAPUTO)

## MEMORANDUM

Presently before the Court is Plaintiffs' Motion for Partial Summary Judgment of Liability on Impartial Tribunal Claims Against Defendant Ciavarella. (Doc. 1459.)[1] Plaintiffs seek summary judgment against Mark Ciavarella, a former Luzerne County Court of Common Pleas judge, for his non-judicial conduct which Plaintiffs assert set in motion and furthered a conspiracy that deprived them of their constitutional right to an impartial tribunal. Because the undisputed facts establish that Ciavarella's non-judicial acts subjected Plaintiffs to a deprivation of their constitutional right to an impartial tribunal, the motion for partial summary judgment will be granted.

## I. Relevant Factual Background

This civil action arises out of the alleged conspiracy related to the construction of juvenile detention facilities, and subsequent detainment of juveniles in these facilities, orchestrated by two former Luzerne County Court of Common Pleas judges, Michael Conahan ("Conahan") and Mark Ciavarella ("Ciavarella"). Plaintiffs in this action seek redress from the former judges, as well as the individuals and business entities involved in

---

[1]    Partial summary judgment is sought by Plaintiffs in Case Nos. 09-286 ("*Wallace*"), 09-291 ("*Conway*"), 09-357 (*"H.T."*), and 09-630 ("*Humanik*") of the consolidated cases. (Doc. 1459.)

3

the construction and operation of these facilities, for the alleged unlawful conspiracy and resulting deprivations of Juvenile Plaintiffs' rights. The alleged conspiracy and resulting injury to Plaintiffs are described in the two operative complaints, the Master Complaint for Class Actions ("CAC") filed by Class Plaintiffs in *H.T.* and *Conway* (Doc. 136), and the Master Long Form Complaint ("IC") filed by Individual Plaintiffs in *Wallace* and *Humanik*. (Doc. 134.)

The Complaints assert the following claims against Ciavarella: (A) violation of Juvenile Plaintiffs' right to an impartial tribunal (CAC Count I; IC Count III); (B) conspiracy to violate Juvenile Plaintiffs' right to an impartial tribunal (CAC Count II; IC Count III); (C) violation of Juvenile Plaintiffs' right to counsel and/or to a knowing, intelligent, and voluntary guilty plea (CAC Count III; IC Count III); (D) conspiracy to deprive Juvenile Plaintiffs of their right to counsel and/or to a knowing, intelligent, and voluntary guilty plea (CAC Count IV; IC Count III); (E) violation of the civil RICO Act, 18 U.S.C. § 1962(c) (CAC Count V; IC Count I); (F) conspiracy to violate the civil RICO Act, 18 U.S.C. § 1962(d) (CAC Count VII; IC Count II); and (G) civil conspiracy (IC Count VIII). On July 27, 2009, Ciavarella filed a motion to dismiss the Complaints in their entirety as to him on the basis of judicial immunity.[2]

By Memorandum and Order dated November 20, 2009, Ciavarella's motion to dismiss was granted in part and denied in part. *See Wallace v. Powell*, No. 9-286, 2009 WL 4051974 (M.D. Pa. Nov. 20-2009). In that Memorandum, I noted that "[b]ecause the law requires that judges no matter how corrupt, who do not act in the clear absence of jurisdiction while performing a judicial act, are immune from suit, former Judge Ciavarella will escape liability for the vast majority of his conduct in this action." *Id*. at *9. Specifically,

---

[2]     Conahan also filed a motion to dismiss based on the doctrines of judicial and legislative immunities. (Doc. 216.)

4

I held that Ciavarella's courtroom acts, namely, the "determinations of delinquency and the sentences imposed," were judicial acts shielded by judicial immunity. *Id*. at *8. Thus, Ciavarella's motion to dismiss was granted as to his "courtroom conduct." *Id*. at *10.

However, because not "*every* act of [Ciavarella] was judicial in nature," the remainder of his motion to dismiss based on judicial immunity was denied. *Id*. at *8 (emphasis in original). In particular, the doctrine of judicial immunity did not provide Ciavarella protection for the allegations relating to non-judicial acts. *Id*. at *10. For instance, Ciavarella's role "in coercing probation officers to change their recommendations is outside the role of a judicial officer" and not protected by judicial immunity. *Id*. at *8. Thus, as to Ciavarella's non-judicial conduct, his motion to dismiss was denied. *See id*. at *10.

On September 8, 2010, Ciavarella filed his Answers with Affirmative Defenses to the Complaints. (Docs. 578; 579.) Thereafter, the actions proceeded to discovery. Additionally, by Memorandum and Order dated May 14, 2013, the motions filed by Plaintiffs in *H.T.* and *Conway* for class certification as to all issues of Defendants' liability was granted, (Docs. 1409; 1410), and a dispositive motion deadline was set for November 4, 2013. (Docs. 1420; 1437.)

On November 4, 2013, Plaintiffs filed the instant motion for partial summary judgment as to liability on their impartial tribunal claims against Ciavarella, a statement of facts, and brief in support of the motion. Plaintiffs, while reserving their rights to appeal, "seek summary judgment against Ciavarella in the context of the Court's immunity ruling." (Doc. 1460, 3 n.2.) Ciavarella's brief in opposition was due on November 29, 2013. *See* Fed. R. Civ. P. 5(b)(2)(c); Fed. R. Civ. P. 6(d); M.D. Pa. L.R. 7.6. Ciavarella has failed to file a brief in opposition or otherwise oppose Plaintiffs' motion. As such, Plaintiffs' motion for partial summary judgment is ripe for disposition.

5

## II. Legal Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Wright v. Corning*, 679 F.3d 101, 103 (3d Cir. 2012) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995)). A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. *See Edelman v. Comm'r of Soc. Sec.*, 83 F.3d 68, 70 (3d Cir. 1996). Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one. *Anderson*, 477 U.S. at 248. An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id*. Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law. *See* 2D Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2727 (2d ed.1983). The moving party may present its own evidence or, where the non-moving party has the burden of proof, simply point out to the court that "the non-moving party has failed to make a sufficient showing on an essential element of her case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

"When considering whether there exist genuine issues of material fact, the court is

required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). Once the moving party has satisfied its initial burden, the burden shifts to the non-moving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law. *Anderson*, 477 U.S. at 256–57. The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990).

"To prevail on a motion for summary judgment, the non-moving party must show specific facts such that a reasonable jury could find in that party's favor, thereby establishing a genuine issue of fact for trial." *Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265, 270 (3d Cir. 2007) (citing Fed. R. Civ. P. 56(e)). "While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla." *Id*. (quoting *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005)). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

### III. Discussion

As noted, Plaintiffs filed their motion for partial summary judgment against Ciavarella, statement of undisputed facts, and brief in support on November 4, 2013. Ciavarella, however, has failed to oppose Plaintiffs' motion. Plaintiffs' motion for partial summary judgment is thus deemed unopposed. Moreover, because Ciavarella failed to file a statement of material facts controverting Plaintiffs' properly filed statement of facts, all

material facts set forth in Plaintiffs' Statement (Doc. 1459-2) will be deemed admitted pursuant to Middle District of Pennsylvania Local Rule 56.1. *See* M.D. Pa. L.R. 56.1 (providing, in pertinent part, that "[s]tatements of material fact in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements. All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party."). Ciavarella likewise failed to submit any evidence in response to that submitted by Plaintiffs. Nonetheless, I must still analyze the merits of Plaintiffs' motion to determine whether summary judgment is appropriate. *See Lorenzo v. Griffith*, 12 F.3d 23, 28 (3d Cir. 1993); *Anchorage Associates v. Virgin Islands Board of Tax Review*, 922 F.2d 168, 174-75 (3d Cir. 1990); *Moultrie v. Luzerne Cnty. Prison*, No. 06–1153, 2008 WL 4748240, at *2 (M.D. Pa. Oct. 27, 2008).

## A.     Undisputed Facts

Plaintiffs' Statement of Facts (Doc. 1459-2) as to which there is no genuine issue of dispute and supporting Exhibits (Doc. 1459, Exs. 1-30) establish the following:

### 1.     The Conspiracy

At all relevant times to this litigation, Ciavarella and Conahan were judges of the Court of Common Pleas for Luzerne County, Pennsylvania. (*Plaintiffs' Statement of Material Facts* ("*Plfs.' SMF*"), Doc. 1459-2, ¶ 20.) Conahan served as president judge of the court between 2002 and 2007. (*Id*. at ¶ 21.) Ciavarella served as judge of the juvenile court from 1996 until September 2001, then again from January 2002 through June 2008. (*Id*. at ¶ 22.)

In late 1999, Ciavarella approached Conahan and suggested that they bring together a team that had the financial ability to build a new juvenile detention facility. (*Ciavarella Test.*, 13:1-7.) At Ciavarella's initiative, Conahan assembled a meeting of individuals, including Robert Powell ("Powell"), that potentially had the financial resources to construct

a new facility. (*Ciavarella Test.*, 13:10-18.) Ciavarella subsequently contacted Robert Mericle ("Mericle") about becoming involved in the project at the suggestion of Conahan. (*Ciavarella Test.*, 16:4-12.) Ultimately, Mericle acquired property for the juvenile detention facility in Pittston, Pennsylvania, and Powell and his partner formed PA Child Care ("PACC") to build the juvenile detention facility. (*Plfs.' SMF*, ¶¶ 27-28.)

Constructing the detention facility initially proved difficult for PACC's owners because they faced hurdles acquiring financing. (*Id*. at ¶ 29.) In particular, the lenders they approached indicated that they were unwilling to loan money unless they had a concrete agreement ensuring repayment. (*Id*.) On or around July 11, 2001, Powell informed Conahan that unless there was an agreement with either Luzerne County or some other entity that could promise that children would be sent to PACC, they would not be able to build the facility. (*Id*. at ¶ 30.) Powell then developed a plan which called for the president judge to sign a placement guarantee to show to lenders. (*Powell Test.*, 119:7-16.) Because Conahan would not become president judge until January 2002, the parties waited to go forward with the plan to build the facility. (*Plfs.' SMF*, ¶ 31.) After Conahan became president judge, he signed a placement guarantee agreement stating that the Luzerne County Court of Common Pleas would pay PACC rent for a new facility in monthly installments which amounted to $1,314,000 annually. (*Id*. at ¶ 32.) As a result, PACC was able to obtain over $12,000,000 in financing. (*Id*.)

Ciavarella learned of the placement guarantee agreement shortly after it was signed, and he knew that the agreement required Luzerne County to make payments to PACC. (*Ciavarella Test.*, 109:7-110:19.) Ciavarella, however, never told anyone about the agreement. (*Id*. at 112:20-22.)

Once Conahan became president judge, he informed the Luzerne County Commissioners that the court would no longer send juveniles to the existing Luzerne County

9

Juvenile Detention Center (the "River Street facility"). (*Id*. at 107:17-18.) Ciavarella also had no intention of sending any juveniles to the River Street facility. (*Id*. at 108:9-12.) Conahan did not seek any funds for the operation of the River Street facility, (*id*. at 107:14-16), and he instructed the Luzerne County Probation Department to return the facility's license to the Pennsylvania Department of Public Welfare. (*Powell Test.*, 125:15-19.)

Ciavarella assisted PACC in getting the facility off the ground. In particular, Ciavarella helped PACC hire the employees of the old facility, which further ensured that the River Street facility could not re-open. (*Id*. at 124:4-125:1.) Ciavarella and Conahan also appeared on television on December 19, 2002 to discuss the need to shut down the River Street facility. (*Ciavarella Test.*, 83:24-84:11, 88:5-13). Ciavarella later acknowledged that he "was not doing anything in [his] official capacity as a judge" when he gave the interview. (*Id*. at 86:18-19.) According to Ciavarella, his actions, together with the actions of Conahan, put the River Street facility out of business. (*Ciavarella Test.*, 108:13-17.) Ciavarella was also aware that closing the River Street facility would benefit PACC. (*Id*. at 87:23-88:1.)

In order to ensure the success of the PACC facility, Powell was told by Conahan that Ciavarella would need to be taken care of financially. (*Powell Test.*,127:25-128:8.) In January 2003, Powell signed an agreement back-dated to February 19, 2002 stating that Mericle would pay him a referral fee once the construction of the PACC facility was completed. (*Id*. at 130:12-131:2.) Powell knew, however, that the approximately $1,000,000 was not intended for him but was intended for Ciavarella and Conahan. (*Id*. at 131:10-12.)

On January 16, 2003, at the direction of Conahan, Powell drafted a document instructing Mericle to pay $610,000 to Robert Matta ("Matta."). (*Id*. at 132:20-133:1.) The money was wire transferred to Matta on January 21, 2003. (*Matta Test.*, 95:4-10.) On January 28, 2003, Matta transferred the $610,000 to Beverage Marketing of PA, Inc. (*Id*.

at 95:19-23.)  On January 28, 2003, $330,000 was transferred from Beverage Marketing to Ciavarella's bank account, and on April 30, 2003 and July 15, 2003, $75,000 was wired from Beverage Marketing to Ciavarella's account. (*Plfs.' SMF*, ¶¶ 49-51.)

After the PACC facility opened in February 2003, (*Plfs.' SMF*, ¶ 82), Ciavarella and Conahan kept track of the number of children sent to the facility and how PACC was doing financially. (*Powell Test.*, 139:17-140:14.)  Ciavarella continued to monitor the profitability of PACC until 2008. (*Plfs.' SMF*, ¶ 53.)

Powell's company, Vision Holdings, and his business partner's company, CIS, doing business as Western PA Child Care ("WPACC"), entered into a new contract with Mericle Construction in June 2004 to construct a juvenile detention and treatment facility in western Pennsylvania. (*Powell Test.*, 157:6-9.)  The WPACC facility was completed in July 2005. (*Plfs.' SMF*, ¶ 56.)  When the WPACC facility was completed, Mericle paid Conahan and Ciavarella an additional $1,000,000. (*Mericle Test.*, 31:10-13.)  Similar to the payments related to the PACC facility, bogus financial transactions were used to conceal the payments from Mericle to Conahan and Ciavarella through Powell in connection with the WPACC facilty. (*Powell Test.*, 160:6-25.)  With respect to the second two payments from Mericle to Conahan and Ciavarella, Ciavarella provided the directions as to where the money should be sent. (*Plfs.' SMF*, ¶ 58.)

In February 2006, Mericle Construction completed a 12 bed addition to the PACC facility. (*Mericle Test.*, 38:14-39:12.)  Mericle paid $150,000 to the former judges for the privilege of building the addition to the PACC facility. (*Id*. at 38:19-22.)

Acting on behalf of other Private Defendants in this action, Powell made payments, including from PACC's funds, to Conahan and Ciavarella. (*Plfs.' SMF*, ¶ 63.)  These payments included checks and wire transfers to Pinnacle Group of Jupiter, an entity controlled by Conahan and Ciavarella, (*id*.), and Powell falsely documented the payments

for various legitimate reasons, such as "rent prepay," "marina prepay," "reserving lease," "rental," and "slip rental fee" to conceal that the payments were for Conahan and Ciavarella. (*Powell Test.*, 145:15-152:21.) These payments totaled at least $590,000 in draws taken by Powell from the PACC account. (*Id*. at 153:9-20.)

Between 2003 and 2007, Ciavarella admitted that he was paid more than $2,700,000 and that he concealed all of the payments. (*Ciavarella Test.*, 116:3-9, 128:1-17.) The payments were concealed by Ciavarella because he knew it "wouldn't look good" if he was receiving payments from Powell while also sending juveniles to his facility. (*Id*. at 128:1-17.)

Between 2003 and 2007, Ciavarella sent anywhere from 217 to 330 juveniles to placement each year. (*Plfs.' SMF*, ¶ 84.) However, between 2009 and 2011, the Luzerne County juvenile court sent between 31 and 38 juveniles for placement each year. (*Id*. at ¶ 85.)

Ciavarella also testified in a hearing conducted in *Joseph v. Scranton Times*, No. 2166-C-2009, in the Lehigh County Court of Common Pleas that he had a duty to disclose material information relevant to his ability to engage in impartial discretionary decision-making. (*Plfs.' SMF*, ¶ 69.) Ciavarella admitted that he violated this duty, and he further acknowledged that during the relevant time period he never informed any of the juveniles who appeared before him that he was receiving money from PACC, WPACC, or Powell. (*Id*. at ¶ 70.)

### 2.    Pennsylvania Supreme Court King's Bench Proceedings

In light of the events described above, the United States Attorney for the Middle District of Pennsylvania, on January 26, 2009, filed a Bill of Information alleging two counts of fraud against Ciavarella and Conahan. (*Plfs.' SMF*, ¶ 1.) Shortly thereafter, on February 11, 2009, the Pennsylvania Supreme Court assumed plenary jurisdiction and appointed the Honorable Arthur E. Grim as Special Master "to review all Luzerne County juvenile court

adjudications and dispositions that have been affected by the recently-revealed criminal allegations." (*In re: J.V.R.*, No. 81 MM 2008, Feb. 11, 2009 Order.) The Pennsylvania Supreme Court found:

> Ciavarella admitted under oath that he had received payments from Robert Powell, a co-owner of the PA Child Care and Western PA Child Care facilities, and from Robert K. Mericle, the developer who constructed the juvenile facilities, during the period of time that Ciavarella was presiding over juvenile matters in Luzerne County. It is a matter of record that Ciavarella routinely committed juveniles to one or another of these facilities. It is also a matter of record that Ciavarella failed to disclose his ties to Powell, much less the financial benefits he received in connection with the facilities to which he routinely committed Luzerne County juveniles. Ciavarella's admission that he received these payments, and that he failed to disclose his financial interests arising from the development of the juvenile facilities, thoroughly undermines the integrity of all juvenile proceedings before Ciavarella. Whether or not a juvenile was represented by counsel, and whether or not a juvenile was committed to one of the facilities which secretly funneled money to Ciavarella and Conahan, this Court cannot have any confidence that Ciavarella decided any Luzerne County juvenile case fairly and impartially while he labored under the specter of his self-interested dealings with the facilities.

(*In re: J.V.R.*, No. 81 MM 2008, Slip. Op. (Oct. 29, 2009) (per curiam)). Thus, the Pennsylvania Supreme Court concluded that "given the nature and extent of the taint, this Court simply cannot have confidence that <u>any</u> juvenile matter adjudicated by Ciavarella during this period was tried in a fair and impartial manner." (*Id*. (emphasis in original).)

### 3.   Ciavarella and Conahan's Criminal Proceedings

As noted, on January 26, 2009, the United States Attorney for the Middle District of Pennsylvania filed a Bill of Information alleging two counts of fraud against Ciavarella and Conahan. (*Plfs.' SMF*, ¶ 1.) The Bill described a conspiracy among the judges and at least two other unnamed parties to conceal $2,600,000 in payments to the judges from the owners of PA Child Care ("PACC") and Western PA Child Care ("WPACC"). (*Id*.) Ciavarella and Conahan, pursuant to plea agreements they had reached with the United States, pled guilty to these counts, but the plea agreements were rejected by the Court. (*Id*. at ¶¶ 2-3.)

On September 9, 2009, a federal grand jury returned a 48-count indictment against Ciavarella and Conahan alleging racketeering, fraud, money laundering, extortion, bribery,

and federal tax violations in connection with the construction and operation of juvenile detention facilities owned by PACC and WPACC. (*Id*. at ¶ 4.)[3] Ciavarella was subsequently re-indicted on September 29, 2010 in a 39-count superseding indictment. (*Id*. at ¶ 8.) Ciavarella pled not guilty to the charged offenses. (*Id*. at ¶ 9.)

Ciavarella proceeded to trial, and the jury returned a verdict finding Ciavarella guilty of 12 of the 39 counts of the superseding indictment, including racketeering, racketeering conspiracy, money laundering conspiracy, conspiracy to defraud the United States, mail fraud, and filing false tax returns. (*Id*. at ¶ 10.)  On August 11, 2011, Ciavarella was sentenced to serve 28 years in prison. (*Id*. at ¶ 11.)

### 4.    Robert Powell and Robert Mericle's Criminal Proceedings

On June 9, 2009, the United States Attorney for the Middle District of Pennsylvania filed a two-count Bill of Information against Robert Powell. (*Id*. at ¶ 13.)  Powell plead guilty and was sentenced to serve 18 months in prison. (*Id*. at ¶¶ 14-15.)  Robert Mericle also pled guilty to misprison of a felony.  He has yet to be sentenced. (*Id*. at ¶ 16.)

### B.    Plaintiffs' Motion for Partial Summary Judgment

Plaintiffs seek partial summary judgment on their claims against Ciavarella for violation of their right to an impartial tribunal and conspiracy to violate their right to an impartial tribunal as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.  Plaintiffs' claims are brought pursuant to 42 U.S.C. § 1983. Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage . . . subjects, or causes to be subjected, any citizen . . . or other person . . . to the deprivation of any rights, privileges, or immunities secured by the

---

[3]     Conahan entered a guilty plea on July 23, 2010, and he was adjudicated guilty as to Count 2 of the indictment and sentenced to a term of imprisonment of 210 months.

Constitution and laws, shall be liable to the party injured, . . ." 42 U.S.C. § 1983. "To establish liability under 42 U.S.C. § 1983, a plaintiff must show that the defendants, acting under color of law, violated the plaintiff's federal constitutional or statutory rights, and thereby caused the complained of injury." *Elmore v. Cleary*, 399 F.3d 279, 281 (3d Cir. 2005) (citing *Sameric Corp. of Del., Inc. v. City of Phila.*, 142 F.3d 582, 590 (3d Cir. 1998)). Plaintiffs seek summary judgment as to liability against Ciavarella on the impartial tribunal claims for his non-judicial acts that set the conspiracy in motion and furthered the conspiracy.

### 1.    Under Color of Law

Under § 1983, Plaintiffs must establish that Ciavarella was acting under color of law. "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West v. Atkins*, 487 U.S. 42, 49, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326, 61 S. Ct. 1031, 1043, 85 L. Ed. 1368 (1941)). Here, the undisputed facts confirm that at all times relevant to Ciavarella's non-judicial acts alleged in the Complaints and for which summary judgment is sought, Ciavarella was a Luzerne County Court of Common Pleas judge cloaked with the authority of state law. (*Plfs.' SMF*, ¶¶ 20, 22.) Ciavarella was therefore acting under color of state law. *Cf. Lopez v. Vanderwater*, 620 F.2d 1229, 1236 (7th Cir. 1980) (rejecting state court judge's claim that "[i]f jurisdiction is absent or the act is not judicial, counsel maintains, the color of law requirement is not met; if the color of law requirement is met, the act is judicial and jurisdiction is present," because "[a]cceptance of this theory would remove the limitations on absolute judicial immunity discussed above and render judges immune from any suit whatsoever under § 1983.").

## 2. Deprivation of Constitutional Rights

According to Plaintiffs, the undisputed facts demonstrate that their federal constitutional rights to an impartial tribunal were violated when they appeared in Ciavarella's courtroom.

"The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases." *Marshall v. Jericho*, 446 U.S. 238, 242, 100 S. Ct. 1610, 64 L. Ed. 2d 182 (1980). Indeed, "it is axiomatic that '[a] fair trial in a fair tribunal is a basic requirement of due process.'" *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 129 S. Ct. 2252, 173 L. Ed. 2d 1208 (2009) (quoting *In re Murchinson*, 349 U.S. 133, 136, 75 S. Ct. 623, 99 L. Ed. 2d 942 (1955)). As such, "a criminal defendant is guaranteed the right to a fair and impartial tribunal." *Richardson v. Quarterman*, 537 F.3d 466, 474 (5th Cir. 2008) (citing *Bracy v. Gramley*, 520 U.S. 899, 117 S. Ct. 1793, 138 L. Ed. 2d 97 (1997)); *Alley v. Bell*, 307 F.3d 380, 386 (6th Cir. 2002); *United States v. Farhad*, 190 F.3d 1097, 1105 (9th Cir. 1999); *United States v. Cross*, 128 F.3d 145, 148 (3d Cir. 1997). Embodied in the guarantee of an impartial tribunal is the absolute right to a criminal proceeding conducted by a judge free of bias or pecuniary motivation. *See, e.g., Ward v. Village of Monroeville*, 409 U.S. 57, 61-62, 93 S. Ct. 80, 34 L. Ed. 2d 267 (1972); *Tumey v. Ohio*, 273 U.S. 510, 532, 47 S. Ct. 437, 71 L. Ed. 749 (1927). The Supreme Court has emphasized that the inquiry as to a judge's bias in the due process context requires an objective determination considering "not whether the judge is actually, subjectively biased, but whether the average judge in his position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.'" *Caperton*, 556 U.S. at 2262, 129 S. Ct. 2252.

I previously held that Plaintiffs "sufficiently established a violation of their federal constitutional rights for purposes of their § 1983 impartial tribunal claims." *Wallace v. Powell*, No. 09-286, 2012 WL 2590150, at *9 (M.D. Pa. July 3, 2012). The Pennsylvania

Supreme Court has similarly found that Plaintiffs suffered a violation of their constitutional right to a fair trial before an impartial tribunal. *See id*. (citing *In re: J.V.R.*, No. 81 MM 2008, Slip. Op. (Oct. 29, 2009) (per curiam)). Accordingly, as there is no genuine dispute that all Juvenile Plaintiffs who appeared before Ciavarella during the relevant time period were denied their constitutional right to an impartial tribunal, this element is established.

### 3. Liability for Non-Judicial Acts

As discussed in detail above, Ciavarella is immune from suit for his judicial acts. As a result, "Ciavarella will escape liability for the vast majority of his conduct in this action." *Wallace*, 2009 WL 4051974, at *9. Nevertheless, judicial immunity does not shelter Ciavarella's "non-judicial conduct." *Id*. at *9-10.

In view of my prior decision, Plaintiffs contend that Ciavarella is liable for his non-judicial acts which set in motion and furthered the conspiracy that resulted in the deprivation of Juvenile Plaintiffs' right to an impartial tribunal. Judicial acts include those "which are traditionally done by judges [such as] issuing orders, resolving cases and controversies, making rulings, and sentencing criminal defendants." *Wallace*, 2009 WL 4051974, at *7. Plaintiffs argue that Ciavarella engaged in a number of non-judicial acts for which he is not protected by judicial immunity, namely, his role in closing the River Street facility, his enactment and expansion of a zero tolerance policy, and his out-of-court conduct which initiated and thereafter concealed the conspiracy.

### a. Closing of the River Street Facility

First, Plaintiffs contend that the undisputed facts entitle them to summary judgment on their impartial tribunal claims against Ciavarella relating to his role in closing the River Street facility. Presented with a threat that the Luzerne County Commissioners would continue to fund and staff the county-run River Street facility, Ciavarella and Conahan worked together to ensure that the old facility would be closed. (*Plfs.' SMF*, ¶¶ 38-42, 73-

77.) In particular, Ciavarella and Conahan appeared on television in December 2002 to urge the shutdown of the River Street facility. (*Id*. at ¶ 73.) Ciavarella also assisted PACC hire employees from the River Street facility by setting up interviews. (*Id*. at ¶¶ 43, 75.) As a result, Ciavarella ensured that the River Street facility could not re-open, effectively putting the facility out of business. (*Id*. at ¶¶ 41-42.)

Ciavarella is not entitled to judicial immunity for his role in closing the River Street facility. That is, appearing on television urging a shutdown of a county-run detention facility and facilitating hiring decisions for a private detention facility are not functions "normally performed by a judge." *Wallace*, 2009 WL 4051974, at *7 (quoting *Stump v. Sparkman*, 435 U.S. 349, 362, 98 S. Ct. 1099, 55 L. Ed. 2d 331 (1978)). During Ciavarella's criminal trial, he acknowledged that he was not performing any official duties when he took part in the television interview. *(Plfs.' SMF*, ¶ 74.) Moreover, aiding PACC in staffing its facility with employees of the River Street facility also falls outside the traditional role of a judge. *Cf. Forrester v. White*, 484 U.S. 219, 229, 108 S. Ct. 538, 98 L. Ed. 2d 555 (1988) ("personnel decisions made by judges[ ] are often crucial to the efficient operation of public institutions (some of which are at least as important as the courts), yet no one suggests that they give rise to absolute immunity from liability in damages under § 1983.").

### b. Zero Tolerance Policy

Second, Plaintiffs argue that the enactment of a zero tolerance policy was not a judicial act. While Ciavarella served as judge of the juvenile court, he enacted an administrative policy that dictated instances in which probation officers had to file charges against and detain juveniles in Luzerne County. (*Plfs.' SMF*, ¶¶ 79-82.) Ciavarella expanded his zero tolerance policy in February 2003, the same month PACC opened, to require that children on probation be violated and detained for any violation of their probation, including zero tolerance for drug and alcohol violations, not attending school, not

18

attending appointments, or violating curfew. (*Id.* at ¶ 80.) Under this policy which was distributed to all juvenile probation officers on February 20, 2003, (*id.* at ¶ 82), Ciavarella eliminated juvenile probation officers' discretion to informally adjust juveniles' charges. (*Id.* at ¶ 79.)

Ciavarella's enactment and expansion of a zero tolerance policy dictating how probation officers were to handle violations of probation and other charging decisions fall outside the scope of judicial action. "Administrative decisions, even though they may be essential to the very functioning of the courts, have not similarly been regarded as judicial acts." *Forrester*, 484 U.S. at 228, 108 S. Ct. 538. Under Pennsylvania law, probation officers have the authority to informally adjust allegations before a delinquency petition is filed. *See* 42 Pa. Cons. Stat. Ann. § 6323; Pa. R. Juv. Ct. P. 312 ("At any time prior to the filing of a petition, the juvenile probation officer may informally adjust the allegation(s) if it appears: (1) an adjudication would not be in the best interest of the public and the juvenile; (2) the juvenile and the juvenile's guardian consent to informal adjustment with knowledge that consent is not obligatory; and (3) the admitted facts bring the case within the jurisdiction of the court."). Moreover, "coercing probation officers to change their recommendations is outside the role of a judicial officer. Probation officers are to advise the court, not the other way round, on sentencing matters." *Wallace*, 2009 WL 4051974, at *8. In adopting the zero tolerance policy, Ciavarella was acting in an administrative capacity, and acts such as that which involve "supervising court employees and overseeing the efficient operation of a court- may have been quite important in providing the necessary conditions of a sound adjudicative system. The decision[ ] at issue, however, [was] not [itself] judicial or adjudicative." *Forrester*, 484 U.S. at 229, 108 S. Ct. 538. Because Ciavarella's enactment and expansion of the zero tolerance policy were non-judicial acts, judicial immunity does not shield this conduct.

### c.    Additional Out-of-Court Actions

Finally, Ciavarella is not sheltered from liability for his out-of-court conduct that was not judicial in nature.  Ciavarella initiated the plan by approaching Conahan and suggesting that they bring together a team that had the financial ability to construct a new detention facility. (*Plfs.' SMF*, ¶¶ 23-26.)  Ciavarella also connected Powell and Mericle. (*Id*. at ¶ 26.)  Ciavarella's failure to disclose the payments he received from Mericle and Vision Holdings also furthered the conspiracy.  Specifically, Ciavarella took steps to conceal the more than $2,700,000 he and Conahan received from Mericle and Powell starting in 2003. (*Id*. at ¶ 66.)  Indeed, Ciavarella sought to conceal the payments because knew that it would not look good that he was receiving payments from Powell while sending juveniles to his detention facility. (*Id*. at ¶ 67.)  In that regard, Ciavarella instructed Mericle where to send the second and third payments. (*Id*. at ¶ 58.)  This out-of-court conduct was not judicial in nature, and, as such, is not protected by judicial immunity.

### 4.    Causation

Lastly, Plaintiffs must establish that Ciavarella "caused the complained of injury." *Elmore*, 399 F.3d at 281.  I previously indicated that the "setting in motion" theory of causation would be applied to individual Defendants in this case. *See Wallace*, 2012 WL 2590150, at *11.  This standard provides:

> A person 'subjects' another to the deprivation of a constitutional right, within the meaning of § 1983, if [that person] does an affirmative act, participates in another's affirmative acts, or omits to perform an act which [that person] is legally required to do that causes the deprivation of which complaint is made. Indeed, the requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.

*Id*. (quoting *Pilchesky v. Miller*, No. 05–2074, 2006 WL 2884445, at *4 (M.D. Pa. Oct.10, 2006).  While the Third Circuit has not squarely addressed the issue of causation in § 1983 cases, *see, e.g., Burnsworth v. PC Lab.*, 364 F. App'x 772, 775 (3d Cir. 2010), the "setting

in motion" theory has been accepted by multiple Circuit Courts of Appeals. *See, e.g., Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011); *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 51 (1st Cir. 2009); *Morris v. Dearborne*, 181 F.3d 657, 672 (5th Cir. 1999); *Sales v. Grant*, 158 F.3d 768, 776 (4th Cir. 1998); *Waddell v. Forney*, 108 F.3d 889, 894 (8th Cir. 1997); *Conner v. Reinhard*, 847 F.2d 384, 396-97 (7th Cir. 1988).

The undisputed facts establish that Ciavarella caused the violation of Plaintiffs' right to an impartial tribunal through the receipt and concealment, by himself and Conahan, of payments from and through other Defendants. In particular, Ciavarella knew he had a duty to disclose information relevant to his ability to engage in impartial decision-making, that he violated that duty, and that he never informed any juveniles that he was receiving payments from PACC, WPACC, or Powell. (*Plfs.' SMF*, ¶¶ 69-70.) The undisputed facts conclusively establish that Ciavarella knew that, as a result of his conduct, Plaintiffs would be deprived of their right to appear before an impartial tribunal.

Ciavarella's role in closing the River Street facility set the conspiracy in motion. Significantly, knowing that he stood to profit from the completion of the PACC facility, Ciavarella took steps to close the old facility and ensure that it would not re-open, resulting in PACC being the only detention facility in Luzerne County where a child could be detained. (*Id*. at ¶¶ 38-42, 73-77.) Yet, despite his financial stake in closing the River Street facility, he never disclosed this interest. (*Id*. at ¶¶ 44, 69-72.) Thus, the undisputed material facts establish that Ciavarella knew, or he should have known, that his role in the closure of the River Street facility and his concealment of his interest in its closure (and the resulting opening of the PACC facility while he served as judge of the juvenile court) would deprive Plaintiffs of an impartial tribunal.

The zero tolerance policy adopted by Ciavarella also furthered the conspiracy and caused the deprivation of Plaintiffs' right to an impartial tribunal. In 2003 when Ciavarella

knew he had a financial interest in PACC, he expanded the zero tolerance policy, which increased the number of juveniles that would appear before him and be detained. As a result of the expansion of this policy, more juveniles appeared before him and were subject to adjudication by a biased tribunal. And, as detailed above, Ciavarella's out-of-court conduct which set the conspiracy in motion, and which concealed the existence and the nature of the conspiracy, as well as the corresponding payments, all furthered the goals of the conspiracy. As the undisputed facts establish that Ciavarella knew or should have known that, as a result of his out-of-court conduct, Plaintiffs would not appear before an impartial tribunal when they were in his courtroom, the causation element of Plaintiffs' § 1983 impartial tribunal claims against Ciavarella is satisfied.

Therefore, for Ciavarella's conduct which is not protected by judicial immunity, *i.e.*, his non-judicial acts, Ciavarella is liable to Plaintiffs on their § 1983 impartial tribunal claims. In particular, Ciavarella's non-judicial acts detailed above set in motion and/or caused the deprivation of Plaintiffs' right to an impartial tribunal as he initiated the scheme to construct a new detention facility, he assisted in closing the River Street facility, and he expanded a policy which increased the number of juveniles that appeared before him. And, these acts were all taken without Ciavarella ever disclosing, and, in fact, while he took affirmative steps to conceal his financial interest in the success of PACC and WPACC. Accordingly, pursuant to 42 U.S.C. § 1983, Ciavarella subjected Plaintiffs to a deprivation of their constitutional right to an impartial tribunal. For the conduct which Ciavarella is not shielded by judicial immunity, he is liable to Plaintiffs on their § 1983 impartial tribunal claims

### IV. Conclusion

For the above stated reasons, Plaintiffs' motion for partial summary judgment against Defendant Ciavarella will be granted. Judgment will be entered in Plaintiffs' favor and against Ciavarella for his conduct which is not protected by judicial immunity on the claims

for violation of Juvenile Plaintiffs' right to an impartial tribunal (CAC Count I; IC Count III), and conspiracy to violate Juvenile Plaintiffs' right to an impartial tribunal (CAC Count II; IC Count III).  A determination of damages will be made at a later date.

An appropriate order follows.


January 9, 2014                                   /s/ A. Richard Caputo
Date                                                    A. Richard Caputo
                                                           United States District Judge