**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

FLORENCE WALLACE, et al.,

     Plaintiffs,

        v.

ROBERT J. POWELL, et al.,

     Defendants.

CIVIL ACTION NO. 3:09-cv-286

(JUDGE CAPUTO)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

WILLIAM CONWAY, et al.,

     Plaintiffs,

        v.

MICHAEL T. CONAHAN, et al.,

     Defendants.

CIVIL ACTION NO. 3:09-cv-0291

(JUDGE CAPUTO)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

H.T., et al.,

     Plaintiffs,

        v.

MARK A. CIAVARELLA, JR., et al.,

     Defendants.

CIVIL ACTION NO. 3:09-cv-0357

(JUDGE CAPUTO)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

SAMANTHA HUMANIK,

    Plaintiff,

      v.

MARK A. CIAVARELLA, JR., et al.,

    Defendants.

CIVIL ACTION NO. 3:09-cv-0630

(JUDGE CAPUTO)

**MEMORANDUM**

Plaintiffs in this consolidated action comprising both individual cases and class actions seek final approval of a settlement agreement (the "Settlement") between Plaintiffs and Defendants PA Child Care, LLC, Western PA Child Care, LLC, and Mid-Atlantic Youth Services, Corp. (collectively "Provider Defendants"). (Doc. 1527.)  The Settlement received preliminary approval on November 27, 2013.  Now, following the final approval hearing held on June 10, 2014, Plaintiffs seek final certification of the Class for settlement, approval of the Settlement, and an award of attorneys' fees and costs.  For the reasons that follow, the Class will be certified, the Settlement will be approved, and attorneys' fees and costs will be awarded as requested.

### I. Background

**A.     Facts**

This civil action arises out of the alleged conspiracy related to the construction of two juvenile detention facilities, and subsequent detainment of juveniles in these facilities, orchestrated by two former Luzerne County Court of Common Pleas judges, Michael Conahan ("Conahan") and Mark Ciavarella ("Ciavarella").  The juvenile detention facilities,

2

PA Child Care ("PACC") and Western PA Child Care ("WPACC"),[1] were both constructed by Mericle Construction, Inc.  Plaintiffs in this action, juveniles or the parents of juveniles who appeared before Ciavarella, seek redress from the former judges, as well as the individuals and business entities involved in the construction and operation of these facilities, for the alleged unlawful conspiracy and resulting deprivations of Juvenile Plaintiffs' rights.

The individual and class complaints assert, in part, the following causes of action against Provider Defendants: (1) 42 U.S.C. § 1983 claims alleging a conspiracy to violate Plaintiffs' constitutional rights; (3) violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, *et seq*.; (3) conspiracy to violate RICO; (4) state-law civil conspiracy; and (5) state-law false imprisonment.

## B.    Procedural History

The first of these consolidated cases, *Wallace v. Powell*, No. 09-CV-286, was filed on February 13, 2009 against multiple Defendants, including Provider Defendants. Although the case was originally filed as a class action, the *Wallace* complaint was subsequently amended in May 2009 to proceed on behalf of a number of individual juvenile and parent Plaintiffs.  Shortly thereafter, *Conway v. Conahan*, No. 09-CV-291, and *H.T. v. Ciavarella*, No. 09-CV-357, were filed as putative class actions, both naming Provider Defendants, among others, as Defendants.  Subsequently, *Humanik v. Ciavarella*, No. 09-

---

[1]    Under the Master Settlement Agreement, (Doc. 1448, Ex. B, *Master Settlement Agreement*, "*MSA,*" ¶ I.B), "Provider Parties" means "PACC, WPACC, and MAYS, and all related parties, successors, assigns, members, managers, shareholders, directors, officers, employees, agents, and attorneys."

CV-630, was filed on behalf of a single individual Plaintiff.  Collectively, these four cases are the "Civil Actions."

The *Conway* and *H.T.* Plaintiffs filed the Master Complaint for Class Actions in June 2009. (Doc. 136.)  At the same time, the *Wallace* and *Humanik* Plaintiffs filed the Master Long Form Complaint for Individual Actions. (Doc. 134.)

With respect to Provider Defendants, they filed various motions to dismiss the actions in 2010 and 2011.  The most recent motion to dismiss filed by Provider Defendants and resolved by the Court was granted in part and denied in part on November 30, 2011. (Doc. 1002.)

Shortly thereafter, on December 16, 2011, Plaintiffs and Robert K. Mericle and Mericle Construction, Inc. (collectively, the "Mericle Parties") filed a Joint Motion for Preliminary Approval of Class Action Settlement (the "Mericle Settlement"). (Doc. 1005.) On February 28, 2012, following a preliminary approval hearing, the Court issued an order conditionally approving the Mericle Settlement. (Doc. 1084.)  On November 19, 2012, the Court held a final approval hearing on the Mericle Settlement.  The Mericle Settlement was granted final approval on December 14, 2012. (Doc. 1268.)   As to the non-settling Defendants, including Provider Defendants, discovery remained ongoing at that time.

On February 1, 2013, Class Plaintiffs sought class certification for the litigation of all issues of Provider Defendants' liability to Plaintiffs pursuant to Federal Rule of Civil Procedure 23(b)(3). (Doc. 1319.)  By Memorandum and Order dated May 14, 2013, Class Plaintiffs' motion for class certification was granted. (Docs. 1409; 1410.)

Subsequently, on October 16, 2013, Plaintiffs and Provider Defendants filed a Joint

4

Motion for Preliminary Approval of Class Action Settlement. (Doc. 1448.) On November 27, 2013, following a preliminary approval hearing, the Court issued an order conditionally certifying the Settlement Class, preliminarily approving the class action settlement, and approving the notice plan as modified. (Doc. 1491.) On June 10, 2014, the Court held a final Settlement approval hearing.

## C.    The Settlement Agreement

Under the terms of the Settlement Agreement, the parties agree to settle the Actions to provide a final resolution of Plaintiffs' claims against Provider Defendants.[2] Solely for the purposes of settlement, two settlement classes are established: (1) the "Juvenile Settlement Class," which consists of "all juveniles who appeared before former Luzerne County Court of Common Pleas Judge Mark A. Ciavarella between January 1, 2003 and May 28, 2008 [the "Class Period"] who were adjudicated or placed by Ciavarella"; and (2) the "Parent Settlement Class," which is comprised of the parents and/or guardians of juveniles who appeared before Ciavarella between January 1, 2003 and May 28, 2008, and, who in connection with the juvenile's appearance: "(i) made payments in their own names or had wages, social security or other entitlements in their own names garnished or withdrawn; (ii)

---

[2]    The MSA defines the "Released Parties" as the "Provider Parties, the Zappala Parties, and any entity or individual that is not a Non-Released Party." (*MSA,* ¶ I.B.) The "Zappala Parties" are "Gregory R. Zappala ("Zappala"), Consulting Innovations and Services, Inc., and Southwestern PA Child Care, LLC, and all related parties, successors, assigns, members, managers, shareholders, directors, officers, employees, agents, and attorneys (excluding Non-Released Parties)." The "Non-Released Parties" are "Robert J. Powell; Powell Law Group P.C.; Beverage Marketing of PA., Inc.; Pinnacle Group of Jupiter, LLC; Vision Holdings, LLC; Mark A. Ciavarella, Jr.; Michael T. Conahan; and any of the foregoing persons' or entities' current or former employees, related parties, successors, or assigns (excluding the Provider Parties and Zappala parties)".

5

paid costs, fees, interest and/or penalties in their own name; (iii) suffered any loss of companionship and/or family integrity, . . . and who were not fully reimbursed as a result of claims made in connection with the Mericle Settlement, . . ." (*MSA*, ¶ I.A.)  The Juvenile Settlement Class and the Parent Settlement Class are referred to collectively as the "Settlement Classes," and the members of the Settlement Classes are the "Settlement Class Members." (*Id*.)

Pursuant to the terms of the Settlement Agreement, Provider Defendants agree to pay $2,500,000.00, which will be used to pay settlement costs and claims by Class Members. (*Id*. at ¶ II.A.)  Under the proposed Allocation Plan, basic benefits are available to qualifying Juvenile Settlement Class Members and Parent Settlement Class Members.

**1.    Juvenile Settlement Class Benefits**

Under the terms of the Allocation Plan, each qualifying Juvenile Settlement Class Member ("Juvenile") will receive settlement payment based on the following Settlement Categories:

   i.    **Probation**: Each qualifying Juvenile who never spent any time in PACC, WPACC, or any other juvenile detention facility as a result of an adjudication by former Judge Ciavarella during the period from January 1, 2003 through May 28, 2008 shall receive one (1) point.

   ii.   **Non-PACC/WPACC**: Each qualifying Juvenile who was placed in a detention facility as a result of an adjudication or placement by former Judge Ciavarella during the period from January 1, 2003 through May 28, 2008, but who never spent any time in either PACC and/or WPACC, shall receive two (2) points.

   iii.  **PACC/WPACC**: Each qualifying Juvenile who was placed in PACC or WPACC as a result of an adjudication or placement by former Judge Ciavarella during the period from January 1, 2003 through May 28, 2008 shall receive five (5) points.

**2.    Parent Settlement Class Benefits**

The Allocation Plan also provides that each qualifying Parent Settlement Class

Member ("Parent") will receive settlement payment as follows:

> Each qualifying Parent Settlement Class Member who, as a result of their child's adjudication or placement by former Judge Ciavarella during the period from January 1, 2003 through May 28, 2008, (i) made payments to Luzerne County or had wages, social security or other entitlements garnished or withdrawn by Luzerene County; or (ii) had court-ordered services or pay court-ordered costs, fees, interest, and/or penalties assessed against them or their child, shall receive the actual amount of monies paid, garnished, or withdrawn.

Parent Settlement Class Members will be paid from the Settlement Fund, however, only if they did not already receive full reimbursement as a result of the Mericle Settlement. Moreover, the total amount of funds to be paid to Parent Settlement Class Members may be reduced pro rata if the total exceeds the amount allocated to the Parent Settlement Class.

### 3.    Allocation Plan

The Cash Settlement Fund will be divided among qualifying Settlement Class Members according to the Plan of Allocation.  The Plan of Allocation provides that court-approved costs and fees will be taken out of the Cash Settlement Fund first.  The remaining funds will then be divided into (1) the Juvenile Fund; (2) the Parent Fund; and (3) the Holdback Fund.

    i.    **Juvenile Fund.** Seventy percent (70%) of the amount remaining in the Cash Settlement Fund will compromise the Juvenile Fund.  Each qualifying Juvenile Settlement Class Member will be assigned to a Settlement Category and awarded a number of points as described above.  The total number of points for all Juvenile Settlement Class Members will be divided in the Juvenile Fund to determine the monetary value of each point.  Each Juvenile Settlement Class Member will receive the value of each point multiplied by his or her points, as determined by his or her Settlement Category.

    ii.    **Parent Fund.** Fifteen percent (15%) of the amount remaining in the Cash Settlement Fund will comprise the Parent Fund.  Each qualifying Parent Settlement Class Member will be awarded a specific amount of money based on the amount of payments documented in the Records or in records provided by the Parent Settlement Class Members showing payments made in their own names.

If the total amount of funds to be paid to the Parent Settlement Class Members exceeds the total funds in the Parent Fund, Parent Settlement Class Members will be awarded their pro-rata share of the Parent Fund.   If the total amount of funds to be paid to Parent Settlement Class Members is less than the total funds in the Parent Fund, the remaining funds will pour over to the Juvenile Fund.

iii.    **Holdback Fund.** Fifteen percent (15%) of the amount remaining in the Cash Settlement Fund will comprise the Holdback Fund. The Holdback Fund will remain in escrow until all final accounting is complete for the Cash Settlement Fund.  With written permission from the Court, the Holdback Fund may be used to pay settlement costs and attorneys' fees.   The Holdback Fund will also be used to pay all costs of the appeal process, described below, and all additional payments to Settlement Class Members resulting from successful appeals.  If the funds remaining in the Holdback fund after payment of all costs, fees, and appeals, total $75,000 or more (3% of the gross Cash Settlement Fund), the remaining funds will be paid to the Juvenile Settlement Class Members in proportion to the number of points assigned to each Juvenile Settlement Class Member.   If the funds remaining in the Holdback Fund after payment of all costs, fees, and appeals, total less than $75,000, Class Counsel will seek permission from the Court regarding the distribution of the remaining funds.

(Doc. 1528, Ex. A, 7-8.)

Each Juvenile and Parent choosing to participate in the Settlement was required to complete a Proof of Claim Form providing necessary information and a release for counsel to obtain relevant records.  Based upon the responses of each Claimant and supporting documentation, the Claims Committee calculated the points for all Settlement Class Members who timely submitted claim forms.

However, in the event a Claimant believes that the Claims Committee "wrongly determined" his or her claim, the Settlement provides the Claimant with the option to appeal to a Court-appointed Special Master for Allocation Appeals.  Where an appeal is lodged by a Claimant, the Notice of Settlement provides:

The Special Master will re-assess the Claims Committee's decision.  This reassessment will include a complete review of your Proof of Claim Form, the information available in the Records, and any additional written documenation provided by you in support of your claim. If appropriate, the Special Master will change the Settlement Category assigned by the Claims Committee or the amount of your payment from the Cash Settlement Fund, and your award will

be adjusted under the terms of the Plan of Allocation.

(Doc. 1528, Ex. A, 8.)  The Notice of Settlement further provides that the "determinations by the Special Master are final and shall not be subject to any further review or appeal." (*Id*.)

To fund this Allocation Appeal Process, Class Counsel request that 15% of the Cash Settlement Fund not be distributed, but instead be held back in the Escrow Account for the benefit of any successful Allocation Appellant and the costs associated with the Allocation Appeal Process.  The requested hold back amount is thus $265,054.74.  As indicated above, in the event that the hold back amount is not fully depleted, the balance will be distributed in accordance with the terms of the Settlement Agreement.

In exchange for the relief provided under the Settlement Agreement, the named Plaintiffs and the Settlement Class Members will release and dismiss all claims against Provider Defendants.  In addition, Settlement Class Members agree and covenant not to sue PA Child Care, LLC, Western PA Child Care, LLC, and Mid-Atlantic Youth Service, Corp., or any of their affiliates as defined in the Settlement Agreement, over any matter which could have been alleged in these Civil Actions.

### 4.     Notice

Notice of the Settlement was disseminated to potential Settlement Class Members through a variety of means, including direct mailings, a toll-free call center, publication in newspapers, and a website.  With respect to direct mailings, Class Counsel mailed a total of 3,795 copies of the Notice of Settlement and Proof of Claim Form to the last known addresses of potential Class Members by first-class mail.  Additionally, the toll-free call center (the "Center") established by Class Counsel, which was open to receive calls twenty-

9

four (24) hours a day, seven (7) days a week, answered over 1,559 calls regarding the litigation and the terms of the Settlement.  The Center was staffed with non-lawyer customer service representatives trained to respond to particular questions regarding the terms of the Settlement.  And, when the Center's customer service representatives were unable to answer questions about the Settlement, they provided contact information to allow the callers to speak with Class Counsel, and Class Counsel all returned calls and answered questions from claimants and potential claimants about the settlement and the Proof of Claim Form.  Additionally, Class Counsel also caused the Notice of Settlement to be published in the *Times Leader* and the *Citizens' Voice*.  Finally, Class Counsel maintained a website containing information about the Settlement.  Since December 3, 2013, the website has received 2,552 visits.

Significantly, Plaintiffs' counsel indicated at the Fairness Hearing that the Claims Committee received 2,243 Proof of Claim Forms.  And, of those Forms received, 2,157 will be considered for payment, which amounts to a participation rate of ninety-six percent (96%).  In comparison, 2,019 Proof of Claims Forms were submitted for participation in the Mericle Settlement, and only 1,614 were considered for payment, resulting in a participation rate of eighty percent (80%).

## II. Discussion

### A.      Class Certification

Even though the Settlement Agreement has already been preliminarily approved, there must still be a final determination as to whether to certify the class and grant final approval of the Settlement. *See In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods.*

*Liab. Litig.*, 55 F.3d 768, 797 (3d Cir. 1995).  The Federal Rules of Civil Procedure provide

that class action settlements must be approved by the Court.  *See* Fed. R. Civ. P. 23(e)

("The claims, issues, or defenses of a certified class may be settled . . . only with the court's

approval.");  *see also Ripley v. Sunoco, Inc.*, 287 F.R.D. 300, 306 (E.D. Pa. 2012).

However, "the ultimate inquiry into the fairness of the settlement under Fed. R. Civ. P. 23(e)

does not relieve the court of its responsibility to evaluate Rule 23(a) and (b) considerations."

*In re Cmty. Bank of N. Va.*, 418 F.3d 277, 299 (3d Cir. 2005).

As such, "before approving a class settlement agreement, 'a district court first must

determine that the requirements for class certification under Rule 23(a) and (b) are met.'"

*Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 296 (3d Cir. 2011) (en banc) (quoting *In re Pet

Food Prods. Liab. Litig.*, 629 F.3d 333, 341 (3d Cir. 2010)).  Rule 23(a) of the Federal Rules

of Civil Procedure contains four threshold requirements which every putative class must

satisfy:

> (1) the class is so numerous that joinder of all members is impracticable; (2)
> there are questions of law or fact common to the class; (3) the claims or
> defenses of the representative parties are typical of the claims or defenses of
> the class; and (4) the representative parties will fairly and adequately protect
> the interests of the class.

Fed. R. Civ. P. 23(a).  These requirements are referred to as numerosity, commonality,

typicality, and adequacy of representation.   If these four prerequisites are satisfied, "a

district court must then determine that the proposed class fits within one of the categories

of class actions enumerated in Rule 23(b)." *Sullivan*, 667 F.3d at 296.  Plaintiffs seek

certification pursuant to Rule 23(b)(3), under which certification is proper where "the court

finds that the questions of law or fact common to class members predominate over any

questions affecting only individual members, and that a class action is superior to other

11

available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

The "[f]actual determinations necessary to make Rule 23 findings must be made by a preponderance of the evidence. In other words, to certify a class the district court must find that the evidence more likely than not establishes each fact necessary to meet the requirements of Rule 23." *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 257-58 (3d Cir. 2009) (quoting *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 320 (3d Cir. 2008)).

### 1.    Rule 23(a)

#### a.    Numerosity

The first requirement for a class action is that the class is so numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a).  "'No single magic number exists satisfying the numerosity requirement." *Logory v. Cnty. of Susquehanna*, 277 F.R.D. 135, 140 (M.D. Pa. 2011) (quoting *Florence v. Bd. of Chosen Freeholders*, No. 05–3619, 2008 WL 800970 at *6 (D. N.J. Mar. 20, 2008)).  However, the Third Circuit has opined that while there is technically no minimum class size, "generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001).

Here, the Settlement Classes are comprised of thousands of members.  As such, the numerosity requirement is satisfied. *See, e.g., Williams v. City of Phila.*, 270 F.R.D. 208, 215 (E.D. Pa. 2010) (numerosity requirement satisfied where putative class could number in the hundreds or thousands); *Zeno v. Ford Motor Co.*, 238 F.R.D. 173, 184 (W.D. Pa. 2006) (proposed class of 2,100 claimants sufficient to satisfy numerosity requirement of

12

Rule 23(a)).

### b.    Commonality

To satisfy Rule 23(a)(2), there must be "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a).  Plaintiffs must thus demonstrate that their claims "depend upon a common contention," the resolution of which "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal–Mart Stores, Inc. v. Dukes*, - - - U.S. - - -, 131 S. Ct. 2541, 2551, 180 L. Ed. 2d 374 (2011).  "Commonality does not require an identity of claims or facts among class members; instead, [t]he commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 184 (3d Cir. 2001) (internal quotation marks omitted); *see also Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 597-98 (3d Cir. 2012).  But, the Supreme Court recently indicated that "[c]ommonality requires the plaintiff to demonstrate that the class members have suffered the same injury." *Wal–Mart*, 131 S.Ct. at 2551 (citations and internal quotation omitted). That is, "[t]heir claims must depend upon a common contention. . . . That common contention, moreover must be capable of classwide resolution- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id*.

The commonality requirement is sufficiently satisfied in this case.  In particular, the claims of the Juvenile Settlement Class and the Parent Settlement Class stem from the construction, and subsequent operation, of two juvenile detention facilities.  Specifically, their claims turn on whether Defendants acted in conspiracy with Conahan and Ciavarella

13

to deprive Juvenile Plaintiffs of their constitutionally guaranteed rights, whether Defendants organized an association-in-fact enterprise, and whether Defendants participated in the affairs of an entity through a pattern of racketeering activity.  These claims are capable of classwide resolution, as they all "arise from the same nucleus of operative facts and involve the same legal theories" against Provider Defendants. *In re Processed Egg Prods. Antitrust Litig.*, 284 F.R.D. 249 (E.D. Pa. 2012).  Thus, the commonality prong of Rule 23(a)(2) is met.

### c.    Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).  "The concepts of typicality and commonality are closely related and often tend to merge." *Marcus*, 687 F.3d at 597 (citing *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir.1994)).  "The typicality criterion is intended to preclude certification of those cases where the legal theories of the named plaintiffs potentially conflict with those of the absentees by requiring that the common claims are comparably central to the claims of the named plaintiffs as to the claims of the absentees." *Baby Neal*, 43 F.3d at 57.  "Factual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory." *Id*. at 58 (citation omitted).  When analyzing typicality, a court must compare the situation of the proposed representative to that of the class as a whole by considering "the similarity of the legal theory and legal claims; the similarity of the individual circumstances on which those theories and claims are based; and the extent to which the proposed representative may

14

face significant unique or atypical defenses to her claims." *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 597 (3d Cir. 2009).

The claims of the Representative Plaintiffs, as identified in the Settlement Agreement, are typical of the Juvenile Settlement Class Members and the Parent Settlement Class Members.  With respect to the Juvenile Settlement Class, the gravamen of the Representative Plaintiffs' claims is that, as a result of the alleged conspiracy, Ciavarella and Conahan had an undisclosed financial interest and conflict-of-interest in adjudicating children delinquent and sending them to placement.  And, like all other Juvenile Settlement Class Members, the Representative Plaintiffs were denied their constitutional right to an impartial tribunal when they appeared before Ciavarella.  As such, the legal theories for all Juvenile Plaintiffs, that their adjudications were unconstitutional, will be the same.  Thus, the typicality requirement is satisfied as to the Juvenile Settlement Class.

The claims of the Parent Settlement Class Representatives are also typical of all Parent Settlement Class Members.  Specifically, all Parent Settlement Class Members assert RICO claims based on the alleged conspiratorial conduct of Defendants, which resulted in the payment of court fees, fines, interest, and penalties.  As the legal theories for all Parent Settlement Class Members will be the same, the typicality requirement for class certification under Rule 23(a)(3) is satisfied.

### d.      Adequacy of Representation

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  "The adequacy requirement has two components: (1) concerning the experience and performance of class counsel; and (2)

concerning the interests and incentives of the representative plaintiffs." *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 181 (3d Cir. 2012) (citing *In re Cmty. Bank of N. Va.*, 418 F.3d at 303).   Essentially, the adequacy inquiry considers whether "the putative named plaintiff has the ability and the incentive to represent the claims of the class vigorously, that he or she has obtained adequate counsel, and that there is no conflict between the individual's claims and those asserted on behalf of the class." *Hassine v. Jeffes*, 846 F.2d 169, 179 (3d Cir. 1988) (citations omitted).

The qualifications and performance of class counsel under Rule 23(a)(4) is based upon the factors set forth in Rule 23(g). *See Sheinberg v. Sorensen*, 606 F.3d 130, 132 (3d Cir. 2010) ("Although questions concerning the adequacy of class counsel were traditionally analyzed under the aegis of the adequate representation requirement of Rule 23(a)(4) . . . those questions have, since 2003, been governed by Rule 23(g)."). That subsection lists several non-exclusive factors that a district court must consider in determining "counsel's ability to fairly and adequately represent the interests of the class," Fed. R. Civ. P. 23(g)(1)(B), including: (1) "the work counsel has done in identifying or investigating potential claims in the action," (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action," (3) "counsel's knowledge of the applicable law," and (4) "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A).

Here, Class Counsel has the experience, skill, and qualification necessary to conduct this litigation.  In particular, the individual attorneys in this action have extensive experience in complex class action litigation involving mass actions and civil rights claims.  Consistent

16

with their qualifications, Class Counsel, throughout this litigation, has demonstrated considerable ability in prosecuting this case.  Specifically, Class Counsel has performed substantial work, and expended considerable time and resources, in presenting the facts and complex legal issues implicated in this litigation, as Class Counsel has prepared multiple complaints, responded to numerous motions to dismiss, engaged in mediation, and reviewed discovery.  Class Counsel has pursued this action vigorously and with great dedication on behalf of all Plaintiffs.  Thus, based on Class Counsel's work to date in this litigation, these attorneys have fairly and adequately represented the interests of the Settlement Class Members.

With respect to the second prong of the adequacy inquiry, the Third Circuit has "recognized that the linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class." *Dewey*, 681 F.3d at 183 (citations omitted).  The adequacy requirement "is designed to ferret out" intra-class conflicts, and to ensure that the named plaintiffs have the incentive to represent the claims of the class. *Id*. at 184 (citations omitted).  If any conflicts "undercut the representative plaintiffs' ability to adequately represent the class" they are "fundamental," such that class representation is structurally faulty and Rule 23(a)(4) cannot be satisfied. *Id*. at 184-85.

The Representative Plaintiffs fairly and adequately protected the interests of the Juvenile Settlement Class and the Parent Settlement Class in this action.  Here, the interests of the Representative Plaintiffs are consistent with the Settlement Class Members, and there appears to be no conflicts between or among the groups.  As discussed, the Representative Juvenile Plaintiffs were damaged as a result of Defendants' allegedly

17

unlawful conduct, and the Representative Juvenile Plaintiffs would have to prove the same

wrongdoing as the Juvenile Settlement Class Members to establish Provider Defendants'

liability.  Similarly, the Representative Parent Plaintiffs were damaged as a result of the

alleged conspiratorial conduct of Defendants, which resulted in the payment of court fees,

fines, interest, and penalties, and which would require all Parent Plaintiffs to demonstrate

the same wrongdoing to establish Defendants' liability.  Thus, as "the interests of the named

plaintiffs are not antagonistic to those of the class[es]," *Marsden v. Select Med. Corp.*, 246

F.R.D. 480, 485 (E.D. Pa. 2007) (citing *In re Cmty. Bank of N. Va.*, 418 F.3d at 303), and

nothing in the record suggests that the Representative Plaintiffs acted in conflict with the

Settlement Classes or failed to vigorously pursue the claims of all Class Members, *see, e.g.,*

*Esslinger v. HSBC Bank Nev., N.A.*, No. 10-3213, 2012 WL 5866074, at *4 (E.D. Pa. Nov.

20, 2012), the adequacy requirement is satisfied by the Representative Plaintiffs.

### 2.    Rule 23(b)(3)

Besides meeting the four threshold requirements under Rule 23(a), a proposed class

must also satisfy one of the three sub-parts of Rule 23(b). *See In re Warfarin Sodium*

*Antitrust Litig.*, 391 F.3d 516, 527 (3d Cir. 2004).  Here, Plaintiffs seek to maintain this class

action under Rule 23(b)(3), which allows for a class action to proceed if "questions of law

or fact common to class members predominate over any questions affecting only individual

members, and [ ] a class action is superior to other available methods for fairly and

efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  These requirements are

commonly separated into the "predominance" and "superiority" requirements. *See In re*

*Cmty. Bank of N. Va.*, 418 F.3d at 308-09.

### a.    Predominance

The predominance inquiry under Rule 23(b)(3) "'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Sullivan*, 667 F.3d at 297 (quoting *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 266 (3d Cir. 2009)). "Parallel with Rule 23(a)(2)'s commonality element, which provides that a proposed class must share a common question of law or fact, Rule 23(b)(3)'s predominance requirement imposes a more rigorous obligation upon a reviewing court to ensure that issues common to the class predominate over those affecting only individual class members." *Id*. (citing *Ins. Brokerage*, 579 F.3d at 266).   Thus, the Third Circuit "'consider[s] the Rule 23(a) commonality requirement to be incorporated into the more stringent Rule 23(b)(3) predominance requirement, and therefore deem it appropriate to analyze the two factors together, with particular focus on the predominance requirement.'" *Id*. (quoting *Ins. Brokerage*, 579 F.3d at 266). And, Third Circuit precedent "provides that the focus of the predominance inquiry is on whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct." *Id*. at 298.

In assessing predominance, "a court at the certification stage must examine each element of a legal claim 'through the prism' of Rule 23(b)(3)." *Marcus*, 687 F.3d at 600 (quoting *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 630 (3d Cir. 2011)). Thus, "[a] plaintiff must 'demonstrate that the element of [the legal claim] is capable of proof at trial through evidence that is common to the class rather than individual to its members.'" *Id*. (quoting *Hydrogen Peroxide*, 552 F.3d at 311).

With respect to the 42 U.S.C. § 1983 claims brought by the Juvenile Settlement

19

Class Members, Juvenile Plaintiffs would have to demonstrate that Provider Defendants "(1) acting under color of law, (2) violated the plaintiff[s'] federal constitutional or statutory rights, (3) and thereby caused the complained of injury." *Elmore v. Cleary*, 299 F.3d 279, 281 (3d Cir. 2005) (citing *Sameric Corp. of Del., Inc. v. City of Phila.*, 142 F.3d 582, 590 (3d Cir. 1998)).  As to the "state actor" inquiry, proof of this element would focus solely on Provider Defendant's conduct.  And, due to the alleged conspiratorial conduct, each member of the Juvenile Settlement Class claims that they appeared before a partial tribunal, depriving them of their constitutional rights.  Because the § 1983 claims against Provider Defendants rely on the same course of conduct, common proof of such conduct, and damage as a result of that conduct, the predominance requirement of Rule 23(b)(3) is met for these claims.

Next, "[t]he elements of a civil RICO claim under § 1962(c) are (1) the conducting of, (2) an enterprise, (3) through a pattern, (4) of racketeering activity, (5) which results in injury to the plaintiffs' business or property." *Tapp v. Proto*, 718 F. Supp. 2d 598, 625 (E.D. Pa. 2010) (citing *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S. Ct. 3275, 87 L. Ed. 2d 346 (1985)).  For a § 1962(d) claim, a plaintiff must establish "(1) an agreement to commit the predicate acts of fraud, and (2) knowledge that those acts were part of a pattern of racketeering activity conducted in such a way as to violate section 1962(a), (b), or (c)." *Rose v. Bartle*, 871 F.2d 331, 366 (3d Cir. 1989) (citing *Odesser v. Continental Bank*, 676 F.Supp. 1305, 1312 (E.D. Pa. 1987)).

Proving the first element of the § 1962(c) RICO claims in this case would involve common questions about the activities of Provider Defendants, and, whether Provider

20

Defendants participated or engaged in conduct with other Defendants. *See Ins. Brokerage*, 579, F.3d at 269.  The second element also involves common legal and factual questions, specifically whether an enterprise existed. *See id*. at 269-70.  Likewise, proof of the third and fourth elements would encompass common questions of law and fact, notably whether activities that constitute racketeering were occurring through the enterprise, and whether these racketeering activities were occurring in a pattern that could be established.  *See id*. at 270.  And, "[w]hile establishing an injury is not as conducive to common proof," "plaintiffs have presented a plausible theory for proving a class-wide injury as a result of the racketeering activities of the alleged enterprise." *Id*.  For the same reasons, the § 1962(d) claim focuses on the conduct of Defendants, and whether Defendants "conspire[d] to violate § 1962(c)." *Id*. at 269.  Thus, all elements of the alleged RICO violations involve common questions of law and fact.  Therefore, Plaintiffs adequately satisfy the predominance requirement of Rule 23(b)(3).

### b.    Superiority

 According to Rule 23(b)(3), the considerations relevant to the superiority inquiry include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).  "The superiority requirement asks a district court 'to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication.'" *In re Cmty. Bank of N. Va.*, 418 F.3d at 309 (quoting *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 632 (3d Cir. 1996), *aff'd*, 521 U.S. 591, 117

S. Ct. 2231, 138 L. Ed. 2d 689 (1997)).   And, when "confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, *see* Fed. Rule Civ. Proc. 23(b)(3)(D), for the proposal is that there be no trial." *Amchem*, 521 U.S. at 620, 117 S. Ct. 2231.

A class resolution in the manner proposed in the instant Settlement is superior to other available methods for resolution of this action against Provider Defendants.  First, proceeding as a class action in this case is far superior to allowing piecemeal litigation of the exact same claims in countless lawsuits. *See, e.g., Logory*, 277 F.R.D. at 146 (quoting *Stanford v. Foamex L.P.*, 263 F.R.D. 156, 174 n.22 (E.D. Pa. 2009)).  Second, where a claim is small in comparison to the costs of prosecuting a lawsuit, a class action allows for litigation costs to be spread among the injured parties. *See Processed Egg Prods.*, 284 F.R.D. at 264.  Indeed, "[a]ddressing the rights of those who would not otherwise be appropriately incentivized to bring their own singular claims was precisely the aim of the Advisory Committee in promulgating Rule 23(b)(3)." *Logory*, 277 F.R.D. at 146 (citing *Amchem*, 521 U.S. at 617, 117 S. Ct. 2231).  Third, this is an appropriate forum for concentrating the claims of the Settlement Classes because the Court has subject matter jurisdiction over the claims and personal jurisdiction over the parties. *See Esslinger*, 2012 WL 5866074, at *5.  Lastly, the difficulties in managing a class action need not be considered since the Settlement will avoid trial. *See Amchem*, 521 U.S. at 620, 117 S. Ct. 2231.  For these reasons, the superiority requirement is satisfied.

### 3.       Conclusion as to Class Certification for Settlement Purposes

Because all of the Rule 23(a) and (b)(3) requirements have been met, the Class will

be certified for settlement purposes.

**B.      Notice**

"In the class action context, the district court obtains personal jurisdiction over the absentee class members by providing proper notice of the impending class action and providing the absentees with the opportunity to be heard or the opportunity to exclude themselves from the class." *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 326 (3d Cir. 1998) (citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12, 105 S. Ct. 2965, 86 L. Ed. 2d 628 (1985)).  Rule 23 contains two distinct notice provisions. *See id*. at 326.  First, Rule 23(c)(2) requires that class members be given the best notice practicable, including individual notice to all members who can be identified through reasonable efforts. Fed. R. Civ. P. 23(c)(2).[3]  Second, Rule 23(e) requires all class members to be notified of the terms of any proposed settlement. Fed. R. Civ. P. 23(e).  This "notice is designed to summarize the litigation and the settlement" and "to apprise class members of the right and opportunity to inspect the complete settlement documents, papers, and pleadings filed in the litigation." *Prudential*, 148 F.3d at 327 (citation omitted).

Here, the Notice of the Provider Defendant Settlement contained the information

---

[3]      The notice, in clear and concise language, must state:

> (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2).

required by Rules 23(c)(2) and 23(e).  Specifically, the Notice detailed the nature of the action, the definitions of the Juvenile Settlement Class and the Parent Settlement Class, the claims of the Settlement Classes, the terms of the Settlement Agreement, and the right to object or request exclusion from the terms of the Settlement.  The Notice also informed members of their opportunity to be heard at the fairness hearing, to enter an appearance through an attorney of their choice, and that the Settlement would be binding on members that did not opt out.

Additionally, Plaintiffs' efforts to notify the Settlement Class Members satisfied the requirements of Rule 23 and due process.  The Notice was sent to potential Settlement Class Members by first-class mail based on the last known addresses of these individuals from the database used to administer the Mericle Settlement.  Notice was also published in two local newspapers, and information about the proposed Settlement was available through a detailed website.  Based on the extensive individual notice, as well as the published notice, the notice requirements of both Rule 23 and the Due Process Clause have been satisfied. *See Zimmer Paper Prods., Inc. v. Berger & Montague, P.C.*, 758 F.2d 86, 90 (3d Cir. 1985) ("first-class mail and publication regularly have been deemed adequate under the stricter notice requirements . . . of Rule 23(c)(2).").

## C.      Fairness of the Settlement

Certified federal class actions may only be settled with court approval. *See* Fed. R. Civ. P. 23(e).  While the approval of a class action settlement is committed to the sound discretion of the district court, "it can endorse a settlement only if the compromise is fair, adequate, and reasonable.'" *Eichenholtz v. Brennan*, 52 F.3d 478, 482 (3d Cir. 1995)

(quoting *Walsh v. Great. Atl. & Pac. Tea Co.*, 726 F.2d 956, 965 (3d Cir. 1983)).

The Third Circuit has identified nine factors, known as the *Girsh* factors, to be considered when determining whether a proposed class action settlement is fair, reasonable, and adequate. *See Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975). These factors are:

> (1) The complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Warfarin*, 391 F.3d at 534-35 (citing *Girsh*, 521 F.3d at 157). "The settling parties bear the burden of proving that the *Girsh* factors weigh in favor of approval of the settlement." *Pet Food*, 629 F.3d at 350 (citing *Gen. Motors*, 55 F.3d at 785).

### 1.    Complexity, Expense, and Duration of Litigation

The first *Girsh* factor "captures the probable costs, in both time and money, of continued litigation." *Warfarin*, 391 F.3d at 535-36. This litigation was commenced well over five years ago, and it encompasses a Class Period dating back to 2003. In order to prepare this action to proceed to trial against Provider Defendants, Plaintiffs would be required to expend considerable financial resources drafting and responding to further motions. And, as recognized by Plaintiffs, this case raises complex legal issues with respect to the RICO and § 1983 claims. Additionally, a trial on the merits would require hours of attorney preparation and the expenditure of hundreds of thousands of dollars. Likewise, even if this case proceeded to trial against Provider Defendants, a "complicated, lengthy trial," would ensue, and the "inevitable . . . post-trial motions and appeals would not only further prolong

the litigation but also reduce the value of any recovery to the class." *Warfarin*, 391 F.3d at

536.  As such, the first *Girsh* factor weighs in favor of approving the Settlement.

> **2.     Reaction of the Class to the Settlement**

"The second *Girsh* factor 'attempts to gauge whether members of the class support

the settlement.'" *Warfarin*, 391 F.3d at 536 (quoting *Prudential*, 148 F.3d at 318).  The Third

Circuit has noted that a vast disparity between the number of potential class members who

received notice of a proposed settlement and the number of objectors "creates a strong

presumption that this factor weighs in favor of the Settlement." *In re Cendant Corp. Litig.*,

264 F.3d 201, 235 (3d Cir. 2001).  Similarly, "[c]ourts have generally assumed that 'silence

constitutes tacit consent to the agreement.'" *Gen. Motors*, 55 F.3d at 812 (quoting *Bell Atl.

Corp. v. Bolger*, 2 F.3d 1304, 1313 n.15 (3d Cir. 1993).

The reaction of the class strongly favors approval of the Settlement.  Here, following

extensive notice, both to potential Settlement Class Members individually and by general

publication, none of the Settlement Class Members objected to the proposed Settlement.

Furthermore, only ten (10) Settlement Class Members opted out of the Settlement.  The

lack of objections and the low number of opt outs demonstrate a general acceptance of the

Settlement by Class Members. *See, e.g.,  Stoetzner v. U.S. Steel Corp.,* 897 F.2d 115,

118–19 (3d Cir.1990) (approving settlement where "only" 29 objections were made in a

281–member class); *Alexander v. Washington Mut., Inc.*, No. 07-4426, 2012 WL 6021098,

at *8 (E.D. Pa. Dec. 4, 2012) (reaction of class favored approval of settlement where only

five class members opted out and no formal objections were filed to the settlement); *Ripley

v. Sunoco, Inc.*,287 F.R.D.300, 312 (E.D. Pa. 2012) (reaction of the class favored approval

26

of settlement where "less than 1 percent of the eligible class members opted out of the settlement").  Also indicative of overwhelming support by the Class is that, when compared to the Mericle Settlement, more than 200 additional Proof of Claim Forms were submitted for payment with respect to the Provider Settlement.   Yet, despite this increase, less Settlement Class Members opted out of the instant Settlement than the Mericle Settlement. The second *Girsh* factor thus strongly counsels in favor of settlement approval.

> ### 3.   Stage of the Proceedings and Amount of Discovery Completed

The third *Girsh* factor "captures the degree of case development that class counsel had accomplished prior to settlement," and allows the court to "determine whether counsel had an adequate appreciation of the merits of the case before negotiating." *Warfarin*, 391 F.3d at 537 (citation, quotations, & alterations omitted); *see also Gen. Motors*, 55 F.3d at 813 ("Given the purpose of this inquiry, . . . it is . . . appropriate to measure the stage by reference to the commencement of proceedings either in the class action at issue or in some related proceeding.").

When analyzing this *Girsh* factor, courts also examine whether the settlement resulted from arm's-length negotiations. *See In re Corel Corp. Sec. Litig.*, 293 F. Supp. 2d 484, 491 (E.D. Pa. 2003).  When the settlement results from arm's-length negotiations, the court will "afford[ ] considerable weight to the views of experienced counsel regarding the merits of the settlement." *McAlarnen v. Swift Transp. Co., Inc.*, Civ. A. No. 09–1737, 2010 WL 365823, at *8 (E.D. Pa. Jan. 29, 2010); *see also Corel Corp. Sec. Litig.*, 293 F. Supp. 2d at 491 ("Courts generally recognize that a proposed class action settlement is presumptively valid where, as in this case, the parties engaged in arm's length negotiations

after meaningful discovery."); *In re Gen. Instrument Sec. Litig.*, 209 F.Supp.2d 423, 431 (E.D. Pa. 2001) ("Significant weight should be attributed to the belief of experienced counsel that the settlement is in the best interests of the class.").

The Settlement was preliminarily approved in November 2013, almost five years after the commencement of this litigation. During that period, considerable time, effort, and money was expended by both parties, including the production and review of over 200,000 pages of documents and hundreds of Plaintiff Fact Sheets. Moreover, numerous pleadings and motions were filed, and responded to, by Plaintiffs and Provider Defendants. As such, at this stage of the proceedings "'the parties certainly had a clear view of the strengths and weaknesses of their cases.'" *McCoy v. Health Net, Inc.*, 569 F. Supp. 2d 448, 461 (D. N.J. 2008) (quoting *Bonett v. Educ. Debt Servs., Inc.*, No. 01-6528, 2003 WL 21658267, at *6 (E.D. Pa. May 9, 2003)). The third *Girsh* factor therefore weighs in favor of settlement approval.

### 4.  Risks of Establishing Liability

"The fourth *Girsh* factor 'examines what the potential rewards (or downside) of litigation might have been had class counsel decided to litigate the claims rather than settle them.'" *Sullivan*, 667 F.3d at 322 (quoting *Cendant*, 264 F.3d at 237). "[T]he more risks that Plaintiffs may face during litigation the stronger this factor favors approving a settlement." *Esslinger*, 2012 WL 5866074, at *9 (citing *Prudential*, 148 F.3d at 319). "The inquiry requires a balancing of the likelihood of success if 'the case were taken to trial against the benefits of immediate settlement.'" *In re Safety Components, Inc. Sec. Litig.*, 166 F. Supp. 2d 72, 89 (D. N.J. 2001) (quoting *Prudential*, 148 F.3d at 319).

28

As previously noted, Plaintiffs face a difficult task of proving all elements of their claims should these actions proceed to trial.  While Plaintiffs did not provide, in detail, the risks of establishing liability in this case, this is understandable in this case "[g]iven that the litigation [will] continue against other defendants, [and] the parties may [have been] reluctant to disclose fully and candidly their assessment of the proposed settlement's strengths and weaknesses that led them to settle separately." *Processed Egg Prods.*, 284 F.R.D. at 271 (quoting David F. Herr, *The Manual for Complex Litigation* § 21.651, at 505 (4th ed. 2011)).

In addition, possible appeals, summary judgment motions, and trial still remain if the Settlement is not approved.  Thus, as "this case involves difficult factual and legal issues which would have translated into protracted litigation and accumulating expenses, in both time and money," *In re. Ins. Brokerage Antitrust Litig.*, 282 F.R.D. 92, 104 (D.N.J. 2012), this factor weighs in favor of approval.

### 5.      Risks of Establishing Damages

This factor "attempts to measure the expected value of litigating the action rather than settling it at the current time." *Cendant*, 264 F.3d at 239 (quoting *Gen. Motors*, 55 F.3d at 816).  "This factor, like the last, involves a balancing of risks." *In re CertainTeed Corp. Roofing Shingle Prods. Liab. Litig.*, 269 F.R.D. 468, 488 (E.D. Pa. 2010).

In this case, even if Plaintiffs were able to establish liability, they would still be tasked with proving the appropriate amount of damages against Provider Defendants.  For Juvenile Plaintiffs that only seek presumed damages with respect to the § 1983 claims, proving damages may not present a daunting task.  However, Juvenile Plaintiffs seeking more than presumed damages may face significant obstacles in establishing individual damages.  The

issue of individualized damages could very well lead to a "battle of the experts" with no guarantee whom the jury would believe. *See Cendant*, 264 F.3d at 236.  Furthermore, even if damages are established, post-trial motions and appeals present increased risk to the recovery of damages.

In the instant case, the risks of establishing damages factor is neutral.  Although some Plaintiffs may face difficulty in establishing individualized or special damages, establishing presumed damages suffered by the Juvenile Settlement Class as a whole would not present the same risks.  As such, this factor does not weigh for or against approval.

### 6.    Risks of Maintaining the Class Action through Trial

The sixth *Girsh* factor "measures the likelihood of obtaining and keeping a class certification if the action were to proceed to trial" in light of the fact that "the prospects for obtaining certification have a great impact on the range of recovery one can expect to reap from the class action." *Sullivan*, 667 F.3d at 322.  "The value of a class action depends largely on the certification of the class because, not only does the aggregation of the claims enlarge the value of the suit, but often the combination of the individual cases also pools litigation resources and may facilitate proof on the merits." *Gen. Motors*, 55 F.3d at 817. However, a "district court retains the authority to decertify or modify a class at any time during the litigation if it proves to be unmanageable." *Id*. (citing *Prudential*, 148 F.3d at 321).

Here, as noted, the Classes have already been certified for all issues of liability. Nevertheless, the Third Circuit has recognized that "[t]here will always be a 'risk' or possibility of decertification, and consequently the court can always claim this factor weighs

in favor of settlement." *Prudential*, 148 F.3d at 321.

### 7.    Ability of Defendants to Withstand a Greater Judgment

The seventh *Girsh* factor considers "whether the defendants could withstand a judgment for an amount significantly greater than the settlement." *Warfarin*, 391 F.3d at 537-38 (citation, quotations, & alteration omitted).   Here, Plaintiffs retained a forensic accountant, Stephen J. Scherf ("Scherf"), to assess and review Provider Defendants' financial records  and its ability to withstand a judgment greater than that provided by the Settlement. (Doc. 1528, Ex. N.)  Scherf opines "within a reasonable degree of professional certianty that the payment of $2.5 million was fair and reasonable given the financial condition and equity value of the Provider Defendants after consideration of the significant third party debt obligations totaling $20,036,722 (comprised of a mortgage to PACC of $7,616,653, a mortgage to WPACC of $12,195,069 and a line of credit to Mays of $225,000)." (*Id*.)  Scherf also concludes that "the payout over the time periods provided above are fair and reasonable given the Provider Defendants' financial obligations." (*Id*.)  Based on this evidence, the seventh *Girsh* factor weighs in favor of approval.

### 8.    Range of Reasonableness of the Settlement in Light of the Best Possible Recovery and the Attendant Risks of Litigation

"The last two *Girsh* factors evaluate whether the settlement represents a good value for a weak case or a poor value for a strong case. The factors test two sides of the same coin: reasonableness in light of the best possible recovery and reasonableness in light of the risks the parties would face if the case went to trial." *Warfarin*, 391 F.3d at 538 (citing *Prudential*, 148 F.3d at 322).  "Notably, in conducting the analysis, the court must guard against demanding too large a settlement based on its view of the merits of the litigation;

after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution." *Sullivan*, 667 F.3d at 324.

To assess the reasonableness of a settlement in a case, such as this, seeking primarily monetary relief, a court should compare "'the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing . . . with the amount of the proposed settlement.'" *Warfarin*, 391 F.3d at 538 (quoting *Prudential*, 148 F.3d at 322).

The Settlement provides for $2,500,000.00 to be distributed to the Settlement Class, less attorneys' fees and costs.  Although Plaintiffs do not set forth an exact estimation of the damages they would likely recover if successful, Plaintiffs discuss the obstacles that must be surmounted before any damages may be awarded.   These hurdles could substantially reduce, if not eliminate, any recovery by Plaintiffs.   Additionally, Plaintiffs retained an ethics expert, Professor Lynn A. Baker, to offer an opinion as to fairness and reasonableness of the Settlement.   Professor Baker has served as an ethics expert in multiple large-dollar, large-group settlements.  Professor Baker, based upon her experience, opines that all of the components of the Settlement Agreement were fair, reasonable, and appropriate under the circumstances.

Here, "while the exact maximum possible recovery in this case may be unclear, the extensive risks of litigation are not." *Esslinger*, 2012 WL 5866074, at *10 (finding eighth and ninth *Girsh* factors favored settlement approval despite lack of exact estimation as to likely recovery).   Based on these attendant risks, the final two *Girsh* factors weigh in favor of approval of the Settlement.

### 9.    *Prudential* Factors

In addition to the *Girsh* factors, courts in the Third Circuit also consider the following factors outlined in *Prudential*:

> the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other facts that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved-or likely to be achieved-for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.

*Prudential*, 148 F.3d at 323.

In this case, none of the *Prudential* factors weigh against approval, and three (3) factors weigh in favor of settlement: (1) whether members are accorded the right to opt out; (2) whether any provisions for attorneys' fees are reasonable; and (3) whether the procedure for processing individual claims under the Settlement is fair and reasonable.  As noted, the Settlement Class Members were given the opportunity to opt out.  The attorneys' fees sought by Class Counsel, as discussed below, are reasonable in light of the time expended litigating this action.  And, finally, the procedure for processing individual claims under the Settlement is fair and reasonable, and the procedure has been explained clearly in forms available to Settlement Class Members.

### 10.    Summary of *Girsh* and *Prudential* Factors

After consideration of the *Girsh* factors and the relevant *Prudential* factors, I conclude that the Settlement is fair, reasonable, and adequate under Rule 23(e).  As discussed, a few factors do not weigh in favor of settlement.  Not every factor need weigh in favor of settlement, however, in order for the Settlement to be approved. *See Cendant*, 264 F.3d

at 242-43 (affirming final settlement approval when not all factors weighed in favor of approval). Because the ultimate balance of the *Girsh* and *Prudential* factors when considered together weigh in favor of settlement, the Settlement will be approved.

**D.   Attorneys' Fees and Costs**

Under Rule 23(h) of the Federal Rules of Civil Procedure, "[i]n a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h).  A district court must conduct a "thorough judicial review of fee applications . . . for all class action settlements." *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 299 (3d Cir. 2005) (quoting *Prudential*, 148 F.3d at 333 (internal quotations omitted)).

> In assessing attorneys' fees, courts typically apply either the percentage-of-recovery method or the lodestar method. The percentage-of-recovery method is generally favored in common fund cases because it allows courts to award fees from the fund "in a manner that rewards counsel for success and penalizes it for failure." *Prudential*, 148 F.3d at 333 (internal quotations omitted). The lodestar method is more typically applied in statutory fee-shifting cases because it allows courts to "reward counsel for undertaking socially beneficial litigation in cases where the expected relief has a small enough monetary value that a percentage-of-recovery method would provide inadequate compensation" or in cases where the nature of the recovery does not allow the determination of the settlement's value required for application of the percentage-of-recovery method. *Id*. Regardless of the method chosen, we have suggested it is sensible for a court to use a second method of fee approval to cross-check its initial fee calculation. *Id*.

*Id*. As such, the percentage-of-recovery method will be employed to determine the proper fee to award Class Counsel, and then the lodestar will be utilized as a cross-check to ensure the reasonableness of the award. *See id*.

**1.   Application of the Percentage-of-Recovery Method**

Class Counsel requests a combined award of common benefit attorneys' fees and expenses of $732,968.36 under the percentage-of-recovery method.  The Third Circuit has

instructed a district court to consider ten factors when undertaking a percentage-of-recovery analysis: (1) the size of the fund created and the number of beneficiaries; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; (7) awards in similar cases; (8) the value of benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations; (9) the percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained; and (10) any innovative settlement terms. *In re Diet Drugs*, 582 F.3d 524, 541 (3d Cir. 2009) (citations omitted).  The award factors, however, "'need not be applied in a formulaic way'" because each case is different, "'and in certain cases, one factor may outweigh the rest.'" *Rite Aid*, 396 F.3d at 301 (quoting *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000)).

        **a.**        **Size of the Fund and Number of Beneficiaries**

The Settlement Agreement establishes a common fund of $2,500,000.00 and notice has been disseminated to over 3,000 individuals.  In general, as the size of the settlement fund increases the percentage of the award decreases. *See Prudential*, 148 F.3d at 339. "The basis for this inverse relationship is the belief that '[i]n many instances the increase [in recovery] is merely a factor of the size of the class and has no direct relationship to the efforts of counsel.'" *Id*. (citing *In re First Fid. Bancorporation Sec. Litig.*, 750 F. Supp. 160, 164 n.1 (D. N.J. 1990)).  As explained below, Class Counsel's requested fees in this case

represent less than thirty percent (30%) of the common benefit fund, well within the range of reasonable fees, on a percentage basis, in the Third Circuit. *See, e.g., Sakalas v. Wilkes Barre Hosp. Co.*, No. 11-546, 2014 WL 1871919, at *5-8 (M.D. Pa. May 8, 2014) (approving award of twenty-seven percent (27%) of the common fund); *Craig v. Rite Aid Corp.*, No. 08-2317, 2013 WL 84928, at *12-13 (M.D. Pa. Jan. 7, 2013) (approving award of thirty-two percent (32%) of the fund).   And, with respect to the Mericle Settlement, I approved a combined award of attorneys' fees and costs of $4,335,000.00, which amounted to 24.4% of the $17,750,000.00 common benefit fund.   Accordingly, this factor weighs in favor of finding the fee request reasonable.

### b. Presence or Absence of Substantial Objections by Class Members

As discussed above with respect to the *Girsh* factors, no objections were filed to the Settlement by any Settlement Class Member.   Similarly, no objections have been filed to Class Counsel's fee application.   "The absence of objections supports the reasonableness of the fee request." *Frederick v. Range Resources-Appalachia, LLC*, No. 08-288, 2011 WL 1045665, at *10 (W.D. Pa. Mar. 17, 2011) (citing *In re Rent-Way Sec. Litig.*, 305 F. Supp. 2d 491, 514-15 (W.D. Pa. 2003)); *In re Amer. Inv. Life Ins. Co. Annuity and Mktg. & Sales Practices Litig.*, 263 F.R.D. 226, 244 (E.D. Pa. 2009) ("small number of objections and the objections' lack of merit indicate that the class is satisfied with the fee award").   This factor also weighs in favor of the requested award of attorneys' fees.

### c. Skill and Efficiency of the Attorneys Involved

The quality of representation of Class Counsel considers "'the quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing,

experience and expertise of the counsel, the skill and professionalism with which counsel prosecuted the case and the performance and quality of opposing counsel.'" *In re Ikon Office Solutions, Inc., Sec. Litig.*, 194 F.R.D. 166, 194 (E.D. Pa. 2000) (quoting *In re Computron Software, Inc.*, 6 F. Supp. 2d 313, 323 (D. N.J. 1998)).  As set forth in greater detail above, Class Counsel is highly experienced, as the  individual attorneys in this action have litigated numerous complex class actions involving mass actions and civil rights claims.  Additionally, Class Counsel's ability to successfully negotiate the Settlement "demonstrates the significant skill and expertise of counsel." *In re Processed Egg Prods. Antitrust Litig.*, No. 08-2002, 2012 WL 5467530, at *3 (E.D. Pa. Nov. 9, 2012).  Likewise, counsel for Provider Defendants has extensive experience defending complex litigation and class actions.  Thus, this factor supports the reasonableness of the fee award.

### d.      Complexity and Duration of the Litigation

The Third Circuit has stated that "complex and/or novel legal issues, extensive discovery, acrimonious litigation, and tens of thousands of hours spent on the case by class counsel" are "the factors which increase the complexity of class litigation." *In re Cendant Corp., PRIDES Litig.*, 243 F.3d 722, 741 (3d Cir. 2001).  These factors all support the requested fee award.  Class Counsel participated in mediation, engaged in discovery, and submitted numerous, well-researched filings.  Equally significant is the complex nature of this litigation, and the alleged judicial corruption scheme for which these actions seek redress.  Furthermore, the litigation proceeded against Provider Defendants for well over four years prior to the parties agreeing to the terms of the Settlement.  Therefore, the complexity and duration of the litigation supports the requested fee award.

37

### e.   Risk of Nonpayment

"This factor allows courts to award higher attorneys' fees for riskier litigation." *Esslinger*, 2012 WL 5866074, at * 13.  Here, Class Counsel undertook this complex civil rights/RICO litigation on a contingent fee basis without any guarantee of payment.  Class Counsel, in litigating this case, incurred hundreds of thousands of dollars in costs and expenses while facing the risk of not being reimbursed.  The risk of nonpayment, therefore, weighs in favor of granting the requested fee award. *See, e.g., Processed Egg Prods.*, 2012 WL 5467530, at *4 ("any contingency fee arrangement includes a risk of non-payment"); *Ripley*, 2012 WL 2402632, at *12 ("it follows, therefore, that there was a risk of nonpayment under a contingency arrangement").

### f.   Amount of Time Devoted by Class Counsel

According to the motion for attorneys' fees, attorneys, paralegals, and staff at Anapol Schwartz, along with the Dyller Law Firm, expended 2,280.37 hours working towards the settlement with Provider Defendants.  (Doc.1535, Ex. L.)  Additionally, since fees were awarded under the Mericle Settlement, attorneys and paralegals at Hangley Aronchick Segal Pudlin & Schiller expended 1,196.4 hours litigating this action, 1,015.3 hours of which were unrelated to the Mericle Settlement. (*Id*. at Ex. M.)  Attorneys at the Juvenile Law Center expended 725.56 hours prosecuting this litigation since November 1, 2012 (the first date after fees were awarded in connection with the Mericle Settlement), and 651.18 of these hours were unrelated to the Mericle Settlement. (*Id*. at Ex. N.) Lastly, from November 1, 2012, attorneys and paralegals at Caroselli Beachler McTiernan & Conboy, LLC expended 1,275 hours on the prosecution of this litigation; however, it is unclear from

38

Plaintiffs' submissions the number of these hours that were unrelated to the Mericle Settlement. (*Id*. at K.)   Upon reviewing the declarations submitted by Class Counsel, Counsel spent thousands of hours litigating claims in this action unrelated to the Mericle Settlement.   Furthermore, the amount of time spent on this case prior to final approval of the Settlement reflects the complexity of Plaintiffs' claims, not the inefficiency of their counsel.   And, the hours spent working on this matter prevented those individuals from litigating other cases.   This factor thus favors granting the motion for attorneys' fees.

### g.      Awards in Similar Cases

"In the Third Circuit, fee awards in common fund cases generally range from 19% to 45% of the fund." *Esslinger*, 2012 WL 5866074, at *15 (citing *Bredbenner v. Liberty Travel, Inc.*, No. 09–905, 2011 WL 1344745, at *15 (D. N.J. Apr. 8, 2011)).   "Many courts, including several in the Third Circuit, have considered 25% to be the 'benchmark' figure for attorney fee awards in class action lawsuits, with adjustments up or down for significant case-specific factors." *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 262 (D. Del. 2002) (gathering case law and awarding 22.5% in fees on a $10.01 million settlement fund). And, courts in the Third Circuit have found a thirty percent (30%) fee reasonable in cases raising violations of constitutional rights. *See, e.g., Delandro v. Cnty. of Allegheny*, No. 06-927, 2011 WL 2039099, at *14 (W.D. Pa. May 24, 2011) ("the Court finds that a percentage of thirty percent (30%) . . . is in fact identical to, the percentage awarded in a number of other strip-search class action settlements in this Circuit"); *Boone v. City of Phila.*, 668 F. Supp. 2d 693, 714 (E.D. Pa. 2009) ("30% fee percentage is commensurate with other strip-search class actions").   Therefore, the combined award of attorneys' fees and costs

amounting to approximately twenty-nine percent (29%) of the Settlement fund is reasonable.

### h.      Value of Benefits Attributed to Class Counsel

The eighth factor the Court must consider is the degree to which the benefits of the settlement are attributable to Plaintiffs' counsel as opposed to the efforts of other actors, such as, for example, government investigators. *See In re Diet Drugs*, 582 F.3d at 541. While government investigation uncovered the alleged conspiracy orchestrated by Ciavarella and Conahan which resulted in the indictment of the former judges, "[t]here is no contention . . . that the settlement could be attributed to work done by other groups, such as government agencies." *Esslinger*, 2012 WL 5866074, at *14.  This factor supports the requested fee.

### i.      Negotiated Fee in a Contingent Fee Arrangement

In private contingency fee cases, attorneys routinely negotiate agreements for between thirty percent (30%) and forty percent (40%) of the recovery. *See In re Ins. Brokerage Antitrust Litig.*, 282 F.R.D. 92, 123 (D. N.J. 2012); *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 194 (E.D. Pa. 2000). The requested fee is below this range.

### j.      Innovative Settlement Terms

In their submission, Class Counsel did not identify any particularly "innovative" terms in the Settlement Agreement.  Thus, this factor neither weighs against nor for the proposed fee request.  *See, e.g, McDonough v. Toys "R" Us, Inc* ., 834 F. Supp. 2d 329, 345 (E.D. Pa. 2011) ( "In the absence of any innovative terms, this factor neither weighs in favor or against the proposed fee request.").

### 2.    Lodestar Cross-Check

"The lodestar crosscheck is intended to gauge the reasonableness of the attorneys' fee award as a whole." *Milliron v. T–Mobile, USA, Inc.*, 423 F. App'x 131, 136 (3d Cir. 2011). In performing the lodestar cross-check, the court multiplies "the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys." *Rite Aid*, 396 F.3d at 305.  Then, the court may apply a multiplier to "account for the contingent nature or risk involved in a particular case and the quality of the attorneys' work." *Id* at 305–06.  If the multiplier that must be used in order to obtain the result reached by application of the percentage-of-recovery method "is too great, the court should reconsider its calculation under the percentage-of-recovery method." *Id*. at 306.  But, because the cross-check is not the primary analysis in common fund cases, it does not require "mathematical precision [ ] or bean-counting." *Id*.  In evaluating the hours reasonably spent on the case, the court does not have to "review actual billing records" but can "rel[y] on summaries submitted by the attorneys." *See id*.

Here, as best can be determined from Counsel's submissions, the lodestar for work performed by Counsel since November 1, 2012 unrelated to the Mericle Settlement is $1,618,843.00.[4]  Based on the approximate number of hours spent prosecuting this action since November 1, 2012 that are not related to the Mericle Settlement, the hourly billable

---

[4]     As stated, this figure is an estimation because Counsel did not indicate the number of hours worked by attorneys and paralegals at Caroselli Beachler McTiernan & Conboy, LLC since November 1, 2012 that were unrelated to the Mericle Settlement.

rate for Counsel of record is approximately $300.00.[5]  In assessing whether the hourly billable rate is reasonable, courts should apply "blended billing rates that approximate the fee structure of all the attorneys who worked on the matter." *Rite Aid*, 396 F.3d at 306.  The hourly rate should be reasonable in light of "the given geographical area, the nature of the services provided, and the experience of the attorneys." *Id*. at 305.  While the requested hourly rates are higher than those typically approved in cases in the Scranton-Wilkes-Barre area, *see, e.g., Supinski v. UPS, Inc.*, No. 06-CV-0793, 2012 WL 2905458, at *2 (M.D. Pa. July 16, 2012) (awarding hourly rate of $250.00); *Carey v. City of Wilkes-Barre*, No. 05-CV-2093, 2011 WL 1900169, at *2 (M.D. Pa. May 19, 2011) (awarding hourly rate of $225.00), a higher hourly billable rate is acceptable in light of the extensive experience that Class Counsel collectively shares and the complex legal services it provided in this case. Moreover, this hourly rate is consistent with the rate awarded to Counsel in connection with the Mericle Settlement. *See Wallace v. Powell*, 288 F.R.D. 347, 376 (M.D. Pa. 2012) (lodestar cross-check demonstrated hourly billing rate of $308.00).

And, using a lodestar of $1,618,843.00, the award of $732,968.36 in combined fees and expenses yields a multiplier of significantly less than one.  Thus, the lodestar cross-check supports the requested fee award.

Additionally, the requested fee when considered in combination with the Mericle Settlement supports a finding that the fee sought pursuant to the Provider Settlement is reasonable.  With respect to the $17,750,000.00 Mericle Settlement, Counsel sought a

---

[5]     This assumes that all hours worked by attorneys and paralegals at Caroselli Beachler McTiernan & Conboy, LLC since November 1, 2012 were unrelated to the Mericle Settlement.

combined award of attorneys' fees and costs of $4,335,000.00, and, at that time, Counsel had spent 34,900.48 hours prosecuting this matter. *See Wallace*, 188 F.R.D. at 373-76. Combined with the Provider Settlement, the claims against Mericle and Provider Defendants have settled for $20,250,000.00, and Counsel fees of $5,067,968.36 amounts to approximately twenty-five percent (25%) of the aggregate settlement value. Moreover, Counsel's lodestar for the period before the Mericle Settlement was $10,754,199.35. *See Wallace*, 188 F.R.D. at 376. And, Counsel's most recent submission indicates that attorneys, paralegals, and staff have expended at least 5,479.33 hours litigating this matter since November 1, 2012, with a lodestar for this time frame of $1,697,837.00. Thus, the aggregate lodestar for both settlement totals $12,452,036.35 for 40,739.81 hours worth of work, which amounts to an hourly rate of approximately $306.00. Thus, the fee requested here is also reasonable when considered in connection with the fee sought and awarded under the Mericle Settlement.

### 3.    Reimbursement of Costs and Expenses

In addition to an award of attorneys' fees, Plaintiffs' counsel seeks reimbursement of expenses in the amount of $107,968.36. The Federal Rules of Civil Procedure provide that a court "may award reasonable attorney's fees and nontaxable costs" to Plaintiffs' counsel. Fed. R. Civ. P. 23(h). "Reimbursement is particularly appropriate in situations where, as here, no class members have objected to it." *Processed Egg Prods.*, 2012 WL 5467530, at *7. Here, Plaintiffs' counsel are requesting a combined award of attorneys' fees and costs, meaning all expenses will be paid and then the remainder of the $732,968.36 will be considered the total fee. As this request is reasonable, Plaintiffs'

43

motion for an award of fees and costs will be approved.

### 4.     Allocation of Fees

Lastly, the motion seeks to allow Lead Counsel to allocate the fee among counsel entitled to share the award.  "Generally, a district court may rely on lead counsel to distribute attorneys' fees among those involved." *Milliron*, 423 F. App'x at 134.  Allocation of fees in this manner is rationale because counsel "are most familiar with the work done by each firm and each firm's overall contribution to the litigation," and this process "conserves the time and resources of the courts." *Processed Egg Prods.*, 2012 WL 5467530, at *7 (citation omitted).  Co-Lead Counsel will therefore be permitted to distribute the fee award to those attorneys who assisted in creation of the Settlement fund.  Of course, should all counsel not agree with Co-Lead Counsel's allocation of fees, the ultimate allocation will then be made by the Court. *See In re Diet Drugs Prods. Liab. Litig.*, No. 99-20593, 2002 WL 32154197, at *24 (E.D. Pa. Oct. 3, 2002).

## III. Conclusion

For the above stated reasons, the Settlement Class will be certified, the Settlement will be approved, and the requested attorneys' fees and costs will be awarded.

An appropriate order follows.

July 7, 2014
Date

/s/ A. Richard Caputo
A. Richard Caputo
United States District Judge