**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

FLORENCE WALLACE, et al.,

    Plaintiffs,

        v.

ROBERT J. POWELL, et al.,

    Defendants.

CIVIL ACTION NO. 3:09-cv-286

(JUDGE CAPUTO)

*************************************************************************************************

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

WILLIAM CONWAY, et al.,

    Plaintiffs,

        v.

MICHAEL T. CONAHAN, et al.,

    Defendants.

CIVIL ACTION NO. 3:09-cv-0291

(JUDGE CAPUTO)

*************************************************************************************************

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

H.T., et al.,

    Plaintiffs,

        v.

MARK A. CIAVARELLA, JR., et al.,

    Defendants.

CIVIL ACTION NO. 3:09-cv-0357

(JUDGE CAPUTO)

*************************************************************************************************

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

SAMANTHA HUMANIK,

    Plaintiff,

      v.

MARK A. CIAVARELLA, JR., et al.,

    Defendants.

CIVIL ACTION NO. 3:09-cv-0630

(JUDGE CAPUTO)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## MEMORANDUM

Plaintiffs in this consolidated action comprising both individual cases and putative class actions have moved for final approval of a settlement agreement (the "Settlement") between Plaintiffs and Defendants Robert J. Powell; Vision Holdings, LLC; and Powell Law Group, P.C. (collectively "Powell Defendants"). (Doc. 1676.) The Settlement received preliminary approval on July 24, 2015. (Doc. 1699.) Now, following the final approval hearing held on December 16, 2015, Plaintiffs seek final certification of the Classes for settlement, approval of the Settlement, and an award of attorneys' fees and costs. For the reasons that follow, the Classes will be certified, the Settlement will be approved, and attorneys' fees and costs will be awarded as requested.

### I. Background

**A.    Facts**

This civil action arises out of the alleged conspiracy related to the construction of two (2) juvenile detention facilities, and the subsequent detainment of juveniles in these facilities, orchestrated by two former Luzerne County Court of Common Pleas judges:

2

Michael Conahan ("Conahan") and Mark Ciavarella ("Ciavarella").  The juvenile detention facilities, PA Child Care ("PACC") and Western PA Child Care ("WPACC"),[1] were both constructed by Mericle Construction, Inc.  Plaintiffs in this action—juveniles or the parents of juveniles who appeared before Ciavarella—seek redress from the former judges as well as the individuals and business entities involved in the construction and operation of these facilities for the alleged conspiracy and resulting deprivations of Juvenile Plaintiffs' rights.

The individual and class complaints assert, in part, the following causes of action against some or all of the Powell Defendants:  (1) 42 U.S.C. § 1983 claims alleging a conspiracy to violate Plaintiffs' constitutional rights; (2) violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, *et seq*.; (3) conspiracy to violate RICO; and (4) state-law civil conspiracy.

**B.    Procedural History**

The first of these consolidated cases, *Wallace v. Powell*, No. 09-CV-286, was filed on February 13, 2009, against multiple defendants, including the Powell Defendants.  Although the case was originally filed as a class action, the *Wallace* complaint was subsequently amended in May 2009 to proceed on behalf of a number of individual juvenile and parent plaintiffs.  Shortly thereafter, *Conway v. Conahan*, No. 09-CV-291, and *H.T. v.*

---

[1]      PACC, WPACC, and Mid-Atlantic Youth Services, Inc. ("MAYS") are the Provider Defendants.  Provider Defendants, along with Consulting Innovations and Services, Inc., Gregory R. Zappala, Robert J. Powell, Powell Law Group P.C., Perseus House, Inc. d/b/a Andromeda House, Beverage Marketing of PA., Inc., Pinnacle Group of Jupiter, LLC, Vision Holdings, LLC, Mark A. Ciavarella, Jr., Michael T. Conahan, Barbara Conahan, and Cindy Ciavarella, and all of the aforesaids' lawyers, agents, and employees, and subsidiary and parent organizations in their capacities as such, are "Non-Released Parties" under the terms of the Settlement Agreement.

*Ciavarella*, No. 09-CV-357, were filed as putative class actions, both naming the Powell Defendants, among others, as Defendants.  Subsequently, *Humanik v. Ciavarella*, No. 09-CV-630, was filed on behalf of a single individual Plaintiff.  The remaining cases against the Powell Defendants pending before this Court are *Clark v. Ciavarella*, No. 09-2535, *Dawn v. Conahan*, No. 10-797, *Belanger v. Ciavarella*, No. 10-1405, *Elia v. Powell*, Nos. 11-0465, 11-0466, and *Gillette v. Ciavarella*, No. 11-658.  These cases, together with *Wallace*, *Conway*, *H.T.*, and *Humanik*, are referred to collectively herein as the "Civil Actions."

The *Conway* and *H.T.* Plaintiffs filed the Master Complaint for Class Actions in June 2009.  (Doc. 136.)  At the same time, the *Wallace* and *Humanik* Plaintiffs filed the Master Long Form Complaint for Individual Actions. (Doc. 134.)

On December 16, 2011, Plaintiffs and Defendants Robert K. Mericle and Mericle Construction, Inc. (collectively "Mericle Defendants") filed a Joint Motion for Preliminary Approval of Class Action Settlement. (Doc. 1005.)  On February 28, 2012, following a preliminary approval hearing, I issued an order conditionally certifying the Settlement Classes, preliminarily approving the class action settlement, and approving the notice plan. (Doc. 1084.)  On November 19, 2012, I held a final approval hearing on the Mericle Settlement.  The Mericle Settlement was granted final approval on December 14, 2012. (Doc. 1268.) As to the non-settling Defendants, including the Powell Defendants, discovery remained ongoing at that time.

On October 16, 2013, Plaintiffs and the Provider Defendants filed a Joint Motion for Preliminary Approval of Class Action Settlement.  (Doc. 1448.)  On November 27, 2013, following a preliminary approval hearing, I issued an order conditionally certifying the

Settlement Classes, preliminarily approving the class action settlement, and approving the notice plan.  (Doc. 1491.)  On June 10, 2014, I held a final approval hearing on the Provider Defendant Settlement.  The Provider Defendant Settlement was granted final approval on July 7, 2014.  (Doc. 1539.)

C.    **The Settlement Agreement**

Under the terms of the Settlement Agreement, the parties agree to settle the Civil Actions (*i.e.*, the *H.T.*, *Conway*, *Wallace*, and *Humanik* Actions) to provide a final resolution of Plaintiffs' claims against the Powell Defendants.  Solely for the purposes of settlement, two (2) settlement classes are established:  (1) the "Juvenile Settlement Class," which consists of "all juveniles who appeared before former Luzerne County Court of Common Pleas Judge Mark A. Ciavarella between January 1, 2003 and May 28, 2008 [the "Class Period"] who were adjudicated or placed by Ciavarella"; and (2) the "Parent Settlement Class," which consists of the parents and/or guardians of juveniles who appeared before Ciavarella between January 1, 2003 and May 28, 2008, and, who in connection with the juvenile's appearance:  "(i) made payments or had wages, social security or other entitlements garnished; (ii) had costs, fees, interest and/or penalties assessed against them or their child; (iii) suffered any loss of companionship and/or family integrity."  (Doc. 1676, Ex. 1, *Master Settlement Agreement*, "*MSA*", ¶ 1(r) & 1(ff).)  The Juvenile Settlement Class and the Parent Settlement Class are referred to collectively as the "Settlement Classes," and the members of the Settlement Classes are the "Settlement Class Members."  (*Id*. ¶ 1(yy).)  Pursuant to the terms of the Settlement Agreement, the Powell Defendants agree to establish a settlement fund of no less than $4,750,000.00, which will be used to pay

settlement costs and claims by Class Members.[2]  (*Id*. ¶ 5(b).)

### 1.    Basic Benefits

The Juvenile Settlement Class will be divided into three (3) Settlement Categories for purposes of recovery from the Cash Settlement Fund:

**(1) Probation Category:**  each qualifying Juvenile Settlement Class member who never spent any time in PACC, WPACC, or any other juvenile detention facility as a result of an adjudication of delinquency by former Judge Ciavarella during the period from January 1, 2003 through May 28, 2008;

**(2) Non-PACC/WPACC Category:**  each qualifying Juvenile Settlement Class Member who was placed in a detention facility as a result of an adjudication of delinquency or placement by former Judge Ciavarella during the period from January 1, 2003 through May 28, 2008 but who never spent any time in PACC and/or WPACC; and

**(3) PACC/WPACC Category:**  each qualifying Settlement Class Member who was placed in PACC or WPACC as a result of an adjudication of delinquency or placement by former Judge Ciavarella during the period from January 1, 2003 through May 28, 2008.

(Doc. 1676, Ex. A-2, at 6.)  Each qualifying Juvenile in the Probation Category shall receive one (1) point.  Each qualifying Juvenile in the Non-PACC/WPACC Category shall receive two (2) points.  Each qualifying Juvenile in the PACC/WPACC Category shall receive five (5) points.  As explained in further detail below, these points will determine how much each Juvenile will recover from the Settlement.

Each qualifying member of the Parent Settlement Class who, as a result of his or her juvenile's adjudication of delinquency or placement by former Judge Ciavarella during the period from January 1, 2003 through May 28, 2008, who either (i) made payments to Luzerne County or had wages, social security or other entitlements garnished or withdrawn by Luzerne County; or (ii) had court-ordered services or paid court-ordered costs, fees, interests, and/or penalties assessed against them or their child, shall receive the actual amount of monies paid, garnished, or withdrawn.  Members of the Parent Settlement Class

---

[2]    The Settlement Agreement provides that the Powell Defendants may be required to make an additional payment, which under no circumstances shall be greater than $2,750,000,00, based upon Defendant Robert J. Powell's net worth.

will be paid from this Settlement Fund only if they did not already receive full reimbursement in the Mericle Settlement and/or the Provider Defendant Settlement.  Moreover, the total amount of funds to be paid to members of the Parent Settlement Class may be reduced *pro rata* if the total exceeds the amount allocated to the Parent Settlement Class.

### 2. The Allocation Plan

The Cash Settlement Fund will be divided among qualifying Settlement Class Members according to the Plan of Allocation.  First, court-approved costs and fees will be taken out of the Cash Settlement Fund.  The remaining amount (the "Net Settlement Fund") will be divided into (1) the Juvenile Fund; (2) the Parent Fund; and (3) the Holdback Fund.  Each fund is described below:

**JUVENILE FUND:** Seventy percent (70%) of the Net Settlement Fund will comprise the Juvenile Fund.

Each qualifying member of the Juvenile Settlement Class who submits a valid and timely Proof of Claim Form will be assigned to a Settlement Category and awarded a number of points as described above.  The total number of points for all members of the Juvenile Settlement Class will be divided into the Juvenile Fund to determine the monetary value of each point.  Each member of the Juvenile Settlement Class will receive the value of each point multiplied by his or her points, as determined by his or her Settlement Category.

**PARENT FUND:** Fifteen percent (15%) of the Net Settlement Fund will comprise the Parent Fund.

Each qualifying member of the Parent Settlement Class who submits a valid and timely Proof of Claim Form will be awarded a specific amount of money based on the amount of payments documented in the Records or in records provided by the member of the Parent Settlement Class showing payments made in his or her own name.

**HOLDBACK FUND:** Fifteen percent (15%) of the Net Settlement Fund will comprise the Holdback Fund.

The Holdback Fund will remain in escrow until all final accounting is complete for the Cash Settlement Fund.  With written permission from the Court, the Holdback Fund may be used to pay settlement costs and attorneys' fees.  The Holdback Fund will also be used to pay all costs of the appeal process, and all additional payments to members of the Settlement Classes resulting from successful appeals.  If funds remain in the Holdback Fund after payment of all costs, fees, and appeals, the remaining funds will be paid to qualifying members of the Juvenile Settlement Class who submit timely and valid Proof of Claim Forms in proportion to the number of points assigned to each such member of the Juvenile Settlement Class.

(Doc. 1676, Ex. A-2, at 7-8.)

A Proof of Claim form was disseminated to each potential claimant for whom Class Counsel had an address with the Notice of the Settlement.  That form required each Juvenile and/or Parent choosing to participate in the Settlement to provide necessary information and to provide a release for obtaining relevant records.  Based upon the responses of each Claimant and a review of all documentation submitted by the Claimant and/or released at the request of the Claimant, the Claims Committee calculated the points for all members of the Settlement Class who timely submitted a valid claim form.

### 3.   Individual Payment Amounts and Appeal Process

If a Claimant believes that the value amount assigned by the Claims Committee was "wrongly determined," the Claimant has the option to appeal the amount to a Court-appointed Special Master for Allocation Appeals.  In cases where an appeal is lodged by a Claimant, the Notice of Settlement provides:

> The Special Master will re-assess the Claims Committee's decision.  This reassessment will include a complete review of your Proof of Claim Form, the information available in the Records, and any additional written documentation provided by you in support of your claim.  If appropriate, the Special Master will allow your claim and/or change the Settlement Category assigned by the Claims Committee or the amount of your payment from the Cash Settlement Fund, and your award will be adjusted under the terms of the Plan of Allocation.

The Notice of Settlement further states that the "determinations made by the Special Master are final and shall not be subject to any further review or appeal."

In order to properly fund the Allocation Appeal Process consistent with the Settlement Agreement, fifteen percent (15%) of the Cash Settlement Fund will not be distributed, but instead be held back in the Escrow Account for the benefit of any successful Allocation Appellants and the costs associated with the Allocation Appeal Process.  The hold back will amount to $712,500.00.  In the event that the hold back amount is not fully depleted, the balance will be returned to the Holdback Fund and will be distributed in accordance with the Settlement Agreement.

### 4.   Release

In exchange for the relief provided under the Settlement Agreement, the named

Plaintiffs and the Settlement Class Members will release and dismiss all claims against the Powell Defendants.[3]  The remaining defendants ("Non-Released Parties") shall receive no release or dismissal of any claims as a result of the Settlement Agreement.  In addition, Settlement Class Members agree and covenant not to sue the Powell Defendants over any matter that could have been alleged in these Civil Actions.

**5.    Notice**

Federal Rule of Civil Procedure 23(e) provides that "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal."  Fed. R. Civ. P. 23(e).  Federal Rule of Civil Procedure 23(c)(2)(B) provides that in any class action maintained under subdivision (b)(3), the court shall "direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B).

Here, notice of the Settlement was disseminated to potential Settlement Class Members through a variety of means, including direct mailings, a toll-free call center, publication in newspapers, and a website.  With respect to direct mailings, Class Counsel mailed a total of 4,056 copies of the Notice of Settlement and Proof of Claim Form to the last known addresses of potential Class Members by first-class mail, postage pre-paid. Additionally, the toll-free call center established by Class Counsel, which was open to

---

[3]     In Plaintiffs' Settlement Agreement with the Provider Defendants, which I approved on July 7, 2014 (Doc. 1539), the parties included a provision stating that it would be the "express intention of the Parties that, to the fullest extent possible, Plaintiffs shall in all future litigation against Non-Released Parties [including the Powell Defendants] eliminate all claims for contribution and/or indemnity that might be asserted against the Released Parties."  (Doc. 1448-1, at 21.)  The Settlement Agreement with the Provider Defendants also stated that in any future settlement agreement with any of the Non-Released Parties [including the Powell Defendants], Plaintiffs would include a provision barring any Non-Released Party from bringing any contribution claim, any indemnity claim, or any other claim related in any way to the claims, allegations, and/or facts in the Actions against the Released Parties."  (*Id.* at 21-22.)  Such a provision was indeed included in the Settlement Agreement at issue with the Powell Defendants.  (Doc. 1676-1, at 16-17.)

receive calls twenty-four (24) hours a day, seven (7) days a week, answered over 1,378 calls. Class Counsel staffed the call center with non-lawyer customer service representatives who were trained to respond to particular questions from Class Members concerning the litigation and the terms of the Settlement. And, when the call center's customer service representatives were unable to answer questions about the Settlement, the representatives arranged for the callers to speak with Class Counsel. In addition to direct mailings of the Class Notice, Class Counsel also caused the Notice of Settlement to be published in the *Times Leader* and the *Citizens' Voice*. Finally, Class Counsel maintained a website containing information about the Settlement. Since August 10, 2015, the website has received 2,736 visits.

## II. Discussion

### A. Class Certification

Even though the Settlement Agreement has already been preliminarily approved, there must still be a final determination as to whether to certify the class and grant final approval of the Settlement. *See In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 797 (3d Cir. 1995). The Federal Rules of Civil Procedure provide that class action settlements must be approved by the Court. *See* Fed. R. Civ. P. 23(e) ("The claims, issues, or defenses of a certified class may be settled . . . only with the court's approval."); *see also Ripley v. Sunoco, Inc.*, 287 F.R.D. 300, 306 (E.D. Pa. 2012) ("Class action settlements must be approved by the Court."). However, "the ultimate inquiry into the fairness of the settlement under Fed. R. Civ. P. 23(e) does not relieve the court of its responsibility to evaluate Rule 23(a) and (b) considerations." *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 299 (3d Cir. 2005).

As such, "before approving a class settlement agreement, 'a district court first must determine that the requirements for class certification under Rule 23(a) and (b) are met.'"

*Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 296 (3d Cir. 2011) (en banc) (quoting *In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 341 (3d Cir. 2010)). Rule 23(a) of the Federal Rules of Civil Procedure contains four (4) threshold requirements that every putative class must satisfy:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). These requirements are referred to as numerosity, commonality, typicality, and adequacy of representation. If these four (4) prerequisites are satisfied, "a district court must then determine that the proposed class fits within one of the categories of class actions enumerated in Rule 23(b)." *Sullivan*, 667 F.3d at 296.

Here, Plaintiffs seek certification pursuant to Rule 23(b)(3). Under this provision, certification is proper where "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

The factual determinations necessary to make Rule 23 findings must be made by a preponderance of the evidence. *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 257–58 (3d Cir. 2009) (citation omitted). In other words, to certify a class, the district court must find that the evidence more likely than not establishes each fact necessary to meet the requirements of Rule 23. *Id.* at 258.

1.      **Rule 23(a)**

a.      **Numerosity**

The first requirement for a class action is that the class is so numerous that joinder

of all members is impracticable.  Fed. R. Civ. P. 23(a).  There is no single magic number

that satisfies the numerosity requirement.  *Logory v. Cnty. of Susquehanna*, 277 F.R.D.

135, 140 (M.D. Pa. 2011) (citation omitted).  However, the Third Circuit has opined that

while there is technically no minimum class size, "generally if the named plaintiff

demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a)

has been met."  *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001).

Here, each of the Settlement Classes includes thousands of individuals.  As such,

the numerosity requirement is satisfied.  *See, e.g., Williams v. City of Phila.*, 270 F.R.D.

208, 215 (E.D. Pa. 2010) (numerosity requirement satisfied where putative class could

number in the hundreds or thousands).

b.      **Commonality**

To satisfy Rule 23(a)(2), there must be "questions of law or fact common to the

class."  Fed. R. Civ. P. 23(a)(2).  Satisfaction of the commonality requirement requires that

plaintiffs demonstrate that their claims "depend upon a common contention," the resolution

of which "will resolve an issue that is central to the validity of each one of the claims in one

stroke."  *Wal–Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2545, 2551 (2011).  Commonality

does not require an identity of claims or facts among class members; commonality will be

satisfied if the named plaintiffs share at least one (1) question of fact or law with the

grievances of the prospective class.  *Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 184

(3d Cir. 2001).  The Supreme Court has indicated that commonality does require the plaintiff to demonstrate that the class members have suffered the same injury.  *Wal–Mart*, 131 S.Ct. at 2551 (citation omitted).

Here, the allegations in the complaints raise the following issues relating to liability of the defendants, including the Powell Defendants:

- Whether the defendants acted in conspiracy with each other;

- Whether the actions of the private-party defendants, allegedly taken in concert with Ciavarella and Conahan, rendered the defendants state actors for purposes of section 1983;

- Whether defendants either conspired to construct the PACC and WPACC facilities and fill them through violations of Plaintiffs' rights, or conspired to set in motion a series of acts that they reasonably knew or should have known would cause Ciavarella to violate Plaintiffs' rights;

- Whether Plaintiffs' detentions in the PACC and WPACC facilities were unlawful;

- Whether various defendants organized an association-in-fact enterprise;

- Whether various defendants participated in the conduct or the affairs of the enterprise through a pattern of racketeering activity.

Thus, given all of the above questions of law and fact that are common to the class, the commonality prong of Rule 23(a)(2) is met.

### c.    Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  The typicality and commonality requirements are "closely related and often tend to merge."  *Marcus v. BMW of N. Am., L.L.C.*, 687 F.3d 583, 597 (3d Cir. 2012) (citing *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir.1994)).  Factual differences will not render a claim atypical if the claim "arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory."  *Baby Neal*, 43 F.3d at 58 (citation and internal quotation marks omitted).  When analyzing typicality, a court must

compare the situation of the proposed representative to that of the class as a whole by considering "the similarity of the legal theory and legal claims; the similarity of the individual circumstances on which those theories and claims are based; and the extent to which the proposed representative may face significant unique or atypical defenses to her claims." *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 597-98 (3d Cir. 2009) (citation omitted).

Here, the claims of the Representative Plaintiffs, as identified in the Settlement Agreement, are typical of the Juvenile Settlement Class Members and the Parent Settlement Class Members.  With respect to the Juvenile Settlement Class, the gravamen of the Representative Plaintiffs' claims is that, as a result of the alleged conspiracy, Ciavarella and Conahan had an undisclosed financial interest and conflict-of-interest in adjudicating children delinquent and sending them to placement.  And, like all other Juvenile Settlement Class Members, the Representative Plaintiffs were denied their constitutional right to an impartial tribunal when they appeared before Ciavarella.  As such, the legal theories for all Juvenile Plaintiffs, that their adjudications were unconstitutional, will be the same.  Thus, the typicality requirement is satisfied as to the Juvenile Settlement Class.

The claims of the Parent Settlement Class Representatives are also typical of all Parent Settlement Class Members.  Specifically, all Parent Settlement Class Members assert RICO claims based on the alleged conspiratorial conduct of Defendants, which resulted in the payment of court fees, fines, interest, and penalties.  As the legal theories for all Parent Settlement Class Members will be the same, the typicality requirement for class certification under Rule 23(a)(3) is satisfied.

### d.    Adequacy of Representation

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  The adequacy requirement has two (2) components: "(1) concerning the experience and performance of class counsel; and (2) concerning the interests and incentives of the representative plaintiffs." *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 181 (3d Cir. 2012) (citation omitted).

14

Essentially, the adequacy inquiry considers whether "the putative named plaintiff has the ability and the incentive to represent the claims of the class vigorously, that he or she has obtained adequate counsel, and that there is no conflict between the individual's claims and those asserted on behalf of the class." *Hassine v. Jeffes*, 846 F.2d 169, 179 (3d Cir. 1988) (citations omitted).

The qualifications and performance of class counsel under Rule 23(a)(4) is based upon the factors set forth in Rule 23(g).  *See Sheinberg v. Sorensen*, 606 F.3d 130, 132 (3d Cir. 2010) ("Although questions concerning the adequacy of class counsel were traditionally analyzed under the aegis of the adequate representation requirement of Rule 23(a)(4) . . . those questions have, since 2003, been governed by Rule 23(g).").  That subsection lists several non-exclusive factors that a district court must consider in determining counsel's ability to fairly and adequately represent the interests of the class, including:  (1) "the work counsel has done in identifying or investigating potential claims in the action," (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action," (3) "counsel's knowledge of the applicable law," and (4) "the resources that counsel will commit to representing the class."  Fed. R. Civ. P. 23(g)(1)(A).

Here, Class Counsel have the experience, skill, and qualifications necessary to conduct this litigation.  In particular, the individual attorneys in this action have extensive experience  in complex class action litigation involving mass actions and civil rights claims.  Consistent with their qualifications, Class Counsel, throughout this litigation, have demonstrated considerable ability in prosecuting this case.  Specifically, Class Counsel have performed substantial work, and expended considerable time and resources, in presenting the facts and complex legal issues implicated in this litigation, as Class Counsel have prepared multiple complaints, responded to numerous motions to dismiss, engaged in mediation, and reviewed discovery.  Class Counsel have pursued this action vigorously and with great dedication on behalf of all Plaintiffs.  Thus, based on Class Counsel's work to date in this litigation, it is apparent that these attorneys have fairly and adequately represented the interests of the Settlement Class Members.

With respect to the second prong of the adequacy inquiry, the Third Circuit has "recognized that the linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class." *Dewey*, 681 F.3d at 183 (citations omitted).  The adequacy requirement "is designed to ferret out" intra-class conflicts, and to ensure that the named plaintiffs have the incentive to represent the claims of the class.  *Id*. at 184 (citations and internal quotation marks omitted).  If any conflicts "undercut the representative plaintiffs' ability to adequately represent the class" and those conflicts are "fundamental," Rule 23(a)(4) cannot be satisfied.  *Id*. at 184–85.

The Representative Plaintiffs fairly and adequately protected the interests of the Juvenile Settlement Class and the Parent Settlement Class in this action.  Here, the interests of the Representative Plaintiffs are consistent with the Settlement Class Members, and there appears to be no conflicts between or among the groups.  As discussed, the Representative Juvenile Plaintiffs were damaged as a result of Defendants' allegedly unlawful conduct, including the Powell Defendants' alleged conduct, and the Representative Juvenile Plaintiffs would have to prove the same wrongdoing as the Juvenile Settlement Class Members to establish Defendants' (and the Powell Defendants') liability.  Similarly, the Representative Parent Plaintiffs were damaged as a result of the alleged conspiratorial conduct of Defendants, including the Powell Defendants, which resulted in the payment of court fees, fines, interest, and penalties, and which would require all Parent Plaintiffs to demonstrate the same wrongdoing to establish Defendants' liability.  Thus, as the interests of the named plaintiffs are not antagonistic to those of the classes, and nothing in the record suggests that the Representative Plaintiffs acted in conflict with the Settlement Classes or failed to vigorously pursue the claims of all Class Members, the adequacy requirement is satisfied here.

### 2.    Rule 23(b)(3)

Besides meeting the four (4) threshold requirements under Rule 23(a), a proposed class must also satisfy one (1) of the three (3) sub-parts of Rule 23(b).  *See In re Warfarin*

*Sodium Antitrust Litig.*, 391 F.3d 516, 527 (3d Cir. 2004).  Here, Plaintiffs seek to maintain this class action under Rule 23(b)(3), which allows for a class action to proceed if "questions of law or fact common to class members predominate over any questions affecting only individual members," and if "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  These requirements are commonly separated into the "predominance" and "superiority" requirements.  *See In re Cmty. Bank of N. Va.*, 418 F.3d at 308-09.

### a.    Predominance

The predominance inquiry under Rule 23(b)(3) "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Sullivan*, 667 F.3d at 297 (citation and internal quotation marks omitted).  Parallel with Rule 23(a)(2)'s commonality element, which provides that a proposed class must share a common question of law or fact, Rule 23(b)(3)'s predominance requirement imposes a more rigorous obligation upon a reviewing court to ensure that issues common to the class predominate over those affecting only individual class members. *Id.* (citing *Ins. Brokerage*, 579 F.3d at 266).  Thus, the Third Circuit "'consider[s] the Rule 23(a) commonality requirement to be incorporated into the more stringent Rule 23(b)(3) predominance requirement, and therefore deem[s] it appropriate to analyze the two factors together." *Id.* (quoting *Ins. Brokerage*, 579 F.3d at 266).  And, Third Circuit precedent "provides that the focus of the predominance inquiry is on whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct." *Id.* at 298.

In assessing predominance, "a court at the certification stage must examine each

element of a legal claim 'through the prism' of Rule 23(b)(3)." *Marcus*, 687 F.3d at 600 (quoting *In re DVI, Inc. Secs. Litig.*, 639 F.3d 623, 630 (3d Cir. 2011)). Thus, a plaintiff must "demonstrate that the element of [the legal claim] is capable of proof at trial through evidence that is common to the class rather than individual to its members." *Id*. (quoting *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008)).

### i.      Liability for Section 1983 Violations

If Plaintiffs' claims were tried, proof of the Powell Defendants' liability to the Juvenile Settlement Class Members for section 1983 violations, including conspiracy to violate section 1983, would be directed to (1) whether the Settling Defendants acted in conspiracy with each other and in concert with Ciavarella and Conahan–*i.e.*, under color of law–to deprive Juvenile Settlement Class Members of their constitutional rights, and (2) whether these actions caused violations of Juvenile Class Members' constitutional rights. *Elmore v. Cleary*, 399 F.3d 279, 281 (3d Cir. 2005) (citation omitted)).

Plaintiffs' proffered evidence of the claimed section 1983 violations would therefore focus exclusively on the ***Powell Defendants'*** conduct, and not on the conduct of the individual juveniles.  Further, the Powell Defendants' alleged conduct identically affected each member of the class.  As a result of the Powell Defendants' allegedly unlawful and conspiratorial conduct, each Juvenile Settlement Class Member appeared before an identically partial tribunal, and each allegedly had his or her rights violated by identical, class-wide conduct in violation of the Constitution.  Therefore, because the section 1983 claims against the Powell Defendants rely on the same course of conduct, common proof of such conduct, and damage as a result of that conduct, the predominance requirement

of Rule 23(b)(3) is met for these claims.

### ii.      Liability for Civil RICO Claims

The elements of a civil RICO claim under section 1962(c) are (1) the conducting of (2) an enterprise (3) through a pattern, (4) of racketeering activity (5) which results in injury to the plaintiffs' business or property.  *Tapp v. Proto*, 718 F. Supp. 2d 598, 625 (E.D. Pa. 2010) (citing *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)).  For a section 1962(d) claim, a plaintiff must establish (1) an agreement to commit the predicate acts of fraud, and (2) knowledge that those acts were part of a pattern of racketeering activity conducted in such a way as to violate section 1962(a), (b), or (c).  *Rose v. Bartle*, 871 F.2d 331, 366 (3d Cir. 1989) (citation omitted).

Like the section 1983 claims, the RICO claims of the Settlement Class Members center on the Powell Defendants' alleged involvement in a scheme to build and operate private, for-profit juvenile detention facilities and to fill those facilities for the purpose of ensuring substantial monetary gains for the defendants.  The Powell Defendants' alleged RICO liability again turns on significant, common issues of law and fact, focusing on the Powell Defendants' alleged conduct–conduct common as to all Settlement Class Members.

For each Settlement Class Member, the question of whether the RICO statute was violated turns on the following common issues of law and fact:  (1) the existence of an enterprise affecting interstate commerce; (2) Defendants' alleged association with the enterprise; and (3) Defendants' alleged participation in the conduct or the affairs of the enterprise through a pattern of racketeering activity.  Here, "the same acts of . . . fraud will be proffered by plaintiffs to establish a pattern of racketeering activity applicable to all of the

plaintiffs' claims," and "[a]ll of the issues concerning a violation of 1962(c) appear to be common to the claims of all class members." *McMahon Books, Inc. v. Willow Grove Assocs.*, 108 F.R.D. 32, 39 (E.D. Pa. 1985).   The same is logically true of the section 1962(d) conspiracy claims; the question of whether Defendants conspired to violate section 1962(c) focuses solely on the alleged conduct of Defendants, and is common to all Settlement Class Members.   Although individual issues might arise in the course of establishing the damages suffered by individual Settlement Class Members if this case were tried, those issues do not predominate in the context of all of the common issues and facts relevant to the RICO claims.

Here, the "proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623.   Accordingly, the predominance element is satisfied here.

### b.    Superiority

According to Rule 23(b)(3), the considerations relevant to the superiority inquiry include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).   The superiority requirement requires a district court "to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." *In re Cmty. Bank of N. Va.*, 418 F.3d at 309 (citation and internal quotation marks omitted).   And, when "confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried,

would present intractable management problems, *see* Fed. Rule Civ. Proc. 23(b)(3)(D), for the proposal is that there be no trial." *Amchem Prods., Inc. v.* Windsor, 521 U.S. 591, 620 (1997).

A class resolution in the manner proposed in the instant Settlement is superior to other available methods for resolution of this action against the Powell Defendants.  First, proceeding as a class action in this case is far superior to allowing "piecemeal litigation" of the exact same claims in countless lawsuits.  *Logory*, 277 F.R.D. at 146 (citation omitted). Second, where a claim is small in comparison to the costs of prosecuting a lawsuit, a class action allows for litigation costs to be spread among the injured parties.  *See In re Processed Egg Prods. Antitrust Litig.*, 284 F.R.D. 249, 264 (E.D. Pa. 2012).  Indeed, "[a]ddressing the rights of those who would not otherwise be appropriately incentivized to bring their own singular claims was precisely the aim of the Advisory Committee in promulgating Rule 23(b)(3)." *Logory*, 277 F.R.D. at 146 (citing *Amchem*, 521 U.S. at 617). Third, this is an appropriate forum for concentrating the claims of the Settlement Classes because the Court has subject matter jurisdiction over the claims and personal jurisdiction over the parties.  *See Esslinger v. HSBC Bank Nev., N.A.*, No. 10-3213, 2012 WL 5866074, at *5.  Lastly, the difficulties in managing a class action need not be considered because the Settlement will avoid trial.  *See Amchem*, 521 U.S. at 620.  For these reasons, the superiority requirement is satisfied.

### 3.      Conclusion as to Class Certification for Settlement Purposes

Because all of the Rule 23(a) and (b)(3) requirements have been met, the Classes will be certified for settlement purposes.

## B.   Notice

In class actions, a district court obtains personal jurisdiction over the absentee class members "by providing proper notice of the impending class action and providing the absentees with the opportunity to be heard or the opportunity to exclude themselves from the class." *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 306 (3d Cir. 1998) (citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985)). Rule 23 contains two (2) distinct notice provisions. *See id*. at 326. First, Rule 23(c)(2) requires that class members be given the best notice practicable, including individual notice to all members who can be identified through reasonable efforts.  Fed. R. Civ. P. 23(c)(2).[4] Second, Rule 23(e) requires all class members to be notified of the terms of any proposed settlement.  Fed. R. Civ. P. 23(e).  This notice is designed "to summarize the litigation and the settlement" and "to apprise class members of the right and opportunity to inspect the complete settlement documents, papers, and pleadings filed in the litigation." *Prudential*, 148 F.3d at 327 (citation and internal quotation marks omitted).

Here, the Notice of the Powell Defendant Settlement contained the information required by Rules 23(c)(2) and 23(e).  Specifically, the Notice detailed the nature of the

---

[4]     The notice, in clear and concise language, must state:

> (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2).

action, the definition of the Juvenile Settlement Class and the Parent Settlement Class, the claims of the Settlement Classes, the terms of the Settlement Agreement, and the right to object or request exclusion from the terms of the Settlement.  The Notice also informed members of their opportunity to be heard at the fairness hearing, to enter an appearance through an attorney of their choice, and that the Settlement would be binding on members that did not opt out.

Additionally, Plaintiffs' efforts to notify the Settlement Class Members satisfied the requirements of Rule 23 and due process.  The Notice was sent to potential Settlement Class Members by first-class mail based on the last known addresses of these individuals.  Notice was also published in two (2) local newspapers, and information about the proposed Settlement was available through a detailed website.  Based on the extensive individual notice, as well as the published notice, the notice requirements of both Rule 23 and the Due Process Clause have been satisfied.  *See Zimmer Paper Prods., Inc. v. Berger & Montague, P.C.*, 758 F.2d 86, 90 (3d Cir. 1985) ("[F]irst-class mail and publication regularly have been deemed adequate under the stricter notice requirements . . . of Rule 23(c)(2).").

**C.     Fairness of the Settlement**

Certified federal class actions may only be settled with court approval.  *See* Fed. R. Civ. P. 23(e).  While the approval of a class action settlement is committed to the sound discretion of the district court, "it can endorse a settlement only if the compromise is fair, adequate, and reasonable.'"  *Eichenholtz v. Brennan*, 52 F.3d 478, 482 (3d Cir. 1995) (citation and internal quotation marks omitted).  This is especially true in cases such as this one "where settlement negotiations precede class certification, and approval for settlement

and certification are sought simultaneously." *In re Warfarin*, 391 F.3d at 535 (citation omitted).

As a preliminary matter, there is an initial presumption of fairness for the settlement if a court finds that: "(1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." *Id.* Here, all four (4) requirements are satisfied.

First, the Settlement Agreement was reached after protracted arm's length negotiations for many months, through numerous face-to-face meetings and teleconferences. (Doc. 1706, at 22.) Second, Class Counsel have engaged in extensive discovery, including the review of hundreds of thousands of pages of documents and the depositions of representatives of the Provider Defendants and Robert J. Powell. (*Id.* at 23.) Third, as discussed, counsel for both parties have extensive experience in similar matters. Lastly, after providing the Notice of Class Action Settlement to Class Members through first-class mail, print publication, and the internet, not a single objection was received, out of a class of approximately 3,910. Only eleven (11) Class Members sought to exclude themselves from the Settlement, which is less than a one percent (1%) opt-out rate.[5] Therefore, there is an initial presumption of fairness for the settlement.

In addition to the initial presumption of fairness, the Third Circuit has identified nine

---

[5]     Although Class Counsel noted in their brief that twelve (12) Class Members had sought to exclude themselves from the Settlement, Class Counsel noted at the final approval hearing held on December 16, 2015, that one (1) of those twelve (12) individuals had contacted counsel and informed them that they no longer would be opting out of the Settlement. Therefore, the total number of Class Members who have sought to exclude themselves from the Settlement is now eleven (11).

(9) factors, known as the *Girsh* factors, to be considered when determining whether a proposed class action settlement is fair, reasonable, and adequate. *See Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975). These factors are:

> (1) The complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*In re Warfarin*, 391 F.3d at 534-35 (citing *Girsh*, 521 F.3d at 157). The settling parties bear the burden of proving that the *Girsh* factors weigh in favor of approval of the settlement. *In re Pet Food Prods. Liab. Litig.*, 629 F.3d at 350 (citing *Gen. Motors*, 55 F.3d at 785).

### 1.    Complexity, Expense, and Duration of Litigation

The first *Girsh* factor "captures the probable costs, in both time and money, of continued litigation." *In re Warfarin*, 391 F.3d at 535-36. Here, the Settlement Agreement provides financial benefits to the Class more quickly than litigation of the numerous complex issues involved in this case could, an especially important aspect considering that many of the Class Members were juveniles at the time of the alleged constitutional violations and other bad acts. As recognized by Plaintiffs, this case raises complex legal issues with respect to the RICO and section 1983 claims. Additionally, a trial on the merits would require hours of attorney preparation and the expenditure of hundreds of thousands of dollars. Likewise, even if this case proceeded to trial against the Powell Defendants, a "complicated, lengthy trial," would ensue, and the "inevitable . . . post-trial motions and appeals would not only further prolong the litigation but also reduce the value of any recovery to the class." *Id.* at 536. As such, the first *Girsh* factor weighs in favor of

approving the Powell Defendant Settlement.

### 2. Reaction of the Class to the Settlement

"The second *Girsh* factor 'attempts to gauge whether members of the class support the settlement.'" *In re Warfarin*, 391 F.3d at 536 (quoting *Prudential*, 148 F.3d at 318). The Third Circuit has noted that a vast disparity between the number of potential class members who received notice of a proposed settlement and the number of objectors "creates a strong presumption that this factor weighs in favor of the Settlement." *In re Cendant Corp. Litig.*, 264 F.3d 201, 235 (3d Cir. 2001). Similarly, "[c]ourts have generally assumed that 'silence constitutes tacit consent to the agreement.'" *Gen. Motors*, 55 F.3d at 812 (quoting *Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1313 n.15 (3d Cir. 1993)).

The reaction of the class strongly favors approval of the Settlement. Here, following extensive notice, both to potential Settlement Class Members individually and by general publication, none of the class of approximately 3,910 potential Class Members objected to the proposed Settlement. Furthermore, only eleven (11) Settlement Class Members opted out of the Settlement, which is less than a one percent (1%) opt-out rate. The lack of objections and the low number of opt outs demonstrate a general acceptance of the Settlement by Class Members. *See, e.g., Stoetzner v. U.S. Steel Corp.,* 897 F.2d 115, 118–19 (3d Cir.1990) (approving settlement where "only" 29 objections were made in a 281–member class); *Ripley v. Sunoco, Inc.*, 287 F.R.D. 300, 312 (E.D. Pa. June 26, 2012) (reaction of the class favored approval of settlement where "less than 1 percent of the eligible class members opted out of the settlement"). The second *Girsh* factor thus strongly counsels in favor of settlement approval.

### 3. Stage of the Proceedings and Amount of Discovery Completed

The third *Girsh* factor "captures the degree of case development that class counsel had accomplished prior to settlement," and allows the court to "determine whether counsel had an adequate appreciation of the merits of the case before negotiating." *In re Warfarin*, 391 F.3d at 537 (citation, internal quotation marks, and alterations omitted); *see also Gen. Motors*, 55 F.3d at 813 ("Given the purpose of this inquiry, . . . it is . . . appropriate to measure the stage by reference to the commencement of proceedings either in the class action at issue or in some related proceeding.").

When analyzing this *Girsh* factor, courts also examine whether the settlement resulted from arm's-length negotiations. *See In re Corel Corp. Sec. Litig.*, 293 F. Supp. 2d 484, 491 (E.D. Pa. 2003). When the settlement results from arm's-length negotiations, the court will afford "considerable weight to the views of experienced counsel regarding the merits of the settlement." *McAlarnen v. Swift Transp. Co., Inc.*, Civ. A. No. 09–1737, 2010 WL 365823, at *8 (E.D. Pa. Jan. 29, 2010); *see also In re Gen. Instrument Secs. Litig.*, 209 F. Supp. 2d 423, 431 (E.D. Pa. 2001) ("Significant weight should be attributed to the belief of experienced counsel that the settlement is in the best interests of the class.").

The Settlement was preliminarily approved in July, 2015, years after the commencement of this litigation. An agreement was reached only after a failed mediation and numerous telephone conferences and face-to-face meetings between counsel for the parties. During that time, considerable time, effort, and money was expended by both parties, including the production and review of over 200,000 pages of documents and hundreds of Plaintiff Fact Sheets. Moreover, numerous pleadings and motions were also

filed, and responded to, by Plaintiffs and the Powell Defendants in this action, including motions to dismiss, motions for summary judgment, certification of a litigation class, and numerous other disputes between the parties. As such, at this stage of the proceedings "'the parties certainly had a clear view of the strengths and weaknesses of their cases.'" *McCoy v. Health Net, Inc.*, 569 F. Supp. 2d 448, 461 (D.N.J. 2008) (citation, internal quotation marks, & alteration omitted). The third *Girsh* factor therefore weighs in favor of settlement approval.

### 4. Risks of Establishing Liability

The fourth *Girsh* factor "examines what the potential rewards (or downside) of litigation might have been had class counsel decided to litigate the claims rather than settle them." *Sullivan*, 667 F.3d at 322 (citation, internal quotation marks, & alteration omitted). "[T]he more risks that Plaintiffs may face during litigation the stronger this factor favors approving a settlement." *Esslinger*, 2012 WL 5866074, at *9 (citing *Prudential*, 148 F.3d at 319). This inquiry requires balancing the likelihood of success if the case were taken to trial against the benefits of immediate settlement. *In re Safety Components, Inc. Secs. Litig.*, 166 F. Supp. 2d 72, 89 (D.N.J. 2001) (quoting *Prudential*, 148 F.3d at 319).

As previously noted, Plaintiffs face a difficult task of proving all elements of their claims should these actions proceed to trial. While Plaintiffs did not provide, in detail, the risks of establishing liability in this case, this is understandable in this case "[g]iven that the litigation [will] continue against other defendants, [and] the parties may [have been] reluctant to disclose fully and candidly their assessment of the proposed settlement's strengths and weaknesses that led them to settle separately. *In re Processed Egg Prods.*, 284 F.R.D. at

271 (citation and internal quotation marks omitted).

In addition, possible appeals, summary judgment motions, and trial still remain if the Settlement is not approved.  Thus, as this case involves difficult factual and legal issues which would have translated into protracted litigation and accumulating expenses, in both time and money, this factor weighs in favor of approval.

### 5.      Risks of Establishing Damages

The next *Girsh* factor "attempts to measure the expected value of litigating the action rather than settling it at the current time."  *In re Cendant Corp. Litig.*, 264 F.3d at 239 (citation and internal quotation marks omitted).  This factor involves a balancing of risks. *In re CertainTeed Corp. Roofing Shingle Prods. Liab. Litig.*, 269 F.R.D. 468, 488 (E.D. Pa. 2010).

Here, even if Plaintiffs were able to establish liability, they would still be tasked with proving the appropriate amount of damages against the Powell Defendants.  For Juvenile Plaintiffs that only seek presumed damages with respect to the section 1983 claims, proving damages may not present a daunting task.  However, Juvenile Plaintiffs seeking more than presumed damages may face significant obstacles in establishing individual damages.  The issue of individualized damages could very well lead to a "battle of the experts" with no guarantee whom the jury would believe.  *See In re Cendant Corp. Litig.*, 264 F.3d at 236. Furthermore, even if damages are established, post-trial motions and appeals present increased risk to the recovery of damages.

In the instant case, the risks of establishing damages factor is neutral.  Although some Plaintiffs may face difficulty in establishing individualized or special damages,

establishing presumed damages suffered by the Juvenile Settlement Class as a whole would not present the same risks.  As such, this factor does not weigh for or against approval.

### 6.    Risks of Maintaining the Class Action through Trial

The sixth *Girsh* factor "measures the likelihood of obtaining and keeping a class certification if the action were to proceed to trial" in light of the fact that "the prospects for obtaining certification have a great impact on the range of recovery one can expect to reap from the class action."  *Sullivan*, 667 F.3d at 322.  The value of a class action depends largely on the certification of the class because not only does the aggregation of the claims enlarge the value of the suit, but often the combination of the individual cases also pools litigation resources and may facilitate proof on the merits.  *Gen. Motors*, 55 F.3d at 817.  However, a "district court retains the authority to decertify or modify a class at any time during the litigation if it proves to be unmanageable."  *Id*. (citing *Prudential*, 148 F.3d at 321).

If the Settlement were rejected, the Powell Defendants would likely vigorously oppose class certification.  And, the Court of Appeals for the Third Circuit has recognized: "There will always be a 'risk' or possibility of decertification, and consequently the court can always claim this factor weighs in favor of settlement."  *Prudential*, 148 F.3d at 321.  The sixth *Girsh* factor therefore slightly favors settlement approval.

### 7.    Ability of Defendants to Withstand a Greater Judgment

The seventh *Girsh* factor considers "whether the defendants could withstand a judgment for an amount significantly greater than the settlement."  *In re Warfarin*, 391 F.3d

at 537–38 (citation, quotations, and alteration omitted).  The parties' briefs are silent on this issue.  Therefore, based on the lack of information submitted with respect to this factor, I am not in a position to determine whether the Powell Defendants could withstand a greater judgment than that provided under the Settlement.  Thus, the seventh *Girsh* factor is neutral.

### 8. Range of Reasonableness of the Settlement in Light of the Best Possible Recovery and the Attendant Risks of Litigation

The last two *Girsh* factors evaluate whether the settlement represents a good value for a weak case or a poor value for a strong case.  *In re Warfarin*, 391 F.3d at 538 (citing *Prudential*, 148 F.3d at 322).  The factors test two (2) sides of the same coin: reasonableness in light of the best possible recovery and reasonableness in light of the risks the parties would face if the case went to trial."  *Id.*  In conducting this analysis, the court must guard against demanding too large a settlement based on its view of the merits of the litigation; after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution.  *Sullivan*, 667 F.3d at 324.  To assess the reasonableness of a settlement in a case seeking primarily monetary relief, such as this one, a court should compare "'the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing . . . with the amount of the proposed settlement.'"  *In re Warfarin*, 391 F.3d at 538 (quoting *Prudential*, 148 F.3d at 322).

Pursuant to the terms of the Settlement Agreement, the Powell Defendants agree to establish a settlement fund of no less than $4,750,000.00, which will be used to pay settlement costs and claims by Class Members.  Although Plaintiffs do not set forth an exact

estimation of the damages they would likely recover if successful, Plaintiffs discuss the obstacles that must be surmounted before any damages may be awarded.  These hurdles could substantially reduce, if not eliminate, any recovery by Plaintiffs.

Additionally, Plaintiffs retained an ethics expert, Professor Lynn A. Baker, to offer an opinion as to the fairness and reasonableness of the Settlement reached between Plaintiffs and the *Provider* Defendants.  Professor Baker has served as an ethics expert in multiple large-dollar, large-group settlements.  Professor Baker, based upon her experience, opined that all of the components of the Provider Defendant Settlement Agreement were fair, reasonable, and appropriate under the circumstances.  Because the Settlement Agreement reached here with the Powell Defendants yields additional monetary benefits over and above what the Settlement Class Members received in the Provider Defendant Settlement, Professor Baker's expert opinion also supports a finding that the Settlement Agreement reached here is reasonable.

### 9.    *Prudential* Factors

In addition to the *Girsh* factors, courts in the Third Circuit also consider the following factors outlined in *Prudential*:

> the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other facts that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved-or likely to be achieved-for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.

*Prudential*, 148 F.3d at 323.

In this case, none of the *Prudential* factors weigh against approval, and three (3)

factors weigh in favor of settlement:  (1) whether members are accorded the right to opt out; (2) whether any provisions for attorneys' fees are reasonable; and (3) whether the procedure for processing individual claims under the Settlement is fair and reasonable.  As noted, the Settlement Class Members were given the opportunity to opt out.  The attorneys' fees sought by Class Counsel, as discussed below, are reasonable in light of the time expended litigating this action.  And, finally, the procedure for processing individual claims under the Settlement is fair and reasonable, and the procedure has been explained clearly in forms available to Settlement Class Members.

### 10.    Summary of *Girsh* and *Prudential* Factors

After consideration of the *Girsh* factors and the relevant *Prudential* factors, I conclude that the Settlement is fair, reasonable, and adequate under Rule 23(e).  As discussed, a few factors do not weigh in favor of settlement.   Not every factor need weigh in favor of settlement, however, in order for the Settlement to be approved.  *See In re Cendant Corp. Litig.*, 264 F.3d at  242-43 (affirming final settlement approval when not all factors weighed in favor of approval).   Because the ultimate balance of the *Girsh* and *Prudential* factors when considered together weigh in favor of settlement, the Settlement will be approved.

### D.    Attorneys' Fees and Costs

Under Rule 23(h) of the Federal Rules of Civil Procedure, "[i]n a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement."  Fed. R. Civ. P. 23(h).  A district court must conduct a "thorough judicial review of fee applications . . . for all class action settlements." *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 299 (3d Cir. 2005) (quoting *Prudential*, 148 F.3d at 333

(internal quotations omitted)).

> In assessing attorneys' fees, courts typically apply either the percentage-of-recovery method or the lodestar method. The percentage-of-recovery method is generally favored in common fund cases because it allows courts to award fees from the fund "in a manner that rewards counsel for success and penalizes it for failure." *Prudential*, 148 F.3d at 333 (internal quotations omitted). The lodestar method is more typically applied in statutory fee-shifting cases because it allows courts to "reward counsel for undertaking socially beneficial litigation in cases where the expected relief has a small enough monetary value that a percentage-of-recovery method would provide inadequate compensation" or in cases where the nature of the recovery does not allow the determination of the settlement's value required for application of the percentage-of-recovery method. *Id*. Regardless of the method chosen, we have suggested it is sensible for a court to use a second method of fee approval to cross-check its initial fee calculation. *Id*.

*Id*. As such, the percentage-of-recovery method will be employed to determine the proper fee to award Class Counsel, and then the lodestar will be utilized as a cross-check to ensure the reasonableness of the award. *See id*.

### 1. Application of the Percentage-of-Recovery Method

Class Counsel request a combined award of common benefit attorneys' fees, disbursements, and costs of $1,456,357.91 under the percentage-of-recovery method. This amounts to 30.66% of the gross Settlement Amount. The Third Circuit has instructed district courts to consider ten (10) factors when undertaking a percentage-of-recovery analysis: (1) the size of the fund created and the number of beneficiaries; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; (7) awards in similar cases; (8) the value of benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations; (9) the percentage fee that would

34

have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained; and (10) any innovative settlement terms.  *In re Diet Drugs*, 582 F.3d 524, 541 (3d Cir. 2009) (citations omitted).  The award factors, however, "need not be applied in a formulaic way" because each case is different, "and in certain cases, one factor may outweigh the rest."  *Rite Aid*, 396 F.3d at 301 (citation and internal quotation marks omitted).

### a.    Size of the Fund and Number of Beneficiaries

The Settlement Agreement establishes a common fund of $4,750,000.00 and notice has been disseminated to over 3,000 individuals.  In general, as the size of the settlement fund increases the percentage of the award decreases.  *See Prudential*, 148 F.3d at 339. The basis for this inverse relationship is the belief that "[i]n many instances the increase [in recovery] is merely a factor of the size of the class and has no direct relationship to the efforts of counsel."  *Id.* (citation omitted).  As explained below, Class Counsel's requested fees in this case represent approximately 30.66% of the common benefit fund, which is within the range of reasonable fees, on a percentage basis, in the Third Circuit.[6]  *See, e.g., Esslinger*, 2012 WL 5866074, at *12 (thirty percent (30%) fee award reasonable considering size of the fund); *In re Processed Egg Prods. Antitrust Litig.*, 2012 WL 5467530, at *3 (approving a thirty percent (30%) fee award for $25,000,000.00 settlement).  And, while the size of the common fund "is certainly substantial, it is not a 'mega-fund' that would dictate

---

[6]     At the final approval hearing held on December 16, 2015, Class Counsel stated that the 0.66% of this 30.66% represents the amount requested in costs. Therefore, Class Counsel's request for attorney fees would amount to 30.0% of the Settlement Amount.

an award at the low end of the sliding scale." *Frederick v. Range Resources-Appalachia, L.L.C.*, No. 08-288, 2011 WL 1045665, at *10 (W.D. Pa. Mar. 17, 2011) ($22,000,000.00 settlement does not qualify as a "mega-fund").   Accordingly, this factor weighs in favor of finding the fee request reasonable.

> **b.   Presence or Absence of Substantial Objections by Class Members**

As discussed above with respect to the *Girsh* factors, no objections were filed to the Settlement by any Settlement Class Member.   Similarly, no objections have been filed to Class Counsel's fee application.   The absence of objections supports the reasonableness of the fee request.   *Frederick*, 2011 WL 1045665, at *10 (citation omitted); *In re Amer. Inv. Life Ins. Co. Annuity & Mktg. & Sales Practices Litig.*, 263 F.R.D. 226, 244 (E.D. Pa. 2009) ("The small number of objections and the objections' lack of merit indicate that the class is satisfied with the fee award") (citation omitted).   This factor also weighs in favor of the requested award of attorneys' fees.

> **c.   Skill and Efficiency of the Attorneys Involved**

The quality of representation of Class Counsel considers "the quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of the counsel, the skill and professionalism with which counsel prosecuted the case and the performance and quality of opposing counsel." *In re Ikon Office Solutions, Inc., Secs. Litig.*, 194 F.R.D. 166, 194 (E.D. Pa. 2000) (citation and internal quotation marks omitted).   As set forth in greater detail above, Class Counsel are highly experienced, as the individual attorneys in this action have litigated numerous complex class actions involving mass actions and civil rights claims.   Additionally, Class Counsel's

ability to successfully negotiate the Settlement "demonstrates the significant skill and expertise of counsel." *In re Processed Egg Prods. Antitrust Litig.*, 2012 WL 5467530, at *3. Likewise, counsel for the Powell Defendants have extensive experience defending complex litigation and class actions. Thus, this factor supports the reasonableness of the fee award.

### d.      Complexity and Duration of the Litigation

The Third Circuit has stated that "complex and/or novel legal issues, extensive discovery, acrimonious litigation, and tens of thousands of hours spent on the case by class counsel" are "the factors which increase the complexity of class litigation." *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 741 (3d Cir. 2001). These factors all support the requested fee award. The litigation itself has been pending for nearly seven (7) years, during which Class Counsel participated in mediation, engaged in discovery, and submitted numerous, well-researched filings. Class Counsel have briefed motions for partial summary judgment and their motion for certification of a litigation class, and they defended Defendants' motions to dismiss and motions for summary judgment. Equally significant is the complex nature of this litigation, and the alleged judicial corruption scheme for which these actions seek redress. Therefore, the complexity and duration of the litigation supports the requested fee award.

### e.      Risk of Nonpayment

This factor allows courts to award higher attorneys' fees for riskier litigation. *Esslinger*, 2012 WL 5866074, at *13. Here, Class Counsel undertook this complex civil rights/RICO litigation on a contingent fee basis without any guarantee of payment. Class Counsel, in litigating this case, incurred hundreds of thousands of dollars in costs and

expenses while facing the risk of not being reimbursed. The risk of nonpayment, therefore, weighs in favor of granting the requested fee award. *See, e.g., In re Processed Egg Prods. Antitrust Litig.*, 2012 WL 5467530, at *4 (noting that any contingency fee arrangement includes a risk of non-payment).

### f.    Amount of Time Devoted by Class Counsel

In connection with the Mericle Settlement, I found that Class and Plaintiffs' Counsel had spent 34,900 hours prosecuting this matter. (Doc. 1268.) That amount of time has only increased since the entry of my December 14, 2012 Order, and during the processing of the Provider Defendant Settlement.

According to the motion for attorneys' fees, Class and Plaintiffs' Counsel have spent an additional 3,657.6 hours prosecuting this matter solely against the Powell Defendants. To date, the time spent by Class and Plaintiffs' Counsel total in excess of 40,000 hours. Such a large number of hours represents a substantial commitment to this litigation. Furthermore, the amount of time spent on this case prior to final approval of the Settlement reflects the complexity of Plaintiffs' claims, not the inefficiency of their counsel. Presumably, the thousands of hours counsel spent working on this matter prevented those individuals from litigating other cases. This factor thus strongly favors granting the motion for attorneys' fees.

### g.    Awards in Similar Cases

In the Third Circuit, "fee awards in common fund cases generally range from 19% to 45% of the fund." *Esslinger*, 2012 WL 5866074, at *15 (citation omitted). Many courts, including several in the Third Circuit, have considered 25% to be the "benchmark" figure for

attorney fee awards in class action lawsuits, "with adjustments up or down for significant case-specific factors." *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 262 (D. Del. 2002) (gathering case law and awarding 22.5% in fees on a $10.01 million settlement fund). And, courts in the Third Circuit have found a thirty percent (30%) fee reasonable in cases raising violations of constitutional rights. *See, e.g., Delandro v. Cnty. of Allegheny*, No. 06-927, 2011 WL 2039099, at *14 (W.D. Pa. May 24, 2011) ("[T]he Court finds that a percentage of thirty percent (30%) . . . is in fact identical to, the percentage awarded in a number of other strip-search class action settlements in this Circuit."); *Boone v. City of Phila.*, 668 F. Supp. 2d 693, 714 (E.D. Pa. 2009) ("30% fee percentage is commensurate with other strip-search class actions").

In the previous Mericle Settlement, I approved a combined award of attorneys' fees and costs of 24.4%. (Doc. 1268.)  In the previous Provider Defendant Settlement, I approved a 29.3% award of combined attorney fees and costs. (Doc. 1539.)  Accordingly, in this settlement, Class Counsel's request for a **combined** award of attorneys' fees and costs of 30.66% is within the range of percentages in similar cases both in the amount of settlement and subject matter of the case.

### h.  Value of Benefits Attributed to Class Counsel

The eighth factor the Court must consider is the degree to which the benefits of the settlement are attributable to Plaintiffs' counsel as opposed to the efforts of other actors, such as, for example, government investigators. *See In re Diet Drugs*, 582 F.3d at 541. While government investigation uncovered the alleged conspiracy orchestrated by Ciavarella and Conahan which resulted in the indictment of the former judges, "[t]here is no

contention . . . that the settlement could be attributed to work done by other groups, such as government agencies." *Esslinger*, 2012 WL 5866074, at *14.  This factor supports the requested fee.

### i.   Negotiated Fee in a Contingent Fee Arrangement

In private contingency fee cases, attorneys routinely negotiate agreements for between thirty percent (30%) and forty percent (40%) of the recovery. *See In re Ins. Brokerage Antitrust Litig.*, 282 F.R.D. 92, 123 (D. N.J. 2012); *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 194 (E.D. Pa. 2000).  The requested fee is within this range.

### j.   Innovative Settlement Terms

In their submission, Class Counsel did not identify any particularly "innovative" terms in the Settlement Agreement.  Thus, this factor neither weighs against nor for the proposed fee request.  *See, e.g, McDonough v. Toys "R" Us, Inc* ., 834 F. Supp. 2d 329, 345 (E.D. Pa. 2011) ( "In the absence of any innovative terms, this factor neither weighs in favor or against the proposed fee request.").

### 2.   Lodestar Cross-Check

The lodestar cross-check gauges the reasonableness of the attorneys' fee award as a whole.  *Milliron v. T–Mobile, USA, Inc.*, 423 F. App'x 131, 136 (3d Cir. 2011).  In performing the lodestar cross-check, the court multiplies "the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys." *Rite Aid*, 396 F.3d at 305.  Then, the court may apply a multiplier to "account for the contingent nature or risk involved in a particular case and the quality of the attorneys'

work." *Id* at 305–06.  If the multiplier that must be used in order to obtain the result reached by application of the percentage-of-recovery method "is too great, the court should reconsider its calculation under the percentage-of-recovery method." *Id*. at 306.  But, because the cross-check is not the primary analysis in common fund cases, it does not require "mathematical precision [ ] or bean-counting." *Id*.  In evaluating the hours reasonably spent on the case, the court does not have to "review actual billing records" but can "rel[y] on summaries submitted by the attorneys." *See id*.

According to Plaintiffs' submission, the lodestar for Class Counsel is $1,067,373.25. This amount was based upon the hourly rates I previously approved in the Mericle and Provider Defendants' Fee Awards.  Because the total attorneys' fee and award requested amounts to $1,425,000.00, the resulting multiplier is approximately 1.34%.  Therefore, the lodestar multiplier in this matter (1.34%) is within the Third Circuit's range of one (1) to four (4).  *Prudential II*, 148 F.3d at 341.  Accordingly, the lodestar cross-check supports the requested award.

### 3.    Reimbursement of Costs and Expenses

In addition to an award of attorneys' fees, Plaintiffs' counsel seeks reimbursement of expenses in the amount of $31,357.91.  The Federal Rules of Civil Procedure provide that a court "may award reasonable attorney's fees and nontaxable costs" to Plaintiffs' counsel.  Fed. R. Civ. P. 23(h).  Reimbursement is particularly appropriate when no class members have objected to it.  *In re Processed Egg Prods. Antitrust Litig.*, 2012 WL 5467530, at *7.  Here, no Class Member has objected to the fact that Class Counsel's expenses would be reimbursed from the Settlement.

Plaintiffs' counsel are requesting a **combined** award of attorneys' fees and costs totaling $1,456,357.91.  From that amount, all expenses first will be paid to reimburse the expenses incurred by each of the firms.  The remainder will be considered the total fee award and will be distributed at the discretion of Co-Lead Counsel.  As this request is reasonable, Plaintiffs' motion for an award of fees and costs will be approved.

### 4.    Allocation of Fees

Lastly, the motion seeks to allow Lead Counsel to allocate the fee among counsel entitled to share the award.  District courts may generally rely on lead counsel to distribute attorneys' fees among those involved.  *Milliron*, 423 F. App'x at 134.  Allocation of fees in this manner is rationale because counsel "are most familiar with the work done by each firm and each firm's overall contribution to the litigation," and this process "conserves the time and resources of the courts."  *In re Processed Egg Prods. Antitrust Litig.*, 2012 WL 5467530, at *7 (citation omitted).  Co-Lead Counsel will therefore be permitted to distribute the fee award to those attorneys who assisted in creation of the Settlement Fund.  Of course, should all counsel not agree with Co-Lead Counsel's allocation of fees, the ultimate allocation will then be made by the Court.  *See In re Diet Drugs Prods. Liab. Litig.*, No. 99-20593, 2002 WL 32154197, at *24 (E.D. Pa. Oct. 3, 2002).

### III. Conclusion

For the above stated reasons, the Settlement Classes will be certified, the Settlement will be approved, and the requested attorneys' fees and costs will be awarded.

An appropriate order follows.


December 21, 2015                                     /s/ A. Richard Caputo
Date                                                 A. Richard Caputo
                                                     United States District Judge