**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **FLORENCE WALLACE**, *et al.*, | : | **CIVIL ACTION NO. 3:09-CV-286** |
| | : | |
| **Plaintiffs** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **ROBERT J. POWELL**, *et al.*, | : | |
| | : | |
| **Defendants** | : | |

## <u>MEMORANDUM</u>

Although most memories fade over the years, certain events are so punctuated by overwhelming circumstances and emotions that no amount of time can erase their mark. Tragically, for many young citizens of our Commonwealth, the day they were adjudicated delinquent by former judge, now convicted felon, Mark A. Ciavarella ("Ciavarella"), is such an event. Last fall, this court received testimony from over 300 witnesses, who testified for the very first time about their experiences between January 2003 and May 2008 in Luzerne County juvenile court. Their collective testimony paints the portrait of justice derailed by a presiding judge who ruled with breathtaking arrogance and an unfathomable disregard of due process.

Ciavarella, along with his codefendant, former judge and fellow convicted felon, Michael T. Conahan ("Conahan"), orchestrated the shutdown of Luzerne County juvenile facilities in 2002 to make way for new detention centers. Unbeknownst to the public, however, both Ciavarella and Conahan received massive payouts for their assistance in the construction and eventual filling of the

new detention centers.  After these misdeeds came to light, plaintiffs initiated suit

against various individuals and entities responsible for this scheme.  Plaintiffs

entered into a series of settlements with all culpable defendants except Ciavarella

and Conahan.  Our colleague, the late Judge A. Richard Caputo, previously entered

judgment against Ciavarella and Conahan and, consequently, the only matter

pending before the court is the issue of damages.[1]  Having heard plaintiffs'

testimony and carefully considered the applicable law, we will award plaintiffs both

compensatory and punitive damages.

## I.    **Procedural History of the Litigation**

Plaintiffs filed suit in 2009 against numerous defendants, including Ciavarella

and Conahan.  The operative complaints allege constitutional violations pursuant to

42 U.S.C. § 1983, violations of the Racketeer Influenced and Corrupt Organizations

Act ("RICO"), 18 U.S.C. § 1962, *et seq.*, civil conspiracy, and false imprisonment.

(See Docs. 134, 136).  In October 2013, the clerk entered default against Conahan for

failure to plead or otherwise defend.  In December 2013, the court granted plaintiffs'

application for default judgment against Conahan on all issues of liability for which

he had not been afforded judicial immunity.  In January 2014, the court granted

plaintiffs' motion for partial summary judgment against Ciavarella, also on all issues

for which he was not protected by judicial immunity.  The court determined

Ciavarella and Conahan were both liable under Section 1983 for violating plaintiffs'

right to an impartial tribunal as well as conspiracy to violate plaintiffs' right to an

---

[1] This case was reassigned to the undersigned judicial officer in March 2020
following the passing of Judge Caputo.  (See Doc. 1781).

impartial tribunal.  (See Docs. 1500, 1510, 1511).  Judge Caputo deferred his determination on damages for both defendants.

Between 2012 and 2015, the court approved three sets of settlements between plaintiffs and many of the defendants to this action, including: Robert Mericle and Mericle Construction, Inc.; Mid-Atlantic Youth Services Corp., PA Child Care, LLC, and Western Child Care, LLC; and Robert J. Powell, Vision Holdings, LLC, and Powell Law Group, P.C.  (See Doc. 1783).

In June 2020, plaintiffs moved for a hearing to assess damages against Ciavarella and Conahan.  (See Doc. 1787).  After several delays due to the ongoing COVID-19 pandemic, we received testimony in September and October 2021, to determine plaintiffs' damages resulting from their now-vacated[2] juvenile adjudications by Ciavarella between January 1, 2003 and May 31, 2008 in Luzerne County.  In separate correspondence filed to the docket, Ciavarella and Conahan waived their right to participate at trial.  (See Docs. 1793, 1795).  We now set forth our decision on damages pursuant to Federal Rules of Civil Procedure 52(a) and 55(b)(2)(B).

---

[2] See In re: J.V.R., No 81 MM 2008, slip op. (Pa. Oct. 29, 2009) (per curiam) (exercising plenary authority pursuant to the Court's King's Bench powers).

II.     **Findings of Fact Pertinent to the Award of Damages**[3]

   A.     **Court's Prior Rulings**

To provide context, we begin with a description of the court's prior rulings on liability.  After granting a motion for default judgment against Conahan in November 2013, Judge Caputo issued a comprehensive summary judgment opinion on Ciavarella's liability in January 2014.  (See Docs. 1500, 1510, 1510).  Plaintiffs' statement of material facts establishes the following narrative.  "In late 1999, Ciavarella approached Conahan and suggested that they bring together a team that had the financial ability to build a new juvenile detention facility," including codefendants Robert Powell and Robert Mericle.  (See Doc. 1510 at 8-9).  Powell formed PA Child Care ("PACC") to construct such a facility.  (See id. at 9).  In 2002, during his term as president judge, Conahan orchestrated a "placement guarantee agreement" whereby the Luzerne County Court of Common Pleas would be required to pay rent to PACC.  (See id.)  Ciavarella was also aware of the placement guarantee agreement, and he and Conahan stopped sending juveniles to then-existing facilities in the area.  (See id. at 9-10).  Both judges appeared on television in December 2002 and publicly discussed "the need to shut down" current juvenile

---

[3] Our factual findings apply to all former juvenile plaintiffs who provided testimony or evidence to the court.  Additional, plaintiff-specific findings are set forth in the court's Damages Appendix, which is incorporated herein by reference.

facilities, clearly aware that such shutdowns would directly benefit PACC.  (See id. at 10).

Conahan informed Powell that "Ciavarella would need to be taken care of financially . . . to ensure the success of the PACC facility."  (See id.)  In January and July 2003, Powell and Mericle wired over $400,000 to Ciavarella using third parties, Robert Matta and Beverage Marketing of PA, Inc., to conceal the payments.  (See id. at 10-11).  Powell and Mericle partnered again in 2004 to construct another juvenile detention center, Western PA Child Care ("WPACC").  (See id. at 11).  After the WPACC facility was completed in July 2005, "Mericle paid Conahan and Ciavarella an additional $1,000,000."  (See id.)  A February 2006 addition to PACC resulted in another $150,000 payment from Mericle to Conahan and Ciavarella.  (See id.)  In total, Ciavarella received over $2.7 million and acknowledged "that he concealed all of the payments . . . because he knew it 'wouldn't look good' if he was receiving payments from Powell while also sending juveniles to his facility."  (See id. at 12).  Ciavarella admitted that from 2003 to 2007, "he never informed any of the juveniles who appeared before him that he was receiving money from PACC, WPACC, or Powell."  (See id.)

In January 2009, the United States Attorney for the Middle District of Pennsylvania filed a Bill of Information against Ciavarella and Conahan, alleging two counts of fraud.  (See id.)  In September 2009, a federal grand jury returned a 48-count indictment against Ciavarella and Conahan alleging racketeering, fraud, money laundering, extortion, bribery, and federal tax violations related to "construction and operation of juvenile detention facilities owned by PACC and

WPACC."  (See id. at 13-14).  Conahan entered a guilty plea in 2010, a jury convicted Ciavarella in 2011, and both men were sentenced to federal prison.  (See id. at 14).

As criminal proceedings began against the former judges, the Pennsylvania Supreme Court in February 2009 appointed a special master "to review all Luzerne County juvenile court adjudications and dispositions . . . affected by the recently-revealed criminal allegations" against the judges.  (See id. at 12-13).  In October 2009, the Pennsylvania Supreme Court authorized the special master to vacate and dismiss with prejudice "all cases in which Ciavarella entered adjudications of delinquency or consent decrees between January 1, 2003 and May 31, 2008."  See In re: J.V.R., slip op. at 6.  The Court reasoned:

> Ciavarella's admission that he received these payments, and that he failed to disclose his financial interests arising from the development of the juvenile facilities, thoroughly undermines the integrity of all juvenile proceedings before Ciavarella.  Whether or not a juvenile was represented by counsel, and whether or not a juvenile was committed to one of the facilities which secretly funneled money to Ciavarella and Conahan, this Court cannot have any confidence that Ciavarella decided any Luzerne County juvenile case fairly and impartially while he labored under the specter of his self-interested dealings with the facilities.

Id. at 6.  The Pennsylvania Supreme Court concluded that "all juvenile adjudications and consent decrees entered by Ciavarella" during this time period were "tainted."  See id. (emphasis in original).

B.     **Luzerne County Juvenile Court Statistics**

Defendants' stunning abuse of power is underscored by statistics from the

Juvenile Court Judges' Commission ("JCJC"), as summarized in the May 2010

report of the Interbranch Commission on Juvenile Justice:[4]

> The statistical picture is striking.  In 2003, Ciavarella
> ordered 330 juveniles from Luzerne County into
> placement.  That was twice the statewide average. More
> significant, *in a county that represented less than 3 percent
> of Pennsylvania's population, this single judge was
> responsible for 22 percent of the juvenile placements
> throughout all of Pennsylvania*. Over the next several years,
> there was a downward trend in juvenile placements across
> the state. Ciavarella followed this downward trend to some
> extent, but his placement rate still remained far higher
> than the norm.  In 2007, he sent 219 youths into placement.
> In context, that number was 2 ½ times the statewide
> average.  Of 1,066 juveniles placed statewide in 2007,
> Ciavarella accounted for 20 percent of them with
> placements from Luzerne County.

INTERBRANCH COMM'N ON JUV. JUST., FINAL REPORT 39 (May 2010) (emphasis

added).  Statistics provided by the JCJC demonstrate that *waiver of counsel rates*

*for Ciavarella's juvenile placements were seven to eleven times higher than the*

*statewide average* during the relevant period of January 1, 2003 through May 31,

2008:

---

[4] See Interbranch Commission on Juvenile Justice Act, Act No. 32, 2009 Pa.
Laws ___ (Aug. 7, 2009) (codified at 71 STAT. AND CONS. STAT. ANN. §§ 1190.35a-e)
(establishing Interbranch Commission on Juvenile Justice ("ICJJ")).



Against this startling factual and statistical backdrop, the court heard testimony from more than 300 individuals over the course of two months. A common theme emerged as witnesses described how these unlawful juvenile adjudications caused significant and enduring harm, touching every facet of their lives and their families' lives.

---

[5] See INTERBRANCH COMM'N ON JUV. JUST., Exhibits - Charts and Statistics 11, https://www.pacourts.us/Storage/media/pdfs/20210208/163106-chartsandstatistics juvenilecourtjudgescommission.pdf (last visited July 26, 2022).

### C.    Ciavarella's Contravention of Statutory Directives—The Administration of a Zero Tolerance Policy in Juvenile Court

In the Commonwealth of Pennsylvania, the Juvenile Act governs, *inter alia*, proceedings "in which a child is alleged to be delinquent." See 42 PA. CONS. STAT. § 6303(a)(1).  The stated purpose of the Juvenile Act includes "supervision, care and rehabilitation" of children who have committed delinquent acts to allow them to "become responsible and productive members of the community." See id. § 6301(b)(2).  Separating a child from his or her parents should be considered "only when necessary" and through the use of "the least restrictive intervention" necessary to balance public safety with the welfare of the child.  See id. § 6301(b)(3)(i).  Confinement, if any, should be "for the minimum amount of time" needed to carry out the statute's purpose.  See id. § 6301(b)(3)(ii).  Thus, juvenile court judges should be "guided by the concepts of balanced and restorative justice," see *In re* J.B., 107 A.3d 1, 18 (Pa. 2014), and "out-of-home placement should be a last resort."  See FINAL REPORT at 39.

Observing that Ciavarella's methods failed to conform to these statutory directives is a gross understatement.  Ciavarella had a zero-tolerance, autocratic approach to juvenile justice.[6]  His objectives were to intimidate, and then to punish.  These draconian methods caused immeasurable injury.  Indeed, his consistent use of in-state and out-of-state residential placements to address minor juvenile

_____

[6] See FINAL REPORT at 6, 13 (noting Ciavarella "took a hard line on juvenile crime" and "relished his role as a 'zero-tolerance' judge").  This court concluded in its summary judgment opinion that "Ciavarella's enactment and expansion of a zero tolerance policy . . . fall outside the scope of judicial action" and that, consequently, "judicial immunity does not shield this conduct."  (See Doc. 1510 at 18-19).

offenses and trivial probation violations devastated both the youths appearing before him and their families.  It was the antithesis of "balanced and restorative justice."  Cf. In re J.B., 107 A.3d at 18.  Ciavarella's acerbic treatment of juveniles in court and his routine pronouncement of lengthy detentions wrought havoc on a generation of local children and adolescents, and their families.

### D.   Appearing in Ciavarella's Courtroom

At trial, we heard from 282 plaintiffs and 32 parents.  The court finds the victims' testimony[7] to be completely credible and credits their remembrances of specific events as well as their candid inability to remember others.  Although their adjudications occurred well over a decade ago, many plaintiffs retained a vivid recollection of their various appearances before Ciavarella.  They recounted his harsh and arbitrary nature, his disdain for due process, his extraordinary abruptness, and his cavalier and boorish behavior in the courtroom.  The following trial testimony provides a flavor of what it was like to appear before former judge Ciavarella:

- To a 14-year-old who appeared for an unpaid underage drinking citation, accompanied by her mother:

  > [Ciavarella] actually looked at me and told me because I liked to drink like the bulldogs, I could get locked up like them, too.  He had two people detain me and started laughing at me when I went to go give my mom a hug, and he told me juvenile delinquents do not get to hug their parents goodbye.  (See 10/8/21 Tr. 148:14-19).

---

[7] Court reporters have provided the court with rough transcripts of all plaintiff testimony between September 27, 2021 and October 25, 2021. Citations thereto are abbreviated "Month/Date/21 Tr. __." Pagination and wording of the rough transcripts may vary from that of the official transcripts.

- To a 15-year-old charged with breaking and entering into a residence which he considered his home:

  > [Ciavarella] told me I didn't need a lawyer . . . . I was in front of him for forty-two seconds, that was it, and I remember that number because it's my grandfather's favorite baseball player, Jackie Robinson . . . I hate that number because it's the amount of time it took him to decide that he was going to lock me up for about ten months. (See 9/27/21 Tr. 46:19-47:2).

- During a 16-year-old's appearance awaiting a decision on his release after serving three months at Camp Adams:

  > [Witness]: [Ciavarella] said, "We'll stop the proceedings, I have to collect a bet." He donned a race cap, I forget which team it was, for a NASCAR team, and I'm not exactly sure the person who took the bet, but they were in the courtroom at the time.

  > The Court:  All right.  And that person showed up and approached the bench and gave the judge money?

  > [Witness]:  He had placed it in his hand, and the judge took his cap off and he stuck it inside the cap.  (See 10/8/21 Tr. 119:20-120:23).

- To a 10-year-old in a schoolyard fight without serious injuries, after she tried to explain she was assaulted and was defending herself:

  > [Ciavarella] told me there's no such thing as self-defense. (See 10/5/21 Tr. 22:23-24).

- Before a 16-year-old's hearing on his probation violation:

  > [Ciavarella] had this one boy in front of me . . . and he asked the kid how many birds did he see in the tree outside, and the kid looked outside and was kind of laughing. He said, "I think I see like four or five birds."  Judge Mark Ciavarella said, "Okay, you get five months, if you see five birds."  Then, I was up next right after that, so I knew I was going away . . . . (See 9/30/21 Tr. 108:20-109:3).

- During a 16-year-old's appearance as the result of an unpaid citation for smoking on school property:

  > At that time my parents had hired a paid lawyer, and so we went. I remember like they took me from PA Child Care to court, and when I got there [Ciavarella] basically didn't let my lawyer speak at all. Like pretty much like my lawyer didn't have any power whatsoever, so—and that was pretty much it. Like he didn't let me talk. He barely let my lawyer talk. [He] just sentenced me. [Ciavarella] said that I was a grown man and old enough to pay the fine myself and they detained me . . . . [He said]: "Your mommy can't help you now." (See 10/8/21 Tr. 68:5-14, 84:16-85:5).

- Recollection of a parent of a 14-year-old appearing on his first citation for drug use:

  > I do distinctly remember when we went in for the first, you know, the first sentencing . . . . The [substance abuse] counselor began speaking and [Ciavarella] just said to her: "You sit down and you shut up, because he's going away. He's going away." (See 10/8/21 Tr. 162:3-9).

- To a 15-year-old charged with breaking into a house but attempting to prove his innocence:

  > Judge Ciavarella asked me what I pleaded and I told him, I was like not guilty and I am trying to explain why. He told me to shut up. I looked at him, I'm like, shut up? I'm like all right, well, I want a lawyer then if that's the case, and he was like, "I don't have to give you nothing, but I can give you a sentence at Glen Mills until I say you're ready." Boom, and that was it. Literally like within twenty-five seconds court was done. (See 9/27/21 Tr. 55:14-23).

- From a 16-year-old who spent 11 months in detention for driving, without a license, the wrong way down a one-way street:

  > [H]e was – it almost seemed like he already had his mind was set, he didn't want to hear anything I had to say [and] it was the very first time I was in trouble . . . [The driving citation] was literally all it entailed . . . He told me "Ms. _____," he said, "I want you to count the number of buttons on your blouse, and that's the number of . . . months that

you're going away for." . . . I was a little kid, I didn't understand, so I did, I looked down and I actually counted them out because I didn't know how many buttons I had, and there were eleven. (See 10/12/21 Tr. 191:20-194:1).

- From a parent of a 17-year-old appearing for possession of marijuana:

  [Ciavarella] conducted like he wasn't a judge. He was like, he was like the king of the court. You couldn't say anything, you couldn't do anything, there was no explanation[] of what was going on, what was going to happen. (See 10/8/21 Tr. 37:7-14).

- To a 16-year-old in placement for 6-7 months as the result of a curfew violation awaiting a decision on her possible release:

  Yes, one thing that I feel like I can't seem to forget is when I was in my last placement, I was there for six or seven months, and I went to see [Ciavarella] to get released, and my grandmother was with me, and if she was alive today this is something she used to bring up every now and then. He was wearing a red hat or red cap . . . [of a baseball team] and they were playing maybe that day, and he asked me what team I would choose, and I picked the wrong team and . . . because I picked the wrong team I was going back to [detention], and I did go back . . . I did go back another seven or eight months and I thought I was coming home. (See 10/12/21 Tr. 181:7-182:3).

- To a 15-year-old appearing as the result of an altercation with her brother:

  [Ciavarella] wanted to send me to Camp Adams I believe it was because he said I didn't know how to behave at home, and I can remember the exact words that day. He let me go because he won a bet with a football game. He was feeling nice he said. (See 10/13/21 Tr. 42:19-25).

- To a 13-year-old cited for graffiti—using a marker on a school window:

  When I went to the [prehearing] meeting they said that I was not going to get placed anywhere, that I was just going to get probation. And when I was in front of Ciavarella, he said he was going to "make an example of me," and then shipped me off to Camp Adams. (See 10/8/21 Tr. 52:5-10).

- Recollection of plaintiff, who was 16 years old, during her adjudication:

> They decided that I was going to be sent [away] for giving the police officer the middle finger. Nothing else. I never had detention. I was never suspended from school. I was on the honor roll. I was in every club. I never did anything. I didn't –- I didn't even have a curfew because I didn't really even go places. I never drank in high school. I didn't smoke cigarettes. And when I was in front of Judge Ciavarella he threw this huge book in my face and he says, "This is your record." And I'm thinking my record of what? All the hundreds I've gotten since I was in kindergarten? (See 9/27/21 19:17-20:2).

These are the stories of just a few of the many, many victims of Ciavarella's abuse of power during his tenure as the presiding judge of juvenile court in Luzerne County.

### E.     Senseless Placement Decisions

The court heard numerous accounts of senseless detentions. Of the 282 former juveniles who testified, 79 were under the age of thirteen. (See Doc. 1854 at 2 n.2). One individual testified that he was only eight years old when he was first adjudicated by Ciavarella. (See 9/29/21 Tr. 7:14-25). After his initial appearance, this child was shipped to a slate of juvenile detention facilities for months at a time, including PACC, WPACC, Camp Adams Youth Camp, the Glen Mills School, and George Junior Republic. (See id. at 8:6-19). He estimated he spent around a decade in detention "bouncing from placement to placement." (See id. at 8:20-9:4). Like him, many youths were detained, adjudicated, and thereafter endured lengthy placements for minor infractions, including:

- Smoking cigarettes on school property;
- Stealing a Hershey bar;
- Writing graffiti on a school window;

- Peeling paint off the side of the school swimming pool;
- Opening a yo-yo in a convenience store;
- Bringing a utility tool or pocketknife to school;
- Jaywalking;
- Truancy;
- Shoplifting for food and necessities;
- Making an obscene gesture or swearing at an adult;
- Setting off a firecracker;
- Taking a neighbor's bicycle for a joyride;
- Pranking a schoolteacher by hiding her purse; and
- Being a few minutes late for curfew.[8]

Witnesses specifically recalled the intense humiliation they experienced when realizing that they would be placed in a juvenile detention facility and taken away from their families—particularly when they believed they would receive only a fine or probation. We repeatedly heard from plaintiffs who had never been in trouble with any school or law enforcement authorities until their initial adjudications before Ciavarella.[9] One plaintiff recalled that her mother attempted to speak with Ciavarella, saying, "Sir, she has never been in trouble before," and he responded "You're a liar. She is a bad girl and now she is going to pay." (See 9/28/21 Tr. 19:19-20:6). Another testified that he brought a paycheck from his job at

---

[8] (See, e.g., 9/27/21 Tr. 118:23-119:1; 9/28/21 Tr. 72:13-73:6, 118:1-6, 192:6-14; 9/29/21 Tr. 7:22-25; 9/30/21 Tr. 14:10-12, 79:1-22; 10/4/21 Tr. 57:20-22, 73:19:75:2, 101:24-102:9, 180:23-181:1; 10/5/21 Tr. 86:17-25, 179:12-180:8; 10/6/21 Tr. 116:22-117:1, 157:21-23; 10/7/21 Tr. 74:13-15; 10/8/21 Tr. 51:2-11, 64:14-18, 96:3-16, 110:1-23; 10/12/21 Tr. 87:2-7, 162:2-13, 185:16-186:22; 10/13/21 Tr. 49:9-50:9, 104:4-10; 10/25/21 Tr. 58:11-17).

[9] (See, e.g., 9/27/21 Tr. 15:13-15; 9/28/21 Tr. 19:19-20:6; 9/29/21 Tr. 47:16-21, 55:9-10; 9/30/21 Tr. 88:21-25, 129:22-130:2; 10/1/21 Tr. 14:2-15:3, 50:9-12, 74:15-25, 111:15-18, 156:3-8; 10/4/21 97:7-98:6, 110:6-11; 10/5/21 Tr. 147:19-22, 172:18-20, 191:16-21, 203:17-19; 10/6/21 Tr. 13:12-18, 26:10-15, 28:13-16, 85:13-18; 10/7/21 Tr. 90:24-91:9, 110:6-17; 10/12/21 Tr. 64:15-23, 170:24-171:19, 191:10-23; 10/13/21 Tr. 44:3-11; 10/25/21 Tr. 30:3-7).

Wendy's to his hearing, in an attempt to pay an outstanding fine: "[Ciavarella] didn't want to hear anything.  There was no say.  I was just immediately cut off." (See 9/30/21 Tr. 8:13-25).  The plaintiff recalled a court clerk or prosecutor trying to intervene on his behalf, but Ciavarella responded "I don't care.  He committed the crimes as a juvenile and he will be sentenced as a juvenile.  You are hereby remanded to the detention center."  (See id. at 9:1-6).

Victims described the shock of being immediately handcuffed and shackled, and both children and parents became emotional while recalling that they were not allowed to say goodbye or hug their loved ones.[10]  Many plaintiffs noted their mere presence in our courtroom brought back terrible memories, as one stated:

> Even though I am 31 and learned to move on from this corruption, having to relive it, this truly has brought back the worst memories and thoughts.  All I can visualize is his disgusting smirk and smile as they took me away, the sounds of my mother crying, and I can hear the shackles clinking off the floor.  Mark Ciavarella will forever be a monster who took my innocence away.  (See 10/1/21 Tr. 8:21-9:2).

Similarly, a parent recalled: "I didn't even get to tell him that I loved him and that everything was going to be okay.  It was devastating to my family.  He was shackled and handcuffed like he was a murderer.  He was only 12."  (See 9/29/21 Tr. 71:10-15).

---

[10] (See, e.g., 9/28/21 Tr. 47:25-48:7; 9/29/21 Tr. 71:5-15; 9/30/21 Tr. 30:7-15; 10/1/21 Tr. 8:21-9:2, 37:6-12, 75:4-14; 10/12/21 Tr. 171:8-19, 190:20-25; 10/13/21 Tr. 181:4-14; 10/25/21 Tr. 3:5-14).

### F.      Physical and Emotional Harm in Detention

Many victims spoke of being placed in facilities populated by individuals charged with far more serious offenses, including armed robbery, arson, aggravated assault, sexual offenses, and other violent felonies.[11]  One witness remarked on the stark contrast in charges between juveniles from Luzerne County and other areas of the state, noting:

> [T]he people that I was housed with at Camp Adams were there for serious offenses from surrounding counties.  You know, assaulting an officer, robbery, arson.  And then there were people from Luzerne County that were in there for stealing a pack of M & M's or getting into a tiff with their high school teacher.  (See 10/5/21 Tr. 137:7-18).[12]

We also heard numerous accounts of individuals who learned how to be a criminal simply by being exposed to hardened juvenile offenders with whom they were placed, as one plaintiff recalled

> I went in as a kid when I was supposed to be learning to drive, and I came out more as a criminal.  I learned how to become a criminal when I was supposed to learn to go to prom, you know, get my driver's license.  [Those] were the best years . . . supposed to be, of my life, and instead I'm learning how to sharpen a toothbrush.  (See 9/27/2021 Tr. 31:24-32:5).

---

[11] (See, e.g., 9/28/21 Tr. 34:23-35:7; 9/30/21 Tr. 66:14-67:7, 88:13-25; 10/4/21 Tr. 42:10-20, 50:7-16; 10/5/21 Tr. 35:11-36:5).

[12] In fact, a parent testified that her son was placed in detention for stealing a Hershey bar.  (See 9/28/21 Tr. 73:2-5).

A number of plaintiffs suffered physical injuries while defending themselves against other youths.[13]  A plaintiff stated that the adults operating one facility explicitly permitted juvenile fighting, testifying:  "The staff at St. Mike's would allow you sixty seconds, if you had an altercation with anybody they'd let [you] go into a room and fight it out . . . they condoned that.  They encouraged it."  (See 9/27/21 Tr. 47:14-20).  Other plaintiffs recalled physical beatings from the adults, as one noted "when the staff members broke up the fight they, you know, they flipped us, and it really wasn't so much of a restraining.  More of like a beat down."  (See 9/27/21 Tr. 69:5-7).

According to witness testimony, threats of sexual assaults were alarmingly common in these facilities, and sexual assaults did, in fact, occur.[14]  One plaintiff stated "I was told quite frequently that I was going to be raped in the shower.  The COs [staff members] were very brutal . . . . Every day was a constant threat of some kind of violence."  (See 9/30/21 Tr. 142:12-19).  Another witness described his experience at Northwestern Academy, fending off an attack from a peer by using the brush issued to detainees to polish their boots.  (See 10/8/21 Tr. 67:7-23).  One plaintiff testified that the sexual abuse he suffered resulted in a sexually transmitted

---

[13] (See, e.g., 9/27/21 Tr. 63:15-25; 9/28/21 Tr. 60:22-61:4, 107:3-16;  9/30/21 Tr. 71:25-72:1, 106:6-18; 10/1/21 Tr. 21:13-22:1, 85:11-21, 148:1-6, 151:20-23; 10/4/21 Tr. 52:9-53:13; 10/5/21 Tr. 38:14-22; 10/6/21 Tr. 173:25-174:8; 10/7/21 Tr. 32:2-9; 10/12/21 Tr. 93:11-17, 188:5-8).

[14] (See, e.g., 9/27/21 Tr. 31:11-20, 87:11-15; 9/28/21 Tr. 63:13-64:3, 127:16-24; 9/29/21 Tr. 64:2-6; 9/30/21 Tr. 142:12-19; 10/1/21 Tr. 22:20-23:1; 10/5/21 Tr. 48:7-16, 120:7-13, 182:5-11; 10/8/21 Tr. 67:7-23).

infection.  (See 10/1/21 Tr. 22:20-23:1).  Another recalled his fear upon seeing "kids come out of the showers and the back of their sweats filled with blood" after they had been sexually assaulted.  (See 9/27/21 Tr. 31:11-20).  Still another described being "sexually assaulted, legitimately choked unconscious, kicked and punched in the face" by staff who wished to "establish dominance over" him at the facility.  (See 9/28/21 Tr. 63:13-64:3).

These juvenile detainees were also forced to fend for themselves in other ways.  Several victims testified regarding the lack of adequate medical care in detention—if they received it at all.  For example, witnesses specifically recalled that they did not receive routine medical attention for physical maladies, including an asthma attack, a dental abscess, an eye infection, a concussion, or a sprained ankle.  (See 9/27/21 Tr. 70:3-8; 9/28/21 52:15-24, 202:3-9; 9/29/21 Tr. 19:18-20:4; 10/7/21 Tr. 44:19-24).  A plaintiff who entered detention at Camp Adams two days after having a cast removed from his broken foot was forced to participate in physical activities despite presenting a note from his doctor.  (See 9/27/21 Tr. 114:11-24).  Instead of providing medical attention, staff "worked [him] harder," and he fractured his foot "in the same spot," which "never healed again correctly."  (See id.)

One plaintiff testified that he contracted tuberculosis while detained at PACC and required hospitalization.  (See 10/1/21 Tr. 41:17-42:5).  Two female plaintiffs testified that they suffered from yeast infections and urinary tract infections because the detention facility used recycled undergarments and forced them to "wear other people's clothes."  (See 10/4/21 Tr. 108:21-109:9; 10/13/21 Tr. 133:1-9).

Another testified that her untreated urinary tract infection worsened to the point that her detention was cut short.  (<u>See</u> 10/25/21 Tr. 28:15-25).  One parent recalled that her daughter was hospitalized in placement, stating "In Danville . . . a guard broke her arm in four places.  She had from her shoulder all the way down casted." (<u>See</u> 10/12/21 Tr. 87:2-7).  Another plaintiff recalled that a guard at Camp Adams "smashed [his] face repeatedly off the desk," sending him to the hospital.  (<u>See</u> 9/28/21 Tr. 23:5-18).

Many plaintiffs testified about the brutal emotional toll their detention exacted while they were away from their families.  One testified that she tried to commit suicide while in detention by cutting her wrists, resulting in a hospitalization and "132 stitches and 19 staples."  (<u>See</u> 10/13/21 Tr. 51:15-25). Another described how she was sent to a local hospital several times for suicidal thoughts and actions, yet her detention continued despite recommendations that she be sent home.  (<u>See</u> 10/1/21 Tr. 75:4-80:3).  She recalled that staff at the facility bullied her due to her mental health, stating "They made my mother agree not to see me as punishment for me being suicidal."  (<u>See</u> <u>id.</u> at 80:15-20).  Another testified:

> I [was] always trying to ring the buzzer to try and make them let me go home.  I was really young. I had panic attacks.  I couldn't sleep . . . I just acted out.  You know, it was kind of a PTSD.  I couldn't sleep, nightmares.  (<u>See</u> 9/30/21 Tr. 38: 6-11).

These experiences underscore yet another grievous problem of Ciavarella's zero-tolerance, one-size-fits-all approach to juvenile offenders.  The record before the court is effectively devoid of evidence that individual mental health circumstances

were taken into consideration before placement was ordered.  Extended residential placement was the default method of dealing with juveniles evidencing any form of mental illness.  Consequently, an inordinate number of former juveniles suffering from significant mental health issues were shipped off to detention facilities without consideration of placement alternatives, which would have put greater emphasis on mental health treatment and counseling.

Plaintiffs' harm also extended to their education.  In-detention schooling, to the extent it occurred at all, was minimal.  One plaintiff recalled that his only form of education was watching the 1990s animated series "The Magic School Bus," and that he required special education classes after his detention ended.  (See 10/5/21 Tr. 24:1-15).  Another stated that his "education was pretty much nonexistent. . . . [T]hey'd just throw us in a room and told us to read a book."  (See 9/28/21 Tr. 117:12-15).  Still another recalled doing nothing but "word searches and crossword puzzles."  (See 9/27/21 Tr. 93:11-20).  One plaintiff described his experience during an 18-month detention:

> I did receive schooling, but . . . the only way I could describe it is I thought it was a joke . . . the schooling that I went through when I was there was . . . remedial at best.  It was just kind of somewhere for us to go and sit for eight hours a day, I guess.  I didn't actually feel like I received an education of any kind for that time.  (See 9/30/21 Tr. 67:11-22).

Plaintiffs also missed out on life events during detention, from weddings and funerals to vacations and religious holidays.  Several testified that close family

21

members died and they were not allowed out to attend the funerals.[15]  One

plaintiff's father died from cancer; although he was able to attend the funeral, he

had to do so "in handcuffs and shackles."  (See 10/7/21 Tr. 101:5-10).  Another

plaintiff summarized the trauma of attending his grandmother's funeral in

handcuffs and shackles:

> The Court: . . . And can you tell me or describe for me the
> emotional and psychological injury that you suffered as a
> result of this placement for driving the wrong way down a
> one-way street?
>
> [Witness]: Absolutely . . . [M]y grandmother, who pretty
> much raised me, passed away while I was in there and I
> had to attend her funeral in handcuffs and shackles, which
> was very embarrassing for my whole family to see me,
> [and] it was just really hard having to go back there that
> night knowing that she had passed away.  You know, being
> a child at that point, I mean I would say that that's like the
> starting point of my life of just everything went downhill.  I
> learned more about, you know, the dark side of life, you
> know, drugs and stuff like that, in there prior to never
> really knowing anything about that stuff. (See 10/12/21 Tr.
> 190:18-191:6).

## G.    Emotional and Reputational Damages Post-Detention

Upon their return to school and the larger community, countless plaintiffs

described a stain on their reputations, even if they had never previously been in

trouble with authorities.  One plaintiff recalled his shame and embarrassment in

school because he "had to have a security guard bring [him] to each class."  (See

10/1/21 Tr. 111:2-8).  Plaintiffs spoke about being ostracized from friend groups, and

---

[15] (See, e.g., 9/28/21 Tr. 118:25-119:5; 10/5/21 Tr. 91:15-22; 10/6/21 Tr. 39:2-11;
10/12/21 Tr. 119:7-14).

noted school officials labeled them as "bad kids" or "criminals."[16]  One plaintiff

recalled "I was arrested at my high school . . . and after the whole experience,

people witnessing that, I had anxiety being around everybody at school . . . I was

labeled."  (See 9/30/21 Tr. 49:12-17).  A parent described how her son's friends

"isolated him," stating "he was not allowed to go to their homes" after his release

from detention.  (See 9/29/21 Tr. 74:9-15).  Another plaintiff summarized the social

stigma he experienced after detention:

> My friends' parents no longer wanted them to hang out
> with me.  I was from a small town . . . and pretty much the
> whole community knew of me, and from that point on, I
> was a criminal.  Everyone looked at me that way.  All my
> friends changed.  I started hanging out with a different
> crowd because that was the only crowd that would hang
> out with me . . . I no longer played sports.  Coaches didn't
> want a criminal on their team.  (See 9/30/21 Tr. 134:20-
> 136:23).

Plaintiffs' educational harm also continued after detention.  Several plaintiffs

informed the court that they were expelled from their previous schools due to their

juvenile records; many were forced to enroll in alternative schooling.[17]  Others

---

[16] (See, e.g., 9/27/21 Tr. 65:7-66:6; 9/29/21 Tr. 47:16-21; 9/30/21 Tr. 48:24-49:20,
89:11-17, 119:14-120:8, 134:20-136:23; 10/1/21 Tr. 114:4-115:6; 10/4/21 Tr. 70:5-18, 86:5-
12, 103:11-19; 10/5/21 Tr. 5:3-11, 203:5-16; 10/7/21 Tr. 85:10-23, 89:9-16; 10/25/21 Tr.
37:3-14).

[17] (See, e.g., 9/30/21 Tr. 42:24-43:4; 10/4/21 Tr. 110:6-24; 10/5/21 Tr. 78:7-22;
10/6/21 Tr. 119:1-10; 10/8/21 Tr. 147:7-13; 10/12/21 Tr. 21:13-22, 45:13-19, 104:14-21,
188:16-21; 10/13/21 Tr. 139:6-17, 176:1-9, 188:11-20; 10/25/21 Tr. 37:3-17).

began failing classes, repeating grades, or dropping out of school altogether.[18]  One witness summarized her lack of education in detention by stating "when I finally came home I was in eleventh grade, and . . . I didn't know how to be in school." (See 10/5/21 Tr. 61:8-10).

Many of defendants' victims have been diagnosed with post-traumatic stress disorder (PTSD), depression, and anxiety; many also suffer from recurrent thoughts of suicide.[19]  One plaintiff stated "Even just coming here today, when I heard this case was reopening, I had nightmares about it almost twice a week . . . I never tell anybody about this period of my lifetime."  (See 9/29/21 Tr. 16:9-15).  Another testified via video that she chose to appear virtually because "I am terrified of the justice system . . .  I'm doing the video [testimony] because I am terrified of the courtroom, and even this is making me nervous."  (See 9/30/21 Tr. 28:15-22).

---

[18] (See, e.g., 9/27/21 Tr. 32:5-18, 39:21-40:3, 80:6-13; 9/28/21 Tr. 7:9-14, 24:3-10, 32:12-18, 40:8-15, 43:20-24, 113:18-24, 117:16-20, 209:22-210:9; 9/30/21 Tr. 82:19-83:7; 10/1/21 Tr. 51:8-13, 110:4-16, 130:12-24, 152:8-22; 10/4/21 Tr. 46:9-16, 85:10-19, 110:6-18; 10/5/21 Tr. 61:3-17, 78:7-79:3, 127:25-128:12, 136:2-24, 152:6-17; 10/6/21 Tr. 30:20-24, 92:25-93:3, 166:15-167:7; 10/7/21 Tr. 15:7-16:14, 59:15-25, 64:16-20, 76:12-20, 84:1-6; 10/8/21 Tr. 20:14-23, 26:10-20, 41:11-18, 48:4-15, 90:1-10; 10/12/21 Tr. 64:25-65:16, 94:6-14, 110:15-22; 10/13/21 Tr. 35:6-18, 43:15-44:2, 53:7-16, 69:2-7, 74:11-17, 80:4-13, 87:17-21, 97:17-19, 139:6-17, 170:14-18; 10/25/21 Tr. 61:1-3).

[19] (See, e.g., 9/27/21 Tr. 48:1-17, 106:1-13, 118:1-18; 9/28/21 Tr. 31:19-32:16, 63:24-64:2, 114:7-20, 142:5-17, 169:9-17; 9/29/21 Tr. 10:1-24, 58:7-19; 9/30/21 Tr. 87:10-21 10/4/21 Tr. 110:6-18; 10/5/21 Tr. 119:1-10; 10/12/21 Tr. 45:13-19, 88:9-16; 10/25/21 Tr. 37:3-17, 59:23-60:3, 69:3-23).

Tragically, but not unexpectedly, many plaintiffs spoke of self-medicating with illegal drugs leading to the vicious cycle of drug addiction.[20] One plaintiff testified that he suffered a serious back injury during his detention in Camp Adams and was prescribed opioids to which he later became addicted. (See 10/1/21 Tr. 136:11-24). Several of the juvenile victims who were alive when this litigation commenced have since died from overdoses or suicide.[21] Their parents testified, and one poignantly observed:

> He couldn't get over it. Every place he went, even though all this was supposed to disappear, nope, you were involved in all of these crimes, you're no good. That's all he ever heard. He couldn't take it no more. He left behind a ten-month old child . . . . I'd give up my life immediately if he could come back and be with his son. (See 9/28/21 Tr. 84:14-85:12).

The presence of continuing psychological harm was palpable. Numerous victims broke down while testifying, tears flowing and emotions bursting over the loss of their self-esteem and the destruction of their childhood. Witnesses painfully described the permanent scars caused by Ciavarella and Conahan:

- As I wrote . . . my opening statement, I get flashbacks of trauma coming to me and thoughts and emotions I wanted to bury, of self-doubt and drug use and just heartache. The feeling of being cheated out of these things that I planned to work for my whole life or career at that point were

---

[20] (See, e.g., 9/27/21 Tr. 28:12-17, 40:8-13, 100:5-25, 143:4-8, 152:3-12; 9/28/21 Tr. 7:17-21, 96:19-97:3, 114:2-16, 133:19-134:2, 142:8-18, 150:2-7, 203:10-23; 9/29/21 Tr. 27:10-17; 9/30/21 Tr. 39:12-22, 70:17-25, 89:21-90:6, 135:6-11; 10/1/21 Tr. 8:17-20, 136:11-19; 10/4/21 Tr. 46:24-47:5; 10/5/21 Tr. 96:13-20; 10/6/21 Tr. 13:10-18, 69:7-14, 104:7-15, 130:2-10; 10/7/21 Tr. 23:7-17, 86:7-18; 10/8/21 Tr. 14:1-6, 48:10-12; 10/12/21 Tr. 6:4-11, 27:2-8).

[21] (See, e.g., 9/28/21 Tr. 68:7-92:13; 9/30/21 Tr. 149:20-153:25; 10/12/21 Tr. 82:6-89:24).

robbed of me because I was seen as a payday for judges regardless of what the charges were. (See 10/12/21 Tr. 50:23-51:4).

- Judges are there to protect our rights, and I don't think that anything was ever done for us. I know so many people that were in my shoes, and there's a courtroom full of them . . . No amount of money could replace a childhood. (See 9/27/21 Tr. 33:9-15).

- That's why being here today is so important to me because, you know, I don't want anybody to ever go through that. You know, I can't even talk about it without crying. So, obviously, it has an effect on me . . . there was a lot of struggle along the way . . . I'm thankful that you guys let us come up here and say this stuff because for nothing else, you know, it feels good for people to listen to you . . . . (See 9/28/21 Tr. 215:18-216:25).

- [Ciavarella] just . . . he ruined my life. I never got to experience none of my childhood. Nothing . . . he just didn't let me get to my future. (See 9/27/21 Tr. 118:6-22).

- I really wish [Ciavarella] could have been here today, you know, just to look him in the eye as all these parents and victims, and it's terrible. You can't put a price on a life, you know? It's sad. (See 9/27/21 Tr. 137:7-11).

- I could sit here the whole day and go over how this affected my life, but I mean it was just a cascading effect from when it all started. (See 9/28/21 29:1-3).

- You tucked me under the rug and sent me home and didn't give me education or didn't give me anything. So what you set for me was failure. It was literally failure. I was a number and I was just put into the [detention] system. That's how I feel about it. He was the one who introduced me to that system, and it took me a long time to get out of it, a long time. (See 9/28/21 Tr. 38:7-12).

- [My detention] caused very deep and pivotal ripple effects in my life. It pretty much put negative mindsets and terrible coping mechanisms for me to come up to have a

transition from a young kid to a young adult . . . I developed an institutionalized mindset.  (<u>See</u> 10/1/21 Tr. 87:7-25).

- No amount of money can fix the once happy child forever lost years ago to these selfish men that I assure you will never return.  A $17 million payout from a real estate tycoon and 17 and 20 year sentences in federal prison isn't long enough to account for all the years stolen from me as a child by cowards who chose personal financial gain over the most detrimental learning years of a young adult's life, who chose personal financial gain with no regard to the physical or mental well-being of those same children or the negative social and emotional impact it would have regarding development delays or life-long trauma for the children they were supposed to help.  (<u>See</u> 9/28/21 Tr. 65:15-66:3).

- I will close with one final thought. The Luzerne County Court System failed us.  They [Ciavarella and Conahan] had abused their power and, in my opinion, should never see the daylight again. The scars of this scandal will continue to live with all of us.  As a survivor, I can assure you the impact of this man's greed [will never] be over or forgotten.  (<u>See</u> 10/4/21 Tr. 76:23-78:3).

- It still bothers me today because I honestly believe, I feel I was just sold out for no reason.  Like everybody just stood in line to be sold.  You know?  But I didn't know we were to be sold.  Just one after another we were incarcerated.  (<u>See</u> 10/8/21 Tr. 138:3-9).

- The one thing I did want to say is, you know, if I had an amount, you know, of money that could be given to me, but if I could trade that for my time, you know, 15 months, roughly, and if I could be a teenager and not ever have had this happen, I would want my time to go back and just be able to finish high school and have a senior year and, you know, just not go through this. So time is more valuable to me.  (<u>See</u> 9/29/21 Tr. 55:11-17).

- Well I'll tell you what, Ciavarella and all those judges . . . they invented a new kind of child abuse.  (<u>See</u> 9/30/21 Tr. 61:9-15).

27

Victims spoke of widespread trust issues as a result of their adjudications—and in particular, losing respect for the legal system and its authority figures.[22]  A plaintiff testified about the lasting effect his detention had on interactions with law enforcement:

> Last year I was at a regular traffic stop . . . I was trying to explain to the police officer that with him standing over me and everything was the reason why I was shaking and couldn't really contain myself.  I ended up having to show mental [health] records in court to explain why my behavior was so erratic.  (See 10/1/21 Tr. 131:19-25).

One parent noted that her son now "always carrie[s] his rights in his pocket because he realized that if he didn't know what his rights were that they would be taken away."  (See 10/1/21 Tr. 14:9-11).  Another stated:

> Like where do you go? Who do you go to? Like what do you do? . . . I certainly didn't have the answers.  I said these are people that we're supposed to trust.  This is what we teach our children, if there's ever an issue it's the police, it's courts, they are the folks that are supposed to protect and make sure that what's correct and right is done.  And th[ey] completely failed everybody in this whole situation. . . (See 9/27/21 Tr. 131:14-22).

As is often the case in such circumstances, painful lessons have been learned and reforms have been undertaken.  Because of this scandal, the Commonwealth passed Act 32 in 2009 to temporarily establish the Interbranch Commission on Juvenile Justice ("ICJJ").  See 71 STAT. AND CONS. STAT. ANN. §§ 1190.35a-e.  The

---

[22] (See, e.g., 9/27/21 Tr. 71:14-20, 88:18-22, 116:11-18; 9/28/21 Tr. 40:16-20, 121:11-16, 217:25-218:6; 9/30/21 Tr. 28:15-22, 126:11-20, 143:20-144:2; 10/1/21 Tr. 14:24-15:3; 10/4/21 Tr. 19:6-16, 73:14-22, 111:13-18; 10/6/21 Tr. 166:19-25; 10/7/21 Tr. 53:10-19; 10/8/21 Tr. 61:2-5, 138:23-139:7; 10/12/21 Tr. 21:9-12; 10/13/21 Tr. 126:22-127:6, 140:6-11; 10/25/21 Tr. 30:19-30:2).

ICJJ's May 2010 report recommended, *inter alia*, updates to the Pennsylvania Code of Judicial Conduct, guaranteed access to defense counsel in juvenile court, reduction in the use of shackles in juvenile courtrooms, and procedural requirements to ensure any juvenile court judge's decision to remove a juvenile from the home is based on the purpose and goals of the Juvenile Act.  <u>See</u> FINAL REPORT at 41-59.  These and other improvements have since been enacted.[23]  Such reforms may be cold comfort to plaintiffs, but it is their legacy to have prompted better procedural protections for future generations of juveniles charged with criminal offenses.

## III.  <u>Conclusions of Law</u>

This court previously granted summary judgment in favor of plaintiffs on their claims against defendants Ciavarella and Conahan on all issues of liability for which defendants were not protected by immunity.  (<u>See</u> Docs. 1500, 1510, 1511).  This determination of liability included, *inter alia*, defendants' violations of the right to an impartial tribunal as well as conspiracy to violate plaintiffs' right to an

---

[23] <u>See, e.g.</u>, *In re*: Adoption of New Rule 139 of the Rules of Juvenile Court Procedure (Pa. April 26, 2011) (*per curiam*); 237 PA. CODE RULE 139 (requiring the removal of restraints unless they are determined necessary to prevent physical harm or disruptive courtroom behavior); *In re*: Order Amending Rules 151, 362, and 512 of the Rules of Juvenile Court Procedure (Pa. May 16, 2011) (*per curiam*); 237 PA. CODE RULE 512 (requiring the court to, *inter alia*, state in open court its reasons for any out-of-home juvenile placement as well as a finding that such placement is consistent with the purposes of the Juvenile Act); *In re*: Order Amending Rule 152 of the Rules of Juvenile Court Procedure (Pa. Jan. 11, 2012) (*per curiam*); 237 PA. CODE RULE 152 (requiring that the court conduct a colloquy on record to ensure any juvenile's decision to waive the right to counsel is knowing, voluntary, and intelligent).

impartial tribunal as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.  (See id.)[24]  Plaintiffs seek both compensatory and punitive damages.  (See generally Doc. 1854).  We address these damages types *seriatim.*

---

[24] Plaintiffs in this action include both the former juveniles who were adjudicated delinquent between 2003 and 2008 as well their parents.  We have reviewed the operative complaints as well as the court's prior opinions and orders determining liability, and those claims for which damages may be assessed.  (See Docs. 134, 136, 1500, 1510, 1511).  This litigation contains both a class action complaint ("CAC") and a master long form complaint ("IC").  Counts I and II in the CAC allege violations of the right to an impartial tribunal and conspiracy to violate that right.  (See Doc. 136 at 159, 162).  Counts I and II are brought only by "all youth plaintiffs," and no parents.  (See id.)  Similarly, Count III of the IC alleges deprivation of, *inter alia*, the right to an impartial tribunal.  (See Doc. 134 at 43-48).  Count III is brought only by "juvenile plaintiffs," not parents.  (See id. at 43).

Judge Caputo's liability determination against Ciavarella orders him liable on CAC Counts I and II, and IC Count III.  (See Doc. 1511 at 3).  It does not include any claims brought by the juveniles' parents.  (See id.)  Judge Caputo's order granting default judgment against Conahan did include claims made by parents, but none of those claims were made pursuant to Section 1983.  And plaintiffs' pre- and post-hearing briefing indicate they only seek damages pursuant to Section 1983.  (See Doc. 1854 at 5-11). In light of these prior orders, we are constrained to conclude we cannot award damages to the parents who incurred court costs or other fees as a result of their children's adjudications.  We have, however, considered their testimony as additional evidence of the damages suffered by juvenile plaintiffs in this suit.

### A.    Compensatory Damages[25]

Compensatory damages are intended to make plaintiffs whole.  See Calhoun v. Yamaha Motor Corp., U.S.A., 216 F.3d 338, 347 (3d Cir. 2000) (citations omitted). In Section 1983 cases, compensatory damages "are governed by general tort-law compensation theory."  See Allah v. Al-Hafeez, 226 F.3d 247, 250 (3d Cir. 2000) (citing Carey v. Piphus, 435 U.S. 247, 255 (1978)).  Stated differently, damages may be awarded for actions that violate constitutional rights and cause compensable injury.  See id.  Compensable harms may include monetary injury and "out-of-pocket loss" as well as noneconomic losses such as reputational injury, humiliation, and "mental anguish and suffering."  See id. (quoting Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 307 (1986)).  A plaintiff's noneconomic damages cannot be precisely calculated.  See Evans v. Port Auth. of N.Y. & N.J., 273 F.3d 346, 356 (3d Cir. 2001).

Courts may consider awards in comparator cases—those involving similar conduct and injuries—as a "helpful guide" in assessing damages.  See Blakely v.

---

[25] We note at the outset of this section that the court approved a supplemental notice to all plaintiffs in the consolidated action in July 2021.  (See Doc. 1815).  This notice informed plaintiffs "By doing nothing, you are waiving your right to seek additional damages from defendants Ciavarella and Conahan in this case."  (See Doc. 1815-1 at 1).  Plaintiffs' counsel dispatched this notice "to 2,183 Juvenile and Parent Plaintiffs who participated in the prior three court approved settlements" with other defendants, and posted the notice on the longstanding website created for this lawsuit.  (See Doc. 1828 ¶¶ 2-3).  Due to the need for an individualized determination of damages suffered by each plaintiff, the court's decision will apply only to those plaintiffs who participated.  Although the court granted conditional class certification, it did so in the context of liability, settlements, and against defendants other than Ciavarella and Conahan.  (See Docs. 1268, 1409, 1410, 1539). We have made an individualized determination of damages based on the testimony and exhibits in the record from plaintiffs who participated.

Cont'l Airlines, Inc., 992 F. Supp. 731, 736 (D.N.J. 1998) (citing Motter v. Everest & Jennings, Inc., 883 F.2d 1223, 1230 (3d Cir. 1989); Gumbs v. Pueblo Int'l, 823 F.2d 768, 773 (3d Cir. 1987)).  In the matter *sub judice*, this court has adjudged both Ciavarella and Conahan liable for violations of—and conspiracy to violate— plaintiffs' right to an impartial tribunal.  (See Docs. 1500, 1510, 1511).  Yet the court's independent review of damages case law reveals a dearth of guidance for this particular type of constitutional violation.  As noted, the Pennsylvania Supreme Court vacated *all* Ciavarella's adjudications of delinquency between January 1, 2003 and May 31, 2008.  See *In re*: J.V.R., slip op. at 6.  The decision to vacate scores of juvenile adjudications because of fundamental unfairness in the proceedings bears striking resemblance to suits involving wrongful imprisonment.  Hence, we will examine wrongful imprisonment case law for guidance in determining an appropriate compensatory damages figure.

Two district courts have concluded that $1 million per year of wrongful imprisonment in an adult prison may reasonably compensate a plaintiff's injuries. See, e.g., Newton v. City of New York, 171 F. Supp. 3d 156, 174 n.111 (S.D.N.Y. 2016) (collecting cases); Limone v. United States, 497 F. Supp. 2d 143, 243-44 (D. Mass. 2007), aff'd on other grounds, 579 F.3d 79 (1st Cir. 2009) (same).  We have also considered the following cases: Connick v. Thompson, 563 U.S. 51, 54 (2011) (noting jury award of $14 million for 18 years of wrongful incarceration, including 14 years on death row); Singletary v. District of Columbia, 766 F.3d 66, 68-69 (D.C. Cir. 2014) (noting jury award of $2.3 million for 10 years of confinement on wrongful conviction of parole violation); Parish v. City of Elkhart, 702 F.3d 997, 999 (7th Cir.

2012) (observing that an average jury award for wrongful conviction is nearly $950,000 per year with a median of nearly $790,000 per year); <u>Waters v. Town of Ayer</u>, No. CIV. A. 04-10521-GAO, 2009 WL 3489372, at *2-3 (D. Mass. Sept. 17, 2009) (awarding $10.72 million for over 18 years of wrongful incarceration); <u>Restivo v. Nassau County</u>, 2015 WL 5796966 (E.D. N.Y. Sept. 30, 2015) (awarding $18 million for 18 years of wrongful imprisonment on rape convictions overturned by DNA evidence); and <u>Sung-Ho Hwang v. Grace Rd. Church</u>, No. 14-CV-7187, 2018 WL 4921638, at *4 n.6 (E.D.N.Y. Aug. 10, 2018) (noting "$1 million per year comes out to $2,739.73 per day of confinement").  We have also considered those cases awarding in excess of $1 million per year, such as <u>Jimenez v. City of Chicago</u>, 732 F.3d 710, 712 (7th Cir. 2013) (noting award of $25 million for 16 years of wrongful incarceration on murder charges against 15-year-old who was tried as an adult); <u>White v. McKinley</u>, 605 F.3d 525, 537, 539 (8th Cir. 2010) (noting award of $14 million for over five years of wrongful incarceration on false accusation that plaintiff molested his adopted daughter); and <u>Dominguez v. Hendley</u>, 545 F.3d 585, 588 (7th Cir. 2008) (noting award of $9.06 million for four years of wrongful incarceration of 15-year-old after sexual assault conviction overturned by DNA evidence).

 <u>Newton</u> is particularly instructive in that the district court surveyed many cases, including those set forth above, awarding damages for wrongful incarceration.  In <u>Newton</u>, the court sought to establish an upper boundary for wrongful incarceration awards where the plaintiff had two convictions, only one of which was overturned.  <u>See</u> <u>Newton</u>, 171 F. Supp. 3d at 172.  After analyzing comparable recoveries, the court granted the defendants' motion for remittitur,

concluding that $1 million per year (or $2,739.73 per day) is the "upper boundary" for similar cases.  Id. at 174.  Importantly, the court factually distinguished various awards based upon a number of factors, including the following: (1) nature and length of the sentence imposed (e.g. death row for murder or a term of years for lesser crimes);[26] (2) whether the individual was serving time in a juvenile facility or adult prison;[27] (3) whether the individual previously had been incarcerated;[28] and (4) whether the wrongful conviction was caused by negligent acts or omissions, or intentional misconduct.[29]

Applying these factors to the instant case, we observe that plaintiffs were sentenced to placements of limited duration in juvenile facilities.  Many witnesses testified about the harsh conditions and the violence and abuse permeating these facilities.  We have considered this important testimony.  We have also considered the fact that plaintiffs' unlawful detentions occurred at a critical time in their development—when they were susceptible to negative influences yet lacking the benefit of immediate family support.  The abrupt and difficult adjustments that these youths faced cannot be overstated.  Although their placements were unquestionably harrowing, we are also compelled to observe that plaintiffs did not suffer the conditions of an adult prison or the security restrictions of inmates on death row or serving life sentences.  The third and fourth Newton factors weigh in

---

[26] See id. at 173 (discussing Limone, 497 F. Supp. 2d at 245).
[27] See id. at 174-75 (discussing Jimenez, 732 F.3d at 714).
[28] See id. at 175 n.115 (citing Green v. Baca, 226 F.R.D. 624, 657 (C.D. Cal. 2005) (collecting cases)).
[29] See id. at 173 (citing Limone, 497 F. Supp. 2d at 153, 245).

favor of plaintiffs.  Although several plaintiffs were adjudicated delinquent before their first experience with Ciavarella, the vast majority were not, and none were previously incarcerated in adult facilities.  Finally, it is abundantly clear that wrongful placement decisions were the result of egregious misconduct, not mere negligence or inadvertence.

We make one final observation:  plaintiffs' adjudications were vacated but, unlike the wrongful convictions surveyed in Newton, none were overturned based upon the plaintiffs' actual innocence.  Cf. Newton, 171 F. Supp. 3d at 160, 172-76. The court recognizes that this distinction is immaterial to many plaintiffs who should not have been adjudicated delinquent in the first place.  We are also cognizant that, generally speaking, plaintiffs were never provided the opportunity to prove their innocence or to present mitigating evidence.  We note only that there is a difference between a finding of actual innocence and having an adjudication vacated due to the taint of judicial misconduct.

Having considered comparable awards and the distinguishing factors set forth in Newton, the court concludes that plaintiffs are entitled to compensatory damages at an initial base rate of $1,000 per day of wrongful detention.  The court has prepared a Damages Appendix which sets forth the number of days that each plaintiff was wrongfully detained.  For certain individuals who could not recall the precise length of their placements, the court has estimated the number of days in detention based upon the testimony, record evidence, and the submissions of plaintiffs' counsel.  Thereafter, the court calculated plaintiffs' initial aggregate awards by multiplying the number of days in detention times the base rate of

$1,000.  Having determined the initial aggregate award, the court adjusted these awards in a final step to meaningfully reflect the unique circumstances and experiences of each plaintiff.  We emphasize that we have carefully considered all record evidence, including multiple reviews of testimony received at trial, and we have varied the initial aggregate award to reflect our necessarily subjective view of the appropriate amount of compensatory damages for each participating plaintiff.[30]

### B.    Punitive Damages

Punitive damages may be warranted in a Section 1983 civil rights suit where a constitutional violation has occurred, even in the absence of compensatory or nominal damages.  See Alexander v. Riga, 208 F.3d 419, 430 (3d Cir. 2000) (citing Curtis v. Loether, 415 U.S. 189 (1974)).  For example, punitive damages may be awarded if the defendants were "motivated by evil motive or intent," or acted with "reckless or callous indifference to the federally protected rights of others."  See id. at 430-31 (quoting Smith v. Wade, 461 U.S. 30, 56 (1983)).  Punitive damages serve "deterrence and retribution" functions, see State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 416 (2003), and are reserved for circumstances involving "something more than a bare violation" of constitutional rights, see Keenan v. City

---

[30] As the Damages Appendix indicates, we have reduced the overall compensatory damages awards by the sum total of past settlement awards in this case.  These past settlements all included a "Griffin release," whereby plaintiffs agreed to reduce any future recovery against "Non-Released Parties" in proportion with the settlement awards.  (See Doc. 1854 at 12); see also Rocco v. Johns-Manville Corp., 754 F.2d 110, 114-16 (3d Cir. 1985) (citing Griffin v. United States, 500 F.2d 1059 (3d Cir. 1974)).  Having examined the settlement agreements, we conclude the releases apply to our damages determination, and therefore reduce the awards *pro rata* according to previous settlement amounts.

of Philadelphia, 983 F.2d 459, 470 (3d Cir. 1992) (quoting Cochetti v. Desmond, 572

F.2d 102, 106 (3d Cir. 1978)).  "Such awards may be particularly appropriate as a

means of vindicating the public interest in preventing violations of civil rights by

state officials." Cochetti, 572 F.2d at 105.[31]

Punitive damage awards are not, however, without limits.  The United States

Supreme Court has developed a set of guideposts to prevent grossly excessive

punitive damages awards, as such awards violate due process.  See BMW of N. Am.,

Inc. v. Gore, 517 U.S. 559, 562 (1996).  In fashioning a punitive damage award, a

court may consider: "(1) the degree of reprehensibility of the defendant's actions; (2)

the disparity between the harm or potential harm suffered by the plaintiff and its

punitive damages award; and (3) the difference between the punitive damages

award and the civil penalties authorized or imposed in comparable cases." Brand

---

[31] Plaintiffs have not submitted evidence of either Ciavarella's or Conahan's net worth or ability to pay the punitive damages assessed herein.  However, evidence of a defendant's financial status is not a "prerequisite to the imposition of punitive damages." See Bennis v. Gable, 823 F.2d 723, 734 n.14 (3d Cir. 1987); accord In re Lemington Home for the Aged, 777 F.3d 620, 630-33 (3d Cir. 2015); see also Third Circuit Model Civil Jury Instructions, Instruction No. 4.8.3 at 110-112 (Aug. 2020).  Although a defendant's wealth and ability to pay may be relevant considerations when fashioning a punitive damages award in some circumstances, see CGB Occupational Therapy, Inc. v. RHA Health Servs., 499 F.3d 184, 193-94 (3d Cir. 2007), accord City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 270 (1981); Dunn v. HOVIC, 1 F.3d 1371, 1384 (3d Cir. 1993) (en banc), it is the defendant's burden to show their financial status militates in favor of limiting a punitive damages award, cf. id. at 1391 (defining the standard for striking a jury's award of punitive damages).  Defendants, having waived their right to participate in this matter, offered no such evidence.  In any event, "[t]he precise award in any case . . . must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." State Farm, 538 U.S. at 425 (emphasis added).

<u>Mktg. Grp. LLC v. Intertek Testing Servs., N.A., Inc.</u>, 801 F.3d 347, 362-63 (3d Cir. 2015) (citing <u>Gore</u>, 517 U.S. at 575).

The reprehensibility analysis is "the most important indicium of the reasonableness of a punitive damages award." <u>See Gore</u>, 517 U.S. at 575.  Under this guidepost, courts examine several factors, such as whether

> the harm caused was physical as opposed to economic;
> the tortious conduct evinced an indifference to or reckless
> disregard of the health or safety of others; the target of
> the conduct had financial vulnerability; the conduct
> involved repeated actions or was an isolated incident; and
> the harm was the result of intentional malice, trickery, or
> deceit, or mere accident.

<u>State Farm</u>, 538 U.S. at 419.  The disparity analysis does not require a "bright-line ratio," but few awards that "exceed[] a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." <u>See id.</u> at 425.  In cases with a "substantial" compensatory damages award, the Supreme Court has postulated that a smaller ratio "perhaps only equal to compensatory damages" may satisfy the strictures of due process. <u>See id.</u>; <u>cf.</u> <u>Exxon Shipping Co. v. Baker</u>, 554 U.S. 471, 513 (2008) (adopting a 1:1 ratio as the "upper limit" for such awards in federal maritime cases).

A more appropriate case for punitive damages is difficult to conjure.  The facts presented coincide with all aggravating factors in the <u>Gore</u> and <u>State Farm</u> reprehensibility analysis. <u>See Gore</u>, 517 U.S. at 575; <u>State Farm</u>, 538 U.S. at 419.  As set forth at length herein, children and adolescents suffered unspeakable physical and emotional trauma at the hands of two judicial officers who swore by solemn

oath to uphold the law.[32]  Instead, Ciavarella and Conahan abandoned their oath

and breached the public trust.  They conspired to close existing detention facilities

and construct new ones in exchange for millions of dollars and the steady

placement of Luzerne County youths.  Their cruel and despicable actions

victimized a vulnerable population of young people, many of whom were suffering

from emotional issues and mental health concerns.  These wrongful acts warrant

punitive damages in order to achieve the objectives of deterrence and retribution.

See State Farm, 538 U.S. at 416.  Furthermore, the circumstances of this case far

exceed "a bare violation" of plaintiffs' constitutional right to an impartial tribunal.

Keenan, 983 F.2d at 470.  And due to Ciavarella and Conahan's status as former

state officials, we conclude punitive damages assist in vindicating "the public

interest in preventing violations of civil rights."  Cochetti, 572 F.2d at 105.

　　　　In arriving at an appropriate dollar amount, we are mindful of the remaining

guideposts for reasonableness set forth in Gore and State Farm, namely: the

disparity of the harm suffered by plaintiffs and the punitive damage award, and the

difference between the punitive damages award and the civil penalties authorized

or imposed in comparable cases.  In light of the Supreme Court's specific

observations in State Farm and Exxon Shipping Co. that substantial compensatory

awards should result in a smaller ratio between punitive and compensatory

---

[32] See PA. CONST. art. VI, § 3; 42 PA. CONS. STAT. § 3151 (stating the oath of
office for judicial officers in the Commonwealth of Pennsylvania: "I do solemnly
swear (or affirm) that I will support, obey and defend the Constitution of the United
States and the Constitution of this Commonwealth and that I will discharge the
duties of my office with fidelity.").

damages, we conclude that a ratio slightly less than 1:1 satisfies the strictures of due process in the instant case.  Accordingly, we will award punitive damages in the amount of $100,000,000.00.

**IV.**     <u>**Conclusion**</u>

Plaintiffs are the tragic human casualties of a scandal of epic proportions. The law is powerless to restore to plaintiffs the weeks, months, and years lost because of the actions of the defendants.  But we hope that by listening to their experiences and acknowledging the depth of the damage done to their lives, we can provide them with a measure of closure and, with this memorandum opinion, ensure that their stories are never forgotten.

Based on the court's individualized review of the record evidence, we will award plaintiffs compensatory damages as set forth in the Damages Appendix.  We further award $100,000,000.00 in punitive damages against defendants Ciavarella and Conahan.  An appropriate order shall issue.

<u>/S/ CHRISTOPHER C. CONNER</u>
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:      August 16, 2022